UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
-
                                              :

UNITED STATES OF AMERICA,        :
                                              :

               - v. -             :

                                            :

DONALD ROTH,                 :     09 Civ. 8712,
                                            :     S7 02 Cr. 1503 (SCR) (LMS)

                   Defendant.    :

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
-

 

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO PETITIONER'S PETITION FOR A WRIT OF HABEAS CORPUS**

 

PREET BHARARA
United States Attorney for the Southern
District of New York
One St. Andrew's Plaza
New York, New York 10007

Benjamin Allee
Assistant United States Attorney
     -Of Counsel-

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to Donald Roth's petition under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (the "Petition").  Roth claims that the non-disclosure of a payment made to a confidential informant two months after the confidential informant testified constituted a <u>Brady</u> and <u>Giglio</u> violation requiring a new trial.  For the reasons stated below, the Court should reject this meritless claim and deny Roth's Petition.

## BACKGROUND

### A.      The Conviction

On February 12, 2004, following a two-and-one-half month trial, a jury convicted Donald Roth, a criminal defense lawyer, and his co-defendant David St. John, a private investigator, of the single count with which each was charged, conspiracy to commit witness tampering and obstruction of justice, in violation of Title 18, United States Code, Section 371. The evidence at trial showed that Roth and his co-defendant attempted to, and did, cajole and deceive percipient witnesses into signing statements (and, in one case, signing a blank piece of paper into which a "statement" was later inserted) that falsely disclaimed the culpability of their clients.  The purpose of these false statements was simple: to obtain favorable dispositions in their clients' criminal cases.

The conspiracy charge arose out of Roth's and St. John's attempt to tamper with a particular witness, Charles "Flip" Melvin, who was a confidential informant working with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") at the time.  Melvin had previously provided information that led to federal charges against two of Roth's and St. John's

clients, Timothy Cherry and Raymond Bryant. Roth and St. John, along with their clients and

others, agreed that St. John would approach Melvin and attempt to get him to sign statements

falsely exculpating Cherry and Bryant. St. John met with Melvin for this purpose, and was

caught on audiotape attempting to obtain false written statements from Melvin.

   The evidence at the trial was voluminous and overwhelming. The Government

proved its case through numerous and various sources, including but not limited to the

following: (1) the testimony of Cherry and Bryant, both of whom provided direct evidence of

conversations with Roth and St. John during which Roth and St. John were told that Bryant and

Cherry had sold crack to Melvin, and nevertheless described their plan to sign false affidavits to

the contrary; (2) recorded conversations between Melvin and St. John, as well as Roth's and St.

John's co-conspirators Malcolm Bryant and Yolanda Delgado, which confirmed the conspiracy;

(3) telephone records showing communication among the co-conspirators at crucial times during

the conspiracy; (4) Roth's own statements at bail hearings, which corroborated Bryant's and

Cherry's testimony; and (5) Rule 404(b) evidence proving Roth's and St. John's tampering with

witnesses, through the same mechanism of false affidavits, in a state murder case against

Raymond Bryant's brother Antonio Bryant. The Government's case was bolstered by the

preposterous, internally inconsistent and mutually contradictory testimony of Roth and St. John,

and the rebuttal testimony of attorney Craig Wallace, who was told by Roth shortly after

Raymond Bryant's arrest that St. John would get Melvin to change his story.

   Attached as Exhibit A to this memorandum is a recitation, taken from the

Government's brief on appeal, of the facts proved at trial to establish Roth's crime.

**B.      Melvin's Testimony**

Although Charles "Flip" Melvin was the witness with whom Roth and St. John sought to tamper, Melvin was a minor witness in their trial because Melvin's conversations during the investigation were recorded by law enforcement and because numerous other witnesses had first-hand knowledge of the defendants' scheme.  The direct testimony of Melvin consumed only 41 pages of the nearly 5,000-page trial transcript, and took less than one morning, on December 8, 2003.  (Tr. 796-837).  Cross-examination consumed 164 pages, and took nearly two full trial days.  (Tr. 840-69, 880-930, 959-76, 989-1022, 1027-33).  Redirect consumed 9 pages.  (Tr. 1033-40, 1044).  Additionally, the Government spent almost no time in summation discussing Melvin; the entire discussion consumed two out of 83 transcript pages. (Tr. 4699-4701).

The full transcript of Melvin's testimony is attached as Exhibit B to this memorandum.

**1.      Direct Examination**

On direct examination, Melvin testified about his federal arrest for gun charges, his agreement to cooperate, his release on bail, his undercover work with the ATF, his guilty pleas to gun and crack distribution charges, his understanding of the possible sentences he could receive, his understanding of his obligations under his cooperation agreement, his understanding of what the Government would do if he upheld his obligations under that agreement, and his understanding of the consequences if he did not uphold those obligations.  (Tr. 797-806).

He then testified about his prior bad acts.  (Tr. 806-12).  He admitted to having used marijuana on a daily basis prior to his arrest in March 2002 (Tr. 806-07); to having sold

marijuana in addition to crack (Tr. 807); to selling 2-3 ounces of crack a week, for $2000-3,000 a week, prior to his arrest in 2002 (Tr. 807-08); and to having not paid taxes on that income (Tr. 808). He admitted to committing a robbery with a BB gun in 1985 at age 15, but testified he could not recall what he stole. (Tr. 808). He described having shot a man who had shot at him, resulting in a 1991 conviction for attempted assault and a sentence of 42 months to 7 years in prison. (Tr. 808-809). He described a 1994 petit larceny conviction, and the resulting sentence of more than a year in prison, arising from a dispute with a female cohabitant. (Tr. 809). He admitted to giving his brother Julius' name when he was arrested for vandalism in 1996, and to resisting arrest at the time. (Tr. 809-10). He described a prison term of one and one-half to 3 years for attempted assault, arising from a dispute with a man who tried to hit him with a bottle, after which Melvin shot the man. (Tr. 810-11). He further admitted to stealing cars for joyriding, to stealing drugs from other dealers, and selling drugs, as part of a gang called the Dark Side. (Tr. 811-12).

Melvin was then questioned about his work with the ATF starting in March 2002. He explained that in that capacity, he brought crack from individuals named Michael Lindsley, a/k/a "Money Mike," Martez Williams, a/k/a "Tez," Marcel Williams, a/k/a "Bloody Assassin," Sukeem Bryant, and Raymond Bryant, a/k/a "Ray Love." (Tr. 812-13). Melvin confirmed that he was the confidential informant ("CI") described in paragraphs 14 and 16 of the Complaint filed against Sukeem and Raymond Bryant. (Tr. 814-15). Those paragraphs described, respectively, a crack transaction between Lindsley and the Bryants that Melvin observed, and a crack purchase from the Bryants by Melvin. (Government Exhibit ("GX") 17).

Melvin then described how he called Malcolm Bryant, Raymond's younger

brother, in response to Malcolm's calls to, and a voice message on, Melvin's cellphone.

Malcolm told Melvin that Raymond had been arrested, that Melvin had something to do with it,

and that Malcolm wanted Melvin to sign a paper saying that Melvin had not had anything to do

with it.  Malcolm offered to "look out" for Melvin, meaning pay him.  (Tr. 817-19).  Melvin

contacted his controlling agent, ATF Special Agent Andrew Boss, who recorded Melvin's return

call to Malcolm.  During that call, Melvin recaptured what had been discussed in the unrecorded

call earlier that evening.  At Agent Boss' instruction, Melvin asked Malcolm, "... you want me to

sign some papers, what the fuck, man, what are ya'll gonna give me?  That's what I want to

know."  Malcolm responded that he wanted to discuss the matter with Melvin in person, and

expressed fear that his phone could be tapped.  Melvin again asked, using slang for payment,

"[unintelligible] you going to hit me off, though?"  Malcolm responded, "Yeah . . . I'm going to

talk to you."  They agreed to speak the next day.  (Defense Exhibit ("DX") C, C1; Tr. 820-22).

       On November 13, 2002, Agent Boss again recorded a conversation between

Malcolm Bryant and Melvin.  Melvin asked Malcolm where Malcolm had gotten the paper he

wanted Melvin to sign.  Malcolm initially said he had gotten it from "[t]he investigator," but

corrected himself to say, "[t]he lawyer, the lawyer."  Melvin asked what the paper said, and

Malcolm said that it said that "Raymond didn't have nothing to do with it," and that Melvin had

never gotten drugs or guns from Raymond Bryant.  Raymond's girlfriend Yolanda Delgado

briefly got on the phone and urged Melvin to sign the document.  Malcolm then asked when

Melvin could sign the paper, "so they can send it to the judge," and told Melvin that "the lawyer

needs it by next week."  Melvin asked why the lawyer had not contacted Melvin.  Malcolm

attempted without success to patch in the lawyer, who he called "Donald," but succeeded in

patching David St. John into the call.  St. John told Melvin that while Melvin's name was not in court papers, "[w]e keep hearing your name thrown at us."  St. John asked to meet Melvin and offered to give advice on Melvin's own legal problems.  Melvin asked about the paper he was being asked to sign, and St. John said he wanted to talk first, because he would not want to put down on paper information that would not help the case.  St. John said he wanted information he could bring to the prosecutors to show them they were wrong.  When Melvin asked what was in it for him, St. John said that his advice was "probably worth quite a bit," whereupon Malcolm interrupted, stating "That's, that's why I want to talk, talk to you in person,"  and St. John added, "I want to work with you here, Flip."  St. John also told Melvin, "Now, I don't want to talk on the phone and I'm sure you understand why."  Melvin said he would call when he was ready to meet, and St. John urged him not to delay, because "they move along pretty fast here in Federal Court."  (Tr. 822-24; GX 20, 20A).[1]

On November 19, 2002, Melvin and St. John had another recorded conversation. When Melvin inquired if St. John had found out anything about the paper Melvin was to sign, St. John said he had spoken to "the lawyer" about it but did not want to discuss it over the phone. Melvin then told St. John four separate times that Raymond Bryant had indeed sold Melvin crack

---

[1]     Although he was not questioned about it on direct examination, as the tape was already in evidence through Agent Boss' testimony, Melvin had another recorded conversation with St. John on November 18, 2002.  They agreed to meet three days later somewhere in Yonkers, New York.  When Melvin asked St. John about the paper to which Malcolm Bryant had been referring, St. John responded, "Oh, that might have been from the attorney, from the lawyer."  In feigning ignorance about the paper, St. John claimed to communicate with Roth only about 5 minutes a day.  St. John told Melvin that based on the Complaint, Raymond Bryant was pretty sure the CI was Melvin.  St. John said he might get together with Roth to prepare a statement for Melvin, which Melvin could sign if he chose.  St. John and Melvin agreed to speak again two days later.  (Tr. 218-23; GX 21, 21A).

and was guilty of the charges.[2]  St. John nevertheless pressed Melvin for an in-person meeting, and they agreed to speak the following day.  (GX 22, 22A; Tr. 824-25).[3]

Melvin then testified about his meeting with St. John at a Thruway rest stop.  He met St. John in St. John's jeep in the parking lot.  (Tr. 826-27).  Their conversation began with St. John discussing the criminal complaint against the Bryants.  St. John stated that Raymond Bryant thought that Melvin was the CI on whom the charges had been based.[4]  He added that if Melvin was in fact the CI, St. John would want to know what information Melvin had provided to the police, so that Raymond could make the best deal possible, and would also want to know whether the police had followed proper procedures.  When Melvin inquired how St. John would help him, St. John proceeded to ask Melvin questions about his pending federal gun case, and then commented (inaccurately) that Tim Cherry was facing federal gun charges as well.  St. John offered to speak to the witness – a woman named Asia – who had reported that Melvin had possessed a firearm.  Melvin interrupted, saying he had come to discuss Raymond Bryant, that St. John was talking about Cherry but that Melvin could not help Cherry, and that Raymond had in fact sold Melvin an ounce of crack.  St. John immediately asked if Melvin had told the police that Bryant had sold Melvin an ounce of crack, and Melvin said he had.  St. John then quizzed Melvin about the circumstances, the roles of Raymond Bryant and his brother Sukeem, and

---

[2]    Melvin referred to Bryant by his nickname, "Ray Love," and told Melvin: "he did sell me some crack;" "he did sell me something;" "he did do it, he did do it;" "he did do it."  "He did do it." (GX 22, 22A).

[3]    On November 20, 2002, Melvin and St. John spoke and agreed to meet the next day at a rest stop on Interstate 87 in lower Westchester.  (GX 23, 23A; Tr. 288-90, 566-67).

[4]    As of the date of the conversation, law enforcement had not divulged that Melvin was the CI described in the complaint charging Raymond and Sukeem Bryant.  (Tr. 304-05).

whether the agents had taped and/or observed the transaction.  (GX 24, 24A).

Melvin asked St. John how, given that they both knew that Raymond had sold Melvin crack, they could help Raymond.  St. John – despite having previously been told by Raymond and by Melvin that Melvin had brought crack from Raymond – denied having known, up to that point, that Raymond had sold to Melvin.   When Melvin asked if St. John had a paper for Melvin to sign, St. John said that someone had typed up a general statement saying that Melvin had never brought drugs or worked with the police, but that Melvin obviously could not sign it "because it would be a lie.  Right?"[5]  Melvin concurred.  St. John then said, "Shit," in a disappointed manner.  (Tr. 828-29; GX 24, 24A).

St. John said he would keep his promise to give Melvin advice, and again offered to speak to the witness who had provided information about Melvin to the police.  He added that he would not have Melvin commit perjury, but he wanted to ask Melvin about the procedures the agents followed in connection with Melvin's buy from Bryant - - such as whether they had searched Melvin before the buy.  St. John then reviewed the transaction again, and Melvin described how he called Bryant under the supervision of the agents to arrange the sale, was searched and wired by the agents, met Sukeem Bryant on the sidewalk to take the drugs, gave payment to Raymond Bryant in the car in which the Bryants had arrived at the scene, and then met with agents to be searched again and turn over the recording and the drugs.  (GX 24, 24A).

St. John and Melvin then discussed other buys Melvin had made.  St. John told Melvin that he was collecting the information to assist the lawyer in evaluating the strength of

---

[5]    St. John knew – from Melvin's four statements during the November 19, 2002 conversation that Melvin had brought crack from Raymond Bryant – that Melvin could not truthfully sign the affidavit, but St. John nevertheless brought it with him to his meeting with Melvin.

the case.  St. John then returned to the subject to Tim Cherry.  He asked Melvin if he had ever

brought or sold drugs or guns with Cherry, and Melvin replied, "Yeah, I yeah I did some with

him before, but I ain't never did nothing with him while we was with, while I was with the

agents."  Seizing on the fact that the agents would thus not have any recordings of Cherry, as

they did of Raymond Bryant, St. John immediately replied, "You never did anything with the

agents?," and when Melvin replied, "Nah," St. John asked Melvin to sign "one of those blank,

uh, forms made up with his [Cherry's] name on it, 'cause I was gonna use it with somebody

else."  The form was a detailed affidavit, with the name of the affiant left blank, to the effect that

the affiant had never engaged in a gun or drug transaction with Cherry.  (It was identical to blank

form affidavits, also in St. John's possession at the time, exculpating Raymond Bryant and

Sukeem Bryant.)  St. John falsely suggested to Melvin that the affidavit was limited to what

Melvin had done with Cherry under supervision of the agents, saying to Melvin, "[Y]ou want to

sign one of them?  That you never did anything for the, for the agents for Tim Cherry."  (GX 24,

24A).

Melvin said that he needed to go to the bathroom, and when he returned, St. John

read Melvin the affidavit, which, as St. John knew, went well beyond what Melvin had done

with the agents.  It stated in substance that the affiant knew nothing of any involvement by

Cherry in illegal narcotics or weapons, and that the affiant had nothing to do with the charges

against Cherry and was never an informant.  Melvin told St. John twice that Melvin had brought

drugs from Cherry, but was willing to sign the affidavit.  St. John then said that Melvin could not

sign the affidavit because "that would be perjury," and he (St. John) "can't be a part of anything

illegal."  As he made those remarks, he was pushing the affidavit and a pen toward Melvin.

9

Melvin did not sign the affidavit.  When Melvin commented that St. John had not said on the

phone that he wanted to talk about Cherry, St. John claimed – despite the fact that Cherry was

charged only with a crack offense – that St. John had made no connection between Melvin and

Cherry until Melvin said something about guns, and that Raymond Bryant had mentioned

Melvin's name to St. John.  (GX 1-3, 24, 24A; Tr. 826-37).

   Melvin's testimony about his interactions with St. John and the other conspirators

was, with the exception of St. John's gesture with the pen and affidavit, corroborated by the tape

recordings and phone records.  Melvin's testimony provided explanations of certain terms in the

tape recordings that were not a matter of dispute, but added almost nothing else to the

Government's case.

  **2.**  **Cross-Examination**

   Melvin was questioned on cross-examination about statements made during the

recorded conversations; how often he had listened to the recordings and when; what he

remembered with and without the aid of the transcripts; his meetings with the Government; and

his review of the transcripts.  (Tr. 840-54, 993-1019).  He was also questioned about his prior

bad acts, including other robberies, false statements in his application for appointed counsel, and

the commission of crimes while on parole; his agreement with the Government and his

understanding thereof; his prior drug dealings with Raymond Bryant and Timothy Cherry; and

his observations of Cherry with guns and drugs.  (Tr. 858-930, 959-76, 989-92, 1019-33).

  **3.**  **Payments Made to Melvin**

   As a confidential informant, Melvin received subsistence payments from the

ATF.  (See Affirmation of ATF Special Agent Andrew Boss, attached as Exhibit C to this

Memorandum, ¶ 1 ("Agent Boss Affirmation")).  These payments were for various living and relocation expenses.  (Boss Affirmation ¶ 1).  The payments were disclosed as part of the 3500 material for Melvin at trial.  (See Pet. Br., Exhibits page 20, Rule 3500 Material (listing 3502Z as "Schedule 'ATF Subsistence for Charles Melvin'" 03-27-02 through 10-01-03); ATF Subsistence for Charles Melvin, marked as 3502-Z, attached as Exhibit E to this Memorandum (the "Schedule of ATF Payments"); see also Emergency Witness Assistance Program documents, marked as 3502-U–3502-X, attached as Exhibit F to this Memorandum).  As set forth in the Schedule of ATF Payments, from March 27, 2002, through October 1, 2003, there were 40 payments made to Melvin, totaling approximately $11,395.06.  (Schedule of ATF Payments).

Approximately two months after Melvin testified, at which time petitioner's trial remained ongoing, ATF made a final payment of $5,000 to Melvin, because Melvin had completed his cooperation, and his cooperation had been significant and useful and had led to the successful prosecution of numerous individuals and was undertaken at a risk to Melvin's safety.  ATF made the payment of $5,000 to Melvin on or about February 21, 2004.  (Boss Affirmation ¶ 2).  Prior to Melvin's testimony, the Government did not have any discussion with Melvin about any payment following his testimony.  (Boss Affirmation, ¶ 3; Affirmation of former Assistant United States Attorney Glenn Colton, attached as Exhibit D to this Memorandum, ¶ 2 ("Colton Affirmation")).  The $5,000 payment was not discussed with Melvin until after he testified.  (Boss Affirmation ¶ 3).  Apart from the provisions of Melvin's plea agreement, attached as Exhibit G to this Memorandum, the Government made no promises to Melvin in exchange for Melvin's cooperation or testimony.  (Colton Affirmation ¶ 2).

11

C.     **The Sentencing**

On April 15, 2005, Judge Robinson sentenced Roth principally to a term of 60 months' imprisonment, which was the statutory maximum for the offense of conviction.  In determining the applicable Guidelines for the defendant, Judge Robinson adopted the calculations set forth in the defendant's PSR.  In the PSR, the United States Probation Office calculated the following: (1) a base offense level of 26, pursuant to U.S.S.G. §§ 2J1.2 and 2X3.1(a); (2) a two-level enhancement for using a minor (Malcolm Bryant) in the commission of the offense, pursuant to U.S.S.G. § 3B1.4; (3) a four-level enhancement for Roth's leadership role in a conspiracy involving five or more participants, pursuant to U.S.S.G. § 3B1.1(a); and (4) a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice, if the Court found that this enhancement applied.  During sentencing, the Court found that Roth lied during his testimony at trial, and ruled that the obstruction of justice enhancement applied.  These calculations resulted in an adjusted offense level of 34.  Because Roth's criminal history category was I, the applicable Guidelines range was 151 to 188 months.  However, in light of the statutory maximum, the resulting Guidelines range was 60 months, and Judge Robinson sentenced Roth to the maximum.

D.     **The Appeal**

Roth appealed his conviction, raising various trial and sentencing claims.  On February 22, 2008, the Second Circuit denied all of Roth's claims in a summary order.  United States v. David St. John and Donald Roth, 267 Fed. Appx. 17 (2d Cir. 2008).   On October 14, 2008, the United States Supreme Court denied Roth's petition for a writ of certiorari.

**E.      The Post-Appeal Rule 33 Motion**

In 2007, more than three years after trial and during the pendency of the appeal,

Roth moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure,

based on new information regarding Melvin.  As described in the Government's submission in

opposition to Roth's Rule 33 motion, in March 2007, the Government interviewed Melvin in

connection with an investigation unrelated to Roth.  Melvin was questioned regarding certain

past acts, and recalled details as to which he had disclaimed recollection during his testimony at

Roth's trial.  When questioned as to why he testified at trial that he did not recall details that he

recalled during the subsequent interview three years later, Melvin stated in substance that he had

been surprised and angered by the questions at trial, and that as a result, he shut down and

"stopped searching" for the answers to the questions.  Based on this information, Roth moved for

a new trial, arguing that "had Melvin given truthful and accurate testimony during the trial, the

jury would have found him less credible and likely would not have voted to convict . . . ."

(District Court Memorandum Decision and Order (the "Rule 33 Decision"), at 2 (Docket number

203)).

On June 3, 2008, Judge Robinson denied Roth's Rule 33 motion.  The Court

found that the new evidence that Melvin had provided false testimony about prior bad acts was

cumulative and not material.  (Rule 33 Decision, at 9-10).  The Court rejected Roth's argument

that "Melvin's testimony was vital to the Government's case," finding the argument "hollow" in

light of the "ample evidence on which a jury could have convicted the defendants, including

telephone records and tape recordings that corroborated Melvin's testimony, and other

Government witnesses who offered evidence of the [petitioner's] crime."  (Rule 33 Decision, at

9-10).

The Court ruled that the new information about Melvin's having falsely denied recollection about details of prior bad acts would "assuredly" not have changed the jury's verdict had it been presented at trial.  (Rule 33 Decision, at 10).  The Court emphasized that Melvin's prior bad acts were disclosed on direct and cross-examination to the jury, such that the new information would have been cumulative impeachment, and again Melvin was substantially corroborated regarding the details of Roth's offense.  Indeed, the Court specifically found that the lone uncorroborated detail to which Melvin testified – that Roth's co-defendant, St. John, pushed the false affidavit and pen toward Melvin during their meeting – "was hardly the smoking gun the movants make it out to be."  (Rule 33 Decision, at 11).

Following the denial of his Rule 33 motion, Roth began his term of incarceration on July 21, 2008.  Roth remains in custody.

**F.       The Petition**

In the instant Petition, Roth asserts one claim.  Petitioner argues that the Government's non-disclosure of the payment of $5,000 made to Melvin, after Melvin testified at the trial, constitutes a <u>Brady</u>/<u>Giglio</u> violation.[6]  Petitioner argues that the Government knew about the future payment to Melvin prior to Melvin's testimony, and failed to disclose the payment in bad faith.  (Pet. Br., at 15).  Petitioner argues that, had the jury known about the payment, the result of the trial would have been different.  Petitioner seeks to vacate the verdict, or, alternatively, for an evidentiary hearing.

**ARGUMENT**

---

[6]       According to Roth, he learned of the payment based on a response to a FOIA claim he made to ATF.

The petition is meritless and should be denied on the current record, without an evidentiary hearing.  As set forth below, there was no promise or even discussion of any payment with Melvin prior to his testifying, and therefore there was no impeachment material suppressed by the Government.  Roth's argument that the Government promised to pay a cooperating witness in exchange for his testimony is nothing more than speculation, and is completely contravened by the evidence and by common sense.  Moreover, Melvin, the sole focus of Roth's challenge, was a minor witness at the trial whose testimony was nearly entirely corroborated by audio recordings and similarly indisputable evidence.  Consequently, Roth fails to show not only that the Government suppressed favorable evidence, but also that the impeachment evidence in Roth's imagination is material.

## A.      Applicable Law

The Government has a duty to disclose evidence favorable to the accused when such evidence is material to guilt, Brady v. Maryland, 373 U.S. 83, 87 (1963), and this duty covers not only exculpatory evidence but also impeachment information for Government witnesses, Giglio v. United States, 405 U.S. 150, 154 (1972).  In order to obtain a new trial on the basis of a Brady violation, the defendant must demonstrate both that the Government suppressed evidence favorable to him, and that the suppressed evidence was material.  See Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Kyles v. Whitley, 514 U.S. 419, 435 (1995); United States v. Diaz, 176 F.3d 52, 108 (2d Cir. 1999); United States v. Orena, 145 F.3d 551, 557 (2d Cir. 1998); United States v. Payne, 63 F.3d 1200, 1209 (2d Cir. 1995).

A petitioner fails to satisfy the first prong of a Brady/Giglio violation if the Government did not suppress evidence.  "The touchstone of the inquiry . . . is principally

whether the prosecutor's office possessed the information in question at the time of the trial."
Morgan v. Salamack, 735 F.2d 354, 358 (2d Cir. 1984); see United States v. Avellino, 136 F.3d
249, 255 (2d Cir. 1998) ("The Brady obligation extends only to material evidence that is known
to the prosecutor."); United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) ("Under Brady
and its progeny, the government has an affirmative duty to disclose favorable evidence known to
it . . . ."); United States v. Turkish, 623 F.2d 769, 775 (2d Cir. 1980) ("[The Brady] principle,
however, has heretofore been limited to evidence in the Government's possession and has not
been extended to create a Government obligation to assist the defense in extracting from others
evidence the Government does not have.").

          Courts therefore reject Brady/Giglio challenges for failure to demonstrate that the
claimed impeachment evidence actually existed at the time of trial.  See, e.g., Shabazz v. Artuz,
336 F.3d 154, 165 (2d Cir. 2003); Green v. Walsh, No. 03 Civ. 908, 2006 WL 2389306, at *19
(S.D.N.Y. Aug. 17, 2006) (rejecting habeas because existence of favorable evidence was
speculative, stating, "In a habeas proceeding, it is the petitioner's burden to demonstrate that the
evidence in question actually existed at the time of trial, and was withheld from production.");
Mallet v. Miller, 432 F. Supp. 2d 366, 378 (S.D.N.Y.2006) ("[M]ere speculation that exculpatory
evidence was withheld is not sufficient under Brady, and the Court cannot compel the production
of evidence that is not known to exist."); Ross v. McCoy, No. 00 Civ. 804 (AKH), 2001 WL
30451, at *5 (S.D.N.Y. Jan. 10, 2001) ("The [government] is under no obligation to produce
evidence that did not exist."); United States v. Eubanks, 92 Cr. 392 (PKL), 1997 WL 401667, at
*5 (S.D.N.Y. July 16, 1997) (finding the Giglio challenge "facially defective," because "[t]he
Government could not have disclosed [the witness]'s misconduct before or during the trial,"

because it occurred after the trial).

The second prong of a Brady/Giglio claim requires a petitioner to demonstrate that the claimed suppressed evidence is material.  "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Strickler, 527 U.S. at 280; (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)); United States v. Orena, 145 F.3d 551, 557 (2d Cir. 1998); Payne, 63 F.3d at 1209.  "A 'reasonable probability' of a different result is . . . shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678).  "[H]ence, the undisclosed evidence will be deemed material only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  Payne, 63 F.3d at 1209 (quoting Kyles, 514 U.S. at 435).

With particular regard to claimed impeachment evidence, "[s]uppressed impeachment evidence is 'material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.'"  United States v. Diaz, 176 F.3d at 108 (quoting United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996)); see also United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998). "[A] new trial is generally not required when the testimony of the witness [as to whom impeachment evidence has been withheld] is corroborated by other testimony."  Payne, 63 F.3d at 1210 (internal quotations omitted)).

**B.    The Government Did Not Violate Its Brady or Giglio Obligations**

1.        **The Government Did Not Suppress Impeachment Evidence**

Roth fails to meet the first prong of a <u>Brady</u>/<u>Giglio</u> claim, because he has not

identified any impeachment material in the Government's possession at the time of trial that was

not disclosed.  Rather, Roth has noted that two months after Melvin testified at the trial, Melvin

received a $5,000 payment from ATF.[7]  This fact alone is not impeachment evidence, because

the payment was made after Melvin testified, and no promise of payment – let alone discussion

of any payment – had been made at the time of Melvin's testimony.  At the time Melvin testified,

the payment did not exist, thus evidence of it was not in the Government's possession and was

not suppressed.  <u>See</u> <u>Shabazz</u>, 336 F.3d at 165; <u>Eubanks</u>, 92 Cr. 392 (PKL), 1997 WL 401667, at

*5 (S.D.N.Y. July 16, 1997) (rejecting the <u>Giglio</u> challenge because the witness's misconduct

occurred after the trial).

Petitioner speculates that the Government must have promised the payment to

Melvin in advance of, and in association with, Melvin's testimony:

> Suppose the government told Flip prior to testifying or even commencing its
> investigation of Roth or the prior 13 defendants [about whom Melvin provided
> reliable information leading to successful prosecutions] that a large cash reward
> might be rewarded to him after all the cases were disposed of or just given Flip a
> few hundred dollars, with no words exchanged, and later called him as a witness. .
> . . There would be a strong argument for disclosing such a benefit.

(Pet. Br., at 14).

There is absolutely no basis for Roth's outrageous hypothesis, which is precisely

the kind of speculation that courts regularly reject as a basis for a habeas claim.  The agent who

handled Melvin and the prosecutor who prepared Melvin to testify have submitted affirmations

---

[7]        While the trial remained ongoing on February 1, 2004, when the request for
payment to Melvin was made, this was nevertheless nearly two months after the completion of
Melvin's testimony.

which demonstrate that Roth's speculation is completely unfounded.  Special Agent Andrew

Boss of ATF was the Agent handling Melvin, and Special Agent Boss states in his affirmation

that there was no discussion of the $5,000 payment with Melvin <u>prior to</u> Melvin's testifying.

(Boss Affirmation ¶ 3).  Special Agent Boss states that he obtained authorization for the

disbursement of $5,000 to Melvin by ATF because Melvin had completed his cooperation with

ATF, and his cooperation had been significant and useful and had led to the successful

prosecution of numerous individuals, and was undertaken at a risk to Melvin's safety.  (Boss

Affirmation ¶ 3).

   Former Assistant United States Attorney Glenn Colton prepared Melvin to testify

and conducted the direct examination of Melvin, and Mr. Colton states in his affirmation that he

does not recall any discussion with Melvin of any payment to be made to Melvin following his

testimony.  (Colton Affirmation ¶ 2).  Mr. Colton further states that Melvin was not promised

any benefits other than what was set forth in Melvin's plea agreement.  (Colton Affirmation ¶ 2).

   Moreover, Roth's speculative claim that the Government promised Melvin $5,000

to testify against Roth, then concealed this promise from the defense and the Court, is

preposterous on its face.  Numerous aspects of petitioner's claim simply make no sense.  The

Government, of course, had no reason to exchange money for the testimony of a relatively minor

witness, whose nearly entire testimony was corroborated by audio recordings and other

indisputable sources.  The Government barely mentioned Melvin during its summation.  Nor did

the Government have any reason to conceal a $5,000 payment to Melvin, as it disclosed all

payments made to Melvin at the time of his testimony (approximately 40 payments totaling more

than $11,000).

A claim similar to that of petitioner was rejected in <u>Shabazz v. Artuz</u>, 336 F.3d 154 (2d Cir. 2003).  In that case, two cooperating witnesses testified at trial that they had not received promises of leniency from the district attorney's office in exchange for their testimony. <u>Id.</u> at 157.  Following trial, the district attorney's office recommended lenient sentences for both cooperating witnesses in light of their truthful testimony at the defendant's trial, and both witnesses consequently received lenient sentences from the Court.  <u>Id.</u> at 165.  On the basis of the favorable treatment the cooperating witnesses received after trial, the petitioner argued that the witnesses must have been promised leniency prior to testifying, and that the non-disclosure of such promises constituted a <u>Brady</u> violation.  <u>Id.</u>

The Second Circuit rejected Shabazz's argument, ruling that favorable treatment of a witness subsequent to the witness's testimony does not show that any promise was made to the witness prior to testifying:

> [P]etitioner is correct that [the cooperating witnesses] received a benefit because they testified against him.  However, this fact, standing alone, does not establish that, prior to petitioner's trial, the District Attorney's Office promised [the cooperating witnesses] leniency.   The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, provided that it does not promise anything to the witnesses prior to their testimony. . . . We hold . . . that the fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.

<u>Id.</u> at 165.

Here, Roth's claim is weaker than that in <u>Shabazz</u>, because the payment with which Roth takes issue was not for testifying against Roth, but was for the body of extensive cooperation undertaken by Melvin over an extensive period, at significant risk to his safety. Nevertheless, Roth's claim should be rejected for the very reasons articulated in <u>Shabazz</u>: the

payment to Melvin after his testimony does not demonstrate that a promise was made to Melvin prior to his testimony, and the evidence shows in fact that no such promise was made to Melvin.[8]

### 2.      Cumulative Impeachment of Melvin Would Have Been Immaterial

Roth also fails to meet the materiality requirement of a claimed <u>Brady</u>/<u>Giglio</u> violation.  Even if Melvin had been promised $5,000 to testify, which he was not, this would have been immaterial because Melvin was a relatively minor witness, Melvin's testimony was corroborated in nearly its entirety, and Melvin's credibility was challenged extensively based on other impeachment evidence during the trial.

Much of this argument was already covered in Judge Robinson's decision denying Roth's Rule 33 motion, which addressed <u>actual</u> new evidence that gave rise to <u>actual</u> additional impeachment material regarding Melvin, in particular new evidence showing that Melvin had lied about details of his prior bad acts.  With respect to the significance, or lack thereof, of Melvin's testimony, Judge Robinson rejected Roth's argument that "Melvin's testimony was vital to the Government's case," finding the argument "hollow" in light of the "ample evidence on which a jury could have convicted the defendants, including telephone

---

[8]      Roth also attempts to recast his <u>Brady</u>/<u>Giglio</u> argument in perjury terms, arguing that the Government "may have knowingly permitted Flip to commit perjury during the trial by allowing him to testify that he did not understand what benefits he would be conveyed from the government in exchange for his cooperation, assistance and testimony at Roth's trial."  (Pet. Br., at 10, 12).  Roth's perjury argument should be rejected for the same reasons as his <u>Brady</u>/<u>Giglio</u> argument, because Roth fails to show that any promises were made to Melvin prior to his testifying.  While the knowing use of witness perjury requires vacatur of a defendant's conviction "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," <u>United States</u> v. <u>Agurs</u>, 427 U.S. at 103; <u>see</u> <u>Jenkins</u> v. <u>Artuz</u>, 294 F.3d 284, 293 (2d Cir.2002), here Melvin simply did not commit perjury.  Melvin did not, as Roth argues, testify that he did not understand what benefits he would be conveyed.  Rather, he testified about his understanding of the Government's obligations under the plea agreement.  Melvin was not promised anything beyond what is set forth in his cooperation agreement (Colton Affirmation ¶ 2), thus he did not commit perjury by not testifying about the promise alleged by Roth.

records and tape recordings that corroborated Melvin's testimony, and other Government witnesses who offered evidence of the [petitioner's] crime."  (Rule 33 Decision, at 9-10). Indeed, Melvin's direct testimony occupied less than one percent of the trial transcript, and the Government hardly discussed Melvin in closing.

Judge Robinson further ruled that even information that Melvin falsely denied recollection about details of prior bad acts would "assuredly" not have changed the jury's verdict had it been presented at trial.  (Rule 33 Decision, at 10).  Judge Robinson emphasized that there was only one uncorroborated detail to which Melvin testified – that Roth's co-defendant, St. John, pushed the false affidavit and pen toward Melvin during their meeting – and ruled that this detail "was hardly the smoking gun the movants make it out to be."  (Rule 33 Decision, at 11).

Judge Robinson's conclusions apply with equal force to petitioner's latest challenge to Melvin.  A promise of a payment to Melvin would not have changed the content of the recorded conversations demonstrating Roth's guilt.  Nor would it have changed the other corroborating evidence, such as, for example, the testimony of Craig Wallace, Roth's friend and colleague in the criminal defense bar, who described that Roth admitted to him that Roth's investigator would speak to Melvin and that Melvin would give the investigator a statement that contradicted what Melvin had told law enforcement.  (Tr., 4507-16, 4524).  See Payne, 63 F.3d at 1210 ("[A] new trial is generally not required when the testimony of the witness [as to whom impeachment evidence has been withheld] is corroborated by other testimony." (internal quotations omitted)).

Moreover, Melvin was the subject of extensive impeachment efforts.  Indeed, the defense at trial apparently found the actual evidence of payments to Melvin – more than $11,000

in payments which were made to Melvin and evidence of which the defense had at its fingertips – so unimportant in light of the other significant impeachment material, that Melvin was not cross-examined about any payments at all. Rather, the defense cross-examined Melvin extensively about his prior bad acts. From both the direct and cross-examinations, by the close of Melvin's testimony, the jury knew that Melvin had committed vandalism, used fake names, stolen cars, stolen drugs from other dealers, sold significant amounts of crack weekly prior to his arrest in 2002, committed a robbery, and shot two men on different occasions. Evidence of an additional payment to Melvin would have been, at most, cumulative impeachment evidence, and is no ground for a new trial.

Roth fails to meet the materiality requirement of a Brady/Giglio violation, and his claim should be rejected on this ground alone.

## C.     Roth Is Not Entitled to an Evidentiary Hearing

Roth alternatively argues for an evidentiary hearing, seeking, in essence, to launch a fishing expedition to cast baseless challenges at the integrity of every prosecutor, agent, and police officer the Court will permit him to question. The Court should reject this request. The current record, including the 5,000 page trial transcript and the affirmations of Special Agent Boss and Former AUSA Colton, is sufficient to find both that no evidence favorable to Roth was suppressed, and that in any event Roth's challenge concerns only cumulative impeachment evidence which would have been immaterial at trial.

No hearing is required if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 18 U.S.C. § 2255. Where a petitioner makes "palpably incredible" allegations that require analysis of facts outside of the

trial record, courts have the discretion to use "'common sense'" to determine the appropriate way to expand the record to address the allegations.  United States v. Chang, 250 F.3d 79, 85 (2d Cir. 2001) (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)).  The Second Circuit has explained that courts therefore need not automatically conduct a "full-blown hearing[] with live testimony," Pham v. United States, 317 F.3d 178, 185-86 (2d Cir. 2003), but rather may choose a "middle road," or "intermediate step," "requiring that the record be expanded to include letters, documentary evidence, and in appropriate cases, even affidavits." United States v. Raines, 423 F.2d 526, 529-30 (2d Cir. 1970); Chang, 250 F.3d at 86.  Expanding the record to include documentary evidence "avoid[s] the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing."  Chang, 250 F.3d at 86.

In Chang, for example, the petitioner submitted a sworn affidavit in which he stated that his trial counsel prohibited him from testifying and did not inform him that the decision to testify was the petitioner's to make, and that had petitioner known that trial counsel could not stop him, petitioner would have testified.  Id., at 81.  Trial counsel submitted an affidavit with contrary assertions.  Id. at 81-82.  The District Court rejected the petitioner's claim without an evidentiary hearing, "reasonably decid[ing] that the testimony of [petitioner] and his trial counsel would add little or nothing to the written submissions."  Id. at 86.

Here, taking the intermediate step of expanding the record to include documents and affidavits creates a sufficient record on which to rule on Roth's claim.  The Boss Affirmation and the Colton Affirmation show conclusively that, while ATF paid Melvin $5,000

approximately two months after he testified, this payment was not discussed with Melvin prior to his testifying, and no promise of any kind was made to Melvin prior to his testimony.  Roth has not shown any evidence to the contrary.  Each affirmation is also consistent with the other: according to both Special Agent Boss and Mr. Colton, there was no discussion of a future payment with Melvin prior to his testifying, which is corroborated by the documentation of the payment which shows that the payment was not requested within ATF until approximately two months after Melvin testified.  Moreover, the evidence is consistent with common sense, as discussed above, as the notion that the Government would promise a cooperating witness cash in exchange for minor, corroborated testimony is preposterous.

The testimony of Special Agent Boss or Mr. Colton, or countless others of whom Roth may seek to inquire,[9] would add little or nothing to the written submissions.  First, as discussed above regarding the immateriality of the challenged information, even if it were true that Melvin was offered $5,000 to testify against Roth, which it is not, there is no likelihood that this would have impacted the jury's verdict, because Melvin was a minor witness and his testimony was corroborated in all but one detail.  Nothing at an evidentiary hearing would alter this ground for denying Roth's claim.  Second, while Roth's allegations challenge the good faith and credibility of Special Agent Boss and others, Roth has not set forth any evidence that is contrary to the accounts of Special Agent Boss and Mr. Colton.  There is, therefore, even less reason for a hearing in this case than in Chang, in which the petitioner was present for the encounters at issue and submitted a sworn statement that his constitutional rights were violated

_____

[9]     Roth seeks to inquire, for example, about the role of several individuals in "the benefits conveyed to Flip, promised to Flip," including United States District Judge and former Assistant United States Attorney Cathy Seibel, who represented the United States at the trial along with Mr. Colton.  (Pet. Br., at 20).

during those encounters.  An evidentiary hearing would only permit raw, baseless attacks at the credibility of Special Agent Boss and Mr. Colton, and would create no more useful a record than that already before the Court.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court

deny Roth's petition, on the current record without an evidentiary hearing.


Dated:  White Plains, New York
       November 29, 2010


                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York

By: _____
                    Benjamin Allee
                    Assistant United States Attorney
                    (914) 993-1962

27

AFFIRMATION OF SERVICE

Benjamin Allee, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.  That, on November 29, 2010, I caused copies of the Government's Memorandum of Law in Opposition to Petitioner's Petition for a Writ of Habeas Corpus to be delivered by mail to:

> Donald Roth, 83933-054 K1
> FCI Sandstone
> POB 1000
> Sandstone, MN 55072

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: White Plains, New York
          November 29, 2010

Benjamin Allee