# EXHIBIT B

1 always agreed with the government, I've not always agreed with
2 the defense. And clearly you have not always agreed with each
3 other.
4        But it seems to me you've got your argument. It seems
5 to me at least as the record stands now, it would be difficult
6 for me to see an appropriate argument that they would make
7 along those lines about that in summation, although I would --
8 as I've made clear, I don't generally like that, if such an
9 argument were made in summation, I'm sure counsel would object
10 and we have a difficult situation. So as we stand now, I think
11 we're okay. I'm not going to have the assistants testify on
12 this. If they were saying jeez, I thought there were such
13 documents but I didn't don't know about it now, it might be
14 worth further inquiry. But the government is saying they have
15 no evidence that such a document exists at this point.
16        MR. ARONWALD: I understand that. And I'm perfectly
17 satisfied with the state of the record at this point.
18        MR. COLTON: May I hand up the tape?
19        MR. HOCHHEISER: Is there a transcript?
20        MR. COLTON: There is no transcript of the tape I'm
21 handing up now.
22        THE COURT: We'll mark it as a court exhibit and we'll
23 come back and discuss what I think most appropriately can and
24 cannot be said about it and counsel can tell me if they think
25 an instruction to the jury is really helpful, and I will listen

1 A. Yes.
2 Q. What's your nickname?
3 A. Flip.
4 Q. How old are you?
5 A. 33.
6 Q. How far did you go in school?
7 A. 11th grade.
8 Q. Who do you currently live with?
9 A. My girlfriend.
10 Q. Anybody else?
11 A. My three kids.
12 Q. Are you currently employed?
13 A. Yes.
14 Q. Generally what kind of work do you do?
15 A. Warehouse work.
16        THE COURT: I'm going to ask you to get a little bit
17 closer to the microphone and keep your voice up so we can all
18 hear what you're saying clearly.
19 Q. Mr. Melvin, did there come a time when you were arrested on
20 federal criminal charges?
21 A. Yes.
22 Q. What did you get arrested for?
23 A. Gun possession.
24 Q. Specifically what were you charged with in the federal
25 case?

1 to it as quickly as I can.
2        THE COURTROOM DEPUTY: I'm marking it Court's Exhibit
3 8.
4        THE COURT: I trust everybody got home on Friday okay.
5 Mr. Skolnik, why don't we get the jury in.
6        (Jury present)
7        THE COURT: Good morning, ladies and gentlemen. I
8 take it you folks got out and beat the snow on Friday. I
9 didn't. So my normal 50 minute ride home took me six and a
10 half hours.
11        I learned this weekend and I'm sure it will shock you
12 that I'm no longer 20 and so shoveling that snow was not quite
13 the task that I thought it was going to be. So if you see me
14 standing up for a sidebar very slowly, please excuse me.
15        MR. COLTON: The government calls Charles Melvin, your
16 Honor.
17 CHARLES MELVIN,
18      called as a witness by the Government,
19      having been duly sworn, testified as follows:
20 DIRECT EXAMINATION
21 BY MR. COLTON:
22 Q. Good morning, Mr. Melvin.
23 A. Good morning.
24        THE COURT: Just keep your voice up.
25 Q. Mr. Melvin, you known by any other name other than Charles?

1 A. Federal gun possession.
2 Q. Were you put in jail after that arrest?
3 A. Yes.
4 Q. How long did you spend in jail?
5 A. About two weeks.
6 Q. Did you get out on bail?
7 A. Yes.
8 Q. As part of getting out on bail, did you agree to do
9 anything with the government?
10 A. Yes.
11 Q. What did you agree to do?
12 A. To cooperate with the them.
13 Q. Approximately when did you get out on bail to cooperate
14 with the government?
15 A. March 2000.
16 Q. March of what year, I'm sorry?
17 A. 2002.
18 Q. What was your understanding when you got out on bail of
19 what you were going to be doing with the government?
20 A. Working with the ATF agents buying drugs, buying guns.
21 Q. Did you, in fact, work with the ATF agents?
22 A. Yes.
23 Q. Did you in fact do undercover buys of drugs?
24 A. Yes.
25 Q. Approximately how many times, just an estimate?

**Page 799**

1  A. A lot.

2  Q. Did you in fact do undercover purchases of firearms or

3  guns?

4  A. Yes.

5  Q. Other than doing undercover purchases, did you also

6  introduce undercover officers to targets?

7  A. Yes.

8  Q. Did you do anything else besides just do undercover

9  purchases, provide any other information?

10  A. Yes.

11  Q. What type of information did you provide in working with

12  the ATF?

13  A. People that was like into drugs, murder, just people that

14  was wanted that I seen.

15  Q. Did you provide any information -- do you know what a stash

16  house is?

17  A. Yes.

18  Q. What's a stash house?

19  A. Where people keep their drugs at.

20  Q. Did you provide any information to ATF during your

21  cooperation about location of stash houses?

22  A. Yes.

23  Q. Did you eventually go to trial on the gun charges that you

24  were charged with in March of 2002?

25  A. No.

**Page 800**

1  Q. Did you plead guilty to that gun charge?

2  A. Yes.

3  Q. Did you plead guilty to any other charge?

4  A. Yes.

5  Q. What charge?

6  A. Crack.

7  Q. At the time you began to cooperate with the government, had

8  the government charged you with crack selling or crack

9  distribution?

10  A. No.

11  Q. Did you tell the government about your crack selling?

12  A. Yes.

13  Q. What did you do that?

14  A. Because they told me I had to be honest. I told them the

15  truth.

16  Q. At this point in time had you been sentenced for the crack

17  distribution and gun charges to which you pled guilty?

18  A. No.

19  Q. What is your understanding of the maximum sentence you face

20  on the crack distribution charge you pled guilty to?

21  A. Life.

22  Q. I'm sorry, I didn't hear you.

23  A. Life.

24  Q. What's your understanding of the mandatory minimum time in

25  prison that the crack charge carries?

**Page 801**

1  A. Ten years.

2  Q. As to the gun charge, what's your understanding of the

3  maximum on that charge?

4  A. Ten years.

5  Q. Is there a mandatory minimum to your understanding on the

6  gun charge?

7  A. No.

8  Q. Did you eventually enter into a cooperation agreement with

9  the government, a formal agreement?

10  A. Yes.

11  Q. Mr. Melvin, I'm showing you what's been marked as 3502-S,

12  as in Sam.

13     (Handed to the witness)

14  Q. Mr. Melvin, as with any document I show you, feel free to

15  take as much time as you feel you need to look at it and let me

16  know when you're ready.

17     (Pause)

18  Q. Again, Mr. Melvin, while you're looking at that, if you

19  could refer to the last page of 3502-S, there's a signature

20  above the typed name Charles Melvin, whose signature is that?

21  A. That's mine.

22  Q. Is 3502-S the cooperation agreement you entered into with

23  the government?

24  A. Yes.

25     MR. COLTON: Your Honor, the government offers 3502-S.

**Page 802**

1     THE COURT: Mr. Colton, I think there was some

2  discussion about language that appears --

3     MR. COLTON: I understand, your Honor. It's just

4  offered. We'll make the appropriate change. We're not

5  planning on displaying it at this point.

6     MR. ARONWALD: No objection with the change.

7     MR. HOCHHEISER: No objection.

8     THE COURT: This will be received subject to the

9  change, redaction that has been previously agreed to.

10     MR. COLTON: For the record, we'll withdraw the offer

11  of 3502-S, we will offer 3502-S1 which has been changed,

12  redacted in accordance with the Court's instructions and I've

13  shown it to Mr. Aronwald and Mr. Hochheiser at this point.

14     MR. ARONWALD: No objection, your Honor.

15     MR. HOCHHEISER: No objection.

16     THE COURT: All right.

17     (Government's Exhibit 3502-S1 received in evidence)

18     MR. COLTON: Your Honor, I ask permission to put

19  3502-S1 in front of the witness.

20     THE COURT: Absolutely.

21  Q. Just for the sake of clarity on the record, Mr. Melvin, if

22  you could turn to the last page of 3502-S1, above the name

23  Charles Melvin do you see a signature?

24  A. Yes.

25  Q. Is that your signature?

Page 803

1  A. Yes.

2  Q. Mr. Melvin, under the cooperation agreement, what is your

3  understanding of what you are required to do under the

4  cooperation agreement?

5  A. To work with the agents, attend all meetings, testify if I

6  have to honestly. Just work with the agents, do what they say

7  to do and attend all meetings.

8  Q. When you say testify, are you required under the agreement

9  to testify in any particular way?

10 A. Yes.

11 Q. What way?

12 A. Honestly.

13 Q. Is there any provision in the agreement with respect to

14 your future behavior in terms of committing any crimes?

15 A. Yes.

16 Q. What do you promise to do under the terms of the cooperatin

17 agreement?

18 A. Stay out of trouble, keep my urine clean.

19 Q. What's your understanding of what the government is

20 required to do if you keep your end of the bargain under the

21 cooperation agreement?

22 A. Excuse me.

23 Q. I'll rephrase the question. If you do everything you

24 promised to do under the cooperation agreement, what does the

25 government have to do?

Page 805

1  Q. The judge that will be sentencing you?

2  A. Yes.

3  Q. In the event that the government does write a letter for

4  you, what is your understanding even with the letter of what

5  the maximum sentence you could get is?

6  A. Life.

7  Q. If the government writes a letter, if you keep your end of

8  the bargain, what's your understanding of the low end of the

9  sentence that you could get?

10 A. Anything the judge wants to give me.

11 Q. So the lowest would be time served?

12 A. Yes.

13 Q. You've heard a reference to the Sentencing Guidelines

14 before?

15 A. Yes.

16 Q. What is your understanding of what your sentencing

17 guideline range would be in the event the government didn't

18 write a letter?

19 A. 262 months to 327 months.

20 Q. If the government does write a letter, does the judge, to

21 your understanding, have to follow that guideline range?

22 A. No.

23 Q. Is it your understanding that the government will or will

24 not recommend a sentence to the judge?

25     MR. ARONWALD: Your Honor, can we just stop the

Page 804

1  A. I don't understand.

2  Q. Have you ever heard the phrase 5K letter?

3  A. Yes.

4  Q. Does that refresh your recollection of what the government

5  has to do if you keep your end of the bargain?

6  A. Yes.

7  Q. What does the government have to do if you keep your end of

8  the bargain under the cooperation agreement?

9  A. Write a letter for me.

10 Q. What is your understanding of what would be in the letter

11 that the government writes?

12 A. All the things that I done.

13 Q. When you say all the things you done, meaning what?

14 A. Cooperation that I did with the agents.

15 Q. Is it your understanding the letter would include only good

16 things you did or other things as well?

17 A. Other things as well.

18 Q. In addition to the good things you've done, what else is

19 the government going to put in the letter to your understanding

20 if you keep your end of the bargain?

21 A. Everything I done, just everything I done.

22 Q. Good and bad?

23 A. Yeah.

24 Q. Who does the letter that we're referring to go to?

25 A. The judge.

Page 806

1  leading and have the witness explain what his understanding is.

2      MR. COLTON: I'll rephrase to make it easier.

3      THE COURT: That wasn't leading but you can rephrase.

4  Q. Who decides your sentence, Mr. Melvin?

5  A. The judge.

6  Q. To your understanding, is the government going to make a

7  recommendation to the judge as to what the government thinks

8  you should get?

9  A. No.

10 Q. What is your understanding of what would happen if you

11 failed to keep your end of the bargain, for example, failed to

12 tell the truth?

13 A. I don't get no letter.

14 Q. And what's the mandatory minimum time you must serve in

15 prison if you don't get a letter?

16 A. Ten years.

17 Q. What's your understanding of what your guideline range will

18 be if you don't tell the truth and therefore don't get a

19 letter?

20 A. 262 months to 327 months.

21 Q. If you do not get a letter, are you going to be entitled,

22 to your understanding, to take back your guilty plea?

23 A. No.

24 Q. You've told this jury you pled guilty to crack

25 distribution. Have you ever used any illegal drugs?

## Page 807

1  A. Yes.

2  Q. What illegal drugs have you used?

3  A. Marijuana.

4  Q. Anything else?

5  A. No.

6  Q. When was the last time you used marijuana?

7  A. March 2002.

8  Q. Before or after your arrest?

9  A. Before my arrest.

10  Q. Back in March of 2002 before your arrest, how often were

11  you using marijuana?

12  A. Every day.

13  Q. Have you sold any drugs other than crack?

14  A. Yeah.

15  Q. What drug?

16  A. Marijuana.

17  Q. Anything else?

18  A. No.

19  Q. What was the years you were selling the most crack in your

20  drug selling days?

21  A. 2002.

22  Q. How much crack a week were you selling back in 2002 before

23  your arrest?

24  A. About two or three ounces a week.

25  Q. Just so the record is clear, have you done any drug selling

## Page 808

1  since the time you were arrested and begun to cooperate with

2  the government?

3  A. No.

4  Q. Approximately how much profit were you making per week from

5  selling two to three ounces of crack a week?

6  A. About two or three thousand dollars a week.

7  Q. What did you do with all the money you were making from

8  your drug sales?

9  A. Party, took care of my kids, bought clothes, bought weed,

10  bought more drugs.

11  Q. Did you pay taxes on the money you were making from drug

12  selling?

13  A. No, I don't pay no taxes.

14  Q. I want to turn your attention to 1985. You were 15 years

15  old at that time?

16  A. Yes.

17  Q. Did you commit a robbery with a BB gun?

18  A. Yes.

19  Q. What did you steal?

20  A. I don't recall.

21  Q. In 1991, you were convicted of attempted assault, is that

22  correct?

23  A. Yes.

24  Q. You got sentenced to 42 months to seven years in prison?

25  A. Yes.

## Page 809

1  Q. What did you do to commit that crime?

2  A. Shot somebody.

3  Q. Can you generally tell what happened.

4  A. Well, I had a beef with this guy. He shot at me. I ran.

5  I got a gun. I came back, shot him.

6  Q. He survived the shooting?

7  A. Yes.

8  Q. How much time did you do in prison?

9  A. Like three and a half years.

10  Q. I turn your attention now to 1994, you were convicted of

11  petit larceny?

12  A. Yes.

13  Q. Can you tell the jury what happened that caused you to

14  get -- what you did to commit that crime.

15  A. I was with this female, we had a disagreement.

16  Q. Were you living with this female at the time?

17  A. Yes. We had a disagreement. I took some things that was

18  mine, I guess she felt like they was hers and pressed charges

19  on me for petit larceny.

20  Q. As a result of being convicted of petit larceny, how much

21  time did you do?

22  A. I'm not sure but --

23  Q. Was it more than a year or less?

24  A. Yes, it was more than a year.

25  Q. Have you ever been arrested for vandalism?

## Page 810

1  A. Yes.

2  Q. When you were arrested for vandalism, did you use your own

3  name or did you give the police somebody else's name?

4  A. I used my brother's name.

5  Q. Your brother being who?

6  A. Julius Melvin.

7  Q. So you didn't tell the police the truth that time when you

8  got arrested?

9  A. No.

10  Q. Turn your attention now to 1996, were you arrested for

11  resisting arrest?

12  A. Yes.

13  Q. Did you in fact resist arrest?

14  A. Yes.

15  Q. Did you get sentenced for that?

16  A. I don't recall.

17  Q. Was that the same incident of the vandalism incident we've

18  been discussing?

19  A. Yes.

20  Q. Now I turn your attention to 1999. You were convicted of

21  attempted assault 2?

22  A. Yes.

23  Q. Did you serve a prison term for that crime?

24  A. Yes.

25  Q. Approximately how long?

Page 811

1 A. One and a half, my sentence was one and a half to three and
2 I served two years.
3 Q. What did you do to commit the attempted assault?
4 A. I had an argument with a guy. It was like an ongoing
5 argument. One night he tried to hit me with a bottle and I
6 shot him.
7 Q. I take it he survived the shooting?
8 A. Yes.
9 Q. Mr. Melvin, if you could lean closer into the microphone,
10 that would help.
11      In addition to the crimes you've been convicted for,
12 you also on occasion have stolen cars to go joy riding?
13 A. Yes.
14 Q. And at one point you were a member of a gang called the
15 Dark Side?
16 A. Yes.
17 Q. What did you do as a member of the Dark Side gang?
18 A. Sold drugs.
19 Q. Crack?
20 A. Yes.
21 Q. At any point in time did you ever steal drugs from other
22 drug dealers?
23 A. Yes.
24 Q. Was that part of your experience in the Dark Side gang?
25 A. Yes.

1 Q. Do you know an individual name Marcel Williams?
2 A. Yes.
3 Q. Does he have a street name?
4 A. Yes.
5 Q. What's his street name?
6 A. Bloody Assassin.
7 Q. Did you do any undercover work with ATF with respect to
8 Bloody Assassin?
9 A. Yes.
10 Q. What did you do?
11 A. I bought crack from him.
12 Q. Do you know Sukeem Bryant?
13 A. Yes.
14 Q. Did you do any undercover with ATF with respect to Sukeem
15 Bryant?
16 A. Yes.
17 Q. What did you do?
18 A. I bought crack from him.
19 Q. Do you know Raymond Bryant?
20 A. Yes.
21 Q. Does he have a street name?
22 A. Yes,
23 Q. What is it, Ray Love.
24 Q. Did you do any undercover work with ATF with respect to Ray
25 Bryant or Ray Love?

Page 812

1 Q. When did you get out of the Dark Side?
2 A. When I went to prison in '97.
3 Q. Mr. Melvin, I want to turn your attention now specifically
4 to your work with the ATF starting in March of 2002.
5 A. Yes.
6 Q. Do you know an individual by the name of Michael Lindsley?
7 A. Yes.
8 Q. What's his street name?
9 A. Money Mike.
10 Q. Did you do any undercover work with the ATF with respect to
11 Money Mike?
12 A. Yes.
13 Q. What did you do?
14 A. I bought crack from him.
15 Q. Do you know an individual named Martez Williams?
16 A. Yes.
17 Q. Does he have a street name?
18 A. Yes.
19 Q. What's his treat name?
20 A. Tez.
21 Q. Did you do any undercover with respect to Martez Williams
22 or Tez when you were working for ATF?
23 A. Yes.
24 Q. What did you do?
25 A. I bought crack from him.

1 A. Yes.
2 Q. What did you do?
3 A. I bought crack from him.
4 Q. I'm going to show you what's been marked as Government's
5 Exhibit 17 in evidence.
6      (Handed to the witness)
7 Q. Referring your attention specifically to page 5, paragraph
8 16, do you see that?
9 A. Yes.
10      MR. COLTON: Permission to read from the document in
11 evidence?
12      THE COURT: Yes.
13      MR. COLTON: Paragraph 16, Government's Exhibit 17.
14 On or about May 13, 2002 the CI met Raymond Bryant a/k/a Ray
15 Love and Sukeem Bryant, the defendants, in the vicinity of
16 Liberty and Catherine Streets, Newburgh, New York. The CI
17 purchased approximately 20 million grams of crack cocaine in
18 changes for a thousand dollars. The meeting was monitored and
19 recorded by law enforcement officers.
20 Q. Mr. Melvin, the CI that's referred to there, who is that?
21 A. That's me.
22 Q. I'm now going to refer your attention to paragraph 14 which
23 starts with the last line on the page before the one you're
24 looking at. Do you see that?
25 A. Yes.

1   MR. COLTON: Again, permission to read one more
2   paragraph.
3       THE COURT: Permission granted --
4       MR. COLTON: Paragraph 14 of Government's Exhibit 17.
5   On or about April 19, 2002 in the vicinity of the 3rd Street
6   apartment, I'm sorry, your Honor, I was reading the wrong
7   paragraph. Paragraph 13 I'd like to read --
8       THE COURT: Go ahead.
9       MR. COLTON: On or about April 14, 2002 the CI was
10  present when Michael Lindsley, a/k/a Money Mike, placed a
11  telephone call to Raymond Bryant the defendant and spoke to
12  Bryant about purchasing crack cocaine. Thereafter, the CI
13  drove Lindsley to meet with Raymond Bryant at the Tarsio
14  bowling lanes in the town of Newburgh. The CI witnessed
15  Lindsley count out money and then meet with Raymond Brieant and
16  Sukeem Bryant, the defendants. Thereafter, the CI brought
17  Lindsley back to the Third Street apartment where the CI
18  watched Lindsley weigh what appeared to be three ounces of
19  crack cocaine.
20  Q. The CI referred to in that paragraph is who?
21  A. Me.
22  Q. To your knowledge, was Raymond Bryant eventually arrested?
23  A. Yes.
24  Q. After Raymond Bryant was arrested, did you have contact
25  with any members of his family?

---

Page 816

1   A. Yes.
2   Q. Who in particular?
3   A. His brother.
4   Q. Which brother?
5   A. Malcolm.
6   Q. Malcolm Bryant?
7   A. Yes.
8   Q. Mr. Melvin, I'm showing you what's been previously marked
9   into evidence as Defendant's Exhibit C. Do you recognize
10  Defendant's Exhibit CI?
11  A. Yes.
12  Q. The exhibit is already in evidence. The first line has a
13  line for SA Andrew Boss. Do you know who that is?
14  A. Yes.
15  Q. Who is that?
16  A. It's the agent.
17  Q. Is Agent Boss the agent that was supervising you in your
18  undercover and informant work?
19  A. Yes.
20  Q. The last line of the first entry for Agent Boss says:
21  Malcolm Bryant has been calling the cell phone of ATF CI 108
22  over the past several weeks. Is that accurate?
23  A. Yes.
24  Q. Now, how did you eventually come to learn that Malcolm
25  Bryant was calling you?

---

1   A. He left voice mail.
2   Q. Did he leave a voice mail when he first started calling you
3   or after some period of time?
4   A. After some period of time.
5   Q. Did you eventually access the voice mail from Malcolm
6   Bryant?
7   A. Yes.
8   Q. What did you do after you accessed that voice mail?
9   A. I called him back.
10  Q. When you called Malcolm Bryant back after getting a voice
11  mail, was anyone else on the phone or was it just you and him?
12  A. First time it was just me.
13  Q. The conversation that's transcribed, Defendant's Exhibit C1
14  in front of you, is that this first conversation with Malcolm
15  Bryant just the two of you or is it a later conversation?
16  A. It's a later conversation.
17  Q. Was the first conversation between yourself and Malcolm
18  Bryant when you returned his voice mail recorded to your
19  knowledge?
20  A. No.
21  Q. What did Malcolm Bryant say to you in that first
22  conversation with him when it was just the two of you on the
23  phone? Mr. Melvin, just as a practical matter, if I'm asking a
24  question, or if any other lawyer asks you a question, you
25  shouldn't read something. If you need time to refresh your

---

Page 818

1   recollection by reading a document, we'll be happy to give it
2   to you.
3       Before we get into the content of the conversation,
4   once you got Malcolm's voice mail, how did you then know that
5   he had been calling you previously?
6   A. Excuse me.
7   Q. I'll ask it another way. Did the phone that you had have
8   caller ID?
9   A. Yes.
10  Q. When you got phone calls with the phone you had back in
11  November of 2002, could you see the number calling you?
12  A. Yes.
13  Q. When you eventually called Malcolm back, was that when you
14  learned what Malcolm Bryant's phone number was?
15  A. Yes.
16  Q. Once you learned from calling Malcolm Bryant back what his
17  phone number was, how did you figure out he'd been calling you
18  previously?
19  A. Because I seen the number on the phone.
20  Q. So until the time you called him back, did you know whose
21  number had been calling you?
22  A. No, I didn't.
23  Q. Now, then turning your attention now to the first
24  conversation you had with Malcolm Bryant following Raymond
25  Bryant's arrest, the one you testified to as not recorded.

Page 819

1 What did Malcolm Bryant say to you?
2 A. That his brother got arrested, and he's saying that I had
3 something to do with it and he wanted me to sign a paper saying
4 that I didn't have nothing to do with it.
5 Q. When you were on the phone with Malcolm, did you admit
6 having something to do with it?
7 A. No.
8 Q. Why not?
9 A. Because I didn't know what to do.
10 Q. Did you seek advice from anybody about what to do?
11 A. After I got off the phone with him I called the agent.
12 Q. The agent being Agent Boss?
13 A. Yes.
14 Q. When Malcolm Bryant asked you to sign an affidavit for his
15 brother Raymond Bryant, did he offer anything to you?
16 A. Yes.
17 Q. What did he offer you?
18 A. Some money.
19 Q. Does the phrase "look out for" you mean anything to you?
20 A. Yes.
21 Q. What does that mean to you?
22 A. That you're going to give me some money.
23 Q. Was that phrase used in your conversation with Malcolm
24 Bryant, the one that was unrecorded?
25 A. Yes.

Page 820

1 Q. Who was the first one to bring up payment for the
2 affidavit, you or Malcolm Bryant?
3 A. He was.
4 Q. Malcolm?
5 A. Yes.
6 Q. After getting off the phone with Malcolm Bryant in the
7 conversation where he told you he would look out for you or pay
8 you, what did you do?
9 A. I called the agent.
10 Q. Agent Boss?
11 A. Yes.
12 Q. Did you tell Agent Boss what happened?
13 A. Yes.
14 Q. Did you then place another call to Malcolm Bryant? Well,
15 strike that. Did you place a call to Malcolm Bryant after
16 talking to the agent?
17 A. Yes.
18 Q. Is that the conversation that's reflected in the transcript
19 C1 in front of you?
20 A. Yes.
21 Q. I'm going to refer your attention specifically to the
22 transcript, the first page.
23     MR. COLTON: Your Honor, for the record this
24 transcript is in the front of the jury's books.
25 Q. Mr. Melvin, specifically on the first page of C1 in front

Page 821

1 of you, the last entry for Charles Melvin. It says, "I'm
2 saying, I'm saying, man, you want me to sign some papers. What
3 the fuck, man, what are you all going to give me, that's what I
4 want to know."
5     Mr. Melvin, why did you ask Malcom Bryant what he's
6 going to give you?
7 A. Because the agent told me to.
8 Q. Because what?
9 A. The agent told me to.
10 Q. At the point in time you asked Malcolm Bryant in C1 "what
11 are you all going to give me", had he already offered to give
12 you something?
13 A. Yes.
14 Q. What?
15 A. Some money.
16 Q. I'm going to now refer your attention, Mr. Melvin, to the
17 third page of C1. It's marked on the bottom with a 3. Are you
18 on page 3?
19 A. Yes.
20 Q. The second to last Charles, actually, in the middle of the
21 page for Charles Melvin you say, "I'm just saying though, man,
22 what the fuck man, all right, check this out, so if I sign
23 those papers, what are you all going to give me, that's way
24 want to know."
25     Malcolm Bryant responds, "I don't want to tell you

Page 822

1 over the phone." And he continues. "I don't want to tell you
2 over the phone, my phone could be tapped."
3     At that point you then tell him, "you going to hit me
4 off, though?" What does the phrase "hit me off" mean?
5 A. Give me some money.
6 Q. And what did he say, did he say he was going to hit you
7 off?
8 A. He said yeah.
9 Q. After this November 12th conversation was taped that's
10 reflected in C1, did you have other conversations with Malcolm
11 Bryant that were recorded or at least one other conversation
12 with Malcolm Bryant that was recorded?
13 A. Yes.
14 Q. Mr. Melvin, I want to show you what's been marked into
15 evidence as Government's Exhibit 20A.
16     (Handed to the witness)
17 Q. Did you have a conversation that was recorded with Malcolm
18 Bryant and others on the phone?
19 A. Yes.
20 Q. Who is Yolanda Delgado?
21 A. It's Ray Love's girlfriend.
22 Q. Was she on the conversation with Malcolm Bryant that's
23 reflected in Government's Exhibit 20A?
24 A. Yes.
25 Q. Who is David St. John, to your knowledge?

Page 823

1   A. Investigator.

2   Q. Investigator for anybody in particular?

3   A. For a lawyer.

4   Q. For the lawyer. Who was the client?

5   A. Ray Love.

6   Q. At the point you spoke with David St. John on November 13,

7   2002, did you know before you started who the lawyer was?

8   A. No, I didn't know who the lawyer was.

9   Q. I want to turn your attention specifically to page 8 of

10  Government's Exhibit 20A that's in front of you. There's an

11  indication that you get a call-waiting, do you see that, about

12  a third of the way down the page?

13  A. Yes.

14  Q. Who called you? Strike that. Did anyone call you that had

15  any relation to the undercover that you were doing for ATF?

16  A. No.

17  Q. If you could flip forward three more pages to page 11 of

18  Government's Exhibit 20A. The second Charles Melvin entry

19  reads, "what am I going to get out of all this?"

20      To which David St. John says, "well, again, until we

21  talk and we know where everybody stands I don't know. I

22  couldn't tell you what you get out of it. My advice is

23  probably worth quite a bit, I can tell you that."

24      And Malcolm Bryant responds, "that's why I want to

25  talk to you, talk to you in person." What did you understand

Page 824

1   Malcolm Bryant to be telling you?

2   A. That he was going to give me money.

3   Q. Referring to the next page, page 12. The first David St.

4   John entry, his last sentence is, "I don't want to talk on the

5   phones and I'm sure you understand why."

6       What did you understand him to be saying?

7   A. That he was going to give me money.

8   Q. That David St. John was going to give you money, that's

9   what you understood?

10  A. Yes, that he was talking about money.

11  Q. But just to be clear, there was no point in time that David

12  St. John actually said "I'm going to give you cash?"

13  A. No, he never said that.

14  Q. Over the course of the time period between this

15  conversation with yourself, Malcolm Bryant and Yolanda Delgado

16  and David St. John and the eventual meeting with David St.

17  John, did you have other phone conversations that were

18  recorded?

19  A. Excuse me.

20  Q. Well, there's a conversation from November 13th that's

21  reflected in Government's Exhibit 20A in front of you.

22  A. Yes.

23  Q. Were there other recorded conversations with David St.

24  John -- I'll just rephrase the question. Between the first

25  conversation that's in front of you now, November 13th and the

Page 825

1   eventual meeting with St. John, were there other recorded

2   conversations?

3   A. Yes.

4   Q. I'm going to show you what's been marked into evidence as

5   Government's Exhibit 22A.

6       (Handed to the witness)

7   Q. Specifically turning your attention to the second page, the

8   fifth Charles Melvin entry says, "I'm saying, but you know he

9   did sell me some crack, you know what I'm saying."

10      St. John says, "who did?"

11      And then you say "Ray Love."

12      Did Ray Love in fact sell you crack?

13  A. Yes.

14  Q. Why did you tell David St. John that Ray Love had in fact

15  sell you crack?

16  A. Because they wanted me to sign a paper saying I didn't have

17  nothing to do with him being arrested.

18  Q. Was this the only time you told him or did you repeat that

19  over the course of your conversations?

20  A. Yeah, I repeated it.

21  Q. After you told St. John that you did in fact buy crack from

22  Ray Love, did he tell you he no longer wanted to meet with you?

23  A. No.

24  Q. Did he still want to meet with you?

25  A. Yes.

Page 826

1   Q. Did you eventually have a meeting with David St. John?

2   A. Yes.

3   Q. Where did that meeting occur?

4   A. At a rest stop but I'm not sure exactly where at.

5   Q. Somewhere in New York?

6   A. Yes.

7   Q. How did you get to that meeting?

8   A. Agent Boss took me.

9       MR. COLTON: One moment, your Honor.

10      (Government counsel confer)

11      THE COURT: Just so the record is clear, in answer to

12  the question of where did the meeting occur, can you tell us

13  again what you said.

14  A. At a rest stop, but I'm not exactly sure where it was at,

15  but it was in New York.

16  Q. Mr. Melvin, I want to show you now what's been marked and

17  received into evidence as Government's Exhibit 24A.

18      (Handed to the witness)

19  Q. Mr. Melvin, did you in fact meet with David St. John on

20  November 21, 2002, at the rest stop?

21  A. Yes.

22  Q. Where did the meeting take place, in the rest stop,

23  outside, in a car?

24  A. Inside of his Jeep.

25  Q. Who was in the Jeep?

1 A. Me and the investigator.

2 Q. If you were asked, would you be able to recognize the

3 investigator, David St. John again?

4 A. Yes.

5 Q. Without anything else, can you describe for the jury what

6 he's wearing?

7 A. Grey jacket, blue shirt, and a tie.

8 Q. Where is he seated in the courtroom?

9 A. Right there.

10     MR. COLTON: Let the record reflect that the witness

11 has identified the defendant David St. John.

12     THE COURT: The record shall so reflect.

13 Q. Prior to meeting with David St. John, did you have a

14 meeting with the agents?

15 A. Yes.

16 Q. Were you provided any equipment?

17 A. Yes.

18 Q. What were you given?

19 A. Wire and a tape recorder.

20 Q. During the meeting on November 21th in David St. John's

21 vehicle, did you tell David St. John whether you had in fact

22 bought crack from Ray Love?

23 A. Excuse me.

24 Q. Did you tell David St. John in his Jeep whether you had

25 bought crack from Ray Love?

1 A. Yes.

2 Q. What did you tell him?

3 A. I told him that he sold me crack.

4 Q. I'm going to turn your attention specifically to page 10 of

5 Government's Exhibit 24A. Are you on page 10, Mr. Melvin?

6 A. Yes.

7 Q. The fourth Charles Melvin entry says, "probably I don't

8 know, but I'm saying, you said you had some papers for me to

9 sign to help Ray Love."

10     St. John says, "well, you say what's that all about."

11     And then St. John says, "what, because I do these

12 kinds of cases a lot, what a, what, are they typed up for me,

13 it was a general, um, statement saying you had never bought

14 drugs or sold drugs or worked for the police or had done this

15 or that. Well, you're telling me you did so you know clearly

16 you can't sign something like that because it would be a lie,

17 right?"

18     Do you see that?

19 A. Yes.

20 Q. And then you say, "yeah."

21     And St. John starts the next phrase with, "um, shit."

22     Can you describe David St. John's demeanor or manner

23 when he said "shit?"

24 A. He was like, like he was --

25     MR. ARONWALD: Objection. I think it mischaracterizes

1 the transcript.

2     THE COURT: Objection overruled.

3     MR. ARONWALD: Tape, I'm sorry.

4     THE COURT: Overruled. You can answer the question if

5 you can.

6 A. Like he was disappointed.

7 Q. Prior to the time David St. John said, talked to you about

8 the general statement that was typed up for him, had you in

9 fact told him you had bought crack from Ray Love?

10 A. Yes, I told him about the crack.

11 Q. I refer your attention back to Government's Exhibit 22A.

12 Did that conversation occur on the same day as the conversation

13 in the Jeep or did it occur earlier?

14 A. Excuse me.

15 Q. That conversation Government's Exhibit 22A, the phone

16 conversation, was that the same day as the meeting in the Jeep

17 or sometime before the meeting in the Jeep?

18 A. It was before the meeting in the Jeep.

19 Q. Specifically, what's the date of the conversation that's

20 22A, it says on the top of the exhibit. The first one.

21 A. November 19, 2002.

22 Q. Is it fair to say that two days before this meeting you had

23 told David St. John you bought crack from Ray Love?

24 A. Yes.

25 Q. I'm going to turn your attention now going forward in the

1 transcript to page 21. Are you on page 21, Mr. Melvin?

2 A. Yes.

3 Q. The fifth David St. John entry, he brings up the name Tim

4 Cherry. Who is Tim Cherry?

5 A. Big Tim.

6 Q. Is that a name used on the street?

7 A. Yes.

8 Q. Did you know big Tim or Tim Cherry?

9 A. Yes.

10 Q. Did you do any drug deals with big Tim, Tim Cherry?

11 A. Yes.

12 Q. St. John, on page 21, says with, "Tim Cherry, did you ever

13 do anything with Tim Cherry?"

14     You say, "as far as like what?"

15     St. John says, "buying drugs or selling drugs for."

16     And you say, "yeah, yeah I did some with him but I

17 ain't never did nothing with him while we was with, while I was

18 with the agents."

19     St. John said, "you never did anything with the

20 agents."

21     You say no. And then St. John responds, "okay, I got

22 one of those blank forms made out with his name on it because I

23 was going to use it for somebody else. Do you want to sign one

24 of them, that you never did anything for the agents for Tim

25 Cherry?"

Page 831

1 When St. John asked you whether you wanted to sign an
2 affidavit saying you never did anything for the agents, did he
3 later read you an affidavit?
4 A. Yes.
5 Q. Did that affidavit say you never did any drug deals with
6 Tim Cherry for the agents or did it simply say you never did
7 any drug deals with Tim Cherry period?
8 A. I don't remember.
9 Q. Did he in fact, do you remember him reading you an
10 affidavit?
11 A. Yes.
12 Q. Did he have a piece of paper from which he was reading?
13 A. Yes.
14 Q. Looking at the transcript, after he asks you whether you
15 want to sign an affidavit for Tim Cherry you say, "I'm saying I
16 don't care, man, I'll sign it, I don't know, I'll sign." Did
17 St. John give you anything at that point?
18 A. No, he didn't give me nothing at that point.
19 Q. You then asked if you can go to the bathroom, is that
20 right?
21 A. Yes.
22 Q. Why did you ask to go to the bathroom?
23 A. Because I didn't know what to do and I wanted to talk to
24 the agent.
25 Q. Agent Boss?

Page 833

1 St. John was reading, was he reading from a piece of paper?
2 A. Yes.
3 Q. About seven lines down in the big St. John entry on page 22
4 he reads from the affidavit saying, "I state absolutely and
5 without hesitation that I have never at any time bought or been
6 given or received illegal drugs of any kind from or through Tim
7 Cherry."
8 Would that have been true?
9 A. Excuse me.
10 Q. The statement, "I state absolutely and without hesitation
11 that I have never at any time bought or been given or received
12 illegal drugs of any kind from or through Cherry."
13 If you signed that paper, would it have been true?
14 A. No.
15 Q. Had you already told David St. John you bought drugs from
16 Cherry?
17 A. Yes.
18 Q. Turning to the next page, on the 8th line down, the last
19 word begins, "I state that I have never acted as an agent or
20 informant in any capacity for any law enforcement agencies,
21 district attorney's offices or any other governmental
22 officials."
23 If you had signed such a paper, would that have been
24 true?
25 A. No.

Page 832

1 A. Yes.
2 Q. Did new fact meet with Agent Boss?
3 A. Yes.
4 Q. Did he give you instructions in the bathroom?
5 A. Yes.
6 Q. What did he tell you?
7 A. Well, he said to me, he told me that the transmitter wasn't
8 working, he was trying to fix it I told him what he said to me,
9 what the investigator said to me.
10 Q. Specifically what did you tell Agent Boss in the bathroom
11 about what was happening in David St. John's Jeep?
12 A. That he was talking about Tim Cherry.
13 Q. Did you tell Agent Boss anything else about what happened
14 in David St. John's Jeep?
15 A. That he wanted me to sign those papers for Tim Cherry.
16 Q. Did you tell Agent Boss anything about Ray Love that was
17 occurring in David St. John's Jeep?
18 A. I don't recall.
19 Q. Did you eventually go back to David St. John's Jeep?
20 A. Yes.
21 Q. I refer your attention now to page 22 of the transcript.
22 The last David St. John entry begins with a long set of
23 writing, do you see that, that carries over to the next page?
24 A. On 22.
25 Q. Yes. It carries over to 23. Do you see that. When David

Page 834

1 Q. Before the time David St. John read you that part of the
2 affidavit he asked you to sign, had you told him you acted as
3 an informant?
4 A. Yes.
5 MR. HOCHHEISER: Objection, your Honor. It's a
6 premise not in evidence. If we could approach, if necessary.
7 THE COURT: Let's approach. Ladies and gentlemen, you
8 might want to use this as a moment to stretch a little bit.
9 (At the sidebar)
10 MR. HOCHHEISER: Your Honor, the reason that I
11 objected is Mr. Colton asked about this affidavit that's being
12 read as the affidavit that Mr. St. John asked Flip to sign. My
13 objection is that the affidavit that Mr. St. John asked Flip if
14 he wanted to sign was an affidavit that St. John in the event
15 never had. That was an affidavit that he didn't buy drugs
16 while working for the agents. He never asked him to sign,
17 excuse me, he never found such an affidavit evidently when he
18 was looking in the trunk of his car while he was in the
19 bathroom but he never asked him to sign this affidavit. The
20 affidavit that he's been asked about he never asked him to
21 sign.
22 If you look in the transcript, you see, somewhere in
23 the transcript he says, would you be willing to sign, do you
24 want to sign something like that that says you never bought
25 anything while with the agents.

Page 835

THE COURT: I hear your objection. I think these are
fair questions and I'll allow them to continue.

(In open court)

THE COURT: The objection is overruled and I'll allow
in witness to answer it. Maybe you can restate the question,
Mr. Colton.

MR. COLTON: Yes, your Honor. I was going to do it --
I'll just repeat it.

Q. Referring to page 23 of the transcript when David St. John
was reading to you from an affidavit, he stated, "I state that
I have never acted as an agent or informant in any capacity for
any law enforcement agencies, district attorney's offices or
any other governmental officials." Prior to the time that
David St. John asked you to sign this affidavit, had you told
him you in fact had acted as an informant?
A. Yes.
Q. Ten lines further down from that, in the affidavit that
David St. John was reading to you, he states, "I also state
that I have never participated in the making of any recorded
observations or conversations by any government agencies and I
have never given to or provided any such agencies officials or
offices with any audio or video recordings." If you signed
such an affidavit, would that have been true?
A. No.
Q. Prior to the time David St. John asked you to sign the

Page 836

affidavit, had you told him that you in fact had worn a wire
and made recordings?
A. Yes.
Q. Turn your attention to the next page, page 24 of the
transcript. And specifically the second to last St. John entry
on that page. Do you see that?
A. Yes.
Q. He says to you, "you told me that if you bought drugs from
him that would be perjury, and I can't, I understand you want
to help, I can tell, but I can't be part of anything illegal."
    At the point in time David St. John is saying I can't
be part of anything illegal, is he taking any physical action?
A. Yes.
Q. What was he doing?
A. He was pushing the paper toward me.
Q. He was pushing an affidavit toward you?
A. Yes.
Q. Was he making any motions of any kind?
A. Yeah, he was just, he had a pen, he was like --
MR. COLTON: Let the record reflect that the witness
had the affidavit in his left hand, the pen in his right hand
and was pushing out in front of him in afford direction.
THE COURT: The record shall so reflect.
Q. And he was pushing the paper and pen toward you at the time
he was saying he can't be part of anything illegal?

Page 837

A. Yes.
MR. COLTON: One moment, your Honor.

(Government counsel confer)

MR. COLTON: Nothing further, your Honor.
MR. ARONWALD: Can we take a break now, Judge?
THE COURT: Sure. Ladies and gentlemen, why don't we
use this to take our mid-morning break and we'll take about 15
minutes or so and reconvene at 11:30.

(Jury not present)

THE COURT: Mr. Melvin, you can step down from the
witness stand.

(Recess)

(Witness resumed the stand)

MR. ARONWALD: Before the jury comes in, Mr. Lawrence
had handed up some notes to you and your Honor was going to
take a look at them.
THE COURT: You mean Friday?
MR. ARONWALD: Actually, I think it was the -- I think
on December 1st, I think it was. Remember there had been a
subpoena issued and he had attended some of the proffer
sessions and had made some notes which he handed up to the
Court for its review to determine whether or not they should be
turned over.
THE COURT: There was only one thing in here that I
thought --

Page 838

MR. COLTON: I would just suggest that if there's
anything that Mr. Lawrence may be needed for, we can call him.
THE COURT: I understand. Thank you.

(Pause)

THE COURT: I have reviewed the documents submitted to
the Court by Mr. Kerry Lawrence, the attorney for Mr. Melvin.
He's provided me with two kinds of documents. The first is a
letter dated September 25, 2003 in which he responds to
Mr. Aronwald's subpoena which was dated September 17, 2003.
The letter was written to Mr. Aronwald.
    And then the second set of documents are handwritten
notes, totaling eleven pages, one dated March 22, 2002, the
other dated March 25. Mr. Lawrence objects to the production
of these documents claiming them to be protected under the work
product privilege. And I agree.
    These documents contain handwritten notes from at
least one proffer session or what is identified as a proffer
session between Mr. Melvin, Mr. Lawrence and the government and
some agents. These are handwritten notes that are clearly not
verbatim statements of the witness. Most lines do not include
a full sentence but contain sometimes a single word, sometimes
two or three words meant to convey clearly some information to
the person who wrote them, but often not clear to anyone else
who would read this, and often not containing verbs or any
other indication that would make it clear to the Court that

Page 839

1  what was being written here was meant to convey exact
2  statements of this witness.
3        I was only able to find two instances in the notes
4  where there were quotes around a statement that was written in
5  the notes. They were both around single words, one being
6  "scary" and the other being "guns." Although I have no doubt
7  that his attorney, Mr. Lawrence, would find these notes helpful
8  in refreshing his recollection as to what was said in these
9  proffer sessions, I think there's little doubt that these are
10 not verbatim or exact statements of the witness and are
11 therefore notes that are intended by the attorney for his
12 personal review and as a reminder of what was said in the
13 meetings without noting them as direct statements from his
14 client.
15       I will also note for the record that at least in my
16 reviews, I do not see even the names of these defendants
17 written. Again, unless some of the more cryptic words or
18 letters here are meant to refer to them. So I'm going to find
19 that these are documents that are clearly attorney work
20 product, and are not subject to discovery for the reasons I've
21 mentioned.
22       MR. ARONWALD: Can we just make an application to have
23 the attorney's notes marked as a court exhibit?
24       THE COURT: Sure. I will have the note that I've just
25 spoken about and the letter to Mr. Aronwald --

Page 840

1        MR. ARONWALD: I'm not interested in the letter to me
2  just the attorney's notes of the proffer session, that's what I
3  would previously ask be marked as a court exhibit.
4        THE COURT: I'm going to include it all and mark it as
5  a court exhibit. These will be marked as Court's Exhibit 9.
6        MR. COLTON: I take it Court's Exhibit 9 is going to
7  remain sealed from the parties?
8        THE COURT: Yes. We will seal this document or two
9  documents.
10       MR. ARONWALD: Judge, what is Court's Exhibit 8?
11       THE COURTROOM DEPUTY: The government's tape that they
12 handed up.
13       THE COURT: Why don't we get the jury in.
14       (Jury present)
15       THE COURT: Mr. Aronwald.
16       MR. ARONWALD: Thank you, your Honor.
17 CROSS EXAMINATION
18 BY MR. ARONWALD:
19 Q. Mr. Melvin, do you still have Government's Exhibit 24A in
20 front of you?
21       MR. ARONWALD: May I, your Honor?
22       THE COURT: Absolutely.
23       (Handed to the witness)
24 Q. Mr. Melvin, let me ask you a question. You testified just
25 a few minutes ago that at the same time that David St. John

Page 841

1  told you on November 21st that he couldn't let you sign an
2  affidavit on behalf of Tim Cherry saying that you never bought
3  drugs from him, at the same time that he told you that he
4  couldn't let you sign that kind of an affidavit because it
5  would be perjury because it would be a lie, and he did tell you
6  that, you remember him telling you that, right?
7  A. I don't recall.
8  Q. You don't recall. Was it that you don't recall? You don't
9  recall what you testified to a few minutes ago or you don't
10 recall whether or not he told you on November 21st that he
11 couldn't let you sign an affidavit for Tim Cherry saying you
12 never did drugs with Cherry because that would be a lie, which
13 of the two don't you recall?
14       THE COURT: Ask him one at a time.
15 Q. What is it you don't recall?
16 A. I don't recall whether or not he said to me that he
17 couldn't let me sign it because it would be perjury.
18 Q. All right. Do you have the transcript in front of you?
19 A. Yes.
20 Q. Take a look at page 24 of Government's Exhibit 24A. Are
21 you on page 24?
22 A. Yes.
23 Q. Take a look at the third entry down from the top of the
24 page where the name David St. John appears. Do you see where
25 it says, David St. John told you, "well, if you bought drugs

Page 842

1  from him, then you know obviously you can't sign something like
2  this," do you see him telling you that?
3  A. Yes.
4  Q. Does that refresh your recollection that he told you that?
5  A. Yes.
6  Q. By the way, before you took the stand to testify here, did
7  you listen to the tape of the November 21st meeting?
8  A. Excuse me.
9  Q. Before you came into court this morning and took the stand
10 to testify, did you ever listen to the tape recording of the
11 November 21st meeting between you and David St. John?
12 A. Yes, I listened to the tape.
13 Q. How many times?
14 A. I don't recall.
15 Q. More than five?
16 A. I don't recall.
17 Q. More than ten?
18 A. I don't recall.
19 Q. When was the last time you listened to it?
20 A. Last week sometime.
21 Q. How many times did you listen to it last week sometime?
22 A. I don't recall.
23 Q. You don't recall how many times you listened to the tape
24 last week?
25 A. No.

Page 843

Page 845

1  Q. Who was with you when you listened to the tape?
2  A. When I listened to the tapes last week, I listened to them
3  by myself.
4  Q. Do you recall now that you listened to the tapes more than
5  once last week?
6  A. I listened to several tapes last week.
7  Q. I'm asking you about the November 21st tape, Government's
8  Exhibit 24 and the transcript Government's Exhibit 24A. How
9  many times did you listen to the tape recording of the November
10 21st meeting, that's all I'm asking you about now. I'm not
11 asking you about any other tapes.
12 A. I don't recall how many times I listened to it.
13 Q. Do you recall whether you ever listened to the November
14 21st tape with someone else?
15 A. A couple of months ago I listened to it with the agent and
16 the DA.
17 Q. By the agent are you referring to Agent Boss?
18 A. Yes.
19 Q. Which DA are you referring to?
20 A. Mr. Colton.
21 Q. Mr. Colton, okay. How many hours have you spent listening
22 to Government's Exhibit 24, the tape recording of the November
23 21st meeting?
24 A. Quite a few hours.
25 Q. What does quite a few mean, more than 20?

1  transcript just now, Mr. Melvin?
2  A. No.
3  Q. And then do you see the next place down where you say --
4  withdrawn. Do you see where Mr. St. John then told you "this
5  says, I know what it says, how it sounds, this all has to do
6  with Tim Cherry, this particular one. See, I made this up, I
7  was hoping to find somebody else." Do you see where Mr. St.
8  John told you that?
9  A. Where you said this is at on this paper.
10 Q. Right after you told him "I'm saying I'll sign it" on page
11 24. Do you see that?
12 A. What was the question you just asked me?
13 Q. After you told Mr. St. John "I'm saying I'll sign it,"
14 didn't Mr. St. John say to you, "this says, I know what it
15 says, how it sounds, this all has to do with Tim Cherry, this
16 particular one. See, I made this up, I was hoping to find
17 somebody else." Do you see, Mr. St. John told you that, right?
18 Without looking at the transcript, do you remember David St.
19 John telling you that?
20 A. No, I don't remember.
21 Q. Now if you look at the transcript, does that refresh your
22 recollection that he did tell you that? Do you see it,
23 Mr. Melvin?
24 A. I see it on the transcript but --
25 Q. Do that refresh -- I'm sorry, what did you say?

Page 844

Page 846

1  A. I don't think it was more than 20.
2  Q. More than 15?
3  A. Several hours.
4  Q. Several hours. Is several less than quite a few?
5  A. Several hours.
6  Q. You said before quite a few. I'm asking whether several is
7  less than quite a few.
8  A. It's all the same to me. Quite a few, several hours.
9  Q. Okay. Thank you. Do you also remember on November 21st
10 during your meeting with Mr. St. John, do you remember -- after
11 Mr. St. John told you, "well, if you bought drugs from him then
12 you know obviously you can't sign something like this," do you
13 remember you told Mr. St. John, "I'm saying, I'll sign it." Do
14 you remember telling Mr. St. John that you would sign it even
15 after he told you that you couldn't sign it because it wasn't
16 true? Without looking at the transcript, Mr. Melvin, do you
17 remember telling him that, yes or no?
18 A. No, I don't remember telling him that.
19 Q. Now look at the transcript, page 24. Right after the part
20 where Mr. St. John says to you, "well, if you bought drugs from
21 him then you know obviously you can't sign something like
22 this," right after that didn't you tell Mr. St. John, "I'm
23 saying I'll sign it?"
24 A. Yes.
25 Q. You didn't remember that before you looked at the

1  A. But I still don't remember it.
2  Q. So looking at the transcript doesn't refresh your
3  recollection?
4  A. This was the tape?
5  Q. My question to you is, if you look at the transcript,
6  Government's Exhibit 24A in evidence, reading the part that I
7  just read to you, does that refresh your recollection that
8  that's what Mr. St. John told you, yes or no?
9  A. No.
10 Q. But you listened to the tape a week ago. Is it your
11 testimony that after listening to the tape only a week ago you
12 have no recollection that Mr. St. John told you that, is that
13 what you're telling us?
14 A. I'm saying I don't remember.
15 Q. Do you remember telling Mr. St. John again, "I'll sign it?"
16 Do you remember telling him that?
17 A. Yes, I remember telling him that there.
18 Q. What did Mr. St. John tell you when you told him you would
19 sign it? Don't look at the transcript, just give us your best
20 recollection without looking at the transcript.
21 A. I don't remember.
22 Q. By the way, other than listening to the tapes last week,
23 when was the last time you went over your testimony with
24 Mr. Colton? Do you understand my question?
25 A. What did you just say?

Page 847

1 Q. Do you understand my question?
2 A. Yes, I understand your question.
3 Q. When was the last time you reviewed your testimony with
4 Assistant United States Attorney Colton?
5 A. It was like, it was a couple of weeks ago.
6 Q. A couple of weeks ago was the last time you went over your
7 testimony with Mr. Colton? Are you certain of that,
8 Mr. Melvin?
9 A. I don't know what you mean by testimony, as far as what?
10 Q. Prepare for your testimony in this case, go over the
11 questions he was going to ask you and the answers you were
12 going to give him, when was the last time you did that?
13   MR. COLTON: Object to the compound form, your Honor.
14 If we can break it down.
15   THE COURT: I will allow the question.
16 Q. Can you answer my question, sir?
17 A. I don't really understand, no.
18 Q. What is it about my question you don't understand. Tell me
19 and then I'll try to rephrase it for you so you can.
20 A. I don't understand, like you saying, was he telling me what
21 to say. What you mean, I don't understand what you mean.
22 Q. When was the last time you met with Mr. Colton to discuss
23 the testimony you were going to give in this courtroom this
24 morning? Do you understand that question?
25 A. I met with Mr. Colton a lot of times.

Page 848

1 Q. I'm asking you when you met him the last time before this
2 morning. Do you understand that question, yes or no?
3 A. No, I don't understand that question.
4 Q. When was the last time you met with Mr. Colton to go over
5 your testimony in this case? Was it Sunday, yesterday?
6 A. No.
7 Q. You didn't meet Mr. Colton yesterday?
8 A. No.
9 Q. Did you meet him Saturday?
10 A. No.
11 Q. Did you meet him Friday?
12 A. I talked to him Friday, yeah.
13 Q. Where did you talk to him on Friday?
14 A. When they brought me lunch.
15 Q. Did you discuss the case with him at that point?
16 A. No. We didn't discuss the case.
17 Q. Okay. So your testimony is that the last time you had any
18 discussion with Mr. Colton about your testimony in this case
19 was a few weeks ago, is that your testimony under oath? Sir?
20 A. I don't recall, man.
21 Q. You don't recall. Okay. So the answer you gave about a
22 few weeks ago may be incorrect, is that right?
23 A. I met with him a few weeks ago.
24 Q. Did you meet with him since a few weeks ago to go over your
25 testimony in this case, yes or no? You don't recall?

Page 849

1   THE COURT: After you ask the witness a question,
2 allow him a chance to answer it.
3   MR. ARONWALD: I thought I had, your Honor, I'm sorry.
4   THE COURT: No, you hadn't, because he hasn't given an
5 answer yet.
6 A. I met with him, but as far as going over the testimony, you
7 know what I'm saying.
8 Q. No, I don't know what you're saying.
9 A. I don't recall.
10 Q. Well, did you ever meet with Ms. Seibel to discuss your
11 testimony in this case?
12 A. A couple of weeks ago, I met with her and Mr. Colton.
13 Q. You met with the two of them together?
14 A. Yes.
15 Q. Was anyone else present?
16 A. Yes, Mr. Boss.
17 Q. Anyone else present?
18 A. Not that I recall.
19 Q. So as I understand your testimony, you don't remember, you
20 can't recall whether you met with Mr. Colton since two weeks
21 ago to discuss your testimony?
22 A. Yes.
23 Q. What about Ms. Seibel, did you meet with her --
24 A. No.
25 Q. -- since two weeks ago to discuss your testimony?

Page 850

1 A. No.
2 Q. What about Agent Boss?
3 A. No.
4 Q. Did you ever meet with anyone to discuss your testimony
5 other than Agent Boss, Ms. Seibel or Mr. Colton?
6 A. No.
7 Q. Okay. Getting back to the tape of November 21st, do you
8 remember David St. John telling you -- you don't have to look
9 at the transcript, Mr. Melvin -- do you remember Mr. St. John
10 telling you "you told me that if you bought drugs from him that
11 would be perjury, and I can't, I understand you want to help, I
12 can tell, but I can't be a part to anything illegal." Didn't
13 Mr. St. John tell you that?
14 A. I don't recall.
15 Q. Look at page 24 of Government's Exhibit 24. The second
16 entry for David St. John from the bottom of the page. Does
17 that refresh your recollection that that's exactly what David
18 St. John told you?
19 A. Yeah.
20 Q. Thank you. Mr. Colton asked you what you understood
21 Mr. St. John to be meaning when he told you certain things on
22 the tape. What did you understand Mr. St. John to be telling
23 you when he said to you "if you bought drugs from him, then
24 obviously you can't sign something like this.". What did you
25 understand Mr. St. John to mean when he told you that?

1 A. What he said. Whatever he said.

2 Q. So whatever he said, you understood that's what he meant?

3 A. That's what he said.

4 Q. Did you understand that's what he meant?

5 A. I was kind of, no, I don't understand that's what he meant.

6 That's what he said.

7 Q. What did you understand him to mean when he said it?

8 A. I don't know what he was trying to do.

9 Q. Okay. Well, isn't it true that Mr. St. John told you that

10 you didn't have to sign anything, do you remember him telling

11 you that?

12 A. No, I don't remember.

13 Q. You don't remember that. Okay. Do you remember telling

14 him that you wouldn't ask you to sign anything anyway because

15 it wouldn't be the truth, do you remember him telling you that?

16 A. No. I don't remember.

17 Q. Okay. Do you remember him telling you that he, Mr. St.

18 John, has to do things on the up-and-up, do you remember him

19 telling you that?

20 A. No, I don't remember.

21     THE COURT: Mr. Melvin, can you just keep your voice

22 up so the jurors can hear you and we can get an accurate

23 transcription.

24 Q. Do you remember Mr. St. John telling you that he used to be

25 a cop and he always did things on the up-and-up when he was a

Page 852

1 cop, do you remember him telling you that?

2 A. Yes, I remember him saying that.

3 Q. Look at page 25 of the transcript, the last entry at the

4 bottom of the page, and see if that refreshes your recollection

5 of what Mr. St. John told you during your meeting.

6 A. I remember him telling me that he used to be a cop.

7 Q. Does looking at the bottom of page 25 of Government's

8 Exhibit 24A refresh your recollection that Mr. St. John told

9 you, "you don't have to sign something?"

10 A. Yeah.

11 Q. Does it also refresh your recollection that he told you he

12 wouldn't ask you to sign it anyway because it wouldn't be the

13 truth?

14 A. I don't recall.

15 Q. So looking at the transcript does not refresh your

16 recollection that he told you that?

17 A. No.

18 Q. You're not saying that he didn't tell you that, are you?

19 A. No, I'm not saying that. I'm saying I don't recall. I

20 don't remember.

21 Q. By the way, when you listened to the tape of the November

22 21st meeting, did you have the transcript with you at the same

23 time?

24 A. Yes.

25 Q. Did you follow along the transcript as you listened to the

Page 853

1 tape?

2 A. Yes.

3 Q. Did you ever, did you assist in the preparation of the

4 transcript?

5 A. Excuse me.

6 Q. Did you help the agents or the United States attorneys make

7 up the transcript, prepare the transcript?

8 A. Certain words they didn't understand that I understood, I

9 told them what it meant.

10 Q. Which words?

11 A. I mean, I don't remember. I would have to see it.

12 Q. In any event, when you listened to the tape of the November

13 21st meeting, Government's Exhibit 24, and you had the

14 transcript and read along with the transcript as you listened

15 to the tape, did you ever tell Mr. Colton, Ms. Seibel, Agent

16 Boss or anyone else that the transcript was wrong?

17 A. No.

18 Q. Did you ever tell them that the transcript said something

19 that shouldn't be there?

20 A. No.

21 Q. Sticking with the transcript -- by the way, you never did

22 sign an affidavit on November 21st, did you?

23 A. What you mean? What type of affidavit?

24 Q. Did you sign any paper while you were in the car with David

25 St. John on November 21st, 2002?

Page 854

1 A. No, I didn't sign no papers.

2 Q. Okay. You testified before on direct examination that

3 while Mr. St. John was telling you that you couldn't sign it

4 because it wouldn't be true, he was pushing a paper to you and

5 a pen. Do you remember testifying to that?

6 A. Yes.

7 Q. But there's nothing on the transcript or the tape to

8 confirm that, is there, Mr. Melvin?

9 A. No.

10 Q. All we have is your word for that, isn't that so,

11 Mr. Melvin?

12 A. Yep.

13 Q. And you're an honorable fellow now, aren't you, Mr. Melvin?

14     MR. COLTON: Objection.

15     THE COURT: Sustained.

16 Q. You're a truthful person now, Mr. Melvin?

17 A. Yes, sir.

18 Q. But you've lied in the past, haven't you?

19 A. Yes, I have.

20 Q. When it suited your purpose, right?

21 A. When I was living that type of life, yes.

22 Q. When you were living that kind of life. What kind of life

23 are we talking about?

24 A. Illegal life.

25 Q. Illegal life.

Page 857

1  A. Yes.
2  Q. We'll get back to that in a minute but as far as the
3  November 21st statement is concerned, when Mr. St. John told
4  you you couldn't sign the affidavit or the paper because it
5  wouldn't be true, you say that he handed you or was pushing to
6  you a piece of paper with a pen, right, do you remember telling
7  us that?
8  A. Yes.
9  Q. You don't say to him on the tape, do you, "what are you
10 doing? You're telling me I can't sign it but you're giving me
11 a piece of paper and a pen to sign it." You don't tell him
12 that on the tape, do you?
13 A. No, I don't say that.
14 Q. By the way, when you went to that meeting on November 21st,
15 you were there to get evidence, weren't you?
16 A. What's evidence? What you mean?
17 Q. Well, you were there to make a tape recording of the
18 conversation with David St. John, right?
19 A. I went there to meet with him.
20 Q. And you were wired with a tape recorder, weren't you?
21 A. Yes.
22 Q. And you were there to make a tape recording to get evidence
23 of whatever it is he told you on the tape?
24 A. I don't know what evidence is.
25 Q. You don't know what evidence is?

Page 856

1  A. No, I just did what the agent told me to do.
2  Q. Okay. Do you know what proof is?
3  A. I just did what the agents told me to do.
4      MR. ARONWALD: Move to strike at not responsive.
5      THE COURT: I'll strike that answer. Do you know what
6  proof is?
7  A. I know what proof is, yes.
8  Q. What is proof, Mr. Melvin?
9  A. When you're trying to prove something.
10 Q. And when you went there to meet with Mr. St. John on
11 November 21st and you were wearing a wire to tape record the
12 conversation, you went there to get proof of Mr. St. John doing
13 something illegal, isn't that so?
14 A. Yes.
15 Q. Okay. And you never told Mr. St. John you were tape
16 recording the meeting, did you?
17 A. No.
18 Q. By the way, did you know at the time that he was also tape
19 recording the meeting?
20 A. No.
21 Q. Did you ever touch the pen that he gave you or handed or
22 pushed to you?
23 A. I don't recall.
24 Q. Mm-hmm. Did you ever touch the paper that you say he
25 pushed to you?

Page 857

1  A. Yes, I looked at the paper.
2  Q. You looked at it. So you touched it with your hands,
3  correct?
4  A. I'm not sure.
5  Q. But you weren't wearing gloves, were you?
6  A. No.
7  Q. So if you touched the paper, your fingerprints should be on
8  it, right?
9      MR. COLTON: Objection.
10     THE COURT: Objection sustained.
11 Q. Do you know whether or not, do you know whether or not any
12 of the papers that were found in the Jeep were ever tested by
13 the government for fingerprints?
14     MR. COLTON: Objection.
15     MR. ARONWALD: Asking whether he knows, Judge.
16     THE COURT: I'll allow the question.
17 Q. Do you know, Mr. Melvin?
18 A. No.
19     THE COURT: No more questions about it.
20     MR. ARONWALD: Yes, your Honor, thank you.
21 Q. All right, let's go through the meeting on November 21st.
22 By the way, you told us, you told Mr. Colton before, that you
23 have a prior criminal record.
24 A. Yes.
25 Q. Okay. And Mr. Colton asked you some questions and you told

Page 858

1  him about specific cases that you were prosecuted for and
2  convicted for, do you remember that?
3  A. Yes.
4  Q. But you weren't arrested and prosecuted for every crime you
5  ever committed, were you?
6  A. No.
7  Q. How many crimes would you say you committed that you never
8  got caught for?
9  A. I don't recall.
10 Q. Well, you told us a few minutes ago that you used to lead
11 an illegal life, do you remember that?
12 A. Yeah.
13 Q. How old were you when you began leading your illegal life?
14 A. I don't recall.
15 Q. Well, did you tell Mr. Colton that you got in trouble when
16 you were 15?
17 A. Yes.
18 Q. Were you leading an illegal life before then or was that
19 the first time you began leading an illegal life?
20 A. I don't remember.
21 Q. What crimes have you committed for which you have never
22 been prosecuted?
23     THE COURT: Just so we're clear, Mr. Aronwald, we're
24 asking him for categories?
25     MR. ARONWALD: Right, categories right now, Judge.

Page 859

1   A. I don't understand.

2   Q. What types of crimes have you committed that you were never

3   prosecuted for?

4   A. Selling crack.

5   Q. Is that all?

6   A. No. That's not all.

7   Q. So tell us what other types of crimes did you commit that

8   you were never arrested or prosecuted for?

9   A. Stealing cars.

10  Q. Stealing cars. How many cars would you say you stole?

11  A. I don't remember. This is a long time ago.

12  Q. How long ago is a long time ago?

13  A. A long time ago.

14  Q. How old were you, what ages?

15  A. I was young. I was a teenager.

16  Q. You were a teenager?

17  A. Yes.

18  Q. So were you 15, 16, 17, 18, 19?

19  A. I don't remember.

20  Q. You don't remember?

21  A. No.

22  Q. You haven't stolen any cars at all since you turned 20, is

23  that what you're testifying to?

24  A. You just asked me how old was I. I don't understand what

25  you mean.

Page 860

1   Q. You just told us that you stole cars when you were a

2   teenager but you don't remember how old you were, right?

3   A. Yes.

4   Q. I'm asking you, are you telling us under oath that you have

5   not stolen any cars since you became 20 years of age?

6   A. I can't recall.

7   Q. Okay. What other types of crimes did you commit that you

8   were never caught for?

9   A. I don't remember.

10  Q. How many times did you sell illegal drugs, including crack

11  cocaine in your lifetime?

12      THE COURT: You're asking him the number of times,

13  each specific sale?

14  Q. I'm asking roughly approximately how many times did you

15  commit the crime of illegal distribution of crack cocaine?

16      THE COURT: I'm not going to let you go far into this

17  area.

18      MR. ARONWALD: Maybe we can discuss that at the

19  sidebar.

20      (At the sidebar)

21      THE COURT: Where are you going with this?

22      MR. ARONWALD: Mr. Colton went through with the

23  witness on direct examination specific crimes that he got

24  prosecuted for. I think the jury has a right to know and I

25  have a right to ask the witness what other crimes he committed

Page 861

1   for which he was never held accountable. I don't understand

2   under what legal authority the Court can preclude me from going

3   into it. It goes into prior criminal conduct which goes to his

4   credibility and it's a fair question.

5       THE COURT: It is a fair question other than to the

6   extent that you're going to waste our time. He's told you that

7   he was dealing drugs, about two to three ounces of crack a

8   week.

9       MR. ARONWALD: That was in one year.

10      THE COURT: I understand. I will let you ask him how

11  many times. However, I don't know that I think it's relevant

12  for this jury -- let me strike that. I think whether or not

13  this witness can tell you a specific number of times isn't

14  really relevant.

15      MR. ARONWALD: Isn't really what?

16      THE COURT: Relevant.

17      MR. ARONWALD: I can ask him. He can say I don't

18  know.

19      THE COURT: I understand. But I'm not going to let

20  you go too far down this. I don't want you to waste this

21  jury's time asking this witness about how many times in a year

22  he told you crack cocaine.

23      MR. ARONWALD: If he says I don't know, I've

24  accomplished what I want to.

25

Page 862

1       (In open court)

2       THE COURT: You may continue.

3   Q. Mr. Melvin, do you know approximately how many times you

4   sold illegal drugs including crack cocaine for which you were

5   never arrested or prosecuted?

6   A. I don't know how many times.

7   Q. Okay. Well, do you remember on direct examination --

8   withdrawn. Other than stealing cars and other than dealing in

9   crack cocaine, were there any other crimes, types of crimes

10  that you committed for which you were never prosecuted or

11  caught?

12  A. I don't remember.

13  Q. Okay. For example, you told us that you shot two people.

14  A. Yes.

15  Q. Did you shoot any other people for which you were never

16  caught?

17  A. No.

18  Q. You told us about a robbery that you committed. You said

19  you didn't remember what you stole. Do you remember that?

20  A. Excuse me.

21  Q. Didn't you tell Mr. Colton that in 1985 you committed a

22  robbery with a BB gun but you didn't remember what you stole,

23  what you took, do you remember telling Mr. Colton that on

24  direct examination an hour and a half ago?

25  A. Yes.

Page 865

1  Q. You don't remember what you stole?
2  A. No.
3  Q. Were there any other robberies that you committed other
4  than the one in 1985?
5  A. Yes.
6  Q. How many?
7  A. I don't remember how many.
8  Q. By the way, when we talk a talk about robbery, you
9  understand robbery to mean a taking by force, you understand
10 that, right, with a gun, a knife, a weapon, you understand
11 that, right?
12 A. Yes.
13 Q. You don't remember how many times you took property from
14 someone using a gun or a knife or a weapon of some sort, you
15 don't remember?
16 A. No, I don't remember.
17 Q. Do you remember when the last time you committed a robbery
18 for which you were in court was?
19 A. '97. '96, '97.
20 Q. You were never arrested for that, right?
21 A. No.
22 Q. Tell us about that?
23 A. I robbed a drug dealer.
24 Q. Who was the drug dealer you robbed?
25 A. Some Jamaicans.

Page 865

1  Q. Without telling us the names of your friends, how many
2  friends did you go there with?
3  A. '96, '9, I was in a gang called the Dark Side.
4  Q. I understand that. How many people did you go to do the
5  robbery with?
6  A. Like seven of us.
7  Q. Seven. What were you armed with?
8  A. Guns.
9  Q. What kind of gun did you have?
10 A. I don't remember what type of gun it was.
11 Q. So you kicked in the door, right?
12 A. Yeah.
13 Q. And you and your seven friends went inside the apartment,
14 is that what you're telling us?
15 A. Yes.
16 Q. How many people did you rob inside the apartment?
17 A. I don't recall how many people was in there.
18 Q. What did you do when you got inside the apartment, what did
19 you do?
20 A. I told them to get on the floor, tied them up, searched the
21 apartment.
22 Q. And you did this -- when you told them to get on the floor
23 you were pointing your gun at them, right?
24 A. Yes.
25 Q. And your seven friends, they had guns too?

Page 864

1  Q. What were their names?
2  A. I don't know their names.
3  Q. How did you commit the robbery, what did you do?
4  A. I kicked in they door and robbed them.
5  Q. Where was this?
6  A. In Newburgh.
7  Q. Were you alone?
8  A. No. I wasn't alone.
9  Q. Who were you with?
10 A. A few people.
11 Q. Who?
12 A. A few friends.
13 Q. Who?
14 A. What --
15     MR. COLTON: I'm going to object to the relevance of
16 the names of the individuals.
17     MR. ARONWALD: It's cross-examination, Judge.
18     MR. COLTON: I'm only objecting to names of
19 individuals, nothing else in the question.
20     MR. ARONWALD: With all due respect, Judge, I think
21 it's a fair question.
22     THE COURT: No, I don't think it's relevant whether he
23 remembers the names of the individuals. I'm going to sustain
24 the objection.
25     When it's a convenient point to break, let me know.

Page 866

1  A. Yeah.
2  Q. So you searched the apartment after you tied these people
3  up, is that correct? Is that what you told us?
4  A. Yes.
5  Q. You don't remember how many people?
6  A. No, I don't recall.
7  Q. What did you take from the apartment?
8  A. Drugs.
9  Q. What kind of drugs?
10 A. Crack.
11 Q. How much crack?
12 A. I don't recall.
13 Q. Any other drugs?
14 A. Weed.
15 Q. How much weed?
16 A. I don't recall.
17 Q. Did you take anything else from the apartment other than
18 drugs?
19 A. Money.
20 Q. How much money?
21 A. I don't recall.
22 Q. Anything else but the money and the drugs?
23 A. That's it.
24 Q. The money you took, are we talking hundreds of dollars or
25 thousands of dollars?

Page 869

1 A. I don't recall.

2 Q. What did you do with the money that you and your seven

3 friends robbed?

4 A. Buy drugs, party, buy clothes.

5 Q. Mm-hmm. Did you divide the money up with your seven

6 friends or did you keep the money?

7 A. Divide it.

8 Q. What about the drugs, what did you do with the drugs?

9 A. Sold them.

10 Q. Any other robberies that you committed that you weren't

11 arrested for other than the one you just told us about?

12 A. I don't understand what you mean, man. You know what I'm

13 saying, I don't understand.

14 Q. What I'm asking you is, did you commit any other robberies

15 for which you were never arrested or prosecuted other than what

16 you just told us?

17 A. I don't remember.

18 Q. You told us that in 1991 you shot someone, I believe you

19 had an argument or a beef with the person, do you remember

20 that?

21 A. Yes.

22 Q. What was the argument or beef about?

23 A. I don't remember.

24 Q. How many times did you shoot that person?

25 A. One time.

Page 869

1 A. I told Mr. Colton that I had a disagreement with this

2 female that I was staying with, we broke up, I took some things

3 that was mine and I guess she didn't feel that they was mine

4 and she pressed charges on me for petit larceny.

5 Q. And you pled guilty to that, right?

6 A. No, I didn't plead guilty to that.

7 Q. You were convicted after trial?

8 A. Yeah.

9 Q. Okay. Did you testify in that case?

10 A. Yes, I did.

11 MR. COLTON: Your Honor, a moment with Mr. Aronwald,

12 please to clear up an issue?

13 THE COURT: Okay.

14 (Counsel confer)

15 THE COURT: Mr. Aronwald, when you find a convenient

16 please, we'll stop for lunch.

17 MR. ARONWALD: This is a good please.

18 THE COURT: We'll reconvene at two o'clock.

19 (Jury not present)

20 MR. COLTON: I just want to inform the Court of what

21 we were talking about so the Court is aware of what the issue

22 is. I think it is appropriate in this limited instance to say

23 it in front of the witness, I'm very confident of that.

24 THE COURT: Why don't we excuse the witness.

25 (Witness left the courtroom).

Page 868

1 Q. Just fired one shot?

2 A. Yeah.

3 Q. Did the bullet hit him?

4 A. Yeah.

5 Q. Where?

6 A. In the face.

7 Q. Where did that happen?

8 A. In Newburgh.

9 Q. Inside a building or outside on the street?

10 A. Outside on the street.

11 Q. Were you alone at that time?

12 A. No.

13 Q. What kind of a gun did you use on that occasion?

14 A. I don't remember.

15 Q. You told us that in 1994 you were convicted for petit

16 larceny over a disagreement. Do you remember telling

17 Mr. Colton that on direct examination?

18 A. Yes.

19 Q. What did you steal?

20 A. I didn't steal anything.

21 Q. I'm sorry.

22 A. I didn't steal anything.

23 Q. Didn't you tell Mr. Colton you committed the crime of petit

24 larceny over a disagreement but you didn't recall how much time

25 you spent in jail?

Page 870

1 MR. COLTON: Your Honor, the confusion that is coming

2 from the witness stand I believe is because the 1994 petit

3 larceny conviction came at the same trial at which he was

4 acquitted of a rape charge. I informed Mr. Aronwald that

5 open-ended questions could lead into areas the Court ruled

6 should not be inquired into. I'm not clear whether Mr. Melvin

7 is a hundred percent sure, I don't know if he's sure of the

8 Court's ruling on that but I'm not allowed to talk to him so in

9 the limited instance, I would ask the Court for permission to

10 talk to him about the substance of the Court's ruling.

11 THE COURT: Do you intend to inquire on the petit

12 larceny issue again?

13 MR. ARONWALD: No, I'm not. The only thing I think

14 though the record should indicate, I'm not sure that I intend

15 to go there anyway, my recollection is that on direct

16 examination in response to Mr. Colton's question Mr. Melvin

17 said that he didn't recall how much time he did on that.

18 Mr. Colton asked him more or less than a year. I think the

19 Court will take judicial notice of the fact that if he did more

20 than a year he had to be convicted of a felony, not a

21 misdemeanor. And petit larceny is a misdemeanor. So there is

22 some confusion in the record based upon the specific question

23 that Mr. Colton put to the witness. I don't know whether the

24 government has reason to believe that the witness' answer was

25 incorrect, but if the witness testified as he has that he did

1 accompanied him when he did this robbery. Number three, I'm
2 not even sure, Judge, that the government is in a position to
3 make any proffer because I'm not sure that Mr. Melvin ever
4 disclosed that robbery to the government. What I would propose
5 to do is ask the witness the question but I'm certainly happy
6 to hear from the government.
7     MR. COLTON: I don't know the answer to the question,
8 so I'm not going to make a representation. I was concerned
9 that who did a particular robbery is not relevant. I
10 understand the Court's concern about potential witnesses out
11 there.
12     Two observations, to borrow Mr. Aronwald's phrase.
13 First, Mr. Melvin did testify that he did robberies of drug
14 dealers. He admitted that. He simply didn't on the stand list
15 every single one he ever did. But he certainly admitted to
16 that fact on the stand in direct examination.
17     I think the relevant point of inquiry is whether
18 anybody else involved in this case had done that with him. I
19 am concerned if he starts naming names in open court that could
20 present a danger, an unintended danger to Mr. Melvin or his
21 family. And that was the reason for the objection.
22     THE COURT: Thank you. No, I don't know about the
23 danger part but I did take it as being irrelevant if they
24 aren't, if the names of the individuals have nothing to do with
25 this matter. Mr. Hochheiser.

1 more than one year on that conviction, it could not possibly
2 have been petit larceny.
3     MR. COLTON: The answer is he was detained pending the
4 rape trial and it could be that he was just detained for longer
5 than that.
6     THE COURT: It could be another area where this
7 witness doesn't recall accurately.
8     MR. COLTON: I agree. But I don't have any knowledge
9 that the record as it stands is incorrect. I just want to make
10 that clear.
11     MR. ARONWALD: I'm not going back in that area. I've
12 been there and done what I had to do.
13     THE COURT: Thank you. We'll reconvene at two. Thank
14 you.
15     (Luncheon recess)
16
17
18
19
20
21
22
23
24
25

1 AFTERNOON SESSION
2     1:53 p.m.
3     (Jury not present)
4     THE COURT: Mr. Aronwald, I cut off questioning this
5 witness, questions of this witness regarding the Dark Side, the
6 names of the other members of the Dark Side group and it occurs
7 to me that to the extent that any of those other members are
8 people involved in this matter, witnesses or other names that
9 we hear, that it probably is relevant. I sustained the
10 objection to that based on the notion that they were wholly
11 unrelated names. But we can do this one of two ways. I can
12 either allow you to ask the questions at least to the extent
13 that they seek to get that, if that's where you were going with
14 that, or the government can make a proffer as to whether or not
15 they know other names we've been hearing in this case, whether
16 they will be witnesses or not, are members of that group. To
17 the extent that they are, then it's relevant to ask him
18 about that, because then he may want to question other
19 witnesses or whatever you want to do with that. But I cut that
20 off, assuming that they were wholly unrelated and upon
21 reflection think that that's probably an unfair assumption.
22     MR. ARONWALD: Two observations. Number one, as your
23 Honor can well imagine, I have not had any contact with
24 Mr. Melvin. Number two, I don't know what his answer would be
25 if he were required to identify the seven people that he says

1     MR. HOCHHEISER: Your Honor, I always like to ask a
2 cooperating witness who is talking about crimes the names of
3 people that he committed the crimes with to demonstrate to the
4 jury that this person, who claims to be completely honest,
5 forthcoming, candid pursuant to his agreement, is not willing
6 to tell you the names of his crimemates, co-conspirators and
7 will disingenuously say I don't remember their names or
8 whatever. And I find that the question is useful in that way,
9 just to show that the witness is unable.
10     You're not going to get any names from him. He's
11 going to say I don't remember and whatever he has to do to
12 evade and avoid giving you the answer, he will, which is a
13 demonstration in itself.
14     THE COURT: Well, Mr. Aronwald if you want to pursue
15 this on your continuation of your cross, I think that that
16 would be reasonable. I want us to be careful about the
17 formulation of the question.
18     MR. ARONWALD: Just so that, because I understand your
19 concern, let me tell you that I would propose asking the
20 question that I asked before, who were the seven people that
21 were with you. I think I agree with Mr. Hochheiser, I don't
22 think the witness is going to name anybody. I think he's going
23 to say he doesn't recall. Maybe there weren't -- but the other
24 question is, is the government representing that Mr. Melvin
25 disclosed this particular robbery and the circumstances of this

Page 875

Page 877

1  robbery to them in the course of his debriefing and
2  cooperation, because if he didn't, then I don't think the
3  government can speak to the question as to whether or not they
4  know whether any of the seven names are any names associated
5  with this case. If the government doesn't know that, the only
6  one who can tell us that is Mr. Melvin.
7         MR. COLTON: We readily admit we don't know the answer
8  to the question. Go ahead and ask was Tim Cherry involved, Ray
9  Bryant. The troubling part of the argument is --
10  Mr. Hochheiser's point I understand. Mr. Melvin wasn't being
11  honest because he didn't give up his friends. Then we can't
12  stand up, because we're precluded, and say in rebuttal, of
13  course he didn't want to because his life was previously
14  threatened and that would be potentially the reason he wouldn't
15  give it up. However, in a compromise to say was this one
16  involved, was this one involved, anybody connected to this
17  case, that would solve the problem.
18         MR. ARONWALD: Let me just say this. It is not for
19  Mr. Colton or the Court or us to assess this witness'
20  credibility. It's the jury. The question I put to him I
21  believe is an appropriate, fair proper question and the jury's
22  assessment of his credibility may very well turn on what his
23  answer to the question is. The jury, for example, may find it
24  difficult to believe that someone could have committed a
25  robbery the way he's described it and not remember the names of

1  a red herring or not. I can see a couple of circumstances.
2  These are individuals who he has said on the stand have robbed
3  people at gunpoint with him. That inherently kind of makes
4  them dangerous people. So I could see how one could make the
5  assessment. Is it right or not, I don't know, that these are
6  people that if their names are mentioned in open court in a
7  case where we've had, and I believe we're going to have,
8  reporters in the room and have had others in the room, it could
9  be dangerous. Is it dangerous or not, I don't really know.
10         Separate and apart from that, I think it's irrelevant,
11  the names of the people, it is totally irrelevant. The other
12  danger of it is is that it could be that mentioning any of
13  these other people could have some effect on a juror because
14  they know one of those names in a good way or a bad way in a
15  way that we weren't able to have a voir dire. It's irrelevant,
16  what the names of the individuals are is irrelevant other than
17  to the extent that those individuals have something to do with
18  the facts that are being presented to the jury.
19         MR. ARONWALD: May I just say one thing? Let me pose
20  this hypothetical, Judge. Let's assume Mr. Melvin were to
21  identify people who he says were with him in the robbery.
22  Let's assume he made that up. Let's assume the defense can
23  prove by bringing these people into the courtroom that they
24  never participated in any robbery with Mr. Melvin and therefore
25  his sworn testimony to the contrary is false.

Page 876

Page 878

1  any of the people that were with him.
2         The other question is this, Judge. The government
3  opened the door by asking him to elaborate on his prior
4  criminal history. For whatever the reason, the government
5  elected not to question him about this particular robbery which
6  conveyed to the jury the misimpression that his criminal
7  activities may have been limited only to those areas that the
8  government chose to question him about. This robbery, assuming
9  it took place as he's described it, the jury can consider all
10  of the circumstances attendant to that criminal act in
11  determining whether or not they want to believe or disbelieve
12  what Mr. Melvin wants to say.
13         We're sort of creating potential problems. This
14  witness is an informant. This witness is testifying he's an
15  informant, he's testified that he gave information and
16  participated in undercover drug deals. The government had no
17  problem in eliciting the names of specific people that he dealt
18  with. If the government felt that disclosing those names and
19  those facts would not in any way jeopardize his safety, then
20  how is asking him to name the seven people that he says
21  accompanied him on a robbery going to endanger his safety? It
22  doesn't make any sense. The government is putting that out
23  there as a red herring. I think I'm entitled to the
24  information.
25         THE COURT: I don't know if they're putting it out as

1         Certainly, Judge, the question could very well be
2  relevant in terms of his credibility. And he's not our
3  witness, Judge.
4         THE COURT: Mr. Aronwald, that argument could make all
5  irrelevant testimony relevant. That is, the fact has nothing
6  to do with anything going on at this trial but if he lies about
7  it it's relevant. On that theory, you could ask any witness
8  any question on the theory that the answer to that question has
9  nothing to do with this trial but if he lies about it, it is
10  now relevant. So you don't get to do that.
11         MR. ARONWALD: False accusations. We're saying in
12  this case Mr. Melvin has falsely accused Mr. St. John of
13  something in his direct examination. There is a history of it,
14  Judge. In the 3500 material the government has provided us,
15  when Mr. St. John was arrested on the gun charge -- Mr. Melvin
16  was arrested on the gun charge in this case, he lied. He said
17  the guns weren't his. He put the weight, he accused someone
18  else of having those guns. He said the guns didn't belong to
19  him, they belonged to someone else.
20         THE COURT: All right. You made your argument.
21  Here's my ruling. To the extent that they are individuals who
22  are at play in this trial, that is, going to be witnesses or in
23  some way impact the events of this trial, you will have the
24  ability to inquire. The way I will propose that you do that is
25  to ask him the threshold question, do you recall the names of

Page 879

1 the individuals who participated in those activities with you
2 or as a member of the Dark Side gangor whatever the crew was
3 called.
4         Assuming you get a negative answer, that is I don't
5 remember any of them, that's the end of the inquiry. Assuming
6 he says that you do, I would propose then that what you do is
7 ask him about specific people. That is, was for instance Tim
8 Cherry a member of that group, was so-and-so a member of that
9 group. And to the extent that he says yes, you can inquire
10 about relevant information, what role that person played
11 about -- with regard to it. But to the extent that he says
12 those were not people who were involved in that group, I am not
13 going to have testimony about it, about the names.
14         MR. COLTON: Just two very quick points. I just
15 suggest that Mr. Aronwald ask: Do you remember the names of
16 any of the people, to avoid an answer that might be confusing.
17 Second, the formulation of the question I think Mr. Aronwald
18 wants to ask, was Tim Cherry one of the seven people who did
19 that robbery, not was he a member of the gang, that's a wholly
20 separate area and if he chooses to go into that, then it's a
21 different question. And I just want to make sure the two
22 questions are asked differently.
23         THE COURT: I think he could ask both those questions.
24         MR. COLTON: I agree. I don't want them mixed and
25 matched to confuse the witness.

Page 880

1         MR. ARONWALD: I think mindful of your ruling, I think
2 I can certainly follow that and I frankly sort of resist the
3 notion that Mr. Colton is going to lay out the questions that I
4 should be asking the questions. Your Honor has an issue before
5 you, you ruled on the issue, I heard what your Honor had to
6 say, I will follow your Honor's suggestion as to how you think
7 it should be handled and I'll do exactly that.
8         THE COURT: Okay. Thank you. Anything else? Let's
9 get the jury in.
10         Just one last point on that. I've again reviewed the
11 handwritten notes that Mr. Lawrence has provided to try to see
12 if on this or any other point I can see anything that is
13 particularly helpful or relevant and I do not. Again, that's
14 upon reviewing Court's Exhibit 9.
15         (Witness resumed the stand)
16         THE COURT: Mr. Aronwald, would you like to continue?
17         MR. ARONWALD: Thank you, Judge.
18 BY MR. ARONWALD:
19 Q. Mr. Melvin, over the lunch hour, did you see Ms. Seibel and
20 Mr. Colton?
21 A. Yes, I seen them.
22 Q. Did you spend any time with them --
23         MR. HOCHHEISER: Judge, he needs to speak closer to
24 the mike.
25         THE COURT: Yes, please do that.

Page 881

1 Q. Did you see Mr. Colton and Ms. Seibel over the lunch hour?
2 A. Yes, I seen them.
3 Q. Did you spend time with them?
4 A. No.
5 Q. Did you come up an elevator with them?
6 A. Yes.
7 Q. Let me ask you this question. Before I asked you about the
8 robbery where you said that you committed a robbery of some
9 Jamaican drug dealers, do you remember that testimony?
10 A. Yeah.
11 Q. And do you recall the names of any of the seven people who
12 participated in the robbery with you?
13 A. No.
14 Q. You testified on direct examination that in the year 2002,
15 you sold two to three ounces of crack cocaine a week, do you
16 remember that testimony?
17 A. Yes.
18 Q. And you also testified that in the year 2002, by illegally
19 selling and distributing those two to three ounces of crack
20 cocaine a week, you were earning between two and three thousand
21 dollars a week. Do you remember that testimony?
22 A. Yes.
23 Q. You told Mr. Colton that you didn't pay taxes on that
24 money, is that right?
25 A. Yep.

Page 882

1 Q. You didn't pay any taxes at all in the year 2002, did you?
2 A. No.
3 Q. You didn't even file a tax return in the year 2002, did
4 you?
5 A. No.
6 Q. All right, well, that's 2002. What about 2001, were you
7 selling crack cocaine in the year 2001?
8 A. No.
9 Q. Were you selling crack cocaine in the year 2000?
10 A. No.
11 Q. Was that because you were in jail in the year 2000 and
12 2001?
13 A. Yep.
14 Q. Okay, what about the year 1999, were you in jail in 1999?
15 A. Yeah.
16 Q. You were in jail in 1999 also?
17 A. Yeah.
18 Q. What about 1998?
19 A. I was home for some of 1998.
20 Q. Were you selling crack cocaine in the year 1998 when you
21 weren't in jail?
22 A. Yes.
23 Q. How much crack were you selling in the year 1998 when you
24 weren't in jail on a weekly basis?
25 A. I don't remember.

Page 883

Page 885

1 Q. Well, in 1998 when you weren't in jail, were you earning
2 about two to three thousand dollars a week selling crack
3 cocaine?
4 A. No. I don't remember.
5 Q. You don't remember how much you made?
6 A. No.
7 Q. So it could have been as much as two or three thousand
8 dollars a week but it could have been more or less than two
9 thousand dollars a week, is that correct?
10 A. Could have been.
11 Q. I'm sorry, I couldn't hear you, sir.
12 A. Could have been.
13 Q. You didn't pay taxes on that money either, did you?
14 A. Nope.
15 Q. You didn't file tax returns in that year either, did you?
16 A. Nope.
17 Q. What about the year 2003. When were you arrested on the
18 gun charge in 2003, in March?
19 A. Yes.
20 Q. So in January and February and in March up to the time of
21 your arrest on the gun possession charge, were you selling
22 crack cocaine then also?
23 A. Yes.
24 Q. And you testified on direct that you were selling two to
25 three ounces a week for two to three thousand dollars a week in

1 your brother, you told them you were your brother, correct?
2 A. Yes.
3 Q. Now, in 1999 you told us that you were convicted for
4 attempted assault in the 2nd degree and that you served two
5 years of a one and a half to three-year sentence, do you
6 remember that?
7 A. Yes.
8 Q. You told Mr. Colton on direct examination that that was
9 over an argument you had with a guy. Do you remember that?
10 A. Yes.
11 Q. And you told Mr. Colton that you shot him?
12 A. Yes.
13 Q. And what was the argument about?
14 A. It was over his girl.
15 Q. It was over his girl?
16 A. Yeah.
17 Q. Just tell us what the argument was about.
18 A. I was messing with his girl, his wife, I was messing with
19 his wife. He was in prison. He came home. I guess he ain't
20 like it, you know what I mean, so we had a fight one time, him
21 and some kid jumped me.
22 Q. He had a fight one time and what happened?
23 A. Some kid jumped me.
24 Q. He and another kid jumped you?
25 A. Yes. And then like a couple of weeks later, we had another

Page 884

Page 886

1 2002. Did that continue into 2003 up until the time of your
2 arrest?
3 A. Excuse me.
4     MR. COLTON: Object to the form.
5     THE COURT: Can you just rephrase the question, Mr.
6 Aronwald.
7     MR. ARONWALD: Sure.
8 Q. In the year 2003 up to the time of your arrest, were you
9 still selling two to three ounces of crack cocaine a week?
10     MR. COLTON: Same objection. The predicate is the
11 problem.
12 Q. When were you arrested in the year 2003, Mr. Melvin?
13     MR. COLTON: Same objection again.
14 Q. Were you arrested in the year 2002?
15 A. Yes.
16 Q. Okay. And since March of 2002, when you were arrested, you
17 haven't been selling any crack cocaine, is that it?
18 A. No.
19 Q. Did you also testify on direct examination that when you
20 were arrested on one occasion, I think for vandalism, you gave
21 the police your brother's name?
22 A. Yes.
23 Q. So your brother's name is what?
24 A. Julius Melvin.
25 Q. When the police arrested you, you gave them the name of

1 dispute at the bar.
2 Q. Just go slowly please. A couple of weeks later you had
3 another dispute with him in a bar?
4 A. Yes.
5 Q. Same guy?
6 A. Yes.
7 Q. What was that dispute about?
8 A. Over his wife.
9 Q. Same subject?
10 A. Yes.
11 Q. And what happened?
12 A. I walked past him in the bar. He was sitting at the table
13 with his wife. I walked past him in the bar. She looked at
14 me, she said something. He ain't like it so he got up, start
15 you know getting all cocky.
16 Q. He started getting cocky?
17 A. Yeah.
18 Q. What do you mean by that, what did I do?
19 A. He started acting crazy, man, you know.
20 Q. No, I don't know. What do you mean when you say he was
21 acting crazy, what did he do?
22 A. He started coming towards me, you know what I'm saying. He
23 had a bottle in his hand, he started coming towards me. So a
24 few of my friends, they stepped in the way, they pushed him
25 back and they told me to calm down and whatever and I was like

Page 887

1  I'm calm, you got to get him. So they took him to the bathroom
2  and one of my friends told me yo, let's go. So we got outside.
3  When we got outside, he came out the bar, he still was acting
4  crazy, still had a bottle in his hand so I started walking down
5  the street and he started coming behind me running his mouth.
6  Q. He started coming behind you doing what with his mouth?
7  A. Running his mouth.
8  Q. What do you mean running his mouth?
9  A. Running his mouth.
10  Q. What was he doing, what do you mean?
11  A. Talking, threatening me, telling me he was going to hit me
12  with the bottle.
13  Q. What did you do?
14  A. I stopped and I told him yo, don't come near me with that
15  bottle. And he's like, what you going to do, shoot me? And I
16  was like, yeah, you come near me with that bottle. And he came
17  closer and I shot him.
18  Q. How many times did you shoot him?
19  A. I shot him one time.
20  Q. Where did you shoot him?
21  A. Excuse me.
22  Q. Where did you shoot him?
23  A. I think I shot him, I think I shot him in the leg.
24  Q. Mm-hmm. So you had the gun on you at the time?
25  A. Yes, I did.

Page 888

1  Q. Mm-hmm. By the way, when you told us earlier today about
2  the time that you and seven of your friends kicked in the door
3  and robbed the Jamaicans of drugs, do you remember that
4  testimony?
5  A. Yes.
6  Q. You never told that to the prosecutors, did you?
7  A. Yeah.
8  Q. You told them about that particular crime?
9  A. I told them that I used to rob Jamaicans and drug dealers
10  for money. They never asked me to go into detail like you did.
11  Q. Oh, okay, okay. How many times did you meet with the
12  prosecutors before you signed your cooperation agreement to
13  discuss your criminal background?
14  A. I know it was a few days. I'm not sure how many days it
15  was, but I know it was like a few days.
16  Q. Did you meet -- do you remember when -- your agreement,
17  your cooperation agreement is in evidence.
18  A. Excuse me.
19  Q. Your cooperation agreement, the agreement that you signed,
20  is in evidence, correct?
21  A. Yes.
22  Q. 3502-S1. Do you remember that?
23  A. Yes.
24  Q. Would you like to see a copy of it, would that help you?
25  A. Yeah, yeah.

Page 889

1  Q. Do you have it in front of you?
2  A. No, I don't have it.
3  MR. ARONWALD: May I approach the witness, your Honor?
4  THE COURT: Absolutely.
5  (Handed to the witness)
6  Q. I'm handing you 3502-S1. You testified before that you
7  recognized your signature on the last page. Do you remember
8  that?
9  A. Yes.
10  Q. Do you remember on what date it was, what was the date that
11  you signed it?
12  A. January 22nd.
13  Q. January 22, 2003, correct?
14  A. Yes.
15  Q. Okay. Now do you remember how many times you met with any
16  prosecutor from the United States Attorney's Office to discuss
17  your criminal history before you signed this document on
18  January 22, 2003?
19  A. I don't remember how many times I met with them.
20  Q. As of January 22, 2003 you had met with Mr. Colton
21  concerning your criminal history, isn't that so?
22  A. Yes.
23  Q. But you don't remember how many times?
24  A. No.
25  Q. Did you meet with any other prosecutor from the United

Page 890

1  States Attorney's Office before January 22, 2003 to discuss
2  your criminal background?
3  A. Yes.
4  Q. Who?
5  A. It was a lady.
6  Q. What's her name?
7  A. I don't remember her name.
8  Q. Was it Ms. Seibel?
9  A. No.
10  Q. Would you remember the name if you heard it?
11  A. Yeah.
12  Q. Teresa Pesce?
13  A. Pesce sounds familiar but I don't know Teresa is her first
14  name.
15  Q. You told us that in March 2002 you were arrested and
16  charged with possession of guns, correct?
17  A. Yes.
18  Q. It was three guns, right?
19  A. Yes.
20  Q. Do you remember, those were all handguns, right?
21  A. Yes.
22  Q. Do you remember the types of handguns they were?
23  A. .357.
24  Q. How many .357s did you have?
25  A. I think it was three of them.

1  Q. Mr. Melvin, all three of those guns were loaded, right?
2  A. Yeah, I think so.
3  Q. Do you know, don't you know?
4  A. I'm not quite sure.
5  Q. Isn't it true that you were charged with possessing three
6  loaded handguns, one of which was a Smith & Wesson chrome
7  colored .357 caliber revolver, do you remember that?
8  A. Yes.
9  Q. Another one was a Sturm Ruger chrome colored .357 caliber
10 revolver, do you remember that?
11 A. No, I don't remember that.
12 Q. You don't remember that.  And one of the handguns that you
13 possessed was an automatic.  Do you remember that?
14 A. No.
15 Q. You don't remember that either.  All right.  The police
16 found those weapons pursuant to a search warrant, didn't they?
17 A. Yes.
18 Q. And included in what the police found and seized they also
19 found a loaded magazine, I'm sorry, they found loaded magazines
20 for the automatic weapon, isn't that so?
21 A. I don't remember that.
22      MR. ARONWALD: Your Honor, may I approach the witness?
23      THE COURT: Sure.
24      (Handed to the witness)
25 Q. Mr. Melvin, I want to place before you Government's

1  Exhibit 3502-G for identification.
2      MR. ARONWALD: Your Honor, just to speed this up,
3  would your Honor have any objection if I stood by the witness
4  and drew his attention to a particular portion of it?
5      THE COURT: Calmly, no.
6  Q. Mr. Melvin, I'd like to draw your attention to this portion
7  over here.
8      MR. COLTON: Over here being what?
9      MR. ARONWALD: Third paragraph down.  You can come
10 over if you want.  Right here.
11      THE COURT: Can you say for the record just so I can
12 follow along.  I don't want a huddle at the witness stand with
13 you.  How many pages in?
14      MR. ARONWALD: Let me just approach and show you,
15 Judge, it might be easier that way.
16      THE COURT: Thank you.
17 Q. This portion over here that I'm pointing to, if you could
18 just read this portion to yourself.  Starting with this word
19 and ending over here.  And once you've done that, just let me
20 know and I'll ask my next question.
21      (Pause)
22 A. All right.
23 Q. Okay?  Mr. Melvin, having read what I just showed you, does
24 that refresh your recollection that you possessed two .357
25 caliber revolvers and one automatic?

1  A. Yeah, yeah.
2  Q. Does it also refresh your recollection that the police also
3  seized loaded magazines for the .380 automatic?
4  A. No, not really.
5  Q. Would you like to see it again?
6  A. No, I don't want to see it again.
7  Q. Do you recall that when the police executed the search
8  warrant they also found ammunition for both .357 caliber
9  revolvers, do you remember that?
10 A. Yes.
11 Q. By the way, these guns belonged to you, right?
12 A. They was in my possession.
13 Q. You pled guilty to possessing the guns, didn't you?
14 A. Yeah.
15 Q. They were your guns, weren't they?
16 A. No, they wasn't my guns, they was in my possession.
17 Q. Whose guns were they?
18 A. The next door neighbor's.
19 Q. You told the police at the time that they arrested you that
20 the guns belonged to the kids next door, do you remember
21 telling them that?
22 A. Yes, I just said that, the next door neighbor.
23 Q. How old were these kids that you said the guns belonged to?
24 A. My age bracket.
25 Q. Your age bracket?

1  A. Yes.
2  Q. You told us you're 33?
3  A. Yes, they was like late 20s.
4  Q. So you told the police that you possessed the guns but they
5  weren't your guns?
6  A. Yes.
7  Q. You told the police you were just holding the guns for the
8  kids next door?
9  A. I don't recall what I told the police, but I know they
10 wasn't my guns.
11 Q. Did you tell the police that you were paid money to hold
12 the guns for the kids next door?
13 A. I don't recall.
14 Q. Wasn't one of the detectives that arrested you a Detective
15 Fiscella?
16 A. Yes.
17 Q. Do you remember being interviewed by him on March 15, 2002
18 at the detective division of the City of Newburgh Police
19 Department?
20 A. Yes.
21 Q. And didn't you tell Detective Fiscella on March 15, 2002
22 that Lindale gave you two hundred dollars to hold the guns,
23 didn't you tell Detective Fiscella that?
24 A. I don't recall.
25 Q. Did you ever touch those guns?

Page 895

1 A. I don't recall.

2 Q. Well, didn't you tell Detective Fiscella that your prints

3 would probably be on the guns, didn't you tell him that on

4 March 15, 2002?

5 A. I don't recall.

6    MR. ARONWALD: Your Honor may I approach, see if I can

7 refresh his recollection?

8    THE COURT: Yes.

9 Q. Let me show you what's been marked as 3502-G. Mr. Melvin,

10 take a look at this document that I've just handed to you.

11 Read it to yourself and tell me what you're finished reading

12 it. Then I have a question for you.

13    (Pause)

14 A. Finished reading.

15 Q. Does that refresh your recollection?

16 A. Nope.

17 Q. Well, did anybody give you any money to hold those guns?

18 A. I don't recall.

19    MR. ARONWALD: I just need one moment if your Honor

20 please.

21    (Pause)

22 Q. By the way, three guns that were seized when the search

23 warrant was executed, that search warrant was for your

24 apartment, correct?

25 A. No.

Page 896

1 Q. Weren't the guns found in your residence, the place where

2 you were living?

3 A. That's my mother's house.

4 Q. Was that your residence, yes or no?

5 A. Yes, I was staying there.

6 Q. So the search warrant was for the place that you were

7 staying, your mother's house, correct?

8 A. Yes.

9 Q. And where the guns were found was your hiding place, the

10 place you used to hide stuff, right?  No?

11 A. I don't know where the guns was found at.

12 Q. Mr. Melvin, didn't the police find the handguns and the

13 ammunition in the attic of the house you were living in?

14 A. That's what they told me.

15 Q. Well, isn't that where you put the guns?

16 A. I have no idea, I don't recall where the guns was at.

17 Q. Well, do you recall that on March 15, 2002, while at the

18 City of Newburgh Police Department, you told Detective Fiscella

19 that the guns were found in your little hideout?

20 A. No, I don't recall saying that.

21    MR. ARONWALD: Can I have a moment, your Honor?

22    THE COURT: Sure.

23    (Counsel confer)

24    MR. ARONWALD: We would move 3502-G in evidence as a

25 defense exhibit.

Page 897

1    MR. COLTON: I assume Mr. Aronwald assumes the last

2 page he's been referring to, but maybe not.

3    MR. ARONWALD: I mean the entire exhibit.

4    MR. COLTON: The government would have an objection.

5 There's no objection to the last page which is what he's been

6 examining from the last 15 minutes.

7    MR. ARONWALD: Can I speak to Mr. Colton for one

8 second.

9    THE COURT: Sure.

10    (Counsel confer)

11    MR. ARONWALD: Your Honor, do you want me to wait for

12 Mr. Hochheiser to come back?

13    THE COURT: I would prefer to wait, yes.

14    (Pause)

15    MR. HOCHHEISER: I apologize, Judge, I didn't mean to

16 hold up the proceedings.

17    THE COURT: That's okay.

18 Q. Mr. Melvin, did you ever use the expression with Detective

19 Fiscella on March 15, 2002, "I dip out there sometimes?"

20 A. I don't recall.

21    MR. ARONWALD: Your Honor, at this point we would

22 offer as Defendant's Exhibit I think it's --

23    MR. COLTON: F?

24    MR. HOCHHEISER: F.

25    MR. ARONWALD: This is a portion of 3502-G.

Page 898

1    MR. COLTON: For the record, if what Mr. Aronwald is

2 referring to is the last page of what's currently 3502-G which

3 is the March 15, 2002 document, that one page, the government

4 has no objection.

5    THE COURT: Okay.  That document will be received.

6    MR. COLTON: It's not the last page, it's the March

7 15th one page.

8    MR. ARONWALD: It's the page I just showed your Honor

9 before.

10    (Defendant's Exhibit F received in evidence)

11 Q. I'll put it up on the ELMO. When for the first time did

12 you see this document?

13 A. Just now when you showed it to me.

14 Q. When you were arrested in this case in March of 2002, did

15 you have a lawyer?

16 A. No, I didn't have no lawyer.

17 Q. Once you were arrested, did the Court give you a lawyer,

18 appoint a lawyer to represent you?

19 A. What do you mean, after I went to court the first time?

20 What you talking about?

21 Q. When you were arrested you were brought into court to be

22 arraigned, correct?

23 A. Yeah.

24 Q. And at the time that you were brought into court to be

25 arraigned, didn't the court assign a lawyer to represent you?

Page 899

1  A. No. I had a private lawyer.

2  Q. Okay. And what was his name?

3  A. Paul Tracht.

4  Q. Did there come a time when he ceased representing you and

5  the court assigned a lawyer to represent you?

6  A. When I got down here to White Plains.

7  Q. I'm sorry.

8  A. Only when I got down here to White Plains.

9  Q. You were arrested up in Newburgh?

10 A. Yes.

11 Q. Were you initially taken for arraignment to a court in

12 Newburgh?

13 A. Yeah.

14 Q. So at that time you were charged on a local New York State

15 charge, correct?

16 A. Yeah.

17 Q. And then the case was transferred federal?

18 A. Yes.

19 Q. Was the case transferred federal because you told the

20 government you were interested in cooperating?

21 A. Yes.

22 Q. Okay. And what happened to the local charge up in the City

23 of Newburgh?

24 A. I don't know.

25 Q. Is that charge still open?

Page 900

1  A. I don't know.

2     MR. COLTON: Your Honor, a moment with Mr. Aronwald

3  please.

4     THE COURT: Okay.

5     (Counsel confer)

6  Q. Is it your understanding that as part of your cooperation

7  agreement with the government, the local charge in the City of

8  Newburgh is being dismissed, is that your understanding?

9  A. I don't know.

10 Q. Okay. In any event, when you came down in federal court

11 for the first time, how soon after your arrest did that happen?

12 A. About a couple of days after.

13 Q. And when you came into court here in this building in White

14 Plains, the judge you appeared before, not Judge Robinson but

15 some other judge, assigned a lawyer to represent you, correct?

16 A. Yes.

17 Q. And you told the court that you couldn't afford your own

18 lawyer, correct?

19 A. Yes, I guess so.

20 Q. And when you told the court that you couldn't afford your

21 own lawyer, did you tell the court that just before your arrest

22 you were selling crack cocaine for two to three thousand

23 dollars a week?

24     MR. COLTON: Your Honor, I object to that and I can be

25 heard if you wish.

Page 901

1     MR. ARONWALD: May we have a sidebar very briefly,

2  Judge.

3     (At the sidebar)

4     MR. COLTON: Here's my issue, I have the idea that Mr.

5  Aronwald is cross-examining this witness about having lied to

6  the court about his financial affidavit, which is okay. But

7  asking him about not disclosing income from drug sales in front

8  of a federal magistrate who has just advised him of his right

9  to remain silent may be inappropriate.

10    MR. ARONWALD: Judge, just one point, we have not

11 received a copy of the CJA affidavit as part of the 3500

12 material. We should have.

13    MR. COLTON: I have never seen it.

14    MR. ARONWALD: If the government represents there

15 isn't any --

16    MR. COLTON: I didn't say that.

17    MR. ARONWALD: I'll ask the witness if he filled out

18 one.

19    THE COURT: I think this objection is well placed.

20 You can ask the questions in a way that doesn't imply --

21    MR. ARONWALD: I'll ask the witness if he filled out

22 the affidavit telling the Court that he couldn't afford a

23 lawyer and at the time that he said that he was selling crack

24 cocaine for or three thousand dollars a week.

25    MR. COLTON: That's okay.

Page 902

1     (In open court)

2  Q. Mr. Melvin, when you appeared in federal court here in this

3  building in White Plains for the first time in March of 2002,

4  do you recall filling out an affidavit asking the Court to

5  appoint a lawyer for you, do you remember that?

6  A. No, I don't remember that.

7  Q. Do you remember that before the court appointed a lawyer to

8  represent you, you were asked whether or not you could afford

9  your own lawyer, do you remember that?

10 A. Yeah.

11 Q. And at the time you told the court that you could not

12 afford your own lawyer, didn't you tell the court that?

13 A. Yes.

14 Q. And when you told the court that you couldn't afford your

15 own lawyer, the fact is that just before you were arrested you

16 were selling crack cocaine for two to three thousand dollars a

17 week, correct?

18 A. Yep.

19 Q. You never told the court when you were asked whether you

20 could afford your own lawyer, you never told the court that you

21 were earning money without saying how you earned it, did you?

22 A. Excuse me.

23 Q. You never told the court that you were working and making

24 two to three thousand dollars a week, did you?

25 A. No, I never told the court that.

Page 905

1  Q. Okay.  Mr. Melvin, if you look at what's up on the screen,
2  I asked you before whether looking at Defendant's Exhibit F
3  refreshed your recollection that you made those statements to
4  Detective Fiscella.  Do you remember my asking you that?
5  A. Yes, I remember you asking me that.
6  Q. And you told us it doesn't refresh your recollection,
7  correct?
8  A. No.
9  Q. Does that mean that you are saying that you did not make
10 those statements to Detective Fiscella or you just don't know
11 whether you did or not?
12 A. I don't remember whether I did or not.
13 Q. By the way, included in your criminal history that you've
14 testified about, was there ever a time in 1996 when a bench
15 warrant was issued because you failed to appear in court when
16 you were supposed to?
17 A. Probably.
18 Q. I'm sorry.
19 A. Probably.
20 Q. Did that happen more than once?
21 A. Yeah, it happened a few times.
22 Q. And when you failed to appear in court, you knew that you
23 were supposed to be in court on that day.  You just decided
24 that you weren't going to go, correct?
25 A. Yeah.

Page 904

1  Q. And on those occasions, you were told by the judge that you
2  were before at the time that you had to be back in court on a
3  certain date, right?
4  A. Yes.
5  Q. So in effect -- withdrawn.  So when you were told to appear
6  and didn't and a bench warrant was issued, you basically
7  disobeyed the court's order to return to court on a date
8  certain, didn't you?
9  A. Yeah.
10 Q. You say you did that more than once.  Can you give us an
11 estimate as to how many times that happened?
12 A. I don't remember how many times it happened.
13 Q. Was it more than twice?
14 A. I don't remember how many times it happened.
15 Q. More than three times?
16 A. I don't remember how many times it happened.
17 Q. More than 15?
18 A. I don't remember how many times it happened.
19 Q. Mr. Melvin, do you still have Government's Exhibit 24A in
20 front of you, the transcript of the November 21st meeting with
21 Mr. St. John?
22 A. Yes.
23 Q. Mr. Melvin, let me ask you this question.  Before November
24 21, 2002, based upon what you've told us on direct and
25 cross-examination, you had a number of criminal cases that were

Page 905

1  brought against you, correct?  You were arrested a number of
2  times and charged with various crimes, correct?  You've told us
3  about that, right?
4  A. Yes.
5  Q. On each and every one of those occasions you were
6  represented by a lawyer, weren't you?
7  A. Yes.
8  Q. And on those occasions, you discussed the case with your
9  lawyer, didn't you?
10 A. Yes.
11 Q. Okay.  On each of those occasions, was it your
12 understanding that your lawyer was going to try to find out as
13 much about the prosecution case against you as he could, was
14 that your understanding?
15      MR. COLTON: Objection to relevance, your Honor.
16      THE COURT: Sustained.
17 Q. Whoever the lawyer was, when your lawyer was representing
18 you, what did you expect the lawyer to do on your behalf?
19      MR. COLTON: Same objection.
20      THE COURT: Sustained.
21 Q. Well, let me ask you this question.  Do you remember that
22 when you met with Mr. St. John on November 21st -- withdrawn.
23 It's true, is it not, that before you met with Mr. St. John on
24 November 21st, Tim Cherry's name never came up in any of the
25 tape-recorded conversations you had with Malcolm Bryant,

Page 906

1  Yolanda Delgado or David St. John, isn't that true?
2  A. Yes.
3  Q. And isn't it true that Tim Cherry's name never came up in
4  any discussion that you had with Malcolm Bryant before November
5  21st, 2002, isn't that also true?
6  A. Yes.
7  Q. Okay.  So when you went to the meeting on November 21st,
8  you expected that Mr. St. John was going to be talking to you
9  only about Ray Bryant, correct?
10 A. Yes.
11 Q. You told Mr. Colton that Ray Bryant has another name, he's
12 known as Ray Love.  Did you tell Mr. Colton that?
13 A. Yes.
14 Q. That's not the only other name he has, is it?
15 A. No.
16 Q. What other names is Ray Bryant known by?
17 A. Peso.
18 Q. What does that mean, do you know?
19 A. No.
20 Q. And you had done drug deals with Raymond Bryant, had you
21 not?
22 A. Yeah.
23 Q. How many times did you do drugs with Raymond Bryant?
24 A. Did I do drugs with him?
25 Q. How many times did you buy drugs from Raymond Bryant?

1  A. Several times.

2  Q. Seven?

3  A. Several times.

4  Q. How many is several, more than five?

5  A. Yes, probably more than five.

6  Q. More than ten?

7  A. No.  Probably more than five.

8  Q. Between five and ten times.

9  A. Yeah.

10  Q. Okay.  Over what period of time?

11  A. 2001, between 2001 and 2002.

12  Q. Didn't you tell us a little bit before that you were in

13  jail in 2001 so you weren't doing any drugs in that year, isn't

14  that what you told us about 20 minutes ago?

15  A. That's not what I told you.

16  Q. Are you saying that you didn't tell us earlier this

17  afternoon that you didn't do any drug deals in the year 2001

18  because you were in jail?

19  A. I told you 2000 I was in jail.  In 2000 I was in jail, 1999

20  I was in jail and I was out for a little bit of 1998.

21  Q. What about 2001?

22  A. 2001 is when I came home from prison.

23  Q. When did you come home from prison in the year 2001?

24  A. I think it was April.

25  Q. All right.  So when you got out of jail in April 2001, did

1  you begin selling drugs, two or three ounces a week for two to

2  three thousand dollars a week?

3  A. Not right away.

4      MR. ARONWALD: May I have a moment, your Honor?

5      (Defense counsel confer)

6      MR. ARONWALD: Your Honor, may I?

7      THE COURT: Yes.

8      MR. COLTON: If you're going to read, can you give us

9  a page and line?

10      MR. ARONWALD: I was about to do that.  I was waiting

11  for the Judge.

12  Q. Mr. Melvin, directing your attention -- reading from page

13  138 of the transcript, Mr. Melvin, do you remember being asked

14  these questions and giving these answers by me?

15      MR. COLTON: Your Honor, if I could just ask for a

16  time for us to catch up on the computer so we could read along

17  at the same time.  Anything read from a transcript, counsel

18  should be permitted to follow.

19      THE COURT: Yes.  Let them access the same

20  information, and the Court by the way.

21      MR. COLTON: Most important.

22      MR. ARONWALD: I'm sorry?

23      MR. COLTON: He said and the Court and I said that's

24  most important.

25      MR. ARONWALD: If Mr. Colton wants to come over here..

1      THE COURT: Let's stop.

2      MR. ARONWALD: He can read it over my shoulder.  I

3  think it's page 138.  I may be wrong.

4  Q. Mr. Melvin, do you remember my asking these questions and

5  you giving these answers a few minutes ago.

6  "Q  All right, well that's 2002, what about 2001, were you

7  selling crack cocaine in the year 2001?

8  "A  No.

9  "Q  Were you selling crack cocaine in the year -- withdrawn.

10      Were you selling crack cocaine in the year 2000?

11  "A  No.

12  "Q  Was that because you were in jail in the year 2000 and

13  2001?

14  "A  Yep."

15      Do you remember being asked those questions and giving

16  those answers?

17  A. Yes.

18  Q. So you did testify that you were not selling crack cocaine

19  in the year 2001 because you were in jail in the year 2001,

20  isn't that so?

21  A. I came home from prison in 2001.

22  Q. Okay.  So your testimony before that you were not -- did

23  you sell crack cocaine in the year 2001 when you got released

24  from prison in April?

25  A. Yeah.  Not right away but I did.

1  Q. If it wasn't right away, how soon after you got released

2  from prison in April of 2001 were you back in business selling

3  crack cocaine?

4  A. About two or three months after that.

5  Q. So we're talking about July 2001?

6  A. Yeah, about that time.

7  Q. So from July 2001 to the end of 2001 and continuing into

8  2002, you were selling crack cocaine two or three ounces a week

9  for two to three thousand dollars a week, right?

10  A. I wasn't selling that much.

11  Q. How much were you selling in 2001, in July?

12  A. I don't even remember.  I know I wasn't selling no ounces.

13  Q. What about August?

14  A. I think I might have been selling weed or something.

15  Q. You weren't selling any crack cocaine at all in the year

16  2001?

17  A. Yeah, I sold some.

18  Q. When did you begin selling crack cocaine in the year 2001?

19  A. It was a couple of months after I was out, I'm not quite

20  sure of the exact date or when it happened.

21  Q. If you got released in April and you say a few months, was

22  it as early as July or was it August?

23  A. I don't remember.  I know it was in 2001.

24  Q. How much cocaine were you selling in September 2001?

25  A. I don't know.

Page 911

1  Q. How about October 2001?
2  A. I don't remember.
3  Q. November of 2001?
4  A. I don't recall how much crack I was selling in 2001.
5  Q. What about December 2001?
6  A. I don't recall how much crack I was selling.
7  Q. But you do remember that beginning in January of 2002, you
8  were selling two to three ounces of crack cocaine a week for
9  two to three thousand dollars a week, right, that's what you
10 testified to?
11 A. 2002 I was selling.
12 Q. All right. So you did several drug deals with Raymond
13 Bryant in the year 2001 and 2002, correct?
14 A. Yeah.
15 Q. And only one of those deals was while you were working
16 undercover for ATF, right?
17 A. Yes.
18 Q. So the rest of them were just deals where you were as
19 guilty as Raymond Bryant was of dealing in crack cocaine,
20 right?
21 A. Yes.
22 Q. How much crack cocaine were you buying from Raymond Bryant
23 on those occasions when you were not working as an informant
24 for the government?
25 A. What time period you talking about?

Page 913

1  saying?
2  A. No. That's not what I'm saying.
3  Q. What is the most that you bought, what is the greatest
4  quantity of crack cocaine you bought from Raymond Bryant before
5  you began cooperating with ATF?
6  A. Maybe between a half ounce or a little bit more than that,
7  something like that.
8  Q. Two and a half ounces did you say?
9  A. Half ounce.
10 Q. How much did you pay for the half ounce?
11 A. Like between four and five hundred dollars.
12 Q. On how money occasions did you buy that much cocaine from
13 Raymond Bryant before you began working for ATF?
14 A. A few times.
15 Q. Were you ever present when Raymond Bryant sold crack
16 cocaine to other people?
17 A. Yeah.
18 Q. How many times?
19 A. I don't recall.
20 Q. More than five?
21 A. I don't recall.
22 Q. If I threw out any number you wouldn't recall, is that
23 correct?
24 A. That's what I don't recall. I don't even remember.
25 Q. So it could have even be as many as 20 times?

Page 912

1  Q. The time period you're talking about.
2  A. A couple of grams here and there. Three and four grams
3  here and there. Nothing major.
4  Q. How much were you paying for the three or four grams?
5  A. $125, $100.
6  Q. What were you using the cocaine for?
7  A. To sell it.
8  Q. You weren't using any of it for yourself?
9  A. No.
10 Q. So is it your testimony that on any occasion when you were
11 doing illegal crack cocaine deals with Raymond Bryant, you were
12 always the purchaser and he was always the seller, correct?
13 A. No, that's not correct.
14 Q. So in other words there were times when you sold him crack
15 cocaine?
16 A. No. I don't understand what you mean.
17 Q. Do you understand purchaser, what that means?
18 A. That means I'm buying.
19 Q. So on all of those occasions, except for the time when you
20 were wired by ATF, when you met with Raymond and Sukeem Bryant,
21 on all those other times you were always the buyer and Ray
22 Bryant was the seller, is that correct?
23 A. Yeah.
24 Q. And on all of those occasions, you were only dealing in
25 grams and never anything more than grams, is that what you're

Page 914

1  A. No. If he sold crack 20 times, I would remember that.
2  Q. But if I understand your testimony, if he sold crack five
3  times you wouldn't remember?
4  A. No, that's not what I just said.
5  Q. Okay. Well as you sit here now, what is your best
6  recollection of the number of times that you were present when
7  Raymond Bryant illegally sold crack cocaine to someone else?
8  A. I don't remember that.
9  Q. What about Tim Cherry. Did you ever do illegal drug deals
10 with Tim Cherry?
11 A. Yes.
12 Q. How many times?
13 A. Several times.
14 Q. Could you tell us what you mean when you say several?
15 A. A lot of times.
16 Q. When you say a lot of times, do you mean more than ten
17 times?
18 A. Yes, it could be more than ten times.
19 Q. Could it be as much as 20 times?
20 A. I don't know. It was a lot.
21 Q. Okay. You just don't know how many. Over what period of
22 time?
23 A. Oh, like the end of 2001.
24 Q. Through?
25 A. Through the time that I got arrested.

Page 915

1  Q. So are you telling us that before your release from prison
2  in April 2001, you never were involved in any illegal drug
3  transactions with Timothy Cherry?
4  A. Excuse me, what are you saying?
5  Q. Are you telling us that before you were released from jail
6  in April 2001, you had never been involved in any illegal drug
7  transactions with Tim Cherry, is that what you're saying?
8  A. Saying April of 2001, so you mean like 2000, 1999, 1998, is
9  that what you're talking about?
10  Q. I'm sorry. Let me rephrase the question. You told us you
11  got released from jail in April 2001, do you remember that?
12  A. Yes.
13  Q. And you told us that you were in jail in 2000, do you
14  remember that?
15  A. Yes.
16  Q. And you told us you were in jail in 1999, do you remember
17  that?
18  A. Yeah.
19  Q. What I'm asking you is, before you were released from jail
20  in April 2001, were you involved in any illegal drug dealings
21  with Tim Cherry? Do you understand the question?
22  A. I don't understand the time frame. I don't understand what
23  you mean.
24  Q. Let me ask it this way. When was the first year ever that
25  you did any illegal drug deals with Tim Cherry, what year?

Page 916

1  A. The end of 2001 until I got arrested in 2002.
2  Q. What type of drug was involved, was it crack cocaine?
3  A. Yep.
4  Q. Was it ever powder cocaine?
5  A. Yes.
6  Q. So it wasn't always crack cocaine.
7  A. Sometime -- yeah.
8  Q. Do you understand the difference between powder cocaine and
9  crack?
10  A. Yeah, I know the difference.
11  Q. Let me finish the question. Do you understand the
12  difference between powder cocaine and crack cocaine?
13  A. Yes.
14  Q. What is the difference?
15  A. The difference is powder cocaine is powder cocaine and
16  crack cocaine is crack cocaine.
17  Q. Okay. Do you make crack cocaine from powder cocaine or do
18  you make powder cocaine from crack cocaine?
19  A. You make crack cocaine from powder cocaine.
20  Q. How do you do that?
21  A. You Cook it up.
22  Q. Okay. Going back to Raymond Bryant for a minute, except
23  for the time that you were working for ATF, did you ever buy
24  powder cocaine from Ray Bryant?
25  A. No.

Page 917

1  Q. Now, with Tim Cherry, beginning in April 2001 up to the
2  time of your arrest in March of 2002, you did powder and crack
3  cocaine deals with him, is that right?
4  A. Yep.
5  Q. Did you do more deals with him involving crack cocaine or
6  powder cocaine?
7  A. Crack cocaine.
8  Q. Okay. Do you remember how many times you purchased
9  powder -- withdrawn. On all of the drug deals you did with Tim
10  Cherry, were you always the buyer and he was the seller?
11  A. Yeah.
12  Q. Okay. So you never sold any drugs to him.
13  A. No.
14  Q. All right. On how many occasions if you remember did you
15  buy powder cocaine from Tim Cherry?
16  A. A few times. I don't remember how many times but a few
17  times because when I bought it powdered, he would cook it up
18  for me.
19  Q. You were present when he cooked it up for you?
20  A. Yeah.
21  Q. When you say a few times, are we talking less than five or
22  more than five?
23  A. Probably around five, four or five times.
24  Q. Let's just stick with the powder cocaine. On those
25  occasions when you bought powder cocaine from Mr. Tim Cherry,

Page 918

1  how much were you buying from him on each occasion? What
2  quantity?
3  A. Between a half ounce and a ounce.
4  Q. And with respect to the crack cocaine, on the occasions
5  when you bought crack cocaine from him, in what quantities were
6  you buying from him?
7  A. Between a half ounce and a ounce.
8  Q. So the most that you ever bought from Tim Cherry, whether
9  it was powder cocaine or crack cocaine, was one ounce?
10  A. Yes.
11      MR. ARONWALD: Judge, we can take a break now.
12      THE COURT: Great. Ladies and gentlemen, we'll take
13  our afternoon break. We'll break for 15 minutes and try to
14  reconvene at around a quarter to four. Thank you.
15      (Jury not present)
16      THE COURT: This witness can leave.
17      (Witness leaves the courtroom)
18      THE COURT: Mr. Aronwald, do you have a sense of how
19  much more you have to go?
20      MR. ARONWALD: Judge, I expect, Judge, that I'll go at
21  least to the end of the day if we break at 4:30. I hope to
22  wrap up by then but it really depends on the witness more than
23  it does me.
24      THE COURT: It depends on the witness' memory?
25      MR. ARONWALD: No, if it did we'd be until February.

Page 921

1 Q. How many?

2 A. Six.

3 Q. Were any of the six children living with you at the time

4 you were arrested?

5 A. No.

6 Q. Were you paying any child support for any of the six

7 children at the time you were arrested?

8 A. What you mean paying child support?

9 Q. Were you contributing money to the mothers of the

10 children --

11 A. I was taking care of --

12 Q. Let me finish. For the support of the children, for their

13 clothing, food, rent, anything?

14 A. I take care of my kids, yes.

15 Q. Were you paying money in March of 2002 for the support of

16 any of your six children?

17 A. I was taking care of them myself. Why I had to pay money

18 to somebody?

19 Q. So you weren't making any child support payments in March

20 of 2002 to the mother or mothers of your children, correct?

21 A. No.

22 Q. No?

23 A. No.

24 Q. Okay. Did you own any automobiles in March of 2002 when

25 you were brought to federal court?

---

Page 920

1 THE COURT: Mr. Hochheiser, do you anticipate asking

2 this witness questions on cross?

3 MR. HOCHHEISER: Let's say yes but I would imagine

4 that mine would be very abbreviated given Mr. Aronwald's cross.

5 THE COURT: Thank you.

6 (Recess)

7 THE COURT: I am in the process of reconsidering my

8 ruling about the attorney notes from Mr. Lawrence taken in the

9 proffer sessions. I think, Mr. Lawrence, seeing that you're

10 here, I may want to, I want to allow you an opportunity to

11 argue that, since this witness will not have his cross

12 completed and what I will do, Mr. Aronwald, is if you finish

13 your cross with him by 4:15, we will stop for the day with him

14 still on your cross. So that I can discuss this matter and

15 determine whether or not I believe those documents ought to be

16 produced.

17 At that point, Mr. Lawrence, I will allow you to argue

18 what you think the Court ought to rule and I will consider

19 whether or not those notes ought to be produced. So I intend

20 to do that at 4:15 today so Mr. Aronwald we'll continue with

21 your cross. If you finish before that, just let me know that

22 that will be a good time to break, I won't make you rest your

23 cross, so if I reconsider my ruling and produce those

24 documents, you'll have a chance to review them tonight and do

25 any cross on those tomorrow morning with this witness that you

---

Page 922

1 A. No.

2 Q. The house that you said was your mother's house, was that

3 your mother's house or your house?

4 A. My mother rented the house.

5 Q. Who owned the house?

6 A. I don't know.

7 Q. You didn't own the house?

8 A. No.

9 Q. Now, with respect to your wife in March of 2002, for how

10 long had you been married for her?

11 A. Since 1995.

12 Q. And there's no question in your mind that as of March 21,

13 2002, you were married to her, right? She was your wife,

14 right?

15 A. She was my wife.

16 Q. And you were married?

17 A. Yeah.

18 Q. Mr. Melvin, when you were brought to court on March 21,

19 2002 in order for you to get a free lawyer from the court, had

20 you to fill out an affidavit, didn't you, a financial

21 affidavit, do you remember that?

22 A. No, I don't remember that.

23 Q. Let me show you what's been marked as Defendant's Exhibit G

24 for identification.

25 (Handed to counsel)

---

Page 920

1 choose to do.

2 MR. ARONWALD: Thank you, your Honor.

3 THE COURT: With that, I think we're ready for the

4 jury.

5 (Jury present)

6 THE COURT: Mr. Aronwald, you may continue.

7 MR. ARONWALD: Thank you, your Honor.

8 Q. Mr. Melvin, getting back to when you were brought down to

9 federal court after you were arrested in March 2002, was that

10 on or about March 21, 2002?

11 A. It was about that time.

12 Q. Okay. At the time in March of 2002, were you married?

13 A. Excuse me.

14 Q. In March 2002, when you were arrested and brought down to

15 federal court, were you married at that time?

16 A. Yeah.

17 Q. And who were you married to?

18 A. Annette Melvin.

19 Q. And did you have any children?

20 A. Nope. By her?

21 Q. We could start with her. Did you have any children with

22 her?

23 A. Nope.

24 Q. Did have any children with anyone else?

25 A. Yeah.

---

Page 925

1  Q. Mr. Melvin, before I show you the document, let me ask you
2  another question. You said that as of March of 2002 you did
3  not own an automobile, correct?
4  A. Yeah.
5  Q. Before you were arrested in March 2002, did you own an
6  automobile?
7  A. No.
8  Q. Did you have the use of an automobile?
9  A. Yeah.
10 Q. Whose car was it?
11 A. I drove a lot of cars.
12 Q. Were these cars you stole or were these cars you had the
13 use of?
14 A. Excuse me.
15 Q. Were these cars you stole or were these cars you had the
16 use of?
17 A. These are my family cars.
18 Q. You didn't own any of them?
19 A. Nope.
20 Q. Let me show you what's been marked as Defendant's Exhibit
21 G. I want to direct your attention to the bottom of the page
22 and ask if you recognize your signature.
23   MR. COLTON: May I, your Honor?
24   THE COURT: Sure.
25   (Handed to the witness)

Page 924

1  A. Yeah, I recognize the signature.
2  Q. That is your signature at the bottom of the page, correct?
3  A. Yes.
4  Q. Correct?
5  A. Yeah.
6  Q. The rest of the writing on the document, that's yours also?
7  A. Nope.
8  Q. Whose writing is it?
9  A. I don't know who writing it is.
10 Q. Did you read that document before you signed it?
11 A. I don't really recall ever seeing this document. I know
12 that's my signature.
13 Q. Do you have any recollection at all of signing that?
14 A. No, I don't.
15 Q. Was that a document that somebody pushed to you with a pen
16 and told you to sign it?
17 A. I don't remember seeing this document.
18 Q. But you do remember -- withdrawn. But that is your
19 signature so you did sign it, correct?
20 A. Yes.
21   MR. ARONWALD: Move it into evidence, your Honor, as
22 Defendant's Exhibit G.
23   MR. COLTON: The government objects, your Honor.
24   (Handed to the Court)
25   THE COURT: Basis for your objection?

Page 925

1   MR. ARONWALD: Can we do this at the sidebar, please?
2   (At the sidebar)
3   MR. COLTON: A number of problems with the document.
4  First of all, a large percentage of it is consistent with his
5  testimony. Second of all, it's a violation of 608(b) proving
6  up a prior inconsistency through extrinsic evidence. And it's
7  my belief that the handwriting on the document is
8  Mr. Lawrence's document so it creates risk that we'll be going
9  into the attorney-client privilege.
10   THE COURT: It certainly can't be privileged if he
11 wrote it on there and handed it into the court.
12   MR. COLTON: But if you get behind the document to
13 figure out why he signed or didn't sign something or what he
14 believed these questions to mean, there is a risk of that.
15 That is not the government's primary argument. If we have to
16 take the document one at a time, if we look at this document
17 the question, are you employed, no, that's what he said in
18 court. Is your spouse employed? We didn't inquire into that
19 one way or another. Have you received any payments from a
20 business or profession? He says not applicable. He's already
21 admitting lying, not telling the Court about making money from
22 drug-dealing so it's nothing inconsistent there. There's no
23 proof that he had any cash on hand. The witness wasn't asked
24 if he had cash on hand. As to property, he says he had no
25 property so that's not inconsistent. The only inconsistent

Page 926

1  statement here is the number of dependents and whether he's
2  separated or married and that's all I see and all they're
3  trying to prove up.
4   MR. ARONWALD: He also says he had no income in the
5  preceding twelve months.
6   MR. COLTON: But he admitted that.
7   MR. ARONWALD: This is a self-authenticating document
8  out of the court file, it's admissible as such. The government
9  can make any arguments they want as to the weight but the
10 document is admissible and frankly, Judge, this is the first
11 case I've ever try as a defense lawyer where a CJA affidavit
12 filled out by a cooperating witness was not turned over as 3500
13 material.
14   MR. COLTON: It's the first time in my life I saw --
15   MR. ARONWALD: I've spoken with Mr. Lawrence and he
16 tells me he has no recollection of there being a CJA affidavit.
17 The witness signed it under penalties of perjury, it goes to
18 his credibility. He lied to the court because it suited his
19 purpose.
20   MR. COLTON: He's admitted all that.
21   THE COURT: I'm going to admit it.
22   (In open court)
23   THE COURT: Defendant's Exhibit G is received in
24 evidence.
25   (Defendant's Exhibit G received in evidence)

Page 929

1 Q. Mr. Melvin, when you signed this affidavit on March 21,
2 2002, you signed it under penalty of perjury, is that correct?
3 A. I don't recall seeing that affidavit.
4    MR. ARONWALD: May I approach, your Honor?
5    THE COURT: Yes.
6 Q. Mr. Melvin, directing your attention to the line above your
7 signature, you see it says: I certify under penalty of perjury
8 that the foregoing is true and correct. Do you see that?
9 A. Yes, I see that.
10 Q. I'm sorry.
11 A. I see that.
12 Q. Can you speak into the microphone?
13 A. Yes, I see that.
14    MR. ARONWALD: May I put this up on the thing?
15    THE COURT: Sure.
16 Q. Mr. Melvin, this is a financial affidavit that you signed
17 and submitted to the federal court on March 21, 2002 when you
18 told the court that you could not afford a lawyer and asked the
19 court to appoint a lawyer for you, correct?
20 A. Yes.
21 Q. You told us a short while ago that you were, prior to your
22 arrest, selling crack cocaine for two to three thousand dollars
23 a week in the year 2002 and were selling crack cocaine in the
24 year 2001 after your release from prison. Do you remember
25 that?

Page 928

1 A. Yes.
2 Q. And yet, do you see where it says other income?
3 A. Yes, I see that.
4 Q. And do you see next to where it says other income, it says:
5 Have you received within the past twelve months any income from
6 a business, profession or other form of self-employment or in
7 the form of rent payments, interest, dividends, retirement or
8 annuity payments or other sources, do you see that?
9 A. Yes, I see it.
10 Q. And you didn't check the box yes, did you? You see there
11 are two boxes, one yes, one no. Do you see that?
12 A. Yes, I see that.
13 Q. And you didn't check the yes box, did you?
14 A. No, I didn't check the yes box.
15 Q. And the yes box is blank, isn't it?
16 A. Yes.
17 Q. You also told us that you were married, correct?
18 A. Yeah.
19 Q. If you look down towards the bottom, you see where it says
20 dependents?
21 A. Yes.
22 Q. And you see where it says marital status?
23 A. Yeah.
24 Q. And there's a box for single, a box for married, a box for
25 widowed and a box for separated or divorced, do you see that?

Page 929

1 A. Yes.
2 Q. You didn't check the married box, did you?
3 A. It says separated or divorced. That doesn't mean that
4 you're not married.
5 Q. You see the box that says married?
6 A. Yes.
7 Q. You didn't check that box did you?
8 A. No. I didn't.
9 Q. Okay. You told us you have six children.
10 A. That's right.
11 Q. In the box you have it says three dependents. Who are the
12 three dependents you were referring to on that affidavit?
13 A. My son and my two daughters and my girl that I am with now,
14 she has two boys, and I just had a baby by her. That makes six
15 kids.
16 Q. It says total number of dependents, it says 3?
17 A. That was back then. I have a newborn baby.
18 Q. In March of 2002, how many children did you have?
19 A. Three.
20 Q. How many children do you have now?
21 A. Six.
22 Q. Okay. I also asked you whether you were paying any child
23 support and you said no. In this form, you see where it says
24 debts and monthly bills at the bottom?
25 A. Yes, I see that.

Page 930

1 Q. And you see the words child support, do you see that?
2    MR. ARONWALD: Can I approach, your Honor?
3    THE COURT: Sure.
4 Q. See the words child support?
5 A. Yes, I see it.
6 Q. And do you see to the right where it says monthly payment,
7 it says 25. Do you see that?
8 A. Yes, I see that.
9 Q. And the fact of the matter is, the court did appoint a
10 lawyer to represent you, correct?
11 A. Yes, they did.
12 Q. That's Mr. Lawrence who is seated in the back of the
13 courtroom?
14 A. Yes.
15    MR. ARONWALD: Your Honor, this might be a convenient
16 time. I'm about to move into a new area altogether.
17    THE COURT: Great, thank you. Well, ladies and
18 gentlemen of the jury, we seem to be done for the day. I will
19 again caution you not to discuss the case among yourselves and
20 get home safely and have a good evening and we'll see you
21 tomorrow morning at 9:30. Thank you.
22    (Jury not present)
23    MR. HOCHHEISER: Could Mr. Roth be excused if this is
24 going to be legal argument?
25    THE COURT: Yes.

1  MR. HOCHHEISER:  Thank you.

2  THE COURT:  Mr. Lawrence, can you come forward,

3  please?  Mr. Hochheiser, I don't have the letter from

4  Mr. Lawrence in front of me but I take it what's happened is

5  you've served a subpoena on Mr. Lawrence for his notes.

6  MR. ARONWALD:  You mean me, right?

7  THE COURT:  I'm sorry, Mr. Aronwald, for his notes of

8  the proffer sessions between -- we should excuse the witness.

9  (Witness leaves the courtroom)

10  THE COURT:  Mr. Aronwald, I take it that you served a

11  subpoena dated September 17, 2003 upon Mr. Kerry Lawrence

12  relating to notes of the proffer sessions between his client,

13  Mr. Melvin, who is now on the stand and the government.

14  Pursuant to that, Mr. Lawrence produced some documents to you

15  and then produced others to the Court and it's that latter

16  group I want to talk about now.

17  Mr. Aronwald, can you tell me the basis of your

18  subpoena and why you think you should have these documents.

19  MR. ARONWALD:  Well, your Honor, I think, my

20  recollection is that this is a subject which we had I think

21  discussed with you when the case was first reassigned to you by

22  Judge McMahon and I believe that there was some legal argument

23  at that time.  I don't have the cases at the top of my head but

24  there was at least one case that I have specific recollection

25  of, a case that was decided by Judge Haight in the Southern

1  District.  There was some other cases, I think one of which was

2  by Judge Barbara Jones, there may have been one, I think there

3  may have been one or two others.  I just don't have them at the

4  top of my head.  But the bottom line and the import of Judge

5  Haight's ruling was that in the interest of preserving a

6  defendant's Sixth Amendment right of cross-examination, the

7  witness should be entitled to the total universe of prior

8  statements by the witness to the extent that they are not

9  preserved by the attorney-client privilege.

10  In the case that I'm making reference to, the

11  attorneys that opposed the subpoena, the defense subpoena,

12  raised and relied upon the work product privilege claim.

13  Clearly even they agreed that the attorney-client privilege

14  itself did not apply because the statements were made in the

15  presence of others, namely the prosecutors.  And so

16  consequently, the statements were not communicated in

17  confidence to the attorney but were statements made by the

18  witness to government prosecutors in the presence of the

19  attorney.

20  THE COURT:  We're not talking about documents that are

21  covered by the attorney-client privilege.

22  MR. ARONWALD:  Judge Haight ruled that even

23  assuming -- Judge Haight said two things.  First -- and I don't

24  think that this is inconsistent with other cases that have

25  interpreted the work product privilege -- first, the work

1  product privilege is not absolute.  The work product privilege

2  is essentially designed to protect the thought and mental

3  processes of the attorney, not the client, the attorney.  And

4  so consequently hypothetically, let's assume that in the

5  proffer notes you have, there is a statement that Mr. Melvin

6  made to the government as noted by Mr. Lawrence, and in

7  parentheses Mr. Lawrence said: "Assistant United States

8  attorney seems incredulous.  Assistant United States attorney

9  doesn't believe.  I don't believe."

10  Obviously the bracketed part would be the attorney's

11  mental processes or thought processes and consequently they

12  would have to be redacted because all that we're claiming to be

13  entitled to are the statements of the client to the government

14  in the attorney's presence.

15  THE COURT:  I understand.  Let me ask you this

16  question, Mr. Aronwald and we can short circuit this and get to

17  my concern.  What is your position if the statements are at

18  least not full statements of the witness, that is they aren't

19  expressed in the document in terms of full and complete

20  sentences, however, one could interpret the statements or the

21  writing as being an indication of what the witness said,

22  although not an exact quote?

23  MR. ARONWALD:  That would be exactly like the 3500

24  material we got from the government.  Handwritten notes,

25  sometimes just a phrase, sometimes just two words, no verbatim

1  or written out or specific statements.  There really would be

2  no difference.  And I think what Judge Haight said in the case

3  I'm referring to is that where the -- first he said that in his

4  mind, he appeared to believe that the Sixth Amendment trumps

5  the work product privilege because of the defendant's right to

6  a fair trial.  He also seemed to say that where the documents

7  in question do not implicate the attorney's thought process,

8  work product doesn't apply.  And finally what he said was that

9  a defendant's attorney has the right to the statements in

10  whatever form for whatever use the attorney can make of them.

11  And he said by way of example, he said if you have two

12  people, a prosecutor and defense lawyer, sitting in on the same

13  proffer session, things that the witness may say may seem

14  important to the prosecutor and he may write them out.  They

15  may seem unimportant to the defense lawyer who may not write

16  them out but there may be other things that the witness says

17  that the defense lawyer views as important and noteworthy that

18  the prosecutor doesn't.  He also said if you have two sides to

19  hearing a statement, the version of that statement may be

20  written differently by one side and differently by the other,

21  and so because of the very nature of the material, the defense

22  lawyer should have access to it and make whatever use of it

23  that he can use.

24  So I think on the basis of that case -- and I might

25  also say that your Honor indicated before that you thought that

Page 935

1 we might be entitled to it only to the extent that it was
2 related to this case and I would beg to differ for this reason.
3 If the statement relates in any way to, for example, Melvin's
4 prior criminal history --
5        THE COURT: If I said that I was mistaken. I don't
6 think I said that.
7        MR. ARONWALD: That's my argument.
8        THE COURT: Mr. Lawrence.
9        MR. LAWRENCE: We would oppose producing these
10 handwritten notes that I made at two proffer sessions that I
11 attended with Mr. Melvin and the government for two different
12 reasons. One, on the specific facts of this case, and I'm not
13 here as amicus for the National Association of Criminal Defense
14 Lawyers, but I do think there are some very compelling policy
15 reasons why my notes ought not to be turned over to defense
16 counsel in this case.
17        The policy reasons would be, number one, going forward
18 a defense lawyer representing a witness during a proffer
19 session would have a serious Hobson's choice as to whether to
20 take notes if there was some precedent that the notes might
21 have to be turned over. Hypothetically, if there are things
22 that I have in my notes that represent Mr. Melvin that may be
23 used by defense counsel in this case to defend their clients,
24 but attack the credibility of my client, that may enure to his
25 detriment in connection with his case. He's not yet sentenced.

Page 936

1 If he is impeached in some substantial part based on something
2 that may be contained in my notes, his right to my effective
3 representation as counsel may be impacted. I may or other
4 defense lawyers going forward might be in a position where we
5 choose not to take notes because we're in a position where the
6 notes could be used against our client.
7        The other policy reason is that Mr. Aronwald cites by
8 analogy the government's turning over 3500 material. As your
9 Honor knows, I was an assistant for a long time and we turned
10 over 3500 material, but the strict reading of the rule of 3500
11 would suggest that most of what's turned over as 3500 material
12 is really not required by law. 3500 would require the turning
13 over of statements that are adopted by a witness in some
14 fashion or sworn to.
15        THE COURT: And in the possession of the government.
16        MR. LAWRENCE: And in the possession of the
17 government. An FBI 302 or an IRS memorandum of interview does
18 not fall within the provisions of 3500 and my concern would be
19 that if in a case like this the Court were to rule that I'm
20 required to turn over my notes, that could steamroll in some
21 respects and have the government in what already is a very
22 narrow provision of 3500 material to people representing
23 criminal defendants, and may make it even more difficult. 3500
24 material, at least right now defense lawyers get FBI 302s and
25 memorandums of interviews and the government may take the

Page 937

1 position that if their 302s are then going to be contrasted
2 with notes taken by defense counsel that they are no longer
3 required to turn over 302s or memorandums of interview which
4 are not by law required.
5        Under the facts of this case, I had initially
6 responded to Mr. Aronwald's subpoena by citing United States v.
7 Paxson, which is at 861 F.2d 730, which is a 1988 District of
8 Columbia Circuit Court of Appeals in which attorney's notes
9 were sought and the court in that case citing Hickman v. Taylor
10 found that they were protected by the work product doctrine.
11        In the Schloss case which Mr. Aronwald cited, after I
12 proposed production and Mr. Aronwald cited Schloss I believe
13 there is a subsequent case that Judge Haight cited and I
14 believe, all I have is the case name, which is United States v.
15 Teicher which was an unreported Southern District case, I think
16 it was 88 Cr. 796, where in that case under similar facts Judge
17 Haight declined to order the turning over of notes based on two
18 critical distinctions. The witness that testified in Schloss
19 actually had reviewed his attorney's notes prior to testifying.
20 And secondly, the witness in that case was considered to be the
21 key central witness.
22        I know as your Honor sits here today you may be of the
23 view that Mr. Melvin is the key central witness in this case,
24 but from what I know of this case, I actually don't think he is
25 the key central witness in this prosecution. Unlike some of

Page 938

1 the other cooperating witnesses who are going to be testifying
2 about things, conversations that occurred that were not
3 recorded, I would say 99.9 percent of what Mr. Melvin's
4 testimony relates to is contained on the tape and Mr. Melvin's
5 value to the government and value to the defendants in this
6 case is what's contained on the tapes, not so much on what he
7 adds that's not subject to interpretation on the tape.
8        THE COURT: Mr. Lawrence, let me ask you a couple of
9 pretty direct questions. First one is, with respect to -- let
10 me step back. With respect to your general argument, you I
11 take it would argue that the work product privilege applies
12 whether or not these are direct quoted statements of the
13 defendant -- of the witness?
14        MR. LAWRENCE: Correct. In fact I can certainly tell
15 your Honor that what I gave the Court a copy of are not
16 verbatim statements, are not the entirety of what Mr. Melvin
17 said and are not only not verbatim of everything he said, it's
18 not even notes of everything he said at all. Because there are
19 many things he said that were not contained in my notes.
20        I cannot point to your Honor line-by-line,
21 word-for-word things that are contained in my notes and tell
22 you this is not a written summary of what my client said but
23 rather is my thought process. However, I think it's a slippery
24 slope in my giving the Court any guidance as to what is part of
25 my thought process --

Page 939

1 THE COURT: Those are some of the difficult questions
2 I wanted to ask you about this.
3 MR. ARONWALD: Can my client be excused before we go
4 into that?
5 THE COURT: Sure. Have a good day.
6 Let me just ask you this general question. I'm trying
7 to get my head around these notes. Do you have a set of the
8 notes in front of you?
9 MR. LAWRENCE: I do.
10 THE COURT: Not as to specific lines, but there seems
11 to me to be two kinds of note-making here and the one that I'm
12 somewhat more troubled by are lines, although they don't always
13 contain full sentences, most often don't, start with the word
14 "I." My question you, when you make notes that start with the
15 word "I," and for the most part those I's don't refer to you
16 but the witness that is speaking, and I have no doubt that
17 these are not exact quotes of what he said, how is it that I
18 should take that as work product as opposed to, if not
19 verbatim, at least the statements of the witness?
20 MR. LAWRENCE: I can't tell the Court what I was
21 thinking when I wrote those down. And even if in some fashion
22 it reflects my thought process as to what my client said, I
23 think it discloses what Mr. Melvin's defense counsel is
24 thinking at the time.
25 THE COURT: Are you saying that these are not verbatim

Page 940

1 quotes? I looked through here for quotation marks and didn't
2 see any of that. And as I mentioned already, many of the lines
3 are not full sentences or even close thereto so I take it that
4 those were not quotations. For instance, the case you cited,
5 United States v. Paxson, the court talks about interviews that
6 were not verbatim but rather contained "assessments, thought
7 processes, analysis and strategy of counsel." And I wanted you
8 to help me with that with respect to these notes and whether
9 it's your statement that that's what these notes contain
10 throughout.
11 MR. LAWRENCE: I would say that it does, your Honor.
12 And although it may, the words that appear on the page may
13 appear to be transcriptions of what my client is saying, I
14 don't feel comfortable telling the Court that what I wrote down
15 is not a reflection of my thought process as to something he
16 said, the way he said it, the significance it had to me, when
17 he said it. And I did not -- I actually do see on one page one
18 word that is in quotes that would suggest to me that that was
19 something that came out of my client's mouth. But other than
20 that, I don't have a level of comfort in my own thought
21 processes when I was taking these notes as to what is simply my
22 client's statement as opposed to my thought process or things
23 that I wrote down to effectively represent Mr. Melvin.
24 And I would be very upset to think that what I was
25 writing down in the course of my representation of Mr. Melvin

Page 941

1 where my job there was not to be a stenographer or an agent
2 whose job it is to memorialize the notes but I'm his advocate
3 are then potentially going to be used to his detriment.
4 And also apparently I gave your Honor -- the last two
5 pages of the copies that I gave you are not notes that reflect
6 the proffer session. They're my notes, but they are not notes
7 of things that were, that occurred during the two proffer
8 sessions.
9 THE COURT: Here's my dilemma. The work product
10 privilege is a qualified one. It is not absolute although
11 clearly the weight of the case law seem to say that in
12 circumstances where the attorney's assessment or thought
13 processes or analysis or strategy or anything of that kind are
14 contained in the notes that are presented, that is the essence
15 of the attorney-client work product and shouldn't be produced.
16 As I have previously -- I do note for the record that
17 there is precious little in this document that contains
18 quotation marks around it. The fact that it exists at all
19 seems to indicate that Mr. Lawrence, at a point where he wanted
20 to make it clear that that's what the client said, put
21 quotation marks around it which would separate that from things
22 that were in any way affected by his work product or his
23 assessments or thought processes or analyses or etc.
24 I'm going to think about this a little more. I want
25 to make sure I read all of the cases. Mr. Aronwald, if you

Page 942

1 would, if you could sometime between now and tomorrow morning
2 send me the citation again to the case by Judge Haight that you
3 want the Court to read, I'd like to review it. My goal here is
4 to be fair to all parties including both the witness and the
5 defense in this case and to not read the rule more stringently
6 than I need to or that I think is proper in this particular
7 case. But I am mindful, Mr. Lawrence, and I think I stated
8 earlier or last week when we first talked about this issue, of
9 the damage I thought could be done if it turns out that
10 attorneys notes and proffer sessions with the government are
11 regularly or routinely turned over.
12 Mr. Aronwald, if you would send that case to me again
13 or citation, call my chambers and give me the citation, I'd
14 like to read it again.
15 MR. ARONWALD: What I would propose to do is when I
16 get back to my office I can fax to your Honor a copy of the
17 letter that was sent to Judge McMahon which had that case
18 authority and other case authorities as well.
19 THE COURT: That would be helpful. Mr. Colton?
20 MR. COLTON: Yes, your Honor. Just information for
21 the Court to consider in its decision in weather the defense
22 has met the substantial need to overcome the qualified
23 privilege. My understanding, obviously I have not seen
24 Mr. Lawrence's notes, is that they apply to proffer sessions
25 from March of 2002. I was present at those proffer sessions.

Page 943

1  I certainly can represent to the Court that at that time I
2  personally, as the prosecutor assigned to the case, had never
3  heard of David St. John or Donald Roth. Those names did not
4  come up as far as I can recall and I can't think of why they
5  would or any of the allegations in this case would have come up
6  back in March of 2002. And I think the Court should just be
7  aware of the timing of that.
8      THE COURT: I think I said earlier today that in my
9  review of these notes I specifically did not see the names of
10 either defendant, and did not see reference to the transactions
11 that are at issue in this case. However, there was discussion
12 of either people or situations that is relevant, there's been
13 some discussion about which is what makes me, made me want to
14 reconsider this issue.
15     So I will do that and try to come back in tomorrow
16 morning. What it may mean is that if I determine that
17 something needs to be turn over, we'll have to figure how to
18 negotiate that in a way that allows you a reasonable time to
19 review that. I'm not saying that that will happen. I'm not
20 hinting anything. The only thing I meant to hint is what I
21 want to think about this some more and I didn't want to pop in
22 tomorrow morning and say I've thought about this without giving
23 Mr. Lawrence and Mr. Aronwald a further chance to argue before
24 the Court.
25     MR. COLTON: The point that Mr. Lawrence was making,

Page 944

1  Mr. Aronwald had cited to the Court the fact that
2  Mr. Lawrence's notes could potentially be similar to notes they
3  get in 3500 material from attorneys or agents that take notes
4  during meetings with people who end up testifying at trial.
5  The government provides such handwritten notes more as a
6  courtesy than under the technical requirements of 3500. It
7  would be unfortunate if that practice of being more forthcoming
8  were then held to the government's detriment or to a witness'
9  detriment. I ask the Court not to consider that in its
10 decision.
11     THE COURT: Thank you.
12     MR. ARONWALD: It's late in the day, but it occurs to
13 me that going back a good number of years, there were a number
14 of instances where 3500 material would be turned over which
15 would be memos of interview, not subscribed to by the witness.
16 And of course the issue was whether or not the agents should
17 retain their original handwritten notes to be turned over along
18 with the typewritten memos. And the Second Circuit said on
19 more than one occasion that the handwritten notes should be
20 preserved and turned over.
21     The issue here is not 3500. The issue here is whether
22 we're entitled to the attorney's notes. We're not talking
23 about notes in the government's possession, custody or control.
24 That's a 3500 issue. I was simply, when your Honor asked me
25 what about just scant notes with one word or two words, I was

Page 945

1  just telling the Court that there's no difference between that
2  and the 3500 material we do get.
3      I really do appreciate, I'm not just saying this, I
4  really do appreciate the thought and the attention you're
5  giving to this issue, the fact that you are reconsidering it
6  indicates to me that it's an issue that you have an interest in
7  and that troubles you so it its refreshing that you would take
8  the time to wrestle with the right way to resolve it. I do
9  appreciate it.
10     THE COURT: All that means is that I'm not very smart,
11 and I may not always get it right the first time around.
12     MR. ARONWALD: I'm just saying that regardless of how
13 you resolve the issue, I appreciate the fact that you're
14 spending this much time trying to deal with the issue.
15     MR. LAWRENCE: I'm scheduled to be in court in
16 Rockland County in the morning. Obviously if your Honor orders
17 that -- you have a copy of the notes. I can't tell your Honor
18 that there's any kind of parsing of these notes that I would
19 really feel comfortable saying, well, these are the things I
20 feel are more work product than the other. I don't think any
21 of them should be turned over for the reasons I've already
22 articulated. If you order them turned over, you have a copy of
23 them and you can make a copy available to counsel.
24     THE COURT: I don't think you need to be here
25 tomorrow. Thank you for your help. I am mindful not only of

Page 946

1  the applications in this case but the larger policy
2  implications. It is my intent to look at the overall situation
3  and be as fair as I can be and do whatever the lawyer requires,
4  and when there is leeway make the best most fair judgment that
5  I can about it, and that's what I'm trying to do here. And the
6  Court will let you know what ruling has been made just so you
7  know but I will try to be prepared to do that tomorrow morning
8  as we continue with your client, Mr. Melvin.
9      MR. COLTON: Your Honor, with Mr. Lawrence here, the
10 government would ask whether Mr. Lawrence in the event the
11 Court overrules his objection on work product, whether he has
12 any objection to both sides getting the notes if one side is
13 going to get it. Obviously, if the Court preserves the
14 privilege, nobody gets it.
15     THE COURT: Mr. Aronwald, that's the trouble with
16 having these arguments so public. The other side knows where
17 you are and what you've asked for, that something exists.
18     MR. ARONWALD: The problem is, Judge, that I issued a
19 supoena for it. I don't remember being a joint subpoena.
20 If the government wants to issue its own subpoena it has the
21 power to do it.
22     MR. COLTON: It's form over substance, Judge.
23     MR. ARONWALD: It's not form over substance. If the
24 government issues a subpoena for the production of certain
25 documents, I can't remember the last time someone complying

Page 947

1  with a subpoena getting a phone call from the assistant United
2  States attorney saying I got these documents, I think that
3  maybe you would like to see them too. The government has
4  subpoena power just like we do. If your Honor determines we're
5  entitled to the notes, then we're entitled to the notes. If
6  the government wants to ask Mr. Lawrence for a copy without the
7  subpoena, that's up to Mr. Lawrence.
8      MR. LAWRENCE: Since Mr. Melvin has signed a
9  cooperation agreement with the government, if your Honor makes
10 theme available to defense counsel on behalf of Mr. Melvin, I'd
11 ask that you make them available to the government as well.
12     THE COURT: Thank you. Okay. I want to say only with
13 a half-hearted smile that I really do appreciate counsel's
14 behavior before the jury today. It was a marked improvement
15 over our last session and I greatly appreciate that. And
16 frankly I think the jury appreciates that. I think that they
17 are then not distracted by other things other than the evidence
18 that's presented before them and I thought that counsel did a
19 great job both in examinations and cross-examinations today and
20 it's helpful to the jury in trying to find out what happened
21 here and how they should ultimately vote.
22     So thank you. I'm sincere about that. Thank you,
23 very much. We are adjourned for the day.
24     (Trial adjourned to Tuesday, December 9, 2003;
25 9:30 a.m.)

Page 948

1              INDEX OF EXAMINATION
2  Witness            D      X     RD    RX
3  CHARLES MELVIN
   Direct ........... 796
4  Cross By Mr. Aronwald: .... 840
5              GOVERNMENT EXHIBITS
6  Exhibit No.              Received
7  3502-S1 ............... 802
8              DEFENDANT EXHIBITS
9  Exhibit No.              Received
10 F ..................... 898
11 G ..................... 926
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### -$-

$100 [1] 912:5
$125 [1] 912:5

### -'-

'9 [1] 865:3
'96 [2] 863:19   865:3
'97 [3] 812:2   863:19
863:19

### -.-

.357 [5] 890:23   891:7
891:9   892:24   893:8
.357s [1]   890:24
.380 [1] 893:3

### -0-

02 [1] 783:4

1 [2] 790:12   791:22
10 [2] 828:4   828:5
108 [1] 816:21
11 [1] 823:17
11:30 [1]   837:8
11th [1] 797:7
12 [1] 824:3
12th [1] 822:9
13 [3] 814:14   815:7
823:6
138 [2] 908:13   909:3
13th [2] 824:20   824:25
14 [3] 814:22   815:4
815:9
15 [14] 808:14   837:7
844:2   858:16   859:18
894:17   894:21   895:4
896:17   897:6   897:19
898:3   904:17   918:13
1503 [1] 783:4
15th [1] 898:7
16 [3] 814:8   814:13
859:18
17 [6] 814:5   814:13
815:4   838:9   859:18
931:11
18 [1] 859:18
19 [3] 815:5   829:21
859:18
1985 [3] 808:14   862:21
863:4
1988 [1] 937:7
1991 [2] 808:21   867:18
1994 [3] 809:10   868:15
870:2
1995 [1] 922:11
1996 [2] 810:10   903:14
1998 [7] 882:18   882:21

### -1-

882:20   882:23   883:1
907:20   915:8
1999 [8] 810:20   882:14
882:14   882:16   885:3
907:19   915:8   915:16
1:53 [1] 872:2
1st [1] 837:19

### -2-

2 [2] 790:12   810:21
20 [10] 796:12   814:17
843:25   844:1   859:22
860:5   907:14   913:25
914:1   914:19
2000 [9] 798:15   882:9
882:11   907:19   907:19
909:10   909:12   915:8
915:13
2001 [41]   882:6
882:7   882:12   907:11
907:11   907:13   907:17
907:21   907:22   907:23
907:25   909:6   909:7
909:13   909:19   909:19
909:21   909:23   910:2
910:5   910:7   910:7
910:11   910:16   910:18
910:23   910:24   911:1
911:3   911:4   911:5
911:13   914:23   915:2
915:6   915:8   915:11
915:20   916:1   917:1
927:24
2002 [62]   792:24
798:17   799:24   807:7
807:10   807:21   807:22
812:4   814:14   815:5
815:9   818:11   823:7
826:20   829:21   838:12
823:25   881:14   881:18
884:1   884:14   884:16
890:15   894:17   894:21
895:4   896:17   897:19
898:3   898:14   902:3
904:24   906:5   907:11
909:6   910:8   911:7
911:11   911:13   916:1
917:2   920:9   920:10
920:12   920:14   921:15
921:20   921:24   922:9
922:13   922:19   923:2
923:5   927:2   927:17
927:23   929:18   942:25
943:6
2003 [14]   783:8
838:8   838:9   883:17
883:18   884:1   884:8
884:12   889:13   889:18
889:20   890:1   931:11
947:24
20A [5] 822:15   822:23
823:10   823:18   824:21
20s [1] 894:3
21 [11] 792:24   826:20
830:1   830:1   830:12
904:24   920:10   922:12
922:18   927:1   927:17

### -21-

21st [23] 841:1   841:10
842:7   842:11   843:7
843:10   843:14   843:23
844:9   850:7   852:22
853:13   853:22   853:25
855:3   855:14   856:11
857:21   904:20   905:22
905:24   906:5   906:7
21th [1] 827:20
22 [8] 832:21   832:24
833:3   838:12   889:13
889:18   889:20   890:1
22A [4] 825:5   829:11
829:15   829:20
22nd [1] 889:12
23 [2] 832:25   835:9
24 [10] 836:4   841:20
841:21   843:8   843:22
844:19   845:11   850:15
850:15   853:13
24A [8] 826:17   828:5
840:19   841:20   843:8
846:6   852:8   904:19
25 [5] 838:8   838:13
852:3   852:7   930:7
262 [2] 805:19   806:20
2nd [1] 885:4

### -3-

3 [4] 790:12   821:17
821:18   929:16
302 [1] 936:17
302s [3] 936:24   937:1
937:3
327 [2] 805:19   806:20
33 [2] 797:5   894:2
3500 [18]   878:14
901:11   926:12   933:23
936:8   936:10   936:10
936:11   936:12   936:18
936:22   936:23   944:3
944:6   944:14   944:21
944:24   945:2
3502-G [5]   892:1
895:9   896:24   897:25
898:2
3502-S [5]   801:11
801:19   801:22   801:25
802:11
3502-S1 [7]   802:11
802:17   802:19   802:22
888:22   889:6   948:7
3rd [1]   815:5

### -4-

42 [1]   808:24
4:15 [2] 919:13   919:20
4:30 [1] 918:21

### -5-

5 [1]   814:7
50 [1]   796:9
5K [1]   804:2

### -6-

608 [1]   925:5

### -7-

703 [1] 792:21
730 [1] 937:7
796 [2] 937:16   948:4

### -8-

8 [4]   783:8   796:3
823:9   840:10
802 [1] 948:7
840 [1] 948:4
861 [1] 937:7
88 [1] 937:16
898 [1] 948:10
8th [1] 833:18

### -9-

9 [4] 840:5   840:6
880:14   947:24
926 [1] 948:11
99.9 [1] 938:3
9:30 [3] 783:8   930:21
947:25

### -A-

a.m [2] 783:8   947:25
a/k/a [2] 814:14   815:10
abbreviated [1] 919:4
ability [1] 878:24
able [5] 785:25   787:15
827:2   839:3   877:15
above [3]   801:20
802:22   927:6
absolute [2]   933:1
941:10
absolutely [5] 802:20
833:4   833:10   840:22
889:4
access [3]   817:5
908:19   934:22
accessed [1] 817:8
accompanied [2]
873:1   876:21
accomplished [1]
861:24
accordance [1] 802:12
accountable [1] 861:1
accurate [3]   790:18
816:22   851:22
accurately [1] 871:7
accusations [1] 878:11
accused [2]   878:12
878:17
acquitted [1] 870:4
act [2]   794:23   876:10
acted [4]   833:19

834:2   835:11   835:15
acting [4]   794:24
886:19   886:21   887:3
action [1]   836:12
activities [2]   876:7
879:1
addition [2]   804:18
811:11
additional [1] 784:15
adds [1] 938:7
adjourned [1] 947:23
947:24
admissible [2] 926:8
926:10
admit [1]   819:5
875:7   926:21
admitted [4]   873:14
873:15   926:6   926:20
admitting [1] 925:21
adopted [1] 936:13
advice [2]   819:10
823:22
advised [1] 901:8
advocate [1] 941:2
affected [1] 941:22
affidavit [57] 787:25
788:11   788:23   789:18
790:6   790:12   790:16
791:17   794:10   794:12
794:15   819:14   820:2
831:2   831:3   831:5
831:10   831:15   833:4
834:2   834:11   834:12
834:13   834:14   834:15
834:17   834:19   834:20
835:10   835:14   835:17
835:23   836:1   836:16
836:21   841:2   841:4
841:11   853:22   853:23
855:4   901:6   901:11
901:22   902:4   922:20
922:21   926:11   926:16
927:1   927:3   927:16
929:12
affidavits [5]   785:24
788:5   788:5   790:3
792:25
afford [9]   836:22
900:17   900:20   901:22
902:8   902:12   902:14
902:20   927:18
afternoon [3]   872:1
907:17   918:13
again [18]   793:14
801:18   815:1   823:20
826:13   827:3   839:17
846:15   870:12   880:10
880:13   884:13   893:5
893:6   930:19   942:2
942:12   942:14
against [3]   905:1
905:13   936:6
age [3]   860:5   893:24
893:25
agencies [4]   833:20
835:12   835:20   835:21

**agent** [41]          788:15
788:19  790:14  790:17
792:22  792:22  793:4
793:5   793:15  793:17
793:18  816:16  816:17
816:17  816:20  819:11
819:12  819:12  820:9
820:10  820:12  820:16
821:7   821:9   826:8
831:24  831:25  832:2
832:10  832:13  832:16
833:19  835:11  843:15
843:17  843:17  850:2
850:5   853:15  856:1
941:1

**agents** [20]         792:24
793:8   798:20  798:21
803:5   803:6   804:14
827:14  830:18  830:20
830:24  831:2   831:6
834:16  834:25  838:19
853:6   856:3   944:3
944:16

**ages** [1] 859:14

**ago** [23]  840:25  841:9
843:15  846:10  846:11
847:5   847:6   848:19
848:22  848:23  848:24
849:12  849:21  849:25
858:10  859:11  859:12
859:12  859:13  862:24
907:14  909:5   927:21

**agree** [7] 785:23  798:8
798:11  838:15  871:8
874:21  879:24

**agreed** [6]          791:4
795:1   795:1   795:2
802:9   932:13

**agreement** [19] 801:8
801:9   801:22  803:2
803:4   803:8   803:13
803:17  803:21  803:24
804:8   874:5   888:12
888:16  888:17  888:19
888:19  900:7   947:9

**ahead** [2]           815:8
875:8

**ain't** [3] 830:17  885:19
886:14

**allegations** [1] 943:5

**allow** [8]           835:2
835:4   847:15  849:2
857:16  872:12  919:10
919:17

**allowed** [1]         870:8

**allows** [1]          943:18

**alone** [3]           864:7
864:8   868:11

**along** [6]           795:7
852:25  853:14  892:12
908:16  944:17

**altogether** [1]  930:16

**always** [13]        793:23
795:1   795:1   795:2
851:25  874:1   912:12
912:12  912:21  916:6
917:10  939:12  945:11

**Amendment** [2]
932:6   934:4

**AMERICA** [1]  783:3

**amicus** [1]        935:13

**ammunition** [2]
823:8   896:13

**among** [1]        930:19

**amwith** [1]       929:13

**analogy** [1]      936:8

**analyses** [1]    941:23

**analysis** [2]      940:7
941:13

**Andrew** [1]     816:13

**Annette** [1]      920:18

**annuity** [1]       928:8

**answer** [24]      788:20
790:20  791:3   793:7
794:2   794:3   826:11
829:4   835:5   847:16
848:21  849:2   849:5
856:5   870:24  871:3
872:24  873:7   874:12
875:7   875:23  878:8
879:4   879:16

**answers** [7]      788:19
791:7   793:12  847:11
908:14  909:5   909:16

**anticipate** [1]   919:1

**anyway** [4]       792:1
851:14  852:12  870:15

**apart** [1] 877:10

**apartment** [10] 815:6
815:17  865:13  865:16
865:18  865:21  866:2
866:7   866:17  895:24

**apologize** [1]  897:15

**Appeals** [1]      937:8

**appear** [5]       903:15
903:22  904:5   940:12
940:13

**APPEARANCES** [1]
783:13

**appeared** [4]    815:18
900:14  902:2   934:4

**applicable** [1]  925:20

**application** [1] 839:22

**applications** [1]
946:1

**applies** [1]       938:11

**apply** [3]         932:14
934:8   942:24

**appoint** [4]      888:18
902:5   927:19  930:9

**appointed** [1]    902:7

**appreciate** [6]   945:3
945:4   945:9   945:13
947:13  947:15

**appreciates** [1] 947:16

**approach** [8]     834:6
834:7   889:3   891:22
892:14  895:6   927:4
930:2

**appropriate** [5] 785:10

**appropriately** [1]
795:23

**April** [13]          815:5
815:9   907:24  907:25
909:24  910:2   910:21
915:2   915:6   915:8
915:11  915:20  917:1

**area** [5]  860:17  871:6
871:11  879:20  930:16

**areas** [2] 870:5   876:7

**argue** [5]           792:4
919:11  919:17  938:11
943:23

**argument** [26]    791:15
791:18  792:1   792:3
792:4   792:9   794:18
794:20  795:4   795:6
795:9   811:4   811:5
867:19  867:22  875:9
878:4   878:20  885:9
885:13  885:17  925:15
930:24  931:22  935:7
938:10

**arguments** [2]    926:9
946:16

**armed** [1]         865:7

**Aronwald** [142] 783:19
784:4   784:4   785:17
786:24  789:13  789:17
789:20  792:3   792:13
792:18  792:19  793:15
794:4   794:17  795:16
802:6   802:13  802:14
802:25  828:25  829:3
837:5   837:14  837:18
838:10  839:22  839:25
840:1   840:10  840:15
840:16  840:18  840:21
849:3   856:4   857:15
857:20  858:23  858:25
860:18  860:22  861:9
861:15  861:17  861:23
864:17  864:20  869:11
869:15  869:17  870:4
870:13  871:11  872:4
872:22  874:14  874:18
875:18  877:19  878:4
878:11  879:15  879:17
880:1   880:16  880:17
880:18  884:4   884:7
889:3   891:22  892:2
892:9   892:14  896:24
897:1   897:3   897:7
897:11  897:21  897:25
898:1   898:8   900:2
901:1   901:5   901:10
901:14  901:17  901:21
908:4   908:6   908:10
908:22  908:25  909:2
918:11  918:18  918:20
918:25  919:12  919:20
920:2   920:6   920:7
924:21  925:1   926:4
926:7   926:15  927:4
927:14  930:2   930:15
931:6   931:7   931:10

**795:6   802:4   869:22**
875:21

**appropriately** [1]
795:23

**April** [13]

**area** [5]

**Aronwald's** [4] 838:9
873:12  919:4   937:6

**arraigned** [2]    898:22
898:25

**arraignment** [1] 899:11

**arrangements** [1]
789:13

**arrest** [15]        798:2
807:8   807:9   807:10
807:23  810:11  810:13
818:25  883:21  884:2
884:8   900:11  900:21
917:2   927:22

**arrested** [41]    797:19
797:22  808:1   809:25
810:2   810:8   810:10
815:22  815:24  819:2
825:17  858:4   859:8
862:5   863:20  867:11
867:15  878:15  878:16
883:17  884:12  884:14
884:16  884:20  884:25
890:15  893:19  894:14
898:14  898:17  898:21
899:9   902:15  905:1
914:25  916:1   920:9
920:14  921:4   921:7
923:5

**articulated** [1]  945:22

**aside** [1] 787:20

**asks** [2]  817:24  831:14

**Assassin** [1]      813:6
813:8

**assault** [4]       808:21
810:21  811:3   885:4

**assess** [1]         875:19

**assessment** [3] 875:22
877:5   941:12

**assessments** [2]
940:6   941:23

**assign** [1]         898:25

**assigned** [3]      899:5
900:15  943:2

**assist** [1]         853:3

**assistant** [6]    783:16
847:4   933:7   933:8
936:9   947:1

**assistants** [1]   795:11

**associated** [1]   875:4

**Association** [1] 935:13

**assume** [8]        784:22
791:13  793:23  877:20
877:22  877:22  897:1
933:4

**assumes** [1]      897:1

**assuming** [5]     872:20
876:8   879:4   879:5
932:23

**assumption** [1] 872:21

**assures** [1]       792:8

**ATF** [17]           798:20
798:21  799:12  799:20
812:4   812:10  812:22
813:7   813:14  813:24
816:21  823:15  911:16
912:20  913:5   913:13
916:23

**attack** [1]         935:24

**attempt** [1]       785:1
793:15

**attempted** [4]    808:21
810:21  811:3   885:4

**attend** [2]         803:5
803:7

**attendant** [1]    876:10

**attended** [2]     837:20
935:11

**attention** [24]    788:7
808:14  809:10  810:10
810:20  812:3   814:7
814:22  818:23  820:21
821:16  823:9   825:7
828:4   829:11  829:25
832:21  836:4   892:4
892:6   908:12  923:21
927:6   945:4

**attic** [1] 896:13

**attorney** [17]     783:14
783:20  838:6   839:7
839:11  839:19  847:4
919:8   912:17  932:19
933:3   933:3   933:8
933:8   934:9   934:10
947:2

**attorney's** [13] 833:21
835:12  839:23  840:2
889:16  890:1   933:10
933:14  934:7   937:8
937:19  941:12  944:22

**attorney-client** [1]
925:9   932:9   932:13
932:21  941:15

**attorneys** [6]     783:16
783:18  853:6   932:11
942:10  944:3

**audio** [1]          835:22

**August** [2]        910:13
910:22

**authorities** [1] 942:18

**authority** [2]     861:2
942:18

**automatic** [4]    891:13
891:20  892:25  893:3

**automobile** [4]   792:23
923:3   923:6   923:8

**automobiles** [1]
921:24

**available** [4]     792:7
945:23  947:10  947:11

**avoid** [2]          874:12
879:16

**aware** [4]          784:14
784:18  869:21  943:7

**away** [3] 908:3   909:25
910:1

-B-

**b** [3]        783:14   791:23
925:5
**baby** [2] 929:14   929:17
**background** [2] 888:13
890:2
**bad** [2]   804:22   877:14
**bail** [4]  798:6      798:8
798:13  798:18
**bank** [1] 792:12
**bar** [5]    886:1     886:3
886:12  888:13   887:3
**Barbara** [2]        785:21
932:2
**bargain** [6]        803:20
804:5    804:8    804:20
805:8    806:11
**based** [6]           791:18
870:22  872:10  904:24
936:1    937:17
**basis** [4] 882:24   924:25
931:17  934:24
**bathroom** [1]      831:19
831:22  832:4    832:10
834:19  887:1
**BB** [2]     808:17   862:22
**beat** [1]  796:8
**became** [1]        860:5
**becomes** [1]       785:6
**bed** [1]   785:6
**beef** [3]  809:4    867:19
867:22
**beg** [1]   935:2
**began** [5]           800:7
858:13  858:19  913:5
913:13
**begin** [1]           908:1
910:18
**beginning** [2]     911:7
917:1
**begins** [2]         832:22
833:19
**begun** [1]           808:1
**behalf** [3]          841:2
905:18  947:10
**behavior** [2]      803:14
947:14
**behind** [3]         887:5
887:6.   925:12
**belief** [1] 925:7
**believes** [1]      788:24
**belong** [1]         878:18
**belonged** [4]      878:19
893:11  893:20  893:23
**bench** [2]           903:14
904:6
**best** [4]  788:20   846:19
914:5    946:4
**between** [19]      791:1

817:17  824:14  824:24
838:18  842:11  881:20
907:8    907:11  913:6
913:11  916:8    916:12
918:3    918:17  931:8
931:12  942:1    945:1
**big** [4]     830:5     830:8
830:10  833:3
**bills** [1] 929:24
**bit** [6]     797:16   823:23
834:8    907:12  907:20
913:6
**blank** [2]           830:22
928:15
**blended** [1]        789:3
**Bloody** [2]         813:6
813:8
**blue** [1]  827:7
**books** [1]           820:24
**borrow** [1]         873:12
**Boss** [25]           788:15
788:19  790:2    790:14
792:10  792:22  793:4
793:5    816:13  816:17
816:20  819:12  820:10
820:12  826:8    831:25
832:2    832:10  832:13
832:16  843:17  849:16
850:2    850:5    853:16
**bottle** [6]           811:5
886:23  887:4    887:12
887:15  887:16
**bottom** [9]          821:17
850:16  852:4    852:7
923:21  924:2    928:19
929:24  932:4
**bought** [30]        808:9
808:9    808:10  812:14
812:25  813:11  813:18
814:3    827:22  827:25
828:13  829:9    829:23
833:5    833:11  833:15
834:24  836:8    841:2
841:25  844:11  844:20
850:10  850:23  913:3
913:4    917:17  917:25
918:5    918:8
**bowling** [1]        815:14
**box** [13] 787:9    928:10
928:13  928:14  928:15
928:24  928:24  928:24
928:25  929:2    929:5
929:7    929:11
**boxes** [1]           928:11
**boys** [1] 929:14
**bracket** [2]        893:24
893:25
**bracketed** [1]     933:10
**break** [9]           837:5
837:7    847:14  864:25
918:11  918:13  918:13
918:21  919:22
**Brieant** [1]        815:15
**briefly** [2]         789:20
901:1
**bring** [1]           820:1

**bringing** [1]      877:23
**brings** [1]         830:3
**broad** [1]           791:23
**broke** [1]           869:2
**brother** [7]        810:5
816:3    816:4    819:2
819:15  885:1    885:1
**brother's** [3]     810:4
884:21  884:23
**brought** [10]       788:7
815:16  848:14  898:21
898:24  905:1    920:8
920:14  922:15  922:18
**Bryant** [63]        787:7
791:24  813:12  813:15
813:19  813:25  814:14
814:15  815:11  815:12
815:13  815:16  815:22
815:24  816:6    816:21
816:25  817:6    817:10
817:15  817:18  817:21
818:16  818:24  819:1
819:14  819:15  819:24
820:2    820:6    820:14
820:15  821:5    821:10
821:25  822:11  822:12
822:18  822:22  823:24
824:1    824:15  875:9
905:25  906:4    906:9
906:11  906:16  906:20
906:23  906:25  911:13
911:19  911:22  912:11
912:20  912:22  913:4
913:13  913:15  914:7
916:22  916:24
**Bryant's** [2]      818:14
818:25
**building** [3]      868:9
900:13  902:3
**bullet** [1]          868:3
**business** [3]      910:2
925:20  928:6
**buy** [8]     825:21   834:15
867:4    867:6    906:25
913:12  916:23  917:15
**buyer** [2]           912:21
917:10
**buying** [7]         798:20
798:20  830:15  911:22
912:18  918:1    918:6
**buys** [1] 798:23

-C-

**C** [3]         783:11   783:15
816:9
**C1** [6]      817:13   820:19
820:25  821:10  821:17
822:10
**caliber** [4]         891:7
891:9    892:25  893:8
**call-waiting** [1]
823:11
**caller** [1]           818:8
**calls** [2] 796:15   818:10
**calm** [1] 886:25   887:1

**Calmly** [1]         892:5
**candid** [1]          874:5
**cannot** [1]          786:9
789:13  791:1    795:24
938:20
**capacity** [2]       833:20
835:11
**car** [4]     826:23   834:18
853:24  923:10
**care** [5]   808:9    831:16
921:11  921:14  921:17
**careful** [1]         874:16
**carries** [3]         800:25
832:23  832:25
**cars** [14] 811:12   859:9
859:10  859:16  859:22
860:1    860:5    862:8
923:11  923:12  923:12
923:15  923:15  923:17
**case** [61] 785:2    787:19
791:16  797:25  847:10
848:5    848:15  848:16
848:18  848:25  849:11
869:9    872:15  873:18
875:5    875:17  877:7
878:12  878:16  898:14
899:17  899:19  905:8
905:13  926:11  930:19
931:21  931:24  931:25
932:10  934:2    934:24
935:2    935:12  935:16
935:23  935:25  936:19
937:5    937:9    937:11
937:13  937:14  937:15
937:16  937:20  937:23
937:24  938:6    940:4
941:11  942:2    942:5
942:7    942:12  942:17
942:18  943:2    943:5
943:11  946:1
**cases** [3]           828:12
858:1    904:25  931:23
932:1    932:24  941:25
**cash** [3] 824:12   925:23
925:24
**catch** [1]           908:16
**categorically** [1]
789:10
**categories** [3]    791:23
858:24  858:25
**Catherine** [1]     814:16
**CATHY** [1]         783:16
**caught** [4]         858:8
860:8    862:11  862:16
**caused** [1]         809:13
**caution** [1]        930:19
**ceased** [1]          899:4
**cell** [1]   816:21
**central** [3]         937:21
937:23  937:25
**certain** [8]         787:11
791:4    847:7    850:21
853:8    904:3    904:8
946:24
**certainly** [10]     787:7
788:3    793:22  873:5

873:15  878:1    880:2
925:10  938:14  943:1
**certify** [1]         927:7
**chambers** [1]      942:13
**chance** [4]          786:22
849:2    919:24  943:23
**change** [3]          802:4
802:6    802:9
**changed** [1]        802:11
**changes** [1]        814:18
**characterization** [1]
789:21
**charge** [3]          792:23
800:1    800:3    800:5
800:20  800:25  801:2
801:3    801:6    870:4
878:15  878:16  883:18
883:21  899:15  899:22
899:25  900:7
**charged** [7]         797:24
799:24  800:8    890:16
891:5    899:14  905:2
**charges** [5]        797:20
799:23  800:17  809:18
869:4
**Charles** [37]      785:24
786:3    786:12  787:4
787:10  787:25  788:3
788:4    788:11  788:12
788:24  789:6    789:8
789:9    789:11  789:19
790:4    790:7    790:10
790:13  790:16  792:25
794:9    794:13  794:13
796:15  796:17  796:25
801:20  802:23  821:1
821:20  821:21  823:18
825:8    828:7    948:3
**check** [7]           785:21
821:22  928:10  928:13
928:14  929:2    929:7
**Cherry** [5]         787:7
789:7    790:9    830:4
830:4    830:8    830:10
830:12  830:13  830:25
831:6    831:7    831:15
832:12  832:15  833:7
833:12  833:16  841:2
841:11  841:12  845:6
845:15  875:8    879:8
879:18  914:9    914:10
915:3    915:7    915:21
915:25  917:1    917:10
917:15  917:25  918:8
**Cherry's** [2]      905:24
906:3
**child** [6] 921:6    921:8
921:19  922:22  930:1
930:4
**children** [12]     920:19
920:21  920:24  921:3
921:7    921:10  921:12
921:16  921:20  929:9*
929:18  929:20
**Chinese** [2]        788:21
793:3
**choice** [1]          935:19

choose [2]        920:1
936:5
chooses [1]       879:20
chose [1]         876:8
chrome [2]        891:6
891:9
CI [11]     814:14    814:16
814:20    815:9    815:15
815:14    815:16    815:17
815:20    816:10    816:21
circuit [3]         933:16
937:8    944:18
circumstances [4]
874:25    876:10    877:1
941:12
citation [3]        942:2
942:13    942:13
cited [5] 937:11    937:12
937:13    940:4    944:1
cites [1] 936:7
citing [2]         937:6
937:9
City [4] 894:18    896:18
899:22    900:7
CJA [3]  901:11    926:11
926:16
claim [1]          932:12
claiming [2]       838:14
933:12
claims [1]         874:4
clarity [1]        802:21
clean [1]          803:18
clear [13]         784:19
788:13    795:8    807:25
824:11    826:11    838:23
838:25    858:23    869:12
870:6    871:10    941:20
clearly [9]        787:4
795:2    797:18    828:15
838:19    838:22    839:19
932:13    941:11
client [17]        784:15
787:6    790:8    792:13
823:4    839:14    931:12
933:3    933:13    935:24
936:6    938:22    939:3
939:22    940:13    941:20
946:8
client's [2]       940:19
940:22
clients [1]        788:3
935:23
close [1] 940:3
closer [4]         797:17
811:9    880:23    887:17
clothes [2]        808:9
867:4
clothing [1]       921:13
co-conspirators [1]
874:6
cocaine [70]       814:17
815:12    815:19    860:11
860:15    861:22    862:4
862:9    881:15    881:20
882:7    882:9    882:20

883:3    883:22    884:9
884:17    900:22    901:24
902:16    909:7    909:9
909:10    909:18    909:23
910:3    910:8    910:15
910:18    910:24    911:8
911:19    911:22    912:6
912:11    912:15    913:4
913:12    913:16    914:7
916:2    916:4    916:6
916:8    916:12    916:12
916:15    916:15    916:16
916:16    916:17    916:17
916:18    916:18    916:19
916:19    916:24    917:3
917:5    917:6    917:7
917:15    917:24    917:25
918:4    918:5    918:9
918:9    927:22    927:23
cocky [2]          886:15
886:16
colored [2]        891:7
891:9
Colton [120]       783:15
784:2    784:7    784:13
785:3    785:21    787:1
793:3    795:18    795:20
796:15    796:21    801:25
802:1    802:3    802:10
802:18    806:2    814:10
814:13    815:1    815:4
815:9    820:23    826:9
827:10    834:11    835:6
835:7    836:20    837:2
837:4    838:1    840:6
843:20    843:21    846:24
847:4    847:7    847:13
847:22    847:25    848:4
848:7    848:18    849:12
849:20    850:5    850:20
853:15    854:14    857:9
857:14    857:22    857:25
858:15    860:22    862:21
862:23    864:15    864:18
868:17    868:23    869:1
869:11    869:20    870:1
870:18    870:23    871:3
871:8    873:7    875:7
875:19    879:14    879:24
880:3    880:20    881:1
881:23    884:4    884:10
884:13    885:8    885:11
889:20    892:8    897:1
897:4    897:7    897:23
898:1    898:6    900:2
900:24    901:4    901:13
901:16    901:25    905:15
905:19    906:11    906:12
908:8    908:15    908:21
908:23    908:25    923:23
924:23    925:3    925:12
926:6    926:14    926:20
942:19    942:20    943:25
946:9    946:22
Colton's [1]       870:16
Columbia [1]       937:8
COMEY [1]          783:14
comfort [1]        940:20
comfortable [2]
940:14    945:19

coming [5]         870:1
886:22    886:23    887:5
887:6
commit [9]         808:17
809:1    809:14    811:3
859:7    860:7    860:15
864:3    867:14
committed [15] 858:5
858:7    858:21    859:2
860:25    862:10    862:18
862:21    863:3    863:17
867:10    868:23    874:3
875:24    881:8
committing [1] 803:14
communicated [2]
787:2    932:16
communication [1]
789:9
compelling [1]  935:14
complete [1]       933:19
completed [1]  919:12
completely [1]  874:4
complying [1]  946:25
compound [1]  847:13
compromise [1]
875:15
computer [2]     785:18
908:16
conceivable [1] 789:5
concern [1]        873:10
874:19    933:17    936:18
concerned [4]      788:2
853:3    873:8    873:19
concerning [4] 787:23
787:24    789:23    889:21
conduct [1]        861:3
confer [7]         826:10
837:3    869:14    896:23
897:10    900:5    908:5
confidence [1] 932:17
confident [1]  869:23
confidential [1]
789:9
confirm [2]        790:3
854:8
confuse [1]        879:25
confusing [1]  879:16
confusion [2]  870:1
870:22
connected [1]  875:16
connection [1] 935:25
consequently [3]
932:16    933:4    933:11
consider [1]       876:9
919:18    942:21    944:9
considered [1] 937:20
consistent [1] 925:4
constituted [1] 787:5
contact [2]        815:24
872:23
contain [4]        838:16
838:21    939:13    940:9
contained [7]  936:2

938:4    938:6    938:19
938:21    940:6    941:14
containing [1] 838:24
contains [1]       941:17
content [1]        818:3
contents [1]       784:19
continuation [1]
874:15
continue [7]       835:2
862:2    880:16    884:1
919:20    920:6    946:8
continues [1]  822:1
continuing [1] 910:7
contrary [1]       877:25
contrasted [1] 937:1
contributing [1]
921:9
control [1]        944:23
convenient [3] 864:25
869:15    930:15
conversation [25]
817:13    817:14    817:15
817:16    817:17    817:22
818:3    818:24    819:23
820:7    820:18    822:9
822:11    822:17    822:22
824:15    824:20    824:25
829:12    829:12    829:15
829:16    829:19    855:18
856:12
conversations [8]
822:10    824:17    824:23
825:2    825:19    835:20
905:25    938:2
convey [2]         838:22
839:1
conveyed [1]       876:6
convicted [10]  808:21
809:10    809:20    810:20
811:11    858:2    868:15
869:7    870:20    885:3
conviction [2]  870:3
871:1
cook [2] 916:21    917:17
cooked [1]         917:19
cooperate [4]  798:12
798:13    800:7    808:1
cooperatin [1] 803:16
cooperating [5] 874:2
899:20    913:5    926:12
938:1
cooperation [15]
799:21    801:8    801:22
803:2    803:4    803:21
803:24    804:8    804:14
875:2    888:12    888:17
888:19    900:6    947:9
cop [3]  851:25    852:1
852:6
copies [5]         786:19
786:20    786:22    792:16
941:5
copy [13]          784:10
784:10    784:11    784:16
791:21    888:24    901:11

938:15    942:16    945:17
945:22    945:23    947:6
correct [38]       785:13
791:12    826:12    857:3
866:3    883:9    885:1
888:20    889:13    890:16
895:24    896:7    898:22
899:15    900:15    900:18
902:17    903:7    903:24
905:1    905:2    906:9
911:13    912:12    912:13
912:22    913:23    921:20
923:3    924:2    924:4
924:19    927:2    927:8
927:19    928:17    930:10
938:14
counsel [27]       785:8
786:7    786:19    791:3
791:3    791:13    792:4
795:9    795:24    826:10
837:3    869:14    896:23
897:10    900:5    908:5
908:17    922:25    935:16
935:23    936:3    937:2
939:23    940:7    945:23
947:10    947:18
counsel's [1]  947:13
count [1]          815:15
counter [1]        792:9
County [1]         945:16
couple [11]        843:15
847:5    847:6    849:12
877:1    885:25    886:2
900:12    910:19    912:2
938:8
course [6]         824:14
825:19    875:1    875:13
940:25    944:16
court [235]        783:1
784:9    784:10    784:11
784:12    784:14    784:18
784:20    784:21    785:5
785:16    786:15    790:18
793:20    793:23    794:17
795:22    795:22    796:4
796:7    796:24    797:16
802:1    802:8    802:16
802:20    806:3    814:12
815:3    815:8    826:11
827:12    829:2    829:4
834:7    835:1    835:3
835:4    836:23    837:6
837:10    837:17    837:22
837:24    838:3    838:5
838:6    838:25    839:23
839:24    840:3    840:4
840:5    840:8    840:13
840:15    840:22    841:14
842:9    847:15    849:1
849:4    851:21    854:15
856:5    857:10    857:16
857:19    858:23    860:12
860:16    860:21    861:2
861:5    861:10    861:16
861:19    862:1    862:2
863:18    864:22    869:13
869:15    869:18    869:20
869:21    869:24    870:5
870:9    870:11    870:12

871:6   871:13   872:4
873:19   873:22   874:14
875:19   876:25   877:6
878:4   878:20   879:23
880:8   880:16   880:25
884:5   889:4   891:23
892:5   892:11   892:16
895:8   896:22   897:9
897:13   897:17   898:5
898:17   898:19   898:21
898:24   898:25   899:5
899:11   900:4   900:10
900:13   900:17   900:20
900:21   901:6   901:19
901:22   902:1   902:2
902:4   902:7   902:11
902:12   902:14   902:19
902:20   902:23   902:25
903:15   903:22   903:23
904:2   904:7   905:16
905:20   908:7   908:19
908:20   908:23   909:1
918:12   918:16   918:18
918:24   919:1   919:5
919:7   919:18   920:3
920:6   920:9   920:15
921:25   922:18   922:19
923:24   924:24   924:25
925:10   925:11   925:18
925:21   926:8   926:18
926:21   926:22   926:23
927:5   927:15   927:17
927:18   927:19   930:3
930:9   930:17   930:25
931:2   931:7   931:10
931:15   932:20   933:15
935:5   935:8   936:15
936:19   937:8   937:9
938:8   938:15   938:24
939:1   939:5   939:10
939:20   939:25   940:5
940:14   941:9   942:3
942:19   942:21   943:1
943:6   943:8   943:24
944:1   944:9   944:11
945:1   945:10   945:15
945:24   946:6   946:11
946:13   946:15   947:12

**court's** [10]   796:2
802:12   840:5   840:6
840:10   870:8   870:10
873:10   880:14   904:7

**courtesy** [1]   944:6

**courtroom** [9]   796:2
827:8   840:11   847:23
869:25   877:23   918:17
930:13   931:9

**covered** [1]   932:21
**Cr** [2]   783:4   937:16
**crack** [91]   800:6
800:8   800:8   800:11
800:16   800:20   800:25
806:24   807:13   807:19
807:22   808:5   811:19
812:14   812:25   813:11
813:18   814:3   814:17
815:12   815:19   825:9
825:12   825:15   825:21
827:22   827:25   828:3
829:9   829:10   829:23

859:4   860:10   860:15
861:7   861:22   862:4
862:9   866:10   866:11
881:15   881:19   882:7
882:9   882:20   882:23
883:2   883:22   884:9
884:17   900:22   901:23
902:16   909:7   909:9
909:10   909:18   909:23
910:3   910:8   910:15
910:18   911:4   911:6
911:8   911:19   911:22
912:11   912:14   913:4
913:15   914:1   914:2
914:7   916:2   916:6
916:9   916:12   916:16
916:16   916:17   916:18
916:19   917:2   917:5
917:7   918:4   918:5
918:9   927:22   927:23

**crazy** [3]   886:19
886:21   887:4

**create** [1]   788:9
**creates** [1]   925:8
**creating** [1]   876:13
**credibility** [6]   861:4
875:20   875:22   878:2
926:18   935:24
**crew** [1]   879:2
**crime** [7]   809:1
809:14   810:23   858:4
860:15   868:23   888:8
**crimemates** [1]   874:6
**crimes** [14]   803:14
811:11   858:7   858:21
859:2   859:7   860:7
860:23   860:25   862:9
862:9   874:2   874:3
905:2
**criminal** [15]   797:20
857:23   861:3   876:4
876:6   876:10   888:13
889:17   889:21   890:2
903:13   904:25   935:4
935:13   936:23
**critical** [1]   937:18
**cross** [11]   840:17
874:15   919:2   919:4
919:11   919:13   919:14
919:21   919:23   919:25
948:4
**cross-examination** [6]
788:15   789:16   789:22
864:17   904:25   932:6
**cross-examinations**
[1]   947:19
**cross-examining** [1]
901:5
**cryptic** [1]   839:17
**custody** [1]   944:23
**cut** [2]   872:4   872:19

**–D–**

**D** [1]   813:22
**DA** [2]   843:16   843:19
**damage** [1]   942:9

**danger** [4]   873:20
873:20   873:23   877:12
**dangerous** [3]   877:4
877:9   877:9
**Dark** [8]   811:15   811:17
811:24   812:1   865:3
872:5   872:6   879:2
**date** [6]   829:19   889:10
889:10   904:3   904:7
910:20
**dated** [5]   838:8
838:9   838:12   838:13
931:11
**daughters** [1]   929:13
**David** [50]   783:5
784:4   788:17   822:25
823:6   823:20   824:3
824:8   824:11   824:16
824:16   824:23   825:14
826:1   826:19   827:3
827:11   827:13   827:20
827:21   827:24   828:22
829:7   829:23   830:3
832:11   832:14   832:17
832:19   832:22   832:25
833:15   834:1   835:9
835:14   835:18   835:25
836:11   840:25   841:24
841:25   842:11   845:18
850:8   850:16   850:17
853:24   855:18   906:1
943:3
**days** [6]   807:20   829:22
888:14   888:14   888:15
900:12
**deal** [1]   945:14
**dealer** [2]   863:23
863:24
**dealers** [4]   811:22
873:14   881:9   888:9
**dealing** [4]   861:7
862:8   911:19   912:24
**dealings** [1]   915:20
**deals** [15]   830:10
831:5   831:7   876:16
906:20   907:17   911:12
911:15   911:18   912:11
914:9   915:25   917:3
917:5   917:9
**dealt** [1]   876:17
**debriefing** [1]   875:1
**debts** [1]   929:24
**December** [4]   783:8
837:19   911:5   947:24
**decided** [2]   903:23
931:25
**decides** [1]   806:4
**decision** [3]   792:13
942:21   944:10
**declined** [1]   937:17
**defend** [1]   935:23
**defendant** [8]   783:18
783:20   784:9   815:11
827:11   938:13   943:10
948:8

**defendant's** [14]
816:9   816:10   817:13
897:22   898:10   903:2
922:23   923:20   924:2
926:23   926:25   932:6
934:5   934:9
**defendants** [7]   783:6
791:16   814:15   815:16
839:16   936:23   938:5
**defense** [27]   786:6
786:10   786:12   786:19
791:4   792:6   795:2
877:22   896:25   908:5
926:11   932:11   934:12
934:15   934:17   934:21
935:13   935:15   935:18
935:23   936:4   936:24
937:2   939:23   942:5
942:21   947:10
**definitively** [3] 789:4
789:14   791:25
**degree** [1]   885:4
**Delgado** [3]   822:20
824:15   906:1
**demeanor** [1]   828:22
**demonstrate** [1]
874:3
**demonstration** [1]
874:13
**Department** [2] 894:19
896:18
**dependents** [5]   926:1
928:20   929:11   929:12
929:16
**DEPUTY** [2]   796:2
840:11
**describe** [2]   827:5
828:22
**described** [2]   875:25
876:9
**designed** [1]   933:2
**destroyed** [1]   792:10
**detail** [1]   888:10
**detained** [2]   871:3
871:4
**detective** [9]   894:14
894:18   894:21   894:23
895:2   896:18   897:18
903:4   903:10
**detectives** [1]   894:14
**determine** [1]   837:22
919:15   943:16
**determines** [1]   947:4
**determining** [1] 876:11
**detriment** [4]   935:25
941:3   944:8   944:9
**differ** [1]   935:2
**difference** [7]   916:8
916:10   916:12   916:14
916:15   934:2   945:1
**different** [8]   879:21
935:11
**differently** [3]   879:22
934:20   934:20
**difficult** [6]   791:24

795:5   795:10   875:24
936:23   939:1
**dig** [1]   793:16
**dilemma** [1]   941:9
**dip** [1]   897:19
**dire** [1]   877:15
**direct** [19]   796:20
839:13   854:2   860:23
862:7   862:24   868:17
870:15   873:16   878:13
881:14   883:24   884:19
885:8   904:24   923:21
938:9   938:12   948:4
**directing** [2]   908:12
927:6
**direction** [1]   836:22
**disagreement** [5]
809:15   809:17   868:16
868:24   869:1
**disappointed** [1]
829:6
**disbelieve** [1]   876:11
**disclosed** [2]   873:4
874:25
**discloses** [1]   939:23
**disclosing** [2]   876:18
901:7
**discovery** [1]   839:20
**discuss** [15]   785:11
795:23   847:22   848:15
848:16   849:10   849:21
849:25   850:4   850:10
888:13   889:16   890:1
919:14   930:19
**discussed** [2]   905:8
931:21
**discussing** [3]   784:7
784:8   810:18
**discussion** [9]   787:14
787:21   789:15   791:23
802:2   848:18   906:4
943:11   943:13
**disingenuously** [1]
874:7
**dismissed** [1]   900:8
**disobeyed** [1]   904:7
**displaying** [1]   802:5
**dispute** [3]   886:1
886:3   886:7
**distinctions** [1] 937:18
**distracted** [1]   947:17
**distributing** [1]   929:14
**distribution** [5] 800:9
800:17   800:20   806:25
860:15
**district** [9]   783:1
783:1   783:12   783:15
833:21   835:12   932:1
937:7   937:15
**divide** [1]   867:5
867:7
**dividends** [1]   928:7
**division** [1]   894:18
**divorced** [2]   928:25

929:3

doctrine [1]        937:10

document [40]        787:24
788:11   788:17   789:6
790:21   791:7   791:9
791:14   791:16   791:22
794:9   794:13   794:21
795:15   801:14   814:10
818:1   840:8   889:17
895:10   898:3   898:5
898:12   923:1   924:6
924:10   924:11   924:15
924:17   925:3   925:7
925:8   925:11   925:13
925:16   925:16   926:7
926:10   933:19   941:17

documents [37]       785:22
787:4   787:5   787:8
787:9   787:10   787:14
787:17   787:18   788:9
788:25   789:2   789:2
789:4   789:11   790:24
790:24   791:2   791:4
791:10   792:10   795:13
838:5   838:7   838:11
838:14   838:16   839:19
840:9   919:15   919:24
931:14   931:18   932:20
934:6   946:25   947:2

doesn't [16]        786:10
786:14   788:23   792:10
794:3   846:2   871:7
874:23   875:5   876:22
901:20   903:6   929:3
933:9   934:8   934:18

dollars [19]        808:6
814:18   866:24   866:25
881:21   883:2   883:8
883:9   883:25   894:22
900:23   901:24   902:16
902:24   908:2   910:9
911:9   913:11   927:22

Donald [5]        783:5
784:9   787:6   790:9
943:3

done [15]        792:21
793:4   804:12   804:13
804:18   804:21   804:21
807:25   828:14   871:12
873:18   892:19   906:20
930:18   942:9

door [9]   864:4   865:11
876:3   888:2   893:18
893:20   893:22   894:8
894:12

doubt [1]        839:6
839:9   939:16

down [22]        823:12
833:3   833:18   835:17
837:10   841:23   845:3
847:14   861:20   886:25
887:4   892:9   899:6
899:8   900:10   920:8
920:14   928:19   939:21
940:14   940:23   940:25

draw [1] 892:6

drew [1] 892:4

drove [2]        815:13

---

923:11

drug [26]        807:15
807:20   807:25   808:8
808:11   811:22   830:10
831:5   831:7   863:23
863:24   873:13   876:16
881:9   888:9   901:7
906:20   907:17   911:12
914:9   915:2   915:6
915:20   915:25   916:2
917:9

drug-dealing [1]
925:22

drugs [45]        788:6
798:20   798:23   799:13
799:19   806:25   807:2
807:13   808:10   811:18
811:21   828:14   828:14
830:15   830:15   833:6
833:12   833:15   834:15
836:8   841:3   841:12
841:25   844:11   844:20
850:10   850:23   860:10
861:7   862:4   866:8
866:9   866:13   866:18
866:22   867:4   867:8
867:8   888:3   906:23
906:24   906:25   907:13
908:1   917:12

due [2]   786:7   864:20

dug [1]   793:15

duly [1]   796:19

during [1]        799:20
827:20   844:10   852:5
935:18   941:7   944:4

---

-E-

early [1] 910:22

earned [1]        902:21

earning [1]        881:20
883:1   902:21

easier [2]        806:2
892:15

effect [1]        877:13
904:5

effective [1]   936:2

effectively [1]   940:23

either [1]        786:13
787:21   792:5   794:21
872:12   883:13   883:15
891:15   943:10   943:12

elaborate [1]   876:3

elected [1]   876:5

elevator [1]   881:5

eleven [1]   838:12

eliciting [1]   876:17

ELMO [1]   898:11

employed [3]   797:12
925:17   925:18

end [14]   791:14   803:20
804:5   804:7   804:20
805:7   805:8   806:11
879:5   910:7   914:23
916:1   918:21   944:4

endanger [1]   876:21

---

ending [1]        892:19

enforcement [3]
814:19   833:20   835:12

enter [1] 801:8

entered [1]        801:22

entire [1]        897:3

entirety [1]   938:16

entitled [8]        806:21
876:23   932:7   933:13
935:1   944:22   947:5
947:5

entry [13]        816:20
821:1   823:18   824:4
825:8   828:7   830:3
832:22   833:3   836:5
841:23   850:16   852:3

enure [1]   935:24

equipment [1]   814:5

essence [1]   941:14

essentially [1]   933:2

estimate [2]   798:25
904:11

etc [1]   941:23

evade [1]   874:12

evasive [3]        788:16
793:15   793:18

evening [1]        930:20

event [7]        787:7
805:3   805:17   834:14
853:12   900:10   946:10

events [1]        878:23

eventual [1]   824:16
825:1

eventually [8]   799:23
801:8   815:22   816:24
817:5   818:13   826:1
832:19

everybody [1]   785:18
796:4   823:21

evidence [27]   791:14
791:18   795:15   802:17
814:5   814:11   816:9
816:12   822:15   825:4
826:17   834:6   846:6
855:15   855:16   855:22
855:24   855:25   888:17
888:20   896:24   898:10
924:21   925:6   926:24
926:25   947:17

evidently [1]   834:17

exact [5]        839:1
839:10   910:20   933:22
939:17

exactly [6]        792:17
826:4   826:14   850:17
880:7   933:23

examination [15]
788:8   796:20   840:17
854:2   860:23   862:7
862:24   868:17   870:16
873:16   878:13   881:14
884:19   885:8   948:1

examinations [1]
947:19

examining [1]   897:6

---

example [6]        789:7
806:11   862:13   875:23
934:11   935:3

except [2]        912:19
916:22

excuse [20]        796:14
803:22   818:6   824:19
827:23   829:14   833:9
834:17   842:8   853:5
862:20   869:24   884:3
887:21   888:18   902:22
915:4   920:13   923:14
931:8

excused [1]        930:23
939:3

executed [2]        893:7
895:23

exhibit [51]        795:22
796:2   802:17   814:5
814:13   815:4   816:9
816:10   816:12   817:13
822:15   822:23   823:10
823:18   824:21   825:5
826:17   828:5   829:11
829:15   829:20   839:23
840:3   840:5   840:5
840:6   840:10   840:19
841:20   843:8   843:8
843:22   846:6   850:15
852:8   853:13   880:14
892:1   896:25   897:3
897:22   898:10   903:2
904:19   922:23   923:20
924:22   926:23   926:25
948:6   948:9

exhibits [1]        790:12
792:12   792:15   948:5
948:8

exist [3] 791:9   794:3
794:21

existence [1]   784:23

exists [5]        794:9
794:10   795:15   941:18
946:17

expect [3]        787:1
905:18   918:20

expected [1]   906:8

experience [1]   811:24

explain [1]   806:1

expressed [1]   933:19

expression [1]   897:18

extent [12]        785:8
789:23   861:6   872:7
872:12   872:17   877:17
878:21   879:9   879:11
932:8   935:1

extrinsic [1]   925:6

---

-F-

F [5]        897:23   897:24
898:10   903:2   948:10

F.2d [1]   937:7

face [3]   787:17   800:19
868:6

fact [33]   785:3   787:8
788:19   789:22   789:24

---

790:5   790:15   791:9
791:20   798:21   798:23
799:2   810:13   825:12
825:14   825:21   826:19
827:21   829:9   831:9
832:2   835:15   836:1
870:19   873:16   878:5
902:15   930:9   938:14
941:18   944:1   945:5
945:13

facts [5] 876:19   877:18
935:12   937:5   937:16

failed [4]        806:11
806:11   903:15   903:22

fair [13]   791:18   793:20
794:1   829:22   835:2
861:4   861:5   864:21
875:21   934:6   942:4
946:3   946:4

faith [2] 794:23   794:25

fall [1]   936:18

false [2] 877:25   878:11

falsely [1]   878:12

familiar [2]        786:3
890:13

family [1]        815:25
873:21   923:17

far [9]   784:24   797:6
830:14   847:9   849:6
855:2   860:16   861:20
943:4

fashion [3]        793:2
936:14   939:21

fax [1]   942:16

FBI [2]   936:17   936:24

February [2]   883:20
918:25

federal [1]        797:20
797:24   798:1   899:17
899:19   900:10   901:8
902:2   920:9   920:15
921:25   927:17

fellow [1]        854:13

felony [1]   870:20

felt [2]   809:18   876:18

female [2]        809:15
809:16   869:2

few [25]   840:25   841:9
843:3   843:25   844:4
844:6   844:7   844:8
848:19   848:22   848:23
848:24   858:10   864:10
864:12   886:24   888:14
888:15   903:21   909:5
910:21   913:14   917:16
917:16   917:21

fifth [2] 825:8   830:3

fight [2] 885:20   885:22

figure [1]        818:17
925:13   943:17

file [3]   882:3   883:15
926:8

files [1]   792:14

fill [1]   922:20

filled [3]        901:17

filling [1]   926:12
finally [1]   902:4
financial [3]   934:8
   922:20   927:16   901:6
finding [1]   788:5
fine [1]   790:22
fingerprints [2]   857:7
   857:13
finish [4]   916:11
   919:12   919:21   921:12
finished [2]   895:11
   895:14
firearms [1]   799:2
fired [1]   868:1
firewall [5]   785:22
   787:3   787:16   788:2
   791:5
first [37]   785:7   787:22
   789:20   791:6   816:12
   816:20   817:2   817:12
   817:14   817:17   817:21
   818:23   820:1   820:22
   820:25   824:3   824:24
   829:20   838:7   858:19
   873:13   890:13   898:11
   898:19   900:11   902:3
   915:24   925:4   926:10
   926:14   931:21   932:23
   932:25   934:3   938:9
   942:8   945:11
Fiscella [8]   894:15
   894:21   894:23   895:2
   896:18   897:19   903:4
   903:10
five [12]   842:15   907:4
   907:5   907:7   907:8
   913:11   913:20   914:2
   917:21   917:22   917:23
   917:23
fix [1]   832:8
flip [4]   797:3   823:17
   834:12   834:13
floor [2]   865:20   865:22
focus [1]   789:25
focused [1]   790:15
folks [2]   793:23   796:8
follow [6]   805:21
   852:25   880:2   880:6
   892:12   908:18
follow-on [2]   791:8
   794:5
following [1]   818:24
follows [1]   786:3
   796:19
food [1]   921:13
force [1]   863:9
foregoing [1]   927:8
form [8]   847:13   884:4
   928:6   928:7   929:23
   934:10   946:22   946:23
formal [1]   801:9
former [1]   784:15
forms [1]   830:22

formulation [2]   874:17
   879:17
forthcoming [2]
   874:5   944:7
forward [6]   785:12
   823:17   829:25   931:2
   935:17   936:4
found [14]   788:12
   793:12   834:17   857:12
   891:16   891:18   891:19
   891:19   893:8   896:1
   896:9   896:11   896:19
   937:10
four [5]   912:2   912:4
   913:11   917:23   918:14
fourth [1]   828:7
frame [1]   915:22
frankly [4]   794:11
   880:2   926:10   947:16
free [2]   801:14   922:19
Friday [1]   793:22
   796:4   796:8   837:17
   848:11   848:12   848:13
friends [11]   864:12
   865:1   865:2   865:13
   865:25   867:3   867:6
   875:11   886:24   887:2
   888:2
front [18]   784:24
   802:19   817:14   820:19
   820:24   820:25   823:10
   824:21   824:25   836:22
   840:20   841:18   869:23
   889:1   901:7   904:20
   931:4   939:8
fuck [2]   821:3   821:22
full [5]   838:21   933:18
   933:19   939:13   940:3
future [1]   803:14

--- -G- ---

G [6]   922:23   923:21
   924:22   926:23   926:25
   948:11
gang [5]   811:14   811:17
   811:24   865:3   879:19
gangor [1]   879:2
general [4]   828:13
   829:8   938:10   939:6
generally [3]   795:8
   797:14   809:3
gentlemen [5]   796:7
   834:7   837:6   918:12
   930:18
girl [4]   885:14   885:15
   885:18   929:13
girlfriend [2]   797:9
   822:21
given [7]   792:12
   827:18   833:6   833:11
   835:21   849:4   919:4
giving [8]   855:10
   874:12   908:14   909:5
   909:15   938:24   943:22
   945:5

Glenn [2]   783:15
   784:2
gloves [1]   857:5
goal [1]   942:3
goes [5]   793:9   793:14
   861:3   861:3   926:17
good [14]   794:23
   794:24   796:7   796:22
   796:23   804:15   804:18
   804:22   869:17   877:14
   919:22   930:20   939:5
   944:13
government [87]
   784:3   784:25   785:25
   787:11   791:3   792:6
   792:8   792:20   794:7
   794:8   794:19   795:1
   795:14   796:15   796:18
   798:9   798:14   798:19
   800:7   800:8   800:11
   801:9   801:23   801:25
   803:19   803:25   804:4
   804:7   804:11   804:19
   805:3   805:7   805:17
   805:20   805:23   806:6
   806:7   808:2   826:10
   835:20   837:3   838:18
   857:13   870:24   872:14
   873:2   873:4   875:6
   874:24   875:3   875:5
   876:2   876:4   876:8
   876:16   876:18   876:22
   878:14   897:4   898:3
   899:20   900:7   901:14
   911:24   924:23   926:8
   931:13   932:18   933:6
   933:13   933:24   935:11
   936:15   936:17   936:21
   936:25   938:5   942:10
   944:5   946:10   946:20
   946:24   947:3   947:6
   947:9   947:11   948:5
government's [32]
   789:21   790:12   802:17
   814:4   814:13   815:4
   822:15   822:23   823:10
   823:18   824:21   825:5
   826:17   828:5   829:11
   829:15   840:11   840:19
   841:20   843:7   843:8
   843:22   846:6   850:15
   852:7   853:13   891:25
   904:19   925:15   936:8
   944:8   944:23
governmental [2]
   833:21   835:13
grade [1]   797:7
grams [1]   814:17
   912:2   912:2   912:4
   912:25   912:25
granted [1]   815:3
great [4]   785:16   918:12
   930:17   947:19
greatest [1]   913:3
greatly [1]   947:15
Grey [1]   827:7
group [6]   872:6
   872:16   879:8   879:9

879:12   931:16
guess [4]   809:18
   869:3   885:19   900:19
guidance [1]   938:24
guideline [3]   805:17
   805:21   806:17
Guidelines [1]   805:13
guilty [10]   800:1
   800:3   800:17   800:20
   806:22   806:24   869:5
   869:6   893:13   911:19
gun [21]   797:23   798:1
   799:23   800:1   800:17
   801:2   801:6   808:17
   809:5   862:22   863:10
   863:14   865:9   865:10
   865:23   868:13   878:15
   878:16   883:18   883:21
gunpoint [1]   877:3
guns [34]   798:20
   799:3   839:6   865:8
   865:25   878:17   878:18
   878:18   890:16   890:18
   891:1   893:11   893:13
   893:15   893:16   893:17
   893:20   893:23   894:4
   894:5   894:7   894:10
   894:12   894:22   894:25
   895:3   895:17   895:22
   896:1   896:9   896:11
   896:15   896:16   896:19
Guss [6]   785:22   787:2
   787:22   791:25   792:5
   792:11
Guss' [1]   787:12
guy [4]   809:4   811:4
   885:9   886:5

--- -H- ---

Haight [7]   931:25
   932:22   932:23   934:2
   937:13   937:17   942:2
Haight's [1]   932:5
half [12]   796:10   809:9
   811:1   811:1   862:24
   885:5   913:6   913:8
   913:9   913:10   918:3
   918:7
half-hearted [1]
   947:13
hand [9]   784:13   789:5
   795:18   836:21   836:21
   886:23   887:4   925:23
   925:24
handed [18]   801:13
   814:6   822:16   825:6
   826:18   837:15   837:21
   840:12   840:23   855:5
   856:21   889:5   891:24
   895:10   922:25   923:25
   924:24   925:11
handguns [5]   890:20
   890:22   891:6   891:12
   896:12
handing [2]   795:21

889:6
handled [4]   880:7
hands [1]   857:2
handwriting [1]
   925:7
handwritten [9]   838:11
   838:16   838:18   880:11
   933:24   935:10   944:5
   944:17   944:19
happening [1]   832:11
happy [3]   785:8
   818:1   873:5
hard [1]   791:1
he'd [1]   818:17
head [3]   931:23   932:4
   939:7
hear [8]   785:14   797:18
   800:22   835:1   851:22
   872:9   873:6   883:11
heard [7]   784:16
   804:2   805:13   880:5
   890:10   900:25   943:3
hearing [2]   872:15
   934:19
held [2]   861:1   944:8
help [9]   794:15   811:10
   828:9   836:10   850:11
   853:6   888:24   940:8
   945:25
helpful [5]   795:25
   839:7   880:13   942:19
   947:20
herring [2]   876:23
   877:1
hers [1]   809:18
hesitation [2]   833:5
   833:10
Hickman [1]   937:9
hide [1]   896:10
hideout [1]   896:19
hiding [1]   896:9
hint [1]   943:20
hinting [1]   943:20
history [6]   876:4
   878:13   889:17   889:21
   903:13   935:4
hit [6]   811:5   822:3
   822:4   822:6   868:3
   887:11
Hobson's [1]   935:19
Hochheiser [26]   783:17
   784:5   784:5   784:21
   785:10   785:12   785:13
   788:1   795:19   802:7
   802:13   802:15   834:5
   834:10   873:25   874:1
   874:21   880:23   897:12
   897:15   897:24   919:1
   919:3   930:23   931:1
   931:3
Hochheiser's [1]
   875:10
hold [4]   894:11   894:22
   895:17   897:16

holding [1]        894:7
hole [1]  793:16
home [8]           796:4
796:9   882:19   885:19
907:22   907:23   909:21
930:20
HON [1]            783:11
honest [3]         800:14
874:4   875:11
honestly [2]       803:6
803:12
Honor [71]         785:20
787:8   789:20   790:1
794:11   796:16   801:25
802:3   802:14   802:18
805:25   815:6   820:23
826:9   834:5   834:16
835:7   837:2   837:4
837:15   840:16   840:21
847:13   849:3   857:20
869:11   870:1   872:23
874:1   880:4   880:5
889:3   891:22   892:2
892:3   895:6   895:19
896:21   897:11   897:21
898:8   900:2   900:24
905:15   908:4   908:6
908:15   920:2   920:7
923:23   924:21   924:23
927:4   930:2   930:15
931:19   934:25   936:9
937:22   938:15   938:20
940:11   941:4   942:16
942:20   944:24   945:16
945:17   946:9   947:4
947:9
Honor's [1]        880:6
honorable [1]      854:13
hope [1] 918:21
hoping [2]         845:7
845:16
hour [3] 862:24   880:19
881:1
hours [8]          796:10
843:21   843:24   843:25
844:3   844:4   844:5
844:8
house [12]         799:16
799:18   896:3   896:7
896:13   922:2   922:2
922:5   922:7
houses [1]         799:21
huddle [1]         892:12
hundred [3]        870:7
894:22   913:11
hundreds [1]       866:24
hypothetical [1]
877:20
hypothetically [2]
933:4   935:21

-I-

I's [1]  939:15
ID [1]   818:8

idea [2] 896:16   901:4
identification [2]
892:1   922:24
identified [1]     827:11
838:17
identify [2]       872:25
877:21
identity [1]       790:9
illegal [24]       806:25
807:2   833:6   833:12
836:10   836:12   836:25
850:12   854:24   854:25
856:13   858:11   858:13
858:18   858:19   860:10
860:15   862:4   912:11
914:9   915:2   915:6
915:20   915:25
illegally [2]      881:18
914:7
imagine [2]        872:23
919:3
impact [1]         878:23
impacted [1]       936:3
impeached [1]      936:1
implicate [1]      790:11
934:7
implicated [2]     787:5
787:19
implications [1]
946:2
implies [1]        794:20
imply [1]  901:20
import [1]         932:4
important [4]      908:21
908:24   934:14   934:17
improvement [1]
947:14
inappropriate [1]
794:19   901:9
incident [1]       810:17
810:17
include [3]        804:15
838:20   840:4
included [2]       891:18
903:13
including [3]      860:10
862:4   942:4
income [1]         901:7
926:4   928:2   928:4
928:5
inconsistency [1]
925:6
inconsistent [4]
925:22   925:25   925:25
932:24
incorrect [3]      848:22
870:25   871:9
incredibly [1]     789:15
incredulous [1] 933:8
INDEX [1]          948:1
indicate [2]       870:14
941:19
indicated [1]      785:20
934:25

indicates [1]      945:6
indication [3]     823:11
838:25   933:21
individual [3]     812:6
812:15   813:1
individuals [9]    864:16
864:19   864:23   873:24
877:2   877:16   877:17
878:21   879:1
inform [1]         869:20
informant [8]      816:18
833:20   834:3   835:11
835:15   876:14   876:15
911:23
information [10]
799:9   799:11   799:15
799:20   838:22   876:15
876:24   879:10   908:20
942:20
informed [1]       870:4
inherently [1]     877:3
initial [1]        794:4
inquire [1]        870:11
878:24   879:9   925:18
inquired [1]       870:6
inquiry [3]        795:14
873:17   879:5
inside [5]         826:24
865:13   865:16   865:18
868:9
instance [6]       787:22
787:23   862:24   870:9
879:7   940:4
instances [2]      839:3
944:14
instruction [1]    785:7
785:9   795:25
instructions [2] 802:12
834:2
intend [3]         870:11
870:14   919:19
intended [1]       839:11
intent [1]         946:2
intention [1]      785:4
intentional [1]    793:14
interest [3]       928:7
932:5   945:6
interested [1]     840:1
899:20
interpret [1]      933:20
interpretation [1]
938:7
interpreted [1]    932:25
interview [3]      936:17
937:3   944:15
interviewed [1] 894:17
interviews [2]  936:25
940:5
introduce [1]      799:6
investigation [2]
788:4   792:23
investigator [5] 823:1
823:2   827:1   827:3

832:9
involved [10]      872:8
873:18   875:8   875:16
875:16   879:12   915:2
915:6   915:20   916:2
involving [2]      784:9
917:5
irrelevant [6]     873:23
877:10   877:13   877:15
877:16   878:5
IRS [1]  936:17
issue [29]         785:6
785:22   787:6   787:15
787:16   787:20   787:20
789:21   789:23   790:11
791:10   869:12   869:21
870:12   880:4   880:5
901:4   942:8   943:11
943:14   944:16   944:21
944:21   944:24   944:5
945:6   945:13   945:14
946:20
issued [4]         837:20
903:15   904:6   946:18
issues [1]         946:24
itself [2] 874:13   932:14

-J-

jacket [1]         827:7
jail [22]  798:2   798:4
868:25   882:11   882:14
882:16   882:21   882:24
883:1   907:13   907:18
907:19   907:19   907:20
907:25   909:12   909:19
915:5   915:11   915:15
915:16   915:19
Jamaican [1]       881:9
Jamaicans [3]      863:25
888:3   888:9
JAMES [1]          783:14
January [7]        883:20
889:12   889:13   889:18
889:20   890:1   911:7
Jeep [14] 788:17   789:22
826:24   826:25   827:24
829:13   829:16   829:17
829:18   832:11   832:14
832:17   832:19   857:12
jeez [1]  795:12
jeopardize [1]     876:19
job [3]   941:1   941:2
947:19
John [98]          783:5
783:20   784:4   789:2
822:25   823:6   823:20
824:4   824:8   824:12
824:16   824:17   824:24
825:1   825:10   825:14
825:21   826:1   826:15
827:3   827:11   827:13
827:24   827:24   828:10
828:11   828:21   829:7
829:23   830:3   830:14
830:15   830:19   830:21
831:1   831:17   832:22

833:1   833:3   833:15
834:1   834:12   834:13
834:14   835:9   835:14
835:18   835:25   836:5
836:11   840:25   841:24
841:25   842:11   844:10
844:11   844:13   844:14
844:20   844:22   845:4
845:8   845:13   845:14
845:17   845:19   846:8
846:12   846:15   846:18
850:8   850:9   850:13
850:16   850:18   850:21
850:22   850:25   851:9
851:18   851:24   852:5
852:8   853:25   854:3
855:3   855:18   856:10
856:12   856:15   878:12
878:15   904:21   905:22
905:23   906:1   906:8
943:3
John's [9]         788:17
792:14   792:23   827:20
828:22   832:11   832:14
832:17   832:19
joint [1] 946:19
Jones [1]          932:2
joy [1]  811:12
judge [51]         783:12
788:1   789:25   792:3
804:25   805:1   805:10
805:20   805:24   806:5
806:7   837:5   840:10
857:15   858:25   864:17
864:20   873:2   876:2
877:20   878:1   878:3
878:14   880:17   880:23
892:15   897:15   900:14
900:14   900:16   901:2
901:10   904:1   908:11
918:11   918:20   918:20
926:10   931:22   931:25
932:2   932:4   932:22
932:23   934:2   937:13
937:16   942:2   942:17
946:18   946:22
judgment [1]       946:4
judicial [1]       870:19
Julius [2]         810:6
884:24
July [4] 910:5   910:7
910:11   910:22
jumped [1]         885:24
885:23   885:24
juror [1] 877:13
jurors [1]         851:22
jury [36] 784:1   784:24
788:10   790:3   791:15
793:10   794:20   795:25
796:5   796:6   806:24
809:13   827:5   837:9
837:14   840:13   840:14
860:24   861:12   869:19
872:3   874:4   875:20
875:23   876:6   876:9
877:18   880:9   918:15
920:4   920:5   930:18
930:22   947:14   947:16

947:20

jury's [3] 820:24
861:21 875:21

-K-

Kathy [1] 784:2
keep [20] 786:8
786:13 786:15 786:20
786:22 791:21 792:13
792:19 796:24 797:17
799:19 803:18 803:20
804:5 804:7 804:20
805:7 806:11 851:21
867:6
kept [1] 786:18
Kerry [2] 838:6
931:11
key [3] 937:21 937:23
937:25
kicked [3] 864:4
865:11 888:2
kid [3] 885:21 885:23
885:24
kids [8] 797:11 808:9
893:20 893:23 894:8
894:12 921:14 929:15
kind [16] 785:9
786:15 797:14 833:6
833:12 836:18 841:4
851:5 854:22 854:22
865:9 866:9 868:13
877:3 941:13 945:18
kinds [3] 828:12
838:7 939:11
knew [3] 788:18
788:18 903:22
knife [2] 863:10 863:14
knowledge [12] 792:22
793:1 793:6 793:8
793:10 793:17 793:21
794:2 815:22 817:19
822:25 871:8
known [3] 796:25
906:12 906:16
knows [4] 793:16
857:15 936:9 946:16

-L-

lack [1] 786:7
ladies [5] 796:7
834:7 837:6 918:12
930:17
lady [1] 890:5
lanes [1] 815:14
language [1] 802:2
larceny [10] 809:11
809:19 809:20 868:16
868:24 869:4 870:3
870:12 870:21 871:2
large [1] 925:4
larger [1] 946:1
last [44] 784:8 784:8
785:9 785:20 801:19
802:22 807:6 814:23

816:20 821:1 821:20
824:4 832:22 833:18
836:5 842:19 842:20
842:21 842:24 843:2
843:5 843:6 846:22
846:23 847:3 847:6
847:12 847:22 848:1
848:4 848:17 852:3
863:17 880:10 889:7
897:1 897:5 897:6
898:2 898:6 941:4
942:8 946:25 947:15
late [2] 894:3 944:12
latter [1] 931:15
law [6] 814:19 833:20
835:12 936:12 937:4
941:11
Lawrence [39] 783:17
784:5 837:14 838:2
838:6 838:13 838:18
839:7 880:11 919:8
919:9 919:17 926:15
930:12 931:2 931:4
931:5 931:11 931:14
933:6 933:7 935:8
935:9 936:16 938:8
938:14 939:9 939:20
940:11 941:19 942:7
943:23 943:25 945:15
946:9 946:10 947:6
947:7 947:8
Lawrence's [3] 925:8
942:24 944:2
lawyer [41] 789:8
790:9 817:24 823:3
823:4 823:7 823:8
898:15 898:16 898:17
898:18 898:25 899:1
899:5 900:15 900:18
900:21 901:23 902:5
902:7 902:9 902:12
902:15 902:20 905:6
905:9 905:12 905:17
905:17 905:18 922:19
926:11 927:18 927:19
930:10 934:12 934:15
934:17 934:22 935:18
946:3
lawyers [4] 788:18
935:14 936:4 936:24
lay [1] 880:3
lead [2] 858:10 870:5
leading [4] 806:1
806:3 858:13 858:18
858:19
lean [1] 811:9
learn [1] 816:24
learned [4] 784:14
796:11 818:14 818:16
least [11] 793:22
795:5 822:11 838:17
839:15 872:12 918:21
931:24 933:18 936:24
939:19
leave [3] 785:14 817:2
918:16
leaves [2] 918:17
931:9

leeway [1] 946:4
left [4] 790:20 817:1
836:21 869:25
leg [1] 887:23
legal [3] 861:2 930:24
931:22
less [6] 809:23 844:4
844:7 870:18 883:8
917:21
letter [23] 789:7
790:8 804:2 804:9
804:10 804:15 804:19
804:24 805:3 805:4
805:7 805:18 805:20
806:13 806:15 806:19
806:21 838:8 838:10
839:25 840:1 931:3
942:17
letters [1] 839:18
level [1] 940:20
Liberty [1] 814:16
lie [3] 828:16 841:5
841:12
lied [4] 854:18 878:16
901:5 926:10
lies [2] 878:6 878:9
life [14] 801:20 800:23
805:6 854:21 854:22
854:22 854:24 854:25
858:11 858:13 858:18
858:19 875:13 926:14
lifetime [1] 860:11
limited [1] 869:22
870:9 876:7
Lindale [1] 894:22
Lindsley [6] 812:6
815:10 815:13 815:15
815:17 815:18
line [8] 814:23 816:12
816:13 816:20 833:18
908:9 927:6 932:4
line-by-line [1] 938:20
lines [7] 795:7 833:3
835:17 838:20 939:10
939:12 940:2
list [1] 873:14
listen [5] 795:25
842:7 842:10 842:21
843:9
listened [16] 842:12
842:19 842:23 843:1
843:2 843:2 843:4
843:6 843:12 843:13
843:15 846:10 852:21
852:25 853:12 853:14
listening [3] 843:21
846:11 846:22
litigation [2] 787:21
787:24
live [1] 797:8
living [6] 809:16
854:21 854:22 896:2
896:13 921:3
loaded [5] 891:1
891:6 891:19 891:19

893:3
local [3] 899:14 899:22
900:7
location [1] 799:21
log [3] 786:15 791:21
791:25
longer [4] 796:12
825:22 871:4 937:2
look [22] 793:15 793:18
793:23 801:15 819:19
820:7 834:22 837:16
841:20 841:23 844:19
845:21 846:5 846:19
850:8 850:15 852:3
895:10 903:1 925:16
928:19 946:2
looked [5] 844:25
857:1 857:2 886:13
940:1
looking [14] 786:5
787:3 787:13 801:18
814:24 831:14 834:18
844:16 845:18 846:2
846:20 852:7 852:15
903:2
Love [15] 813:23
813:25 814:13 823:5
825:11 825:12 825:14
825:22 827:22 827:25
828:9 829:9 829:23
832:16 906:12
Love's [1] 822:21
low [1] 805:8
lowest [1] 805:11
lunch [4] 848:14
869:16 880:19 881:1
Luncheon [1] 871:15
lying [1] 925:21

-M-

magazine [1] 891:19
magazines [2] 891:19
893:3
magistrate [1] 901:8
mail [7] 817:1 817:2
817:5 817:8 817:11
817:18 818:4
major [1] 912:3
majority [1] 786:6
makes [4] 877:3
929:14 943:13 947:9
Malcolm [36] 816:6
816:6 816:21 816:24
817:5 817:10 817:14
817:17 817:21 818:13
818:14 818:16 818:24
819:1 819:5 819:14
819:23 820:2 820:4
820:6 820:14 820:15
821:10 821:25 822:10
822:12 822:17 822:22
823:24 824:1 824:15
905:25 906:4
Malcolm's [1] 818:4
Malcom [1] 821:5

man [8] 821:2 821:3
821:21 821:22 831:16
848:20 867:12 886:19
801:5 806:14
mandatory [3] 800:24
manner [1] 828:22
Marcel [1] 813:1
March [39] 798:15
798:16 799:24 807:7
807:10 812:4 838:12
838:13 883:18 883:20
884:16 890:15 894:17
894:21 895:4 896:17
897:19 898:3 898:6
898:14 902:3 917:2
920:9 920:10 920:12
920:14 921:15 921:19
921:24 922:9 922:12
922:18 923:2 923:5
927:1 927:17 929:18
942:25 943:6
marching [1] 787:12
marijuana [4] 807:3
807:6 807:11 807:16
marital [1] 928:22
mark [2] 795:22 840:4
marked [14] 801:11
814:4 816:8 821:17
822:14 825:4 826:16
839:23 840:3 840:5
895:9 922:23 923:20
947:14
marking [1] 796:2
marks [1] 940:1
941:18 941:21
married [12] 920:12
920:15 920:17 922:10
922:13 922:16 926:2
928:17 928:24 929:2
929:4 929:5
Martez [2] 812:15
812:21
matched [1] 879:25
material [13] 878:14
901:12 926:13 933:24
934:21 936:8 936:10
936:11 936:22 936:24
944:3 944:14 945:2
matter [10] 787:8
788:19 789:23 789:25
790:5 817:23 872:8
873:25 919:14 930:9
maximum [3] 800:19
801:3 805:5
may [54] 784:14 787:18
787:19 789:21 790:1
790:10 790:10 792:4
792:9 795:18 814:14
838:2 840:21 848:22
862:2 872:18 875:22
875:23 876:7 877:19
889:3 891:22 895:6
901:1 901:9 908:4
908:6 909:3 919:10
920:6 923:23 927:4
927:14 932:2 932:3
934:13 934:13 934:14

934:15  934:15  934:16
934:19  935:22  935:24
936:2   936:3   936:3
936:23  936:25  937:22
940:12  940:12  943:16
945:11

**McMahon** [2]      931:22
942:17

**mean** [37]           793:21
819:19  819:21  822:4
837:17  843:25  847:9
847:21  847:21  850:25
851:7   853:11  853:23
855:16  859:25  863:9
867:12  885:20  886:18
886:20  887:8   887:10
897:3   897:15  898:19
903:9   906:18  912:16
914:14  914:16  915:8
915:23  921:8   925:14
929:3   931:6   943:16

**meaning** [2]          804:13
850:21

**means** [3]            912:17
912:18  945:10

**meant** [8]            838:22
839:1   839:18  851:2
851:4   851:5   853:9
943:20

**meet** [18]            815:13
815:15  825:22  825:24
826:19  832:2   848:7
848:9   848:11  848:24
849:10  849:23  850:4
855:19  856:10  888:11
888:16  889:25

**meeting** [29]         814:18
824:16  825:1   826:1
826:3   826:7   826:12
826:22  827:13  827:14
827:20  829:16  829:17
829:18  829:22  842:7
842:11  843:10  843:23
844:10  852:5   852:22
853:13  855:14  856:16
856:19  857:21  904:20
906:7

**meetings** [4]         803:5
803:7   839:13  944:4

**Melvin** [118]         785:24
786:3   786:12  787:4
788:3   788:4   788:24
789:6   789:8   789:9
789:11  789:19  790:4
790:7   790:10  792:25
794:13  794:14  796:15
796:17  796:22  796:25
797:19  801:11  801:14
801:18  801:20  802:21
802:23  803:2   806:4
810:6   811:9   812:3
814:20  816:8   817:23
820:25  821:1   821:5
821:16  821:21  822:14
823:18  825:8   826:16
826:19  828:5   828:7
830:1   837:10  838:6
838:18  840:19  840:24
844:16  845:1   845:23

847:8   850:9   851:21
854:8   854:11  854:13
854:16  856:8   857:17
862:3   870:6   870:16
872:24  873:3   873:13
873:20  874:24  875:6
875:10  876:12  877:20
877:24  878:12  878:15
880:19  884:12  884:24
891:1   891:25  892:6
892:23  895:9   896:12
897:18  902:2   903:1
904:19  904:23  908:12
908:13  909:4   920:8
920:18  922:18  923:1
927:1   927:6   927:16
931:13  933:5   935:11
935:22  937:23  938:16
940:23  940:25  946:8
947:8   947:10  948:3

**Melvin's** [11]        787:10
787:25  788:11  788:12
790:13  790:16  794:9
935:3   938:3   938:4
939:23

**member** [6]          811:14
811:17  879:2   879:8
879:8   879:19

**members** [4]         815:25
872:6   872:7   872:16

**memorandum** [1]
936:17

**memorandums** [2]
936:25  937:3

**memorialize** [1]
941:2

**memory** [1]          918:24

**memos** [2]           944:15
944:18

**mental** [1]          933:2
933:11

**mentioned** [5]       784:24
790:25  839:21  877:6
940:2

**mentioning** [1]      877:12

**messing** [2]         885:18
885:18

**met** [17]    814:14  847:22
847:25  848:1   848:4
848:23  849:6   849:12
849:13  849:20  889:15
889:19  889:20  905:22
905:23  912:20  942:22

**Michael** [3]         785:22
812:6   815:10

**Mickey** [1]          784:16

**microphone** [3] 797:17
811:9   927:12

**mid-morning** [1]
837:7

**middle** [1]          821:20

**might** [11]           787:15
795:13  834:8   879:16
892:15  910:14  930:15
934:24  935:1   935:20
936:4

**mike** [4] 812:9   812:11

815:10  880:24

**million** [1]          814:17

**mind** [4] 789:1   790:2
922:12  934:4

**mindful** [3]          880:1
942:7   945:25

**mine** [5] 801:21  809:18
869:3   869:3   919:4

**minimum** [3]         800:24
801:5   806:14

**minute** [4]           785:17
796:9   855:2   916:22

**minutes** [8]          837:8
840:25  841:9   858:10
897:6   907:14  909:5
918:13

**mischaracterizes** [1]
828:25

**misdemeanor** [2]
870:21  870:21

**misimpression** [1]
876:6

**misleading** [5]      788:15
789:15  789:17  789:22
793:2

**mistake** [1]          790:7

**mistaken** [1]        935:5

**mixed** [1]            879:24

**moment** [9]          791:13
826:9   834:8   837:2
869:11  895:19  896:21
900:2   908:4

**money** [32]           808:7
808:11  812:9   812:11
815:10  815:15  819:18
819:22  821:15  822:5
824:2   824:7   824:8
824:10  866:19  866:20
866:22  866:24  867:2
867:5   867:6   881:24
883:13  888:10  894:11
895:17  902:21  913:12
921:9   921:15  921:17
925:21

**monitored** [1]       814:18

**monthly** [2]          929:24
930:6

**months** [11]         805:19
805:19  806:20  806:20
808:24  843:15  910:4
910:19  910:21  926:5
928:5

**morning** [13]         796:7
796:22  796:23  842:9
847:24  848:2   919:25
930:21  942:1   943:16
943:22  945:16  946:7

**most** [2]             788:24
795:23  807:19  838:20
908:21  908:24  913:3
918:8   936:11  939:13
939:15  946:4

**mother** [2]           921:20
922:4

**mother's** [4]         896:3
896:7   922:2   922:3

**mothers** [2]          921:9
921:20

**motions** [1]         836:18

**Mouse** [1]           784:16

**mouth** [6]            887:5
887:6   887:8   887:8
887:9   940:19

**move** [1]             856:4
896:24  924:21  930:16

**moves** [1]            791:8

**Ms** [26]      782:4   784:17
785:21  786:2   786:17
786:25  787:1   787:2
787:12  787:12  787:22
788:14  790:6   791:20
791:25  792:5   792:11
792:12  794:11  849:10
849:23  850:5   853:15
880:19  881:1   890:8

**murder** [1]           799:13

**must** [1] 806:14

**-N-**

**N.Y** [1]  783:9

**name** [55]            785:24
786:3   786:9   786:11
787:4   787:10  787:25
788:11  788:12  788:24
789:6   789:11  789:18
790:4   790:7   790:13
790:16  791:17  792:25
794:9   794:13  794:13
796:25  801:20  802:22
810:3   810:3   810:4
812:6   812:8   812:17
812:19  813:1   813:3
813:5   813:21  830:3
830:6   830:22  841:24
874:22  876:20  884:21
884:23  884:25  890:6
890:7   890:10  890:14
899:2   905:24  906:3
906:11  906:14  937:14

**named** [1]            812:15

**namely** [1]           932:15

**names** [35]           786:4
789:9   839:16  864:1
864:2   864:16  864:18
864:23  865:1   872:6
872:8   872:11  872:15
873:19  873:24  874:2
874:6   874:7   874:10
875:4   875:4   875:25
876:17  876:18  877:6
877:11  877:14  877:16
878:25  879:13  879:15
881:11  906:16  943:3
943:9

**naming** [1]          873:19

**narrow** [1]          936:22

**National** [1]        935:13

**nature** [1]          934:21

**near** [2] 887:14  887:16

**necessary** [1]       834:6

**need** [11]            784:22
785:14  785:17  787:23

792:7   801:15  817:25
895:19  942:6   942:22
945:24

**needed** [1]           838:2

**needs** [2]            880:23
943:17

**nefarious** [1]        792:21

**negative** [1]         879:4

**negotiate** [1]        943:18

**neighbor** [1]         893:22

**neighbor's** [1]      893:18

**never** [51]           787:23
824:13  828:13  830:17
830:19  830:24  831:2
831:5   831:6   833:5
833:11  833:19  834:15
834:16  834:17  834:19
834:20  834:24  835:11
835:19  835:21  841:2
841:12  853:21  856:15
858:7   858:21  859:2
859:8   860:8   861:1
862:5   862:10  862:15
863:20  867:15  877:24
888:6   888:10  901:13
902:19  902:20  902:23
902:25  905:24  906:3
912:25  915:2   915:6
917:12  943:2

**new** [8]      783:1   783:15
814:16  826:5   826:15
832:2   899:14  930:16

**newborn** [1]         910:15

**Newburgh** [10]      814:16
815:14  864:6   868:8
894:18  896:18  899:9
899:12  899:23  900:8

**next** [13] 824:3   828:21
832:23  833:18  836:4
845:3   892:20  893:18
893:20  893:22  894:8
894:12  928:4

**nickname** [1]        797:2

**night** [1] 811:5

**Noah** [2]             783:18
784:5

**nobody** [1]          946:14

**none** [2] 787:9      789:10

**Nope** [7]             883:14
883:16  895:16  920:20
920:23  923:19  924:7

**normal** [1]           796:9

**note** [3] 839:15  839:24
941:16

**note-making** [1]
939:11

**noted** [1]            933:6

**notes** [63]           837:15
837:21  838:12  838:16
838:19  839:3   839:5
839:7   839:11  839:23
840:2   840:11  919:8
919:19  931:5   931:7
931:12  933:5   933:24
935:10  935:15  935:20
935:20  935:22  936:2

936:5    936:6    936:20
937:2    937:8    937:17
937:19    938:18    938:19
938:21    939:7    939:8
939:14    940:8    940:9
940:21    941:2    941:5
941:6    941:6    941:14
942:10    942:24    943:9
944:2    944:2    944:3
944:5    944:17    944:19
944:22    944:23    944:25
945:17    945:18    946:12
947:5    947:5

noteworthy [1] 934:17

nothing [12] 819:4
825:17 830:17 831:18
837:4 854:7 864:19
873:24 878:5 878:9
912:3 925:22

notice [1] 870:19

noting [1] 839:13

notion [2] 872:10
880:3

November [34] 792:24
818:11 822:9 823:6
824:20 824:25 826:20
827:20 829:21 841:1
841:10 842:7 842:11
843:7 843:9 843:13
843:22 844:9 850:7
852:21 853:12 853:22
853:25 855:3 855:14
856:11 857:21 904:20
904:23 905:22 905:24
906:4 906:7 911:3
now [43] 789:17 793:4
793:5 795:5 795:10
795:13 795:21 809:10
810:10 810:20 812:3
814:22 816:24 818:23
818:23 821:16 824:25
826:16 829:25 832:21
837:5 843:4 843:10
844:19 845:1 845:21
854:13 854:16 858:25
878:10 885:3 889:15
898:13 914:5 917:1
918:11 922:9 929:13
929:20 931:13 931:16
936:24 942:1

number [21] 791:22
818:11 818:14 818:17
818:19 818:21 860:12
861:13 872:22 872:24
873:1 904:25 905:1
913:22 914:6 925:3
926:1 929:16 935:17
944:13 944:13

----

## -O-

o'clock [1] 869:18
oath [2] 848:19 860:4
object [5] 795:9
847:13 864:15 884:4
900:24
objected [1] 834:11
objecting [1] 864:18

objection [29] 802:6
802:7 802:14 802:15
828:25 829:2 834:5
834:13 835:1 835:4
854:14 857:9 857:10
857:14 864:24 872:10
873:21 884:10 884:13
892:3 897:4 897:5
898:4 901:19 905:15
905:19 924:25 946:11
946:12
objective [2] 790:1
790:2
objects [2] 838:13
924:23
observations [3]
835:20 872:22 873:12
obviously [8] 842:1
844:12 844:21 850:24
933:10 942:23 945:16
946:13
occasion [6] 811:12
868:13 884:20 912:10
918:1 944:19
occasions [11] 904:1
905:5 905:8 905:11
911:23 912:19 912:24
913:12 917:14 917:25
918:4
occur [4] 826:3
826:12 829:12 829:13
occurred [3] 790:22
938:2 941:7
occurring [1] 832:17
occurs [2] 872:6
944:12
October [1] 911:1
off [1] 785:14 819:11
820:6 822:4 822:4
822:7 872:4 872:20
offer [6] 785:2 802:10
802:11 819:15 819:17
897:22
offered [3] 791:14
802:4 821:11
offers [1] 801:25
office [4] 789:2
889:16 890:1 942:16
officers [2] 799:6
814:19
offices [3] 833:21
835:12 835:22
officials [3] 833:22
835:13 835:21
often [4] 807:10 838:23
838:24 939:13
old [7] 797:4 808:15
858:13 859:14 859:24
860:2 893:23
once [7] 818:4 818:16
843:5 892:19 898:17
903:20 904:10
one [85] 786:4 788:3
790:1 790:15 791:24
792:17 811:1 811:1
811:5 811:14 814:23

----

815:1 818:25 819:24
820:1 822:11 826:9
829:20 830:22 830:23
837:2 837:24 838:12
838:17 839:5 841:14
845:6 845:16 861:9
863:4 867:11 867:25
868:1 871:1 872:11
872:22 873:15 875:6
875:15 875:16 877:4
877:14 877:19 879:18
880:10 884:20 885:5
885:20 885:22 887:2
887:19 891:6 891:9
891:12 892:25 894:14
895:19 897:7 898:3
898:7 901:10 901:18
905:5 911:15 918:9
925:16 925:19 928:11
928:11 931:24 932:1
932:2 932:3 933:20
934:20 935:12 935:17
938:9 939:11 940:17
940:17 941:10 944:19
944:25 946:12
ongoing [1] 811:4
open [8] 793:22 835:3
862:1 873:19 877:6
899:25 902:1 926:22
open-ended [1] 870:5
opened [1] 876:3
opportunity [1] 919:10
oppose [1] 935:9
opposed [4] 786:7
932:11 939:18 940:22
order [4] 904:7 922:19
937:17 945:22
orders [2] 787:12
945:16
original [1] 944:17
originals [1] 786:19
ought [4] 919:15
919:18 919:19 935:15
ounce [8] 913:6
913:9 913:10 918:3
918:3 918:7 918:7
918:9
ounces [13] 807:24
808:5 815:18 861:7
881:15 881:19 883:25
884:9 908:1 910:8
910:12 911:8 913:8
outside [5] 826:23
868:9 868:10 887:2
887:3
overall [1] 946:2
overcome [1] 942:22
overcomplicating [1]
788:2
overruled [3] 829:2
829:4 835:4
overrules [1] 946:11
own [17] 792:19 793:16
793:16 810:2 900:17
900:21 902:9 902:12
902:15 902:20 921:24

----

922:7 923:3 923:5
923:18 940:20 946:20
owned [1] 922:5

## -P-

p.m [1] 872:2
page [53] 801:19
802:22 814:7 814:23
820:22 820:25 821:17
821:18 821:21 823:9
823:12 823:17 824:3
824:3 825:7 828:4
828:5 830:1 830:1
830:12 832:21 832:23
833:3 833:18 835:9
836:4 836:4 836:6
841:20 841:21 841:24
844:19 845:10 850:15
850:16 852:3 852:4
852:7 889:7 897:2
897:5 898:2 898:3
898:6 898:7 898:8
908:9 908:12 909:3
923:21 924:2 940:12
940:17
pages [4] 823:17
838:12 892:13 941:5
paid [1] 894:11
paper [7] 819:3
825:16 831:12 833:1
833:13 833:23 836:15
836:24 845:9 853:24
854:4 855:4 855:6
855:11 856:24 857:1
857:7
papers [8] 786:6
786:8 821:2 821:23
828:8 832:15 854:1
857:12
paragraph [9] 814:7
814:13 814:22 815:2
815:4 815:7 815:7
815:20 892:9
parentheses [1] 933:7
parsing [1] 945:18
part [18] 791:5 798:8
811:24 834:1 836:10
836:12 836:25 844:19
846:6 850:12 873:23
875:9 900:6 901:11
933:10 936:1 938:24
939:15
participated [5] 835:19
876:16 877:24 879:1
881:12
particular [11] 803:9
816:2 823:2 845:6
845:16 873:9 874:25
876:5 888:8 892:4
942:6
particularly [4] 787:24
791:20 793:5 880:13
parties [3] 794:24
840:7 942:4
party [2] 808:9 867:4
past [5] 816:22 854:18
886:12 886:13 928:5

----

922:7    923:3    923:5
923:18    940:20    946:20
owned [1]    922:5

Paul [1] 899:3
Pause [6]    801:17
838:4 892:21 895:13
895:21 897:14
Paxson [2]    937:7
940:5
pay [8] 808:11 808:13
820:7 881:23 882:1
883:13 913:10 921:17
paying [5]    912:4
921:6 921:8 921:15
929:22
payment [2]    820:1
930:6
payments [4]    921:19
925:19 928:7 928:8
pen [8] 836:19 836:21
836:24 854:5 855:6
855:11 856:21 924:15
penalties [1]    926:17
penalty [2]    927:2
927:7
pending [1]    871:3
people [36]    788:8
799:13 799:13 799:19
862:13 862:15 864:10
865:4 865:16 865:17
866:2 866:5 872:8
872:25 874:3 874:20
876:1 876:17 876:20
877:3 877:4 877:6
877:11 877:13 877:21
877:23 879:7 879:12
879:16 879:18 881:11
913:16 934:12 936:22
943:12 944:4
per [1] 804:4
percent [2]    870:7
938:3
percentage [1]    925:4
perfectly [1]    795:16
period [9]    786:21
817:3 817:4 824:14
831:7 907:10 911:25
912:1 914:21
perjury [1]    836:9
841:5 841:17 850:11
926:17 927:2 927:7
permission [5]    802:18
814:10 815:1 815:3
870:9
permitted [1]    908:18
person [12]    787:2
791:23 791:23 792:17
792:18 823:25 838:23
854:16 867:19 867:24
874:4 879:10
personal [1]    839:12
personally [1]    943:2
Pesce [3]    787:1
890:12 890:13
Peso [1] 906:17
petit [10]    809:11
809:19 809:20 868:15
868:23 869:4 870:2

----

870:11  870:21  871:2
**phone** [19]
817:11  817:23  818:7
818:10  818:10  818:14
818:17  818:19  819:5
819:11  820:6  822:1
822:2  822:2  822:18
824:17  829:15  947:1
**phones** [1]         824:5
**phrase** [7]         804:2
819:19  819:23  822:4
828:21  873:12  933:25
**physical** [1]      836:12
**piece** [4] 831:12  833:1
855:6  855:11
**place** [11]        791:1
820:14  820:15  826:22
845:3  876:9  891:25
896:1  896:6  896:9
896:10
**placed** [2]       815:10
901:19
**plainly** [1]      790:2
**Plains** [5]        783:9
899:6  899:8  900:14
902:3
**plan** [1] 785:1
**planning** [1]     802:5
**play** [1] 878:22
**played** [1]       879:10
**plea** [1] 806:22
**plead** [3]        800:1
800:3  869:6
**pleasant** [1]     793:5
**pled** [5] 800:17  800:20
806:24  869:5  893:13
**point** [30]       784:11
785:1  786:21  794:22
795:15  795:17  800:16
802:5  802:13  811:14
811:21  821:10  822:3
823:6  824:11  831:17
831:18  836:11  848:15
864:25  873:17  875:10
880:10  880:12  897:21
901:10  919:17  938:20
941:19  943:25
**pointing** [2]     865:23
892:17
**points** [1]       879:14
**police** [17]      810:3
810:7  828:14  884:21
884:25  891:15  891:18
893:2  893:7  893:19
894:4  894:7  894:9
894:11  894:18  896:12
896:18
**policy** [4]       935:14
935:17  936:7  946:1
**pop** [1] 943:21
**portion** [5]      892:4
892:6  892:17  892:18
897:25
**pose** [1] 877:19
**position** [5]     873:2

933:17  936:4  936:5
937:1
**positions** [1]   794:25
**positive** [1]     786:5
**possessed** [3]    891:13
892:24  894:4
**possessing** [2]   891:5
893:13
**possession** [9]   797:23
798:1  883:21  890:16
893:12  893:16  936:15
936:16  944:23
**possible** [2]     787:14
787:18
**possibly** [1]     871:1
**potential** [1]    873:10
876:13
**potentially** [3]  875:14
941:3  944:2
**powder** [16]      916:4
916:8  916:12  916:15
916:15  916:17  916:18
916:19  916:24  917:2
917:6  917:9  917:15
917:24  917:25  918:9
**powdered** [1]     917:17
**power** [2]        946:21
947:4
**practical** [1]    817:23
**practice** [1]     944:7
**precedent** [1]    935:20
**preceding** [1]    926:5
**precious** [1]     941:17
**preclude** [1]     861:2
**precluded** [1]    875:12
**precluding** [1]   794:22
**predicate** [1]    884:10
**prefer** [1]       897:13
**premise** [1]      834:6
**preparation** [1]  853:3
**prepare** [2]      847:10
853:7
**prepared** [1]     946:7
**presence** [3]     932:15
932:18  933:14
**present** [17]     784:1
796:6  815:10  837:9
840:14  849:15  849:17
869:19  872:3  873:20
913:15  914:6  917:19
918:15  920:5  930:22
942:25
**presented** [3]    877:18
941:14  947:18
**preserved** [2]    932:9
944:20
**preserves** [1]    946:13
**preserving** [1]   932:5
**pressed** [1]      809:18
869:4
**pretty** [2]       788:13
938:9
**prevent** [1]      788:8

**previously** [7]   802:9
816:8  818:5  818:18
840:3  875:13  941:16
**primary** [1]      925:15
**prints** [1]       895:2
**prison** [14]      800:25
806:15  808:24  809:8
810:23  812:2  885:19
907:22  907:23  909:21
909:24  910:2  915:1
927:24
**private** [1]      899:1
**privilege** [22]   786:8
787:6  787:15  787:20
788:2  788:9  789:1
790:11  838:15  925:9
932:9  932:12  932:13
932:21  932:25  933:1
933:1  934:5  938:11
941:10  942:23  946:14
**privileged** [3]   789:7
789:11  925:10
**problem** [9]      786:24
790:19  790:22  791:6
794:4  875:17  876:17
884:11  946:18
**problems** [2]     876:13
925:3
**procedure** [1]    788:21
**proceedings** [1] 897:16
**process** [8]      791:5
919:7  934:7  938:23
938:25  939:22  940:15
940:22
**processes** [7]    933:3
933:11  933:11  940:7
940:21  941:13  941:23
**produce** [1]      919:9
**produced** [5]     919:16
919:19  931:14  931:15
941:15
**producing** [1]    935:9
**product** [16]     838:15
839:20  932:12  932:25
933:1  933:1  934:5
934:8  937:10  938:11
939:18  941:9  941:15
941:22  945:20  946:11
**production** [3]    838:13
937:12  946:24
**profession** [2]   925:20
928:6
**proffer** [19]     837:20
838:17  838:17  839:9
840:2  872:14  873:3
919:9  931:8  931:12
933:5  934:13  935:10
935:18  941:6  941:7
942:10  942:24  942:25
**profit** [1]       808:4
**promise** [1]      803:16
**promised** [1]     803:24
**proof** [6]        856:2
856:6  856:7  856:8
856:12  925:23
**proper** [2]       875:21

942:6
**property** [3]     863:13
925:24  925:25
**propose** [5]      873:4
874:19  878:24  879:6
942:15
**proposed** [1]     937:12
**prosecuted** [9]   858:1
858:4  858:22  859:3
859:8  860:24  862:5
862:10  867:15
**prosecution** [2] 905:13
937:25
**prosecutor** [6]   889:16
889:25  934:12  934:14
934:18  943:2
**prosecutor's** [1]
788:7
**prosecutors** [4] 888:6
888:12  932:15  932:18
**protect** [1]      933:2
**protected** [2]    838:14
937:10
**prove** [3]        856:9
877:23  926:3
**provide** [4]      799:9
799:11  799:15  799:20
**provided** [7]     784:10
784:16  827:16  835:21
838:7  878:14  880:11
**provides** [1]     944:5
**proving** [1]      925:5
**provision** [1]    803:13
936:22
**provisions** [1]   936:18
**public** [1]       946:16
**purchased** [2]    814:17
917:8
**purchaser** [2]    912:12
912:17
**purchases** [3]    799:2
799:5  799:9
**purchasing** [1]   815:12
**purpose** [2]      854:20
926:19
**pursuant** [3]     874:5
891:16  931:14
**pursue** [1]       874:14
**pushed** [4]       856:22
856:25  886:24  924:15
**pushing** [6]      836:15
836:16  836:22  836:24
854:4  855:5
**put** [13]  785:6  786:1
790:25  798:2  802:18
804:19  870:23  875:20
878:17  896:15  898:11
927:14  941:20
**puts** [1]  790:25
**putting** [2]      876:22
876:25

**-Q-**

**qualified** [1]    941:10
942:22
**quantities** [1]   918:5
**quantity** [2]     913:4
918:2
**quarter** [1]      918:14
**questioning** [6]  789:25
790:14  790:20  790:23
791:8  872:4
**questions** [22]   788:20
789:24  791:8  835:2
847:11  857:19  857:25
870:5  872:5  872:12
879:22  879:23  880:3
880:4  901:20  908:14
909:4  909:15  919:2
925:14  938:9  939:1
**quick** [1]        879:14
**quickly** [2]      787:18
796:1
**quite** [11]       789:5
796:12  823:23  843:24
843:25  844:4  844:6
844:7  844:8  891:4
910:19
**quotation** [3]    940:1
941:18  941:21
**quotations** [1]   940:4
**quote** [1]        933:22
**quoted** [1]       938:12
**quotes** [4]       839:4
939:17  940:1  940:18

**-R-**

**raised** [1]       932:12
**ran** [1]  809:4
**range** [3]        805:17
805:21  806:17
**rape** [2] 870:4  871:4
**rather** [2]       938:23
940:6
**Ray** [23] 813:23  813:24
813:25  814:14  822:21
823:5  825:11  825:12
825:14  825:22  827:22
827:25  828:9  829:9
829:23  832:16  875:8
906:9  906:11  906:12
906:16  912:21  916:24
**Raymond** [23]     787:7
813:19  814:14  815:11
815:13  815:15  815:22
815:24  818:24  819:15
906:20  906:23  906:25
911:12  911:19  911:22
912:11  912:20  913:4
913:13  913:15  914:7
916:22
**RD** [1]  948:2
**read** [22] 814:10  815:1
815:7  815:23  831:3
834:1  834:12  838:24
846:7  853:14  882:18
892:23  895:11  908:8
908:16  908:17  909:2

924:10 941:25 942:3
942:5 942:14

**readily** [1]   875:7

**reading** [13]   815:6
818:1 831:9 831:12
833:1 833:1 835:10
835:18 846:6 895:17
895:14 908:12 936:10

**reads** [2]   823:19
833:4

**ready** [2]   801:16
920:3

**really** [16]   786:13
789:3 795:25 847:17
861:14 861:15 877:9
893:4 918:22 924:11
934:1 936:12 945:3
945:4 945:19 947:13

**reason** [10]   788:14
789:14 794:8 834:10
870:24 873:21 875:14
876:4 935:2 936:7

**reasonable** [2]   874:16
943:18

**reasonably** [1]   787:11

**reasons** [8]   792:16
792:19 793:25 839:20
935:12 935:15 935:17
945:21

**reassigned** [1]   931:21

**rebuttal** [2]   792:4
875:12

**received** [15]   787:9
802:8 802:17 826:17
833:6 833:11 898:5
898:10 901:11 925:19
926:23 926:25 928:5
948:6 948:9

**recess** [3]   837:12
871:15 919:6

**recognize** [4]   816:9
827:2 923:22 924:1

**recognized** [1]   889:7

**recollection** [29]
786:4 786:11 790:6
804:4 818:1 839:8
842:4 845:22 846:3
846:7 846:12 846:20
850:17 852:4 852:8
852:11 852:16 870:15
892:24 893:2 895:7
895:15 903:3 903:6
914:6 924:13 926:16
931:20 931:24

**recommend** [1]   805:24

**recommendation** [1]
806:7

**reconsider** [2]   919:23
943:14

**reconsidering** [2]
919:7 945:5

**reconstructed** [1]
792:15

**reconvene** [4]   837:8
869:18 871:13 918:14

**record** [25]   786:1

786:18 788:9 789:16
792:17 795:5 795:17
802:10 802:21 807:25
820:23 826:11 827:10
827:12 836:20 836:23
839:15 856:11 857:23
870:14 870:22 871:9
892:11 898:1 941:16

**recorded** [11]   814:19
817:18 818:25 822:11
822:12 822:17 824:18
824:23 825:1 835:19
938:3

**recorder** [2]   827:19
855:20

**recording** [10]   784:7
784:8 784:15 842:10
843:9 843:22 855:17
855:22 856:16 856:19

**recordings** [2]   835:22
836:2

**records** [1]   791:21

**red** [2]   876:23   877:1

**redacted** [1]   802:12
933:12

**redaction** [1]   802:9

**refer** [4]   801:19   814:22
820:21 821:16 829:11
832:21 839:18 939:15

**reference** [3]   805:13
932:10 943:10

**referred** [1]   814:20
815:20

**referring** [10]   804:24
814:7 824:3 835:9
843:17 843:19 897:2
898:2 929:12 934:3

**refile** [1]   792:14

**reflect** [5]   827:10
827:12 836:20 836:23
941:5

**reflected** [4]   820:18
822:10 822:23 824:21

**reflection** [1]   872:21
940:15

**reflects** [1]   939:22

**refresh** [16]   804:4
817:25 842:4 845:21
845:25 846:2 846:7
850:17 852:8 852:11
852:15 892:24 893:2
895:7 895:15 903:6

**refreshed** [1]   903:3

**refreshes** [1]   852:4

**refreshing** [2]   839:8
945:7

**regard** [1]   879:11

**regarding** [1]   872:5

**regardless** [1]   945:12

**regularly** [1]   942:11

**relate** [1]   790:5

**related** [2]   787:19
935:2

**relates** [2]   935:3
938:4

**relating** [1]   931:12

**relation** [1]   823:15

**release** [2]   915:1
927:24

**released** [6]   909:23
910:1 910:21 915:5
915:11 915:19

**relevance** [5]   784:25
786:7 789:1 864:15
905:15

**relevant** [17]   784:18
787:17 861:11 861:14
861:16 864:22 872:9
872:17 873:9 873:17
878:2 878:5 878:7
878:10 879:10 880:13
943:12

**relied** [1]   932:12

**rely** [1]   789:12

**remain** [2]   840:7
901:9

**remember** [141]   786:14
788:23 793:4 794:12
831:8 831:9 837:19
841:6 844:9 844:10
844:13 844:14 844:17
844:18 844:25 845:18
845:20 846:1 846:14
846:15 846:16 846:17
846:21 849:19 850:8
850:9 851:10 851:12
851:13 851:13 851:15
851:16 851:17 851:18
851:20 851:24 852:1
852:2 852:6 852:20
853:11 854:5 855:6
858:2 858:11 858:20
859:11 859:19 859:20
860:2 860:9 862:7
862:12 862:19 862:19
862:22 862:23 863:1
863:7 863:13 863:15
863:16 863:17 865:10
866:5 867:17 867:19
867:23 868:14 868:16
874:7 874:11 875:25
879:5 879:15 881:9
881:16 881:21 882:25
883:4 883:5 885:6
885:9 888:3 888:16
888:22 889:7 889:10
889:15 889:19 889:23
890:7 890:10 890:20
890:22 891:7 891:10
891:11 891:12 891:13
891:15 891:21 893:9
893:20 894:17 902:5
902:6 902:7 902:9
903:4 903:5 903:12
904:12 904:14 904:16
904:18 905:21 908:13
909:4 909:15 910:12
910:23 911:2 911:7
913:24 914:1 914:3
914:8 915:11 915:14
915:16 917:8 917:14
917:16 922:21 922:22
924:17 924:18 927:24
946:19 946:25

**remembers** [3]   786:5
789:12 864:23

**reminded** [1]   793:3

**reminder** [1]   839:12

**rent** [2]   921:13   928:7

**rented** [1]   922:4

**repeat** [2]   825:18
835:8

**repeated** [1]   825:20

**rephrase** [7]   803:23
806:2 806:3 824:24
847:19 884:5 915:10

**reporters** [1]   877:8

**represent** [10]   792:6
898:18 898:25 899:5
900:15 902:8 930:10
935:22 940:23 943:1

**representation** [4]
791:19 873:8 936:3
940:25

**represented** [1]   905:6

**representing** [6]
794:25 874:24 899:4
905:17 935:18 936:22

**represents** [1]   901:14

**require** [1]   936:12

**required** [8]   803:3
803:8 803:20 872:25
936:12 936:20 937:3
937:4

**requirements** [1]
944:6

**requires** [1]   946:3

**residence** [2]   896:1
896:4

**resist** [1]   810:13
880:2

**resisting** [1]   810:11

**resolve** [3]   787:15
945:8 945:13

**resolved** [1]   787:21
789:24

**respect** [16]   784:23
785:5 785:7 787:25
803:13 812:10 812:21
813:7 813:14 813:24
864:20 918:4 922:9
938:9 938:10 940:8

**respects** [1]   936:21

**responded** [1]   937:6

**responds** [4]   821:25
823:24 830:21 838:8

**response** [1]   870:16

**responsive** [1]   856:4

**rest** [7]   826:4   826:14
826:20 826:22 911:18
919:22 924:6

**restate** [1]   835:5

**result** [1]   809:20

**resumed** [3]   783:21
837:13 880:15

**retain** [1]   944:17

**retirement** [1]   928:7

**return** [2]   882:3
904:7

**returned** [14]   786:6
786:7 786:9 786:10
786:12 786:16 786:18
786:19 787:18 788:25
788:25 792:15 792:18
817:18

**returning** [1]   791:22

**returns** [1]   883:15

**review** [9]   785:8
787:4 791:5 837:22
839:12 919:24 942:3
943:9 943:19

**reviewed** [8]   788:17
790:24 791:2 791:10
838:5 847:3 880:10
937:19

**reviewing** [1]   880:14

**reviews** [1]   839:16

**revolver** [2]   891:7
891:10

**revolvers** [1]   892:25
893:9

**ride** [1]   796:9

**riding** [1]   811:12

**right** [69]   786:20
802:15 821:22 827:9
828:17 831:20 836:21
841:6 841:18 844:19
844:22 845:10 845:17
848:22 854:20 855:6
855:18 857:8 857:21
858:25 858:25 860:2
860:24 860:25 863:10
863:11 863:20 863:11
865:23 869:5 877:5
878:20 881:24 882:6
890:18 890:20 891:1
891:15 892:10 892:22
893:11 896:10 901:8
904:3 905:3 907:25
908:3 909:6 909:25
910:1 910:9 911:9
911:12 911:16 911:20
917:3 917:14 922:13
922:14 929:10 930:6
931:6 932:6 934:5
934:9 936:2 936:24
945:8 945:11

**risk** [2]   925:8   925:14

**rob** [2]   865:16   888:9

**robbed** [6]   863:23
863:24 864:4 867:3
877:2 888:3

**robberies** [4]   863:3
867:10 867:14 873:13

**robbery** [23]   808:17
862:18 862:22 863:8
863:9 863:17 864:3
865:5 873:1 873:4
873:9 874:25 875:1
875:25 876:5 876:8
876:21 877:21 877:24
879:19 881:8 881:8
881:12

**Robinson** [2]   783:11

900:14

rock [1]  791:1

Rockland [1]  945:16

role [1]  879:10

room [4] 788:18  792:17
877:8  877:8

Roth [9] 783:5  783:18
784:6  784:9  787:6
789:2  790:9  930:23
943:3

Roth's [1]  788:3

roughly [1]  860:14

routinely [1]  942:11

Ruger [1]  891:9

rule [4] 919:18  936:10
936:19  942:5

ruled [3] 870:5  880:5
932:22

ruling [8]  870:8
870:10  878:21  880:1
919:8  919:23  932:5
946:6

running [4]  887:8
887:7  887:8  887:9

RX [1]  948:2

— S —

S7 [1]  783:4

SA [1]  816:13

safely [1]  930:20

safety [2]  876:19
876:21

sake [1] 802:21

sale [1] 860:13

sales [2] 808:8  901:7

Sam [1] 801:12

satisfied [1]  795:17

Saturday [1]  848:9

saw [3]  790:3  790:16
926:14

says [49] 785:4  791:20
793:3  793:8  816:20
821:1  823:20  825:8
825:10  828:7  828:10
828:11  829:20  830:12
830:15  834:23  834:24
836:8  841:25  844:20
845:5  845:6  845:14
845:15  861:23  872:25
876:20  877:21  879:6
879:9  879:11  925:20
925:24  926:4  927:7
928:2  928:4  928:8
928:19  928:22  929:3
929:5  929:11  929:16
929:16  929:23  930:6
930:7  934:16

scant [1] 944:25

scary [1]  839:6

scheduled [1]  945:15

Schloss [3]  937:11
937:12  937:18

school [1]  797:6

SCR [1]  783:4

screen [1]  903:1

seal [1]  840:8

sealed [1]  840:7

search [7]  793:13
793:13  891:16  893:7
895:22  895:23  896:6

searched [3]  794:24
865:20  866:2

seated [2]  827:8
930:12

second [13]  784:23
785:5  787:22  821:20
823:18  825:7  836:5
838:11  850:15  879:17
897:8  925:5  944:18

secondly [1]  937:20

see [72]  785:23  792:10
795:6  796:13  802:23
814:8  814:24  818:11
823:11  828:18  832:23
832:25  834:22  836:6
839:16  841:24  842:2
845:3  845:4  845:6
845:7  845:11  845:16
845:17  845:22  845:24
852:4  853:11  877:1
877:4  880:11  880:12
880:19  881:1  888:24
893:5  893:6  895:6
898:12  926:2  927:7
927:8  927:9  927:11
927:13  928:2  928:3
928:4  928:8  928:9
928:10  928:11  928:12
928:19  928:22  928:25
929:5  929:23  929:25
930:1  930:1  930:4
930:5  930:6  930:7
930:8  930:20  940:2
940:17  943:9  943:10
947:3

seeing [1]  788:23
790:6  919:9  924:11
924:17  927:3

seek [2] 819:10  872:13

seem [6] 788:16  792:20
930:18  934:13  934:15
941:11

Seibel [20]  783:16
784:2  784:4  784:17
785:21  786:2  786:17
786:25  788:14  790:6
791:20  792:12  794:11
849:10  849:23  850:5
853:15  880:19  881:1
890:8

seized [3]  891:18
893:3  895:22

self-authenticating
[1]  926:7

self-employment [1]
928:6

sell [7]  788:6  825:9
825:12  825:15  860:10
909:23  912:7

seller [3]  912:12

912:22  917:10

selling [43]  800:8
800:11  807:19  807:20
807:22  807:25  808:5
808:12  830:15  859:4
881:19  882:7  882:9
882:20  882:23  883:2
883:21  883:24  884:9
884:17  900:22  901:23
902:16  908:1  909:7
909:9  909:10  909:18
910:11  910:12  910:14
910:15  910:18  910:24
911:4  911:6  911:8
911:11  927:22  927:23

send [2] 942:2  942:12

sense [2]  876:22
918:18

sent [1] 942:17

sentence [9]  800:19
805:5  805:9  805:24
806:4  811:1  824:4
838:21  885:5

sentenced [4]  800:16
808:24  810:15  935:25

sentences [3]  933:20
939:13  940:3

sentencing [3]  805:1
805:13  805:14

separate [4]  789:3
877:10  879:20  941:21

separated [3]  926:2
928:25  929:3

September [4]  838:8
838:9  910:24  931:11

serious [1]  935:19

serve [3] 792:5  806:14
810:23

served [5]  805:11
811:2  885:4  931:5
931:10

session [8]  838:17
838:18  840:2  872:1
934:13  935:19  941:6
947:15

sessions [1]  837:21
839:9  919:9  931:8
931:12  935:10  941:8
942:10  942:24  942:25

set [8]  786:13  786:19
787:11  787:20  792:15
832:22  838:11  939:7

sets [1]  791:23

seven [16]  808:24
833:3  865:6  865:7
865:13  865:25  867:2
867:5  872:25  874:20
875:4  876:20  879:18
881:11  888:2  907:2

several [14]  816:22
843:6  843:3  844:4
844:4  844:5  844:6
844:8  907:1  907:3
907:4  911:12  914:13
914:14

shall [2] 827:12  836:23

shirt [1] 827:7

shit [3] 828:21  828:23

shock [1]  796:11

shoot [6]  862:15
867:24  887:15  887:18
887:20  887:22

shooting [2]  809:6
811:7

short [2] 927:21  933:16

shot [12] 809:2  809:4
809:5  811:6  862:13
867:18  868:1  885:11
887:17  887:19  887:23
887:23

shoulder [1]  909:2

shoveling [1]  796:12

show [11]  814:2
814:4  822:14  825:4
826:16  874:9  892:14
895:9  922:23  923:1
923:20

showed [3]  892:23
898:8  898:13

showing [2]  801:11
816:8

shown [1]  802:13

shows [1]  791:16

side [12] 794:22  811:15
811:17  811:24  812:1
865:3  872:5  872:6
879:2  934:20  946:12
946:16

sidebar [10]  789:24
793:22  796:14  834:9
860:19  860:20  901:1
901:3  925:1  925:2

sides [2] 934:18  946:12

sign [5] 819:3  819:14
821:2  821:22  825:16
828:9  828:16  830:23
831:1  831:15  831:16
831:16  832:15  834:2
834:12  834:14  834:16
834:19  834:21  834:23
834:24  835:14  835:25
841:1  841:4  841:11
841:17  842:1  844:12
844:13  844:14  844:15
844:21  844:23  845:10
845:13  846:15  846:19
850:24  851:10  851:14
852:9  852:12  853:22
853:24  854:1  854:3
855:4  855:10  855:11
924:16  924:19  925:13

signature [11]  801:19
801:20  802:23  802:25
889:7  923:22  924:1
924:2  924:12  924:19
927:7

signed [14]  833:13
833:23  835:22  888:12
888:19  889:11  889:17
924:10  925:13  926:17
927:1  927:2  927:15
947:8

significance [1]
940:16

signing [1]  924:13

silent [1]  901:9

similar [3]  790:12
937:16  942:2

simply [6]  790:1
790:2  831:6  873:14
940:21  944:24

sincere [1]  947:22

single [4]  838:21
839:5  873:15  928:24

sit [2]  794:8  914:5

sits [2]  937:22

sitting [2]  886:12
934:12

situation [2]  795:10
946:2

situations [1]  943:12

six [8]  796:9  921:2
921:3  921:6  921:16
929:9  929:14  929:21

Sixth [1]  932:6
934:4

Skolnik [2]  784:13
796:5

slippery [1]  938:23

slope [1]  938:24

slowly [2]  796:14
886:2

smart [1]  945:10

smile [1]  947:13

Smith [1]  891:6

snitch [2]  789:8
790:10

snow [2] 796:8  796:12

so-and-so [1]  879:8

sold [14] 807:13  811:18
828:3  828:14  862:4
867:9  881:15  910:17
912:14  913:15  914:1
914:2  914:7  917:12

solve [1]  875:17

someone [8]  843:14
863:14  867:18  875:24
878:17  878:19  914:7
946:25

sometime [5]  829:17
842:20  842:21  916:7
942:1

sometimes [5]  838:21
838:21  897:19  933:25
933:25

somewhat [1]  939:12

somewhere [2]  826:5
834:22

son [1]  929:13

soon [2]  900:11  910:1

sorry [15]  798:16
800:22  815:6  829:3
845:25  849:3  868:21
883:11  891:19  899:7
903:18  908:22  915:10

927:10   931:7
**sort** [3]   863:14   876:13
880:2
**sorted** [1]   787:14
**sought** [2]   788:8
937:9
**sounds** [3]   845:5
845:15   890:13
**sources** [1]   928:8
**Southern** [4]   783:1
783:15   937:15 .
**speak** [7]   786:2
786:23   787:13   875:3
880:23   897:7   927:12
**speaking** [1]   939:16
**specific** [11]   858:1
860:13   860:23   861:13
870:22   876:17   879:7
931:24   934:1   935:12
939:10
**specifically** [14]
790:14   794:14   797:24
812:3   814:7   820:21
820:25   823:9   825:7
828:4   829:19   832:10
836:5   943:9
**speculating** [1]   790:9
**speed** [2]   784:16
892:2
**spend** [3]   798:4
880:22   881:3
**spending** [1]   945:14
**spent** [2]   843:21
868:25
**spoke** [2]   815:11
823:6
**spoken** [2]   839:25
926:15
**spouse** [1]   925:18
**St** [107]   783:5   783:20
784:4   788:17   789:2
792:14   792:23   822:25
823:6   823:20   824:3
824:8   824:12   824:16
824:16   824:23   825:1
825:10   825:14   825:21
826:1   826:19   827:3
827:11   827:13   827:20
827:21   827:24   828:10
828:11   828:21   828:22
829:7   829:23   830:3
830:12   830:15   830:19
830:21   831:1   831:17
832:11   832:14   832:17
832:19   832:22   833:1
833:3   833:15   834:1
834:12   834:13   834:14
835:9   835:14   835:18
835:25   836:5   836:11
840:25   841:24   841:25
842:11   844:10   844:11
844:13   844:14   844:20
844:22   845:4   845:7
845:13   845:14   845:17
845:18   846:8   846:12
846:15   846:18   850:6
850:9   850:13   850:16

850:18   850:21   850:22
850:25   851:9   851:17
851:24   852:5   852:8
853:25   854:3   855:3
855:18   856:10   856:12
856:15   878:12   878:15
904:21   905:22   905:23
906:1   906:8   943:3
**stand** [1]   789:17
792:11   795:10   837:11
837:13   842:6   842:9
870:2   873:14   873:16
875:12   877:2   880:15
892:12   931:13
**standing** [1]   796:14
**stands** [4]   789:17
795:5   823:21   871:9
**start** [5]   794:22   886:14
920:21   939:13   939:14
**started** [9]   817:2
823:7   886:16   886:19
886:22   886:23   887:4
887:5   887:6
**starting** [2]   812:4
892:18
**starts** [3]   814:23
828:21   873:19
**stash** [3]   799:15   799:18
799:21
**state** [8]   789:16   795:17
833:4   833:10   833:19
835:10   835:18   899:14
**statement** [12]   828:13
829:8   833:10   839:4
855:3   926:1   933:5
934:19   934:19   935:3
940:9   940:22
**statements** [20]   838:20
839:2   839:10   839:13
903:3   903:10   932:8
932:14   932:16   932:17
933:13   933:17   933:18
933:20   934:1   934:9
936:13   938:12   938:16
939:19
**states** [15]   783:1
783:3   783:14   783:16
835:18   847:4   853:6
889:16   890:1   933:7
933:8   937:6   937:14
940:5   947:2
**status** [1]   928:22
**Stay** [1]   803:18
**staying** [3]   869:2
896:5   896:7
**steal** [5]   803:18   811:21
868:19   868:20   868:22
**stealing** [1]   859:9
859:10   862:8
**steamroll** [1]   936:20
**stenographer** [1]
941:1
**step** [2]   837:10   938:10
**STEPHEN** [1]   783:11
**stepped** [1]   886:24
**stick** [1]   917:24

**Sticking** [1]   853:21
**still** [9]   825:24   840:19
846:1   884:9   887:3
887:4   899:25   904:19
919:14
**stole** [7]   859:10   860:1
862:19   862:22   863:1
923:12   923:15
**stolen** [3]   811:12
859:22   860:5
**stood** [1]   892:3
**stop** [8]   805:25   826:4
826:14   826:20   826:22
869:16   909:1   919:13
**stopped** [1]   887:14
**strategy** [2]   940:7
941:13
**street** [1]   812:8
812:17   813:3   813:5
813:21   815:5   815:17
830:6   868:9   868:10
887:5
**Streets** [1]   814:16
**stretch** [1]   834:8
**strict** [1]   936:10
828:21   873:19
**strike** [5]   820:15
823:14   856:4   856:5
861:12
**stringently** [1]   942:5
**stuff** [2]   794:22   896:10
**Sturm** [1]   891:9
**subject** [6]   788:4
802:8   839:20   886:9
931:20   938:7
**submitted** [2]   838:5
927:17
**subpoena** [17]   792:5
792:8   837:20   838:9
931:5   931:11   931:18
932:11   932:11   937:6
946:19   946:19   946:20
946:24   947:1   947:4
947:7
**subscribed** [1]   944:15
**subsequent** [1]   937:13
**substance** [3]   870:10
946:22   946:23
**substantial** [1]   936:1
942:22
**such** [21]   785:4
789:4   790:21   791:7
791:9   791:14   791:17
791:25   792:7   794:9
794:9   794:20   795:8
795:12   795:15   833:23
834:17   835:21   835:23
926:8   944:5
**suggest** [4]   838:1
879:15   936:11   940:18
**suggested** [1]   785:9
**suggestion** [1]   880:6
**suited** [1]   854:20
926:18
**Sukeem** [5]   813:12
813:14   814:15   815:16

912:20
**summary** [1]   938:22
**summation** [6]   789:18
794:20   794:22   794:23
795:7   795:9
**Sunday** [1]   848:5
**supervising** [3]   790:7
792:22   816:17
**support** [8]   921:6
921:8   921:12   921:15
921:19   929:23   930:1
930:4
**supposed** [3]   793:24
903:16   903:23
**survived** [2]   809:6
811:7
**sustain** [1]   864:23
**sustained** [5]   854:15
857:10   872:9   905:16
905:20
**sworn** [3]   796:19
877:25   936:14

-T-

**Tabak** [15]   785:22
786:2   787:2   787:9
787:12   787:22   788:22
788:22   789:12   790:5
791:20   791:25   792:5
792:11   794:12 .
**table** [1]   886:12
**taking** [5]   836:12
863:9   921:11   921:17
940:21
**talks** [1]   940:5
**tape** [44]   784:7   784:8
784:23   784:23   785:6
785:7   785:8   785:11
785:15   795:18   795:20
827:19   829:3   840:11
842:7   842:10   842:12
842:23   843:1   843:7
843:9   843:14   843:22
846:4   846:10   846:11
850:7   850:22   852:21
853:1   853:12   853:15
854:7   855:9   855:12
855:17   855:20   855:22
855:23   856:11   856:15
856:18   938:4   938:7
**tape-recorded** [1]
905:25
**taped** [1]   822:9
**tapes** [6]   843:2   843:4
843:6   843:11   846:22
938:6
**tapped** [1]   822:2
**targets** [1]   799:6
**Tarsio** [1]   815:13
**task** [1]   796:13
**tax** [2]   882:3   883:15
**taxes** [5]   808:11   808:13
881:23   882:1   883:13
**Taylor** [1]   937:9

**technical** [1]   944:6
**teenager** [1]   859:15
859:16   860:2
**Teicher** [1]   937:15 .
**Teitelbaum** [2]   783:18
784:6
**telephone** [1]   815:11
**telling** [42]   793:10
793:11   824:1   828:15
841:6   842:2   844:14
844:17   844:18   845:19
846:13   846:15   846:16
846:17   847:20   850:8
850:10   850:22   851:10
851:13   851:15   851:17
851:19   851:24   852:1
852:6   854:3   855:6
855:10   860:4   862:23
865:1   865:14   868:16
887:11   893:21   901:22
915:1   915:5   925:21
940:14   945:1
**tells** [1]   926:16
**ten** [9]   801:1   801:4
806:10   835:17   842:17
907:6   907:8   914:16
914:18
**Teresa** [2]   890:12
890:13
**term** [1]   810:23
**terms** [8]   787:3
787:13   787:16   793:9
803:14   803:16   878:2
933:19
**tested** [1]   857:12
**testified** [14]   796:19
818:25   840:24   841:9
854:2   870:25   876:15
881:14   881:18   883:24
889:6   903:14   911:10
937:18
**testify** [10]   795:11
803:5   803:8   803:9
842:6   842:10   869:9
873:13   884:19   909:18
**testifying** [6]   854:5
859:23   876:14   937:19
938:1   944:4
**testimony** [30]   846:11
846:23   847:3   847:7
847:9   847:10   847:23
848:5   848:17   848:18
848:19   848:25   849:6
849:11   849:19   849:21
849:25   850:4   877:25
878:5   879:13   881:9
881:16   881:21   888:4
909:22   912:10   914:2
925:5   938:4
**Tez** [2]   812:20   812:22
**thank** [23]   838:3
840:16   844:9   850:20
857:20   871:13   871:13
873:22   880:8   880:17
892:16   918:14   919:5
920:2   920:7   930:17
930:21   931:1   944:11

945:25  947:12  947:22
947:22

**theme** [1]                     947:10

**theory** [2]                     878:7
878:8

**Thereafter** [2]  815:12
815:16

**therefore** [4]                  791:9
806:18  839:11  877:24

**thereto** [1]                    940:3

**thinking** [2]                   939:21
939:24

**thinks** [1]                     806:7

**third** [5]  815:17  821:17
823:12  841:23  892:9

**thought** [21]                   795:12
796:13  837:25  849:3
933:2  933:11  934:7
934:25  938:23  938:25
939:22  940:6  940:15
940:20  940:22  941:12
941:23  942:9  943:22
945:4  947:18

**thousand** [15]                  808:6
814:18  881:20  883:2
883:7  883:9  883:25
900:22  901:24  902:16
902:24  908:2  910:9
911:9  927:22

**thousands** [1]  866:25

**threatened** [1]  875:14

**threatening** [1]  887:11

**three** [42]                     797:11
807:24  808:5  808:6
809:9  811:1  815:18
823:17  838:22  861:7
873:1  881:15  881:19
881:20  883:2  883:7
883:25  883:25  884:9
890:18  890:25  891:1
891:5  895:22  900:22
901:24  902:16  902:24
904:15  908:1  908:2
910:4  910:8  910:9
911:8  911:9  912:2
912:4  927:22  929:11
929:12  929:19

**three-year** [1]  885:5

**threshold** [1]  878:25

**threw** [1]                      913:22

**through** [8]                    833:6
833:12  857:21  860:22
914:24  914:25  925:6
940:1

**throughout** [1]  940:10

**tie** [1]  827:7

**tied** [2]  865:20  866:2

**Tim** [38]  789:17  789:7
790:8  830:3  830:4
830:5  830:8  830:8
830:10  830:10  830:12
830:13  830:24  831:6
831:7  831:15  832:12
832:15  833:6  841:2
841:11  845:6  845:15
875:8  879:7  879:18

905:24  906:3  914:9
914:10  915:7  915:21
915:25  917:1  917:9
917:15  917:25  918:8
798:25
842:13  842:21  842:23
843:9  843:12  847:25
860:10  860:12  860:14
861:11  861:13  861:21
862:3  862:6  863:13
867:24  887:18  888:11
889:15  889:19  889:23
903:21  904:11  904:12
904:14  904:15  904:16
904:18  905:2  906:23
906:25  907:1  907:3
907:8  912:14  912:21
913:14  913:18  913:25
914:1  914:3  914:6
914:12  914:13  914:15
914:16  914:17  914:18
914:19  917:8  917:16
917:16  917:17  917:21
917:23

**timing** [1]                     943:7

**Timothy** [1]  915:3

**today** [7]                      794:8
888:1  919:20  937:22
943:8  947:14  947:19

**together** [2]                   789:3
849:13

**tomorrow** [7]  919:25
930:21  942:1  943:15
943:22  945:25  946:7

**tone** [1]  793:5

**tonight** [1]  919:24

**too** [3]  861:20  865:25
947:3

**took** [12]  796:9  808:9
809:17  826:8  842:6
842:9  862:23  863:13
866:24  869:2  876:9
887:1

**top** [4]  829:20  841:23
931:23  932:4

**total** [2]  929:16  932:7

**totaling** [1]  838:12

**totally** [1]  877:11

**touch** [3]  856:21
856:24  894:25

**touched** [1]  857:2
857:7

**toward** [3]  836:15
836:16  836:24

**towards** [3]  886:22
886:23  928:19

**town** [1]  815:14

**Tracht** [1]  899:3

**transactions** [3]
915:3  915:7  943:10

**transcribe** [1]  785:1

**transcribed** [1]  817:13

**transcript** [43]  792:21
795:19  795:20  820:18
820:22  820:24  829:1
830:1  831:14  832:21

834:22  834:23  835:9
836:5  841:18  843:8
844:16  844:19  845:1
845:18  845:21  845:24
846:2  846:5  846:19
846:20  850:9  852:3
852:15  852:22  852:25
853:4  853:7  853:7
853:14  853:14  853:16
853:18  853:21  854:7
904:20  908:13  908:17

**transcription** [1]
851:23

**transcriptions** [1]
940:13

**transferred** [2]  899:17
899:19

**transmitter** [1]  832:7

**treat** [1]  812:19

**trial** [14]  783:21  791:14
791:19  799:23  869:7
870:3  871:4  878:6
878:9  878:22  878:23
934:6  944:4  947:24

**tried** [1]  811:5

**trouble** [1]                    803:18
858:15  946:15

**troubled** [1]                   939:12

**troubles** [1]                   945:7

**troubling** [1]                  875:9

**true** [14]  833:8  833:13
833:24  835:23  844:16
851:9  854:4  855:5
891:5  905:23  906:1
906:3  906:5  927:8

**trumps** [1]                     934:4

**trunk** [1]                      834:18

**trust** [1]  796:4

**truth** [6]  800:15  806:12
806:18  810:7  851:15
852:13

**truthful** [2]                   788:20
854:16

**try** [7]  847:19  880:11
905:12  918:13  926:11
943:15  946:7

**trying** [8]                     832:8
851:8  856:9  926:3
939:6  945:14  946:5
947:20

**Tuesday** [1]                    947:24

**turn** [14]  802:22  808:14
809:10  810:10  810:20
812:3  823:9  828:4
829:25  836:4  875:22
936:20  937:3  943:17

**turned** [13]                    837:23
859:22  926:12  935:15
935:21  936:9  936:11
942:11  944:14  944:17
944:20  945:21  945:22

**turning** [6]                    818:23
825:7  833:18  936:8
936:12  937:17

**turns** [1]  942:9

**twelve** [2]                     926:5
928:5

**twice** [1]                      904:13

**two** [65]  798:5  807:24
808:5  808:6  811:2
817:15  817:22  829:22
838:7  838:22  839:3
840:8  841:13  849:13
849:20  849:25  861:7
862:13  869:18  871:13
872:11  872:22  872:24
873:12  879:14  879:21
881:15  881:19  881:20
883:2  883:7  883:8
883:24  883:25  884:9
885:4  892:24  894:22
900:22  902:16  902:24
908:1  908:1  910:4
910:8  910:9  911:8
911:9  913:8  927:22
928:11  929:13  929:14
932:3  932:23  933:25
934:11  934:18  935:10
935:11  937:17  939:11
941:4  941:7  944:25

**type** [5]  799:11  853:23
854:21  865:10  916:2

**typed** [4]                      790:13
801:20  828:12  829:8

**types** [1]                      859:2
859:7  860:7  862:9
890:22

**typewritten** [1]  944:18

**-U-**

**ultimately** [1]  947:21

**unable** [1]                     874:9

**under** [17]                     803:2
803:3  803:8  803:16
803:20  803:24  804:8
838:14  848:19  860:4
861:2  926:17  927:2
927:7  937:5  937:16
944:6

**undercover** [14] 798:23
799:2  799:5  799:6
799:8  812:10  812:21
813:7  813:14  813:24
816:18  823:15  876:16
911:16

**understand** [49] 795:16
802:3  804:1  823:25
824:5  824:6  836:9
838:3  846:24  847:1
847:2  847:17  847:18
847:20  847:21  847:24
848:2  848:3  849:19
850:11  850:22  850:25
851:4  851:5  851:7
853:8  859:1  859:24
861:1  861:10  861:19
863:9  863:9  863:10
865:4  867:12  867:13
873:10  874:18  875:10
912:16  912:17  914:2
915:21  915:22  915:22
916:8  916:11  933:15

**understood** [4]  824:9

850:20  851:2  853:8

**undertook** [1]  786:20

**unfair** [1]                     792:20

**unfortunate** [1] 944:7

**unfortunately** [1]
786:25

**unimportant** [1]
934:15

**unintended** [1] 873:20

**United** [14]                    783:1
783:3  783:14  783:16
847:4  853:6  889:16
889:25  933:7  933:8
937:6  937:14  940:5
947:1

**universe** [1]                   932:7

**unless** [3]                     792:8
793:25  839:17

**Unlike** [1]                     937:25

**unnecessary** [1]
788:8

**unrecorded** [1] 819:24

**unrelated** [2]                  872:11
872:20

**unreported** [1] 937:15

**up** [54]  784:13  788:14
789:17  795:18  795:21
796:14  796:24  797:17
820:1  828:12  829:8
830:3  837:15  837:21
840:12  845:6  845:16
851:22  853:7  865:20
866:3  867:5  869:2
869:12  875:11  875:12
875:15  877:22  881:5
883:20  884:1  884:8
886:14  892:2  897:16
898:11  899:9  899:22
903:1  905:24  906:3
908:16  916:21  917:1
917:17  917:19  918:22
925:6  926:3  927:14
943:4  943:5  944:4
947:7

**up-and-up** [2]  851:18
851:25

**upset** [1]                      940:24

**urine** [1] 803:18

**used** [14]                      806:25
807:2  807:6  810:4
819:23  830:6  851:24
852:6  853:10  888:9
896:10  935:23  936:6
941:3

**useful** [1]                     874:8

**using** [4]                      807:11
863:14  912:6  912:8

**-V-**

**v** [5]                783:4  937:6
937:9  937:14  940:5

**vague** [1]                      786:4

**value** [2]                      938:5
938:5

vandalism [4]   809:25
810:2   810:17   884:20
various [1]        905:2
vast [1]   786:6
vehicle [1]        827:21
verbatim [8]      838:20
839:10  933:25  938:16
938:17  939:19  939:25
940:6
verbs [1]          838:24
version [1]        934:19
vicinity [2]        814:15
815:5
video [1]          835:22
view [2] 794:24  937:23
views [1]          934:7
violation [1]      925:5
voice [11]         793:5
796:24  797:17  817:1
817:2   817:5   817:8
817:10  817:18  818:4
851:21
voir [1]  877:15
volunteering [1]
788:21
vote [1]  947:21

-W-

wait [2]  897:11  897:13
waiting [1]        908:10
walked [2]        886:12
886:13
walking [1]       887:4
wall [2]  788:21  793:3
wants [6]         805:10
876:12  879:18  908:25
946:20  947:6
Warehouse [1]  797:15
warrant [7]       891:16
893:8   895:23  895:23
896:6   903:15  904:6
waste [2]         861:6
861:20
watched [1]      815:18
ways [1] 872:11
weapon [3]       863:10
863:14  891:20
weapons [1]      891:16
wearing [3]      827:6
856:11  857:5
weather [1]      942:21
weed [4] 808:9   866:14
866:15  910:14
week [39]         784:8
785:10  785:20  807:22
807:24  808:4   808:5
808:6   842:20 .842:21
842:24  843:2   843:5
843:6   846:10  846:11
846:22  861:8   881:15
881:20  881:21  883:2
883:8   883:9   883:25
883:25  884:9   900:23

901:24  902:17  902:24
908:1   908:2   910:8
910:9   911:8   911:9
927:23  942:8
weekend [1]      796:11
weekly [1]        882:24
weeks [13]       798:5
816:22  847:5   847:6
848:19  848:22  848:23
848:24  849:12  849:20
849:25  885:25  886:2
weigh [1]         815:18
weight [3]        878:17
926:9  941:11
Wesson [1]      891:6
White [5]         783:9
899:6   899:8   900:13
902:3
whole [2]         788:21
789:14
wholly [3]        872:10
872:20  879:19
widowed [1]     928:25
wife [7] 885:18  885:19
886:8   886:13  922:9
922:13  922:15
William [2]       783:19
784:4
Williams [3]     812:15
812:21  813:1
willing [2]       834:23
874:5
wire [3] 827:19  836:1
856:11
wired [2]         855:20
912:20
wish [1] 900:25
withdraw [1]     802:10
withdrawn [7]   845:4
862:8   904:5   905:22
909:9   917:9   924:18
within [2]         928:5
936:18
without [15]      788:21
791:25  792:7   794:18
827:5   833:5   833:10
839:13  844:16  845:18
846:20  865:1   902:21
943:22  947:6
witness [86]     790:21
791:1   793:20  794:1
796:18  801:13  802:19
806:1   814:6   822:16
825:6   826:18  827:10
835:5   836:20  837:11
837:13  838:20  839:2
839:10  840:23  849:1
860:23  860:25  861:13
861:21  869:23  869:24
869:25  870:2   870:23
870:25  871:7   872:5
872:5   873:5   874:2
874:9   874:22  876:14
874:18  878:3   878:7
879:25  880:15  889:3
889:5   891:22  891:24

892:3   892:12  901:5
901:17  901:21  918:16
918:17  918:22  919:2
919:11  919:25  923:25
925:23  926:12  926:17
931:8   931:9   932:7
932:8   932:18  933:18
933:21  934:13  934:16
935:18  936:13  937:18
937:20  937:21  937:23
937:25  938:13  939:16
939:19  942:4   944:15
948:2
witness' [5]      791:17
870:24  875:19  918:24
944:8
witnessed [1]   815:14
witnesses [8]   792:5
792:7   872:8   872:16
872:19  873:10  878:22
938:1
word [8] 833:19  838:21
854:10  892:18  939:13
939:15  940:18  944:25
word-for-word [1]
938:21
words [11]        838:22
839:5   839:17  853:8
853:10  912:14  930:1
930:4   933:25  940:12
944:25
worked [1]       828:14
worn [1] 836:1
worst [1]         793:24
worth [2]         795:14
823:23
wrap [1] 918:22
wrestle [1]       945:8
write [6] 804:9   805:3
805:18  805:20  934:14
934:15
writes [2]        804:11
805:7
writing [6]        832:23
924:6   924:8   924:9
933:21  940:25
written [8]        790:13
838:10  839:1   839:4
839:17  934:1   934:20
938:22
wrong [5]         791:12
792:2   815:6   853:16
909:3
wrote [7]         789:7
791:17  838:23  925:11
939:21  940:14  940:23

-X-

x [3]     783:2   783:7
948:2

-Y-

year [40] 798:16  809:23
809:24  861:9   861:21
870:18  870:20  871:1

881:14  881:18  882:1
882:3   882:7   882:9
882:11  882:14  882:20
882:23  883:15  883:17
884:8   884:12  884:14
887:13  907:17  907:23
909:7   909:9   909:10
909:12  909:19  909:19
909:23  910:15  910:18
911:13  915:24  915:25
927:23  927:24

years [11]         801:1
801:4   806:16  807:19
808:14  808:24  809:9
811:2   860:5   885:5
944:13
Yep [7]  854:12  881:25
882:13  902:18  909:14
916:3   917:4
yesterday [2]    848:5
848:7
yet [1]  849:5   928:2
935:25
yo [2]   887:2   887:14
Yolanda [3]     822:20
824:15  906:1
York [6] 783:1   783:15
814:16  826:5   826:15
899:14
young [1]         859:15
yourself [5]      817:17
824:15  892:18  895:11
912:8
yourselves [1]  930:19

-Z-

zealously [1]    794:25



Page 949

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                    S7 02 Cr. 1503 (SCR)

 5   DAVID ST. JOHN and DONALD ROTH,

 6              Defendants.

 7   ------------------------------x

 8                                   December 9, 2003
                                     9:50 A.M.
 9                                   White Plains, N.Y.

10   Before:

11              HON. STEPHEN C. ROBINSON,

12                                   District Judge

13              APPEARANCES

14   JAMES B. COMEY
          United States Attorney for the
15        Southern District of New York
     GLENN C. COLTON
16   CATHY SEIBEL
          Assistant United States Attorneys
17
     LAWRENCE HOCHHEISER
18   NOAH TEITELBAUM
          Attorneys for Defendant Roth
19
     WILLIAM ARONWALD
20        Attorney for Defendant St. John

21
                  TRIAL RESUMED
22

23

24

25
```

Page 950

1    (Jury not present)

2    THE COURT: Good morning. I'm sorry I was late, I was

3  actually visited by Judge McMahon and spent a little time since

4  I hadn't seen her since the beginning of this trial.

5    Let me just give you my final ruling on the production

6  of the documents. Again this has to do with defense counsel's

7  subpoena to Mr. Melvin's attorney, Kerry Lawrence, requesting

8  production of the notes that Mr. Lawrence took in the proffer

9  sessions with the government.

10    I have had a chance to read and review and study a

11  little bit United States v. Marcus Schloss which is the case

12  that Mr. Aronwald cited to the Court, a Southern District of

13  New York case found at 189 U.S. District LEXIS at 6271, an

14  opinion by Judge Haight where he performs an analysis and in

15  that case determines that the records should be produced.

16    There seems to be two predominant themselves in the

17  litigation about whether or not attorney notes should be

18  produced. One comes out of Hickman v. Taylor which is the

19  United States Supreme Court decision in 1947. And what that

20  case said is the rule would permit discovery of attorney

21  work product "only upon a showing that the party seeking

22  discovery had substantial need of the materials in the

23  preparation of the party's case."

24    And without going through the full analysis, I

25  actually believe that such a need has been shown in this case

Page 951

1  given that this is a criminal trial and there's a need for

2  those documents in order to allow the defendant to assess the

3  credibility of witnesses in front of the jury. In a later

4  case, Judge Goettel reasoned that in quashing a subpoena for

5  the notes of counsel for a cooperating witness, he reasoned

6  that the disclosure would impact the availability of defense

7  counsel to represent his client both as a target, as an

8  indicted defendant and as a cooperating defendant not yet

9  sentenced. And in the Haight case, he talks about those two

10  kinds of lines of thought and then found that in that case, he

11  thought the documents ought to be produced. But I want to read

12  just a small section because I think it's important to

13  understand why I am not going to produce the documents in this

14  case.

15    In United States v. Schloss, Judge Haight says "in a

16  criminal case, defense counsel is entitled to examine the notes

17  of interviews with prosecutors or government agents kept by

18  attorneys for an important government witness." And then he

19  sets out the two circumstances that need to be met: "1. Where

20  disclosure causes no prejudice to the witness; and 2. Where

21  there is an expression of the attorney's thoughts or beliefs

22  that are expressed in the notes."

23    His analysis in the Schloss case was that those two

24  circumstances were met, that is, that there would be no

25  prejudice to the witness because he knows that the witness in

Page 952

1  his case, which is Mr. Solomon, he notes that in the case that

2  he was considering where Mr. Solomon's notes, the notes of

3  Mr. Solomon's attorneys were being subpoenaed, he notes that

4  "Solomon is no longer a target of the investigation. He has

5  been sentenced and has served his sentence. His professional

6  licensing problems have been resolved entirely in his favor.

7  And under those circumstances the notes should be produced."

8    That, however, is not the circumstance we have with

9  respect to Mr. Melvin. Mr. Melvin has not yet been sentenced

10  and the disclosure of the interview notes of his attorney could

11  cause him prejudice in those proceedings as they go forward.

12  Judge Haight notes in his opinion that "the gravity of the

13  invasion of Solomon's rights depends primarily upon the

14  prejudice to him if disclosure is made. Here there is no

15  prejudice."

16    And so for that reason, I think that Judge Haight's

17  opinion in Schloss would fall in an analysis or be

18  distinguished from the case that we have at hand. I will, if

19  counsel want to discuss this any further at a later date, I'd

20  be happy to do that but it is my opinion that those notes

21  should not be disclosed.

22    The other thing I will note just for the record is

23  Mr. Lawrence yesterday indicated that in his opinion, the

24  second part of the analysis that Judge Haight suggests, that is

25  that the expression of the attorney's thoughts or beliefs

Page 953

1  should be excised from the notes, Mr. Lawrence indicated that
2  he didn't think that could be done in this case because as he
3  saw it, the expression of his thoughts were so inextricably
4  intertwined with the notes that he couldn't make such a
5  delineation between what were his thoughts, analyses, and what
6  were the statements of the defendant. Whether or not I think
7  that's actually accurate with respect to all parts of the notes
8  or not is neither here nor there because I do find that given
9  that this defendant has not yet been sentenced and in fact in
10  this trial there has been much made of the fact that a judge
11  will have to assess what is the appropriate sentence for this
12  defendant, I do find that this witness could suffer significant
13  harm should these notes be produced and I'm not going to
14  produce them.
15       With that, Mr. Skolnik, can we get the jury in.
16       MS. SEIBEL: I just want to hand up to the Court and
17  to counsel a proposed instruction for that moment which seems
18  very far off when we get to the Antonio Bryant evidence. We
19  had talked about that it would be proper for the Court to give
20  an instruction when that came in and I'm going to hand up a
21  proposed instruction to your Honor's clerk.
22       THE COURT: Great, thank you. We don't need to make a
23  decision about this today but can we think about whether or not
24  we think there's going to be a need, whether or not we still
25  think we can finish by the 17th because if we can't, I would

Page 954

1  like not to sit this Friday and I'd also like to give the jury
2  as much notice of that as possible so to the extent they can do
3  whatever they want to do on Friday they can make plans.
4       It just seems to me less and less likely as we go
5  forward that we're going to finish by the 17th which is next
6  Wednesday, that is finish in its entirety, the case, the
7  evidence, summation, charge has been given and deliberations
8  completed.
9       MR. COLTON: One other thing. During last week's I
10  don't remember whether it was a sidebar or some proceeding
11  where the jury wasn't present, the Court had indicated to
12  counsel that the question to a witness, do you remember what's
13  in the prison log, do you remember what the tape says, what the
14  transcript says, were not proper questions, asking questions
15  about what those things mean or other things connected to
16  evidence that's already in a transcript or in a document was
17  proper but simply the formulation do you remember wasn't.
18       The Court in its discretion thus far has allowed that
19  to continue. I frankly am afraid to object in front of the
20  jury if the Court's ruling is going to change on that but that
21  is surely making the length of the cross-examination longer.
22  The government to be clear doesn't want to restrain any proper
23  cross-examination, but the memory test of do you remember
24  what's in the transcript or do you remember what's in the
25  prison log still seems inappropriate and I want to get some

Page 955

1  guidance from the Court before the jury came in.
2       THE COURT: I do think that as a general matter when
3  we have a transcript in evidence that question is not helpful.
4  However, when you do have witnesses on the stand who have the
5  inability to recall so much of what happened, I do think that
6  those questions become more relevant and appropriate and that
7  is the reason why I've allowed counsel to ask those questions.
8  I will keep that in mind because I do want to speed this up.
9  However, I do want to be as fair as I can be and allow the
10  questioning of counsel. And I don't mean this at all in a
11  critical way of anyone, any witness or anyone, but we have had
12  a lot of I don't recalls. And the jury can make of that what
13  they do, the lawyers will certainly make of that what they will
14  in argument. But when you have witnesses remembering one line
15  of a conversation but then not remembering others, I do think
16  it is reasonable for counsel to want to test their memory to an
17  extent that I would probably not allow if testimony were going
18  differently.
19       So counsel can continue as they've been doing and to
20  the extent that the Court has difficulty, I will certainly
21  always hear objections from any counsel and rule on them and as
22  you may have seen from time to time, if I think something
23  inappropriate is about to happen that will cause something to
24  be heard by the jury that they shouldn't hear, I may sustain an
25  objection. I will try to get better at that because many of my

Page 956

1  sustaining of unspoken objections is when I see counsel rising
2  to object, I will sustain it because I want to prevent the
3  inappropriate part of the question to come out or to have the
4  witness answer the question and instruct the jury to disregard
5  what they just heard. I will at least have counsel state the
6  word objection before they rule. Anything else?
7       MR. HOCHHEISER: I just want to remind you, if I can,
8  we are waiting with baited breath for your views concerning the
9  tape that you were given the other day.
10       THE COURT: I have to say --
11       MR. HOCHHEISER: If I may say, consider the
12  possibility that we might want to do this out of the presence
13  of the public. I don't know.
14       THE COURT: I'm not going to go into any detail other
15  than to say, the tape as it was given to me was in the middle
16  of a conversation and so what I did was listen from that point
17  to the end and it occurs to me that I've got to go back to the
18  beginning because in that portion there was nothing
19  particularly interesting in it. So I rewound the tape back to
20  the beginning but unfortunately last night because I was
21  preoccupied with other matters I didn't go back to the
22  beginning of the conversation and listen all the way through
23  which I will before the end of the day today.
24       MR. HOCHHEISER: I didn't mean to rush you.
25       THE COURT: I didn't take it that way but thank you

Page 957

1  for reminding me.
2       We've received a note which has been marked as Court's
3  Exhibit 10 and the note is unsigned so we don't know which
4  juror wrote it but it says, "can we find out how many witnesses
5  each side intends to calling?"
6       How would you folks like to see the Court respond to
7  that?
8       MR. COLTON: I think we can answer that question.
9  Certainly defense has no obligation to answer the question. My
10 fear in answering it from the government's perspective is the
11 number of witnesses is far more daunting than the actual time
12 the government is taking with those witnesses so really the
13 time of the trial has been in control more of the defense than
14 the government so I'm inclined not to answer it at all other
15 than to say we will endeavor to keep the trial moving as fast
16 as we can.
17      THE COURT: Mr. Aronwald?
18      MR. ARONWALD: I would just suggest you tell the jury,
19 unfortunately it's a note you can't answer because at this
20 point it's not clear how many more witnesses are going to be
21 called.
22      THE COURT: Does the defense want me to say anything
23 like, and you should also be aware that the defendant has no
24 obligation to call any witnesses?
25      (Defense counsel confer)

Page 958

1       MR. HOCHHEISER: You can leave that part out of it.
2  They do understand that they're not going to have to stay here
3  through the holidays and all.
4       THE COURT: They understand that. We will go into a
5  break at the end of the day on the 17th and return in January.
6  We said that both during the voir dire and in other dialogues
7  with them.
8       (Jury present)
9  CHARLES MELVIN,
10      called as a witness by the Government,
11      having been duly sworn, testified as follows:
12      THE COURT: Good morning, members of the jury. I
13 received a note asking the question can we find out how many
14 witnesses each side intends to calling. And though I can
15 understand sort of a desire to have a little timeline and be
16 able to count down and see how close it appears, the short
17 answer is no, you can't find out and I apologize for that.
18 Other than you should know that I know it seems from time to
19 time like it is going slowly, but it is important that each
20 side has a chance to put in the evidence as they think it's
21 appropriate to do and frankly, some of that changes depending
22 on how the testimony comes in. A witness may be added or
23 deleted as we go along based on the testimony that you hear so
24 we wouldn't want to say to you there are going to be X number
25 of witnesses and then for you to make something of the fact

Page 959

1  that there were either more or less than that number. But we
2  will move forward as expeditiously as we can.
3       In that regard, we're going to continue with Mr.
4  Aronwald. Mr. Melvin, please remember that you are under oath,
5  and continue to be under oath.
6  CROSS EXAMINATION
7  BY MR. ARONWALD:
8  Q. Good morning, Mr. Melvin.
9  A. Good morning.
10 Q. Mr. Melvin, just to go back to something we touched upon
11 yesterday, you told us about the robberies that you committed.
12 You said that you committed robberies of other drug dealers, do
13 you remember that?
14 A. Yes.
15 Q. Okay. Did you mean to suggest by your answer that the only
16 people that you've ever robbed were drug dealers?
17 A. Yes.
18 Q. Okay. Now, we left off yesterday and we were talking about
19 Tim Cherry and you described for us the drug-dealings that you
20 yourself had with Tim Cherry, do you remember that?
21 A. Yes.
22 Q. Okay. And by the way, when you left the stand yesterday,
23 between leaving the stand yesterday at the end of the day and
24 taking the stand again this morning, did you discuss your
25 testimony with anyone at all?

Page 960

1  A. No.
2  Q. Okay. Were you present when Tim Cherry was engaged in drug
3  deals with people other than yourself?
4  A. Yeah.
5  Q. In fact, you observed Mr. Cherry sell drugs for large
6  amounts of cash on a number of occasions, isn't that so?
7  A. Yeah.
8  Q. In fact, isn't it true that you saw Mr. Cherry sell drugs
9  for as much as 15 thousand dollars on occasion?
10 A. Yeah.
11 Q. Isn't it also true that on a number of occasions you saw
12 Tim Cherry in possession of a handgun?
13 A. I seen him one time.
14 Q. Are you sure you only saw him one time and not many times?
15 A. Yeah, I seen him many times.
16 Q. You just told us you saw him one time. Is it one time or
17 is it many times, which is it?
18 A. I seen him a few times with it.
19 Q. Is a few times less than numerous times?
20 A. I don't understand what you mean.
21 Q. When you say a few times, can you tell us what a few means
22 to you, quantify it for us. You're talking two times, three
23 times, four times?
24 A. I don't recall, but I seen him a couple of times.
25 Q. A couple of times. Did you ever tell anyone you saw him

Page 961

1 with a handgun numerous times?

2 A. I seen him a couple of times with a handgun.

3 Q. Did you ever tell anyone you saw him with a handgun

4 numerous times?

5 A. I don't recall.

6 Q. On how many occasions were you present when you saw Tim

7 Cherry dealing drugs?

8 A. A few times.

9 Q. Well, how many times were you in Tim Cherry's house?

10 A. I was at his house often.

11 Q. Okay. How many times would often be?

12 A. I don't know how many times.

13 Q. Is it more than ten?

14 A. I don't know how many times.

15 Q. Well, did you see him with a gun every time you were in his

16 house?

17 A. Yeah, I seen him with a gun a few times.

18 Q. Every time you were in his house?

19 A. I can't say every time. But most of the time.

20 Q. Do you remember testifying before the grand jury on

21 November 14, 2002?

22 A. Yeah, I remember testifying in front of the grand jury.

23 Q. And do you remember being asked this question and giving

24 this answer at page 27?

25     MR. COLTON: A moment for counsel to find it, your

Page 962

1 Honor. Okay.

2 Q. Do you remember being asked this question and giving this

3 answer beginning at page 27, line 23.

4 "Q But he always had a gun while he was in the house?

5 "A Yeah."

6     Do you remember being asked that question and giving

7 that answer in the grand jury?

8 A. No, I don't remember.

9     MR. ARONWALD: May I approach the witness, your Honor?

10     THE COURT: Yes.

11 Q. Mr. Melvin, showing you what's been marked as Government's

12 Exhibit 3502-H, directing your attention to page 27, the bottom

13 of the page, lines 23-25, just read those lines to yourself.

14     (Handed to the witness)

15 A. I see it.

16 Q. Does that refresh your recollection that you were asked

17 that question and gave that answer when you were in the grand

18 jury?

19 A. No.

20 Q. Do you deny you were asked that question and gave that

21 answer in the grand jury?

22 A. No, I'm not denying it. I just don't remember.

23 Q. On every occasion when you were in the house with Tim

24 Cherry when he was doing drug transactions or cooking crack

25 cocaine, did you see him with a gun in his pocket?

Page 963

1 A. Yeah, I seen him with a gun.

2 Q. Mr. Melvin, with respect to your arrest on possession of

3 three firearms, it's true, is it not, that on March 15, 2002

4 you -- by the way, do you know Antoinette Boykin?

5 A. The name sounds familiar.

6 Q. Who is Asia?

7 A. It's a female.

8 Q. What's her relationship to you -- withdrawn, what was her

9 relationship to you on March 15, 2002?

10 A. We had no relationship.

11 Q. On March 15, 2002 didn't you pull a gun on Asia?

12 A. Yeah.

13 Q. Why did you do that -- withdrawn. What was that all about?

14 A. She was arguing with my home girl sister.

15 Q. She was arguing with your girl's sister?

16 A. Yes.

17 Q. What's your girl's name?

18 A. Tanu.

19 Q. Okay. So Asia was arguing with your girl's sister and then

20 what did you do? Do you understand my question? I'm asking

21 you to describe for us what led up to your pulling a gun and

22 pointing it at her?

23 A. Well, she came over, I was in the house sleeping, they came

24 in the house and told me that Asia and some other girls was

25 bothering them. So I went outside, told them to get in the

Page 964

1 car.

2 Q. Told who to get in the car?

3 A. My girl and her sister. And Asia came over to the car and

4 started spraying mace in the car. So I told her to stop. So

5 my mother was looking out the window, my mother told her to get

6 away from the house with that. On she started cussing at my

7 mother, disrespecting her. So I pulled a gun out, put it to

8 her head, told her to get away from the front of my door.

9 Q. You pulled a gun and put it to Asia's head?

10 A. Yes.

11 Q. And told her what?

12 A. Get away from the front of my door.

13 Q. And the gun was loaded at that time, right?

14 A. Yes.

15 Q. And that was one of the three guns that the police found

16 when they ultimately searched your home, right?

17 A. Yeah.

18 Q. By the way, you told us that in August of 2000 you got

19 released from prison, August of 2001, do you remember that?

20     MR. COLTON: Objection, I'm not sure which date he's

21 asking.

22 A. I don't know.

23 Q. Do you remember testifying yesterday that you got --

24     THE COURT: If you can answer that question, you

25 should answer.

Page 965

1   A. I thought I said April.
2   Q. April of 2001, correct?
3   A. Yes.
4   Q. Okay. And when you got out, you were released on parole,
5   isn't that correct?
6   A. Yeah.
7   Q. Okay. And before you were paroled, did you appear before a
8   parole board?
9   A. No.
10   Q. Did you meet with anybody from the Parole Commission before
11   you were given parole?
12   A. Well, I had a one and a half to three.
13   Q. Okay.
14   A. 18 months, well, like 16 months I went to the board and
15   they hit me, they didn't release me. Then I CR which means
16   conditional release, after a certain amount of time they got to
17   let you go anyway, so when I got out I didn't see no board.
18   Q. You were out on parole when you were released, correct?
19   A. Yes.
20   Q. You understood that there were certain conditions of your
21   parole, correct?
22   A. Yes.
23   Q. You under understood that one of the conditions of your
24   parole was that you not engage in further criminal conduct,
25   correct?

Page 966

1   A. Yes.
2   Q. You understood at the time that you were buying crack
3   cocaine that you were violating the law, correct?
4   A. Yeah.
5   Q. So even though you understood that it was one of the
6   conditions of your parole that you not engage in any further
7   criminal conduct, as soon as you got paroled you went back and
8   you started engaging in other crimes involving crack cocaine,
9   isn't that so?
10   A. Yes.
11   Q. Much like your agreement with the government says that one
12   of the conditions of your agreement is that you not commit any
13   further crimes, correct?
14   A. Yes.
15   Q. By the way, when you got released from prison in April of
16   2001 and began buying crack cocaine, you were buying it not for
17   your personal use but to resell it, correct?
18   A. Yes.
19   Q. And you into you that every time you sold crack cocaine you
20   were committing a felony in New York State, correct?
21   A. Yes.
22   Q. Okay. And when you were involved in those crack cocaine
23   deals once you got released from prison, nobody was forcing you
24   to buy and sell crack cocaine, were they?
25   A. No.

Page 967

1   Q. That was a way you were supporting yourself, correct?
2   A. Yes.
3   Q. Mr. Colton showed you yesterday your agreement,
4   Government's Exhibit 3502-S1, do you remember that?
5   A. Yes.
6   Q. When was the last time before yesterday that you looked at
7   and read your agreement?
8   A. A couple of weeks ago.
9   Q. And that wasn't the first time you read the agreement, was
10   it, a couple of weeks ago?
11   A. No.
12   Q. If you can, approximate for us how many times you have read
13   your agreement?
14   A. A couple of times.
15   Q. Your lawyer, Mr. Lawrence, also signed the agreement, isn't
16   that so?
17   A. I don't --
18     MR. ARONWALD: May I approach, your Honor?
19     THE COURT: Please.
20     (Handed to the witness)
21   Q. Mr. Melvin, I'm putting before you Government's
22   Exhibit 3502-S1, directing your attention to page 5, the last
23   page of the agreement, directing your attention to the bottom
24   of the page. Do you see your signature?
25   A. Yes.

Page 968

1   Q. And do you see that Mr. Lawrence has signed the agreement
2   as well right under your signature?
3   A. Yes.
4   Q. Do you remember who signed the agreement on behalf of the
5   United States Attorney's Office?
6   A. No. I don't.
7   Q. You see up here it says Glenn C. Colton?
8   A. Yes.
9   Q. Before you signed the agreement, without telling us what
10   was said, did you discuss the terms and conditions of this
11   agreement with your lawyer before you signed it?
12   A. Yes.
13   Q. And when you signed the agreement, was there anything in
14   the agreement that you did not feel that you understood?
15   A. No.
16   Q. And before you signed the agreement, isn't it true that
17   Mr. Colton and/or others in the United States Attorney's Office
18   explained the terms of the agreement to you?
19   A. Yes.
20   Q. Isn't it true that the reason that you signed the agreement
21   was because as you told us yesterday you were facing 262 to 327
22   months in prison?
23   A. I don't recall.
24   Q. You don't recall whether that's the reason you signed the
25   agreement or you don't recall whether that's the amount of time

Page 969

1  that you were facing?
2  A. I don't recall that that's what I told you yesterday.
3  Q. Okay. Well, aside from what you told me yesterday, isn't
4  it true that before you signed the agreement you understood
5  that you faced, according to the government's guideline
6  calculations, a sentence of between 262 to 327 months?
7  A. Yes.
8  Q. You understood that, correct?
9  A. Yes.
10  Q. In fact, before you signed your agreement, did your lawyer
11  show you a letter that the prosecutor, Mr. Colton, had written
12  to him concerning what the government's calculation of your
13  guideline range was?
14      MR. COLTON: Object to form and ask that he be asked
15  if he saw it.
16      MR. ARONWALD: Withdraw the question. I'll rephrase
17  it.
18  Q. Did you see a letter from the United States Attorney's
19  Office, from Mr. Colton, to your lawyer, Kerry Lawrence, dated
20  January 21, 2003 setting forth Mr. Colton's calculations as to
21  what your sentencing guideline range would be?
22  A. I don't remember.
23      MR. ARONWALD: May I again approach the witness, your
24  Honor?
25      THE COURT: Yes.

Page 970

1      (Handed to the witness)
2  Q. Mr. Melvin, I'm placing before you Government's
3  Exhibit 3502-T. I'm asking you just to take a look at that,
4  read it to yourself, and tell me whether or not you've ever
5  seen that letter before today.
6      (Pause)
7  Q. Thank you. Did you see this letter before today?
8  A. Yes, I seen it before.
9  Q. When did you see it for the first time, Mr. Melvin?
10  A. It was awhile ago.
11  Q. Wasn't it at or about the same time that you signed your
12  cooperation agreement?
13  A. It could have been. I don't remember.
14      MR. ARONWALD: I'm sorry, Judge, can I approach again?
15      THE COURT: Sure.
16  Q. Mr. Melvin, looking at 3502-T, do you see the date on the
17  top of the document?
18  A. Yes.
19  Q. Okay. You signed your agreement, 3502-S1 on January 22,
20  2003, do you see that?
21  A. Yes.
22  Q. Looking at the date of 3502-T and the January 22nd date on
23  3502-S1, does that refresh your recollection that you saw
24  3502-T at or about the same time that you signed the agreement?
25  A. Yes.

Page 971

1  Q. It does, right? Please talk into the microphone. So you
2  understood at the time that you signed your agreement that
3  according to the government's guideline calculations, you faced
4  a sentence within the guidelines of between 262 and 327 months,
5  correct?
6  A. Yes.
7  Q. And you understood that meant a minimum of 21 years and a
8  maximum of 27 years, correct?
9      MR. COLTON: Object, your Honor. I think he means
10  under the guidelines.
11      MR. ARONWALD: Under the guidelines.
12      THE COURT: Is that what you thought, that it was
13  between 21 and 27 years?
14  A. I never added up the months. I just knew it was 262 months
15  and 327 months.
16  Q. If I understand your testimony correctly, you never
17  considered what 262 months translated to in years, you never
18  did that?
19  A. No, never did that.
20  Q. And you never figured out what 327 months translated to in
21  years.
22  A. I knew it was a long time.
23  Q. Okay. Now, Mr. Melvin, you also understood, didn't you,
24  that the government's calculation of the 262 to 327 months was
25  simply an estimate, and that the guideline range could actually

Page 972

1  be higher than 262 to 327 months, you knew that, didn't you?
2  A. No, unh-uh.
3  Q. You didn't know that?
4  A. I don't remember.
5  Q. Do you remember pleading guilty, Mr. Colton asked you about
6  your plea of guilty, do you remember your plea?
7  A. Yes.
8  Q. Do you remember that that took place on January 22, 2003 in
9  this building before United States Magistrate Judge Lisa Smith,
10  do you remember that?
11  A. I remember pleading guilty.
12  Q. Do you remember there was a judge that you were pleading
13  guilty before?
14  A. I don't remember what judge it was.
15  Q. Do you remember whether it was a man or a woman?
16      THE COURT: That's really not relevant. We can move
17  on.
18  Q. Do you remember that the judge before whom you were
19  pleading guilty told you that the government's understanding or
20  calculation of the guideline range of 262 to 327 months was not
21  binding on the court, do you remember the judge telling you
22  that?
23  A. Excuse me.
24  Q. Do you remember that when you pled guilty on January 22 of
25  this year, the judge that you were before told you that the

Page 973

1 government's calculation of the 262 to 327 months was only an
2 estimate and it was not binding on the court? Do you
3 understand my question?
4  A. I understand your question.
5  Q. Do you remember being told that by the judge that you pled
6 guilty before?
7  A. No, I don't remember being told that.
8  Q. I'm sorry.
9  A. I don't remember being told that.
10 Q. Do you remember the judge that you pled guilty before told
11 you, telling you -- withdrawn. Didn't the judge that you pled
12 guilty before tell you that the government's calculation of 262
13 to 327 months was not even binding on the government and that
14 they could reach a different calculation of your guideline
15 range, do you remember the judge telling you that?
16 A. No, I don't remember.
17 Q. Do you remember the judge that you pled guilty before told
18 you that the court could not determine what your actual
19 sentencing guideline range would be until a full presentence
20 report had been completed, do you remember the judge telling
21 you that?
22 A. No, I do not remember.
23    THE COURT: Mr. Aronwald, instead of asking him what
24 he remembers the judge telling him, why don't you ask him what
25 his understanding is?

Page 974

1    MR. ARONWALD: Can I show the witness a document now?
2    THE COURT: I'm not going to let you go any further
3 along that line.
4  Q. Tell the jury your understanding of what your sentence
5 might be based on what you were told by the United States
6 Attorney's Office and what the judge told you?
7  A. Anywhere between 262 months to 327 months.
8  Q. Is it your testimony that you have no recollection of being
9 told by anyone that that 262 to 327 month calculation was only
10 an estimate and was not binding on the government or the court,
11 you don't remember anybody telling you that?
12 A. I just don't recall.
13    MR. ARONWALD: May I approach the witness now, your
14 Honor?
15    THE COURT: Yes.
16 Q. Placing before you Government's Exhibit 3502-R, directing
17 your attention to page 17 beginning at line 9 and continuing
18 through page 18, line 12. Just read those portions to yourself
19 and when you're finished doing that let me know and then I'll
20 put the next question to you.
21    (Handed to the witness)
22 Q. Sir, does that refresh your recollection that on January
23 22, 2003 when you were pleading guilty in this building, the
24 judge that you were before told you that the government's
25 understanding and calculation of the sentencing guideline range

Page 975

1 is not binding upon the court, does that refresh your
2 recollection that you were told that?
3  A. No, it don't refresh my recollection but it's on the paper.
4  Q. I'm sorry.
5  A. It doesn't refresh my recollection, but it's on the paper
6 so --
7  Q. So you're not denying you were told that by the judge you
8 were pleading before?
9  A. No, I'm not denying.
10 Q. In fact, wasn't it also your understanding that the
11 government's sentencing guideline calculation of 262 to 327
12 months was not binding on the United States Probation
13 Department, the Department that would be responsible for your
14 presentence investigation report, wasn't that your
15 understanding?
16 A. That's what it say on the paper.
17 Q. Wasn't that, independent of what's on the paper, wasn't
18 that your understanding at the time?
19 A. I don't recall.
20 Q. Looking at the document that I showed you, does it refresh
21 your recollection that you were told by the judge you pleaded
22 guilty before on January 22nd that the government's guideline
23 calculation of 262 to 327 months is not binding on the
24 government and that they were free to reach a different
25 guideline calculation, does the --

Page 976

1    THE COURT: We've been over and over this. He said he
2 doesn't remember.
3    MR. ARONWALD: I showed him a document to see whether
4 it refreshes his recollection, your Honor. I just want to ask
5 him whether it refreshes his recollection as to those two last
6 questions. I don't know what the answer will be.
7    THE COURT: Does it refresh your recollection?
8    THE WITNESS: No, sir.
9    MR. ARONWALD: We would move into evidence the plea
10 allocution transcript, Government's Exhibit 3502-R as
11 Defendant's Exhibit H.
12    MR. COLTON: I just want to understand the offer. Is
13 it a portion or the entire thing?
14    (Defense counsel confer)
15    THE COURT: You might want to think about what the
16 rule is under which you think that might come in.
17    MR. COLTON: If I could have a moment to talk with
18 counsel, we might be able to settle this issue.
19    THE COURT: I don't know what their basis is and I
20 don't know if you can settle it, but okay.
21    (Counsel confer)
22    MR. ARONWALD: Should we discuss this at the sidebar,
23 the basis for it?
24    THE COURT: Sure.
25    (At the sidebar )

Page 977

1 THE COURT: Mr. Aronwald, your basis for believing
2 this document comes in?
3 MR. ARONWALD: It's a sworn statement of the witness,
4 basically, which is inconsistent with his testimony here. He
5 basically is saying has no recollection of whether he was told
6 this. The transcript indicates that he was told and he
7 indicated at the time that he fully understood it and it's
8 basically an official transcript of a court proceeding.
9 THE COURT: His testimony is not opposite to that. He
10 didn't say it didn't happen. He said he didn't remember.
11 MR. HOCHHEISER: It's not hearsay under 801 something
12 or other, (d)(1). It's specifically not hearsay because it's a
13 sworn statement by the witness on the subject, so if he doesn't
14 remember, it's his own sworn statement as to what it is he
15 doesn't remember.
16 THE COURT: This is not a sworn statement.
17 MR. ARONWALD: He was under oath.
18 THE COURT: But the statements that you're seeking to
19 get in are not his statements. The statements you're seeking
20 to get in are the statements of the judge.
21 MR. HOCHHEISER: They become his statements when he
22 says I understand that statement.
23 MR. ARONWALD: He's under oath and it's an advice of
24 rights and the judge is asking questions and he says I
25 understand that. I asked him were you told by the judge such

Page 978

1 and such and he says he has no recollection of it. The judge
2 asked him each time do you understand that and he said yes.
3 THE COURT: He didn't say he didn't understand it when
4 the judge said it to him. You asked him if he recalled that
5 the judge said it to him and he says he doesn't recall that the
6 judge said it to him.
7 MR. HOCHHEISER: He's trying to prove --
8 THE COURT: That's the point.
9 MR. HOCHHEISER: Mr. Aronwald is trying to prove that
10 he did understand these facts that were in the transcript.
11 THE COURT: He didn't say he didn't understand that.
12 MR. ARONWALD: He said his understanding was that he
13 could be sentenced to 262 to 327. The transcript reflects
14 otherwise.
15 MR. COLTON: I just have a question about what the
16 offer is.
17 THE COURT: First of all, it's not to the entire
18 document. I assume we're talking about a portion.
19 MR. ARONWALD: I have no objection to the entire
20 document coming in.
21 MR. COLTON: We do.
22 MR. ARONWALD: I don't understand what the basis is
23 for the government's objection to the entire document coming
24 in, but if the Court wants to limit the offer, we would limit
25 the offer to the pages that I asked the witness to read, 17

Page 979

1 beginning on line 9 continuing through page 18 line 11 and I
2 can during the recess just redact those pages and introduce
3 that as the exhibit.
4 THE COURT: I want to be clear. You asked this
5 witness what he understands as he sits here today and he told
6 you what his understanding was. This transcript is what the
7 judge said to him at that time and did he understand. That's
8 not what you asked him. So his testimony today is not opposite
9 to what's in that transcript.
10 MR. ARONWALD: I believe in all due respect I asked
11 him what his understanding was at the time he pled guilty on
12 January 22nd. If the Court wants me to reformulate the
13 question and ask him that way.
14 THE COURT: I don't care whether you reformulate the
15 questions or not, I think you ought to ask questions and make
16 the document you want to put into evidence relevant to that
17 point.
18 MR. ARONWALD: I think I have. I think when the
19 witness says he doesn't remember that goes to the question of
20 his credibility, would the jury expect that a person pleading
21 guilty less than a year ago to these charges facing this kind
22 of sentencing would remember what he was told at that time.
23 And if the jury concludes that he's being evasive.
24 THE COURT: Now you're trying to put in extrinsic
25 evidence of that fact and that is not what you're allowed to

Page 980

1 do.
2 MR. HOCHHEISER: Your Honor, may I. Your Honor is
3 looking at this as a prior inconsistent statement.
4 THE COURT: That's exactly what he's offering it as.
5 MR. ARONWALD: No, I'm not.
6 MR. HOCHHEISER: It's not. Under 801 it is a prior
7 sworn statement of the witness of the facts sought to be
8 proved, that is, that he was told this and understood it. This
9 document, just like grand jury testimony, if he said I don't
10 remember it could be put in to prove the fact that he said he
11 understood it.
12 THE COURT: And what I'm saying to you is that the
13 witness was not asked whether he was asked if he understood
14 that at the time. That's what that is an answer to.
15 MR. HOCHHEISER: He was asked among other things if he
16 was told this at the time because he was asked if he understood
17 it now.
18 THE COURT: What he said was he didn't remember.
19 MR. HOCHHEISER: This proves that he was told it.
20 MS. SEIBEL: 801 only allows prior sworn statements
21 that are inconsistent with the trial testimony.
22 MR. HOCHHEISER: No, it doesn't, if the witness says I
23 don't remember and the commentary to 801 tells you that.
24 THE COURT: We'll give the jury a break and you find
25 it for me.

## Page 981

1  (In open court)

2  THE COURT: Ladies and gentlemen, we're going to take

3  a brief break now. Why don't you take a 15-minute break, 10

4  minutes if you would. We'll get you at ten after eleven.

5  Thank you.

6  (Jury not present)

7  THE COURT: In witness will be excused.

8  (Witness not present)

9  THE COURT: Let me be clear. The grand jury testimony

10  that you are referring to --

11  MR. ARONWALD: It's not grand jury testimony, it's the

12  plea allocution transcript.

13  THE COURT: I'm sorry. The plea allocution

14  transcript, you're citing to a portion on pages 17 and 18 where

15  the witness was asked if he had a certain set of understandings

16  to which he answers yes. Rule 801, I take it you're offering

17  it under 081(d)(1), says the declarant testifies at a trial or

18  hearing and is subject to cross examination concerning this

19  statement and the statement is (a) inconsistent with the

20  declarant's testimony and was given under oath subject to

21  perjury. My statement to you is the questions that you asked

22  are not inconsistent, his answers are not inconsistent with his

23  testimony.

24  MR. ARONWALD: Your Honor, Mr. Hochheiser indicated

25  that the statement was being offered under 801(d). I am also

## Page 982

1  offering it under Rule 803, specifically as a recorded

2  recollection, memorandum or record concerning a matter about

3  which a witness once had knowledge but now has insufficient

4  recollection to enable the witness to testify fully and

5  accurately, shown to have been made or adopted by the witness

6  when the matter was fresh in the witness' memory and to reflect

7  that knowledge correctly. If admitted, the memorandum or

8  record may be read into evidence but may not itself be received

9  as an exhibit unless offered by an adverse party. I'm the

10  adverse party, I'm offering the exhibits, and it meets all of

11  the elements of 803, subdivision (5).

12  THE COURT: That's not how you were offering it.

13  MR. ARONWALD: I didn't get to speak to why I was

14  offering it.

15  THE COURT: That is not how the testimony was coming

16  out. 803 goes to when there are facts that a witness is now

17  saying he doesn't recall. What I'm trying to say to you is,

18  what you asked this witness was, did he recall the judge saying

19  this to him. Then you offered this up -- I'm sorry.

20  MR. ARONWALD: I didn't say anything. I was just

21  moving my chair forward.

22  THE COURT: Let's go back. The questions on page 17

23  are saying do you understand that and he says yes, I understand

24  that. Your question to him about understanding was not did he

25  understand it then but does he understand that to be the case

## Page 983

1  now as he sits on the witness stand. When he says no, I don't

2  understand that, this becomes irrelevant as 803 evidence. If

3  what he was asked -- I hate to do this because I don't like to

4  tell people how to do the testimony to get the evidence in, but

5  go ahead and make your argument about this.

6  MR. ARONWALD: I'm looking at the transcript, I don't

7  have a page number, I don't know whether the pagination is the

8  same, it looks like page 25, what I said to, what I asked the

9  witness at line 6 of that page was "tell the jury your

10  understanding of what your sentence might be based upon what

11  you were told by the United States Attorney's Office and what

12  the judge told you." The answer is "anywhere between 262 to

13  327 months." I'm clearly asking him what is your understanding

14  based upon what you were told.

15  I don't want to waste a whole lot of time. I have no

16  problem asking him the questions what was your understanding on

17  January 22, 2003 as to what your sentence might be, what was

18  your understanding on January 22nd as to whether the guideline

19  calculation of 262 to 327 was binding upon the Court, the

20  United States Probation Office, I have no problem asking the

21  questions that way. The portions I want to introduce are

22  clearly admissible, however, under 803(5).

23  THE COURT: As you asked the questions they're not

24  relevant. You have to get through the hearsay objection and

25  then you have to demonstrate relevance. Just by saying they're

## Page 984

1  not hearsay doesn't mean they're relevant. There are a lot of

2  things that are not hearsay but are not relevant. Based on the

3  questions that are asked, this isn't relevant under 803 and it

4  isn't the kind of statement that 801 contemplates because,

5  based on the question that you asked, it wasn't a statement

6  opposite of that.

7  MR. ARONWALD: I'm happy to ask the question in the

8  way that your Honor seems to suggest is necessary to implicate

9  803.

10  MR. HOCHHEISER: Can I just make a suggestion to save

11  time. It seems to me that what would be relevant, forget about

12  what did or didn't occur so far, what we want to bring out from

13  the witness is what he understands his situation is without the

14  5K1 letter, what the situation is as it's expressed in the

15  Pimentel letter. So we want to ask him what his understanding

16  is today.

17  When he says I understand A, B and C but I don't

18  recall or have no knowledge about anything else, then the next

19  question is, well, weren't you told the rest on this earlier

20  date by Judge Smith. And if he says I don't remember, then it

21  seems to me that we can prove that he in fact told that at

22  that time with his sworn statement which proves the point.

23  It's an extrinsic proof. It's not credibility, it's

24  bias. So it's provable extrinsically and the document is an

25  official transcript. He's under oath. He says at that time

## Page 985

1 that he was told this information. What we're asking him now
2 is what is your understanding today and if you say I don't know
3 certain things, the question, next question is were you told
4 those things by Judge Smith in January of 2003. And if he says
5 I don't know, I don't remember, then you can certainly
6 introduce the sworn transcript where he says he has received
7 that information at that time. It seems perfectly reasonable.
8     MR. COLTON: Just to note for the record that the
9 witness' testimony on direct is the guideline range he expects
10 with that letter is 262 to 327 and the statute carries a
11 maximum of life and his testimony was he could get the life
12 with the letter, his testimony was that he could get life with
13 or without the letter.
14     THE COURT: I think it is fair for them to examine if
15 he now on cross-examination gives a different variation on that
16 answer.
17     MR. COLTON: As to what he understands today. But to
18 try to prove up what he understood eleven months ago doesn't
19 seem to matter.
20     MR. ARONWALD: I'm going to follow your lead, not
21 Mr. Colton's. Your Honor has indicated the questions you think
22 are necessary. Those are exactly the questions I'm going to
23 ask the witness.
24     THE COURT: All right. Let's get the jury back.
25     MR. ARONWALD: Are you going to take another

## Page 986

1 mid-morning break.
2     THE COURT: You want a chance to break?
3     MR. ARONWALD: Thank you.
4     (Recess)
5     MR. HOCHHEISER: Your Honor, I apologize. I may have
6 had the wrong section in my head and I may have misdirected
7 your Honor. If you look at Rule 804, hearsay objections,
8 declarant unavailable, the peculiar, under the peculiar
9 definitions of the Rules of Evidence, a witness is unavailable
10 if under (a)(3) he testifies to a lack of memory of the subject
11 matter of the declarant's statement or he persists in refusing
12 to testify concerning the subject matter, and then under
13 Section (b) a hearsay exception is former testimony.
14     They're saying if the witness is here to be
15 cross-examined and he professes to lack a memory concerning the
16 matter that you're asking him about and you have his former
17 testimony on the same subject under oath, it seems to me that
18 that's admissible. It's not for credibility alone but for bias
19 because it has to do with his understanding of what he's
20 getting out of it. I just add that because I may have misled
21 your Honor. I don't know what Mr. Aronwald's intentions are,
22 he's doing the examination.
23     MR. ARONWALD: While truly believing that the
24 statement is admissible, I have spoken to government counsel
25 and what we've decided to do to avoid having to waste any more

## Page 987

1 time on this issue is we will offer in evidence, and I
2 understand the government will not object to the Pimentel
3 letter coming into evidence which the witness has already said
4 he saw and knew and understood before he signed, at or about
5 the same time.
6     THE COURT: Does that get at the issue you wanted to
7 get at here?
8     MR. ARONWALD: It does in the sense that the letter
9 indicates that the government's guideline calculation is not
10 binding upon the government, the Court or Probation.
11     MR. COLTON: The government has no objection to 3502-T
12 coming in. Can we just clear up that the signature on the
13 document is not mine.
14     MR. ARONWALD: It purports to be Mr. Colton's
15 signature.
16     MR. COLTON: Well, it's clearly Ms. Pesce signing for
17 me.
18     MR. ARONWALD: I'm not going to argue to the jury that
19 Mr. Colton signed it.
20     THE COURT: Yes you are.
21     MR. HOCHHEISER: That's why it's there, because he
22 authorized it to be placed there as if he signed it.
23     MR. COLTON: The government stands by its estimate in
24 the Pimentel. That's not the issue.
25     MR. ARONWALD: We can stipulate that the signature

## Page 988

1 which purports to be his is actually Mr. Pesce's with his
2 authorization. Whatever he wants to do is fine with me.
3     THE COURT: Let's get finished with this argument. We
4 don't need to do that. I don't think Mr. Colton is denying
5 knowledge that this letter was written or delivered to this
6 witness and his attorney.
7     MR. COLTON: Certainly not.
8     THE COURT: Let's move forward. Are we all set, do we
9 know where we're going?
10     MR. ARONWALD: Yes. As a housekeeping matter, we had
11 been offering exhibits in evidence and I don't believe any of
12 the exhibits have actually been marked by the court clerk so I
13 don't know whether or not we need to have these exhibits marked
14 or not because as they are right now, each side labels the
15 exhibit but it doesn't have any marking that it is an exhibit.
16 The record reflects it.
17     MS. SEIBEL: I would suggest, Judge, rather than
18 having us march up to Mr. Skolnik each time, when we send the
19 exhibits into the jury we can go over this with Mr. Skolnik.
20     THE COURT: I think there should be a marking on all
21 of the exhibits. I'm trying to keep a strict log of what's
22 been admitted in evidence from both sides. But we should
23 actually have markings on the labels and then we'll have on the
24 record that the Court has received them in evidence.
25     (Jury present)

## Page 989

1    THE COURT: Ladies and gentlemen, just as a little bit
2 of an advanced warning and housekeeping matter, tomorrow we
3 will break for lunch precisely at 12:30. Wednesdays are the
4 days in this courthouse when the judges have their meeting and
5 I was reminded this morning that I missed last Wednesday's
6 meeting and so I will try not to do that again this week. So
7 we will break for lunch at 12:30 tomorrow and probably not
8 reconvene until about two o'clock.
9      MR. Aronwald.
10      MR. ARONWALD: Your Honor, at this time defense offers
11 Defendant's Exhibit H the Pimentel letter dated January 21,
12 2003.
13      THE COURT: I think that's I. I have the plea
14 allocution as H.
15      MR. ARONWALD: I'm withdrawing that offer.
16      THE COURT: But it was still identified on the record
17 so we'll keep that as H and that will be I. Just so it's clear
18 we don't have two things being called H in the record.
19      MR. COLTON: No objection from the government to
20 Defendant's Exhibit I.
21      (Defendant's Exhibit I received in evidence)
22 Q. Mr. Melvin, Defendant's Exhibit I, the letter I showed you
23 before that was addressed to your lawyer, Mr. Lawrence, setting
24 forth the guideline calculations, you understood what that
25 letter said before you signed your cooperation agreement and

## Page 990

1 before you pled guilty, correct?
2 A. Yes.
3 Q. Okay. Now, in terms of your cooperation agreement, isn't
4 it true that the reason that you signed your agreement was
5 because you wanted the benefit of a 5K letter or motion by the
6 government on your behalf, correct?
7 A. Yes.
8 Q. Okay. And tell the jury, if you will, what your
9 understanding was at the time that you signed your cooperation
10 agreement of the effect of a 5K motion by the government on
11 your behalf.
12 A. It just helps you out at sentencing time.
13 Q. Okay. Is that your full understanding of what the effect
14 of a 5K1 letter would be if the government were to submit one
15 on your behalf?
16 A. Yes.
17 Q. You haven't been sentenced yet, correct?
18 A. No, sir.
19 Q. And you know the judge who is going to sentence you. Who
20 is that, do you know?
21 A. I have no idea.
22 Q. Weren't you told at the time that you pled guilty that the
23 judge that would be sentencing you is Judge McMahon?
24      THE COURT: I'm going to sustain the objection to
25 that. It's not clear who is going to sentence him.

## Page 991

1      MR. ARONWALD: I was only asking him what he was told
2 at the time. I'll withdraw the question.
3 Q. Let me ask you this question, Mr. Melvin, isn't it true
4 that when you signed your cooperation agreement and when you
5 pled guilty on January 22nd, you knew and understood that if
6 the government decided to submit a 5K1 letter on your behalf,
7 that would allow the judge who sentences you to ignore the
8 sentencing guideline range, isn't it true you understood that?
9 A. Excuse me.
10 Q. Didn't you understand at the time that you pled guilty on
11 January 22nd and when you signed your cooperation agreement on
12 January 21st that the importance of a 5K1 letter would be that
13 the sentencing judge could ignore the sentencing guideline
14 range and sentence you to no time or probation, didn't you
15 understand that?
16 A. Yes.
17 Q. Okay. And isn't that what you were hoping for when you
18 signed the agreement, that you would get that kind of a letter
19 from the government?
20 A. Yes.
21 Q. Okay. And isn't it also true that you understood at the
22 time you signed the agreement on January 21st that the decision
23 whether or not to submit that 5K1 motion on your behalf was
24 strictly the government's decision?
25 A. Yes.

## Page 992

1 Q. And you understood that if the government's decision was
2 not to submit that letter on your behalf, that there was
3 basically nothing you could do so long as the government's
4 position was made in good faith, correct?
5 A. I don't understand what you mean.
6 Q. What was your understanding as to what your rights would
7 be, if any, if the government decided not to submit the 5K1
8 letter on your behalf?
9 A. That I get sentenced to whatever the guidelines is or
10 whatever my range is, whatever.
11 Q. So you understood, didn't you, that no matter how much
12 information you provided to the United States Attorney's
13 Office, if they decided not to submit the letter for you, the
14 judge would have to sentence you within the guideline range,
15 that was your understanding, correct?
16 A. Yeah.
17 Q. As you sit here now, Mr. Melvin, isn't it true that you are
18 hoping that the government will ultimately submit the 5K1
19 motion for you?
20 A. Yeah.
21 Q. And isn't it also true that you're hoping that the
22 sentencing judge, based on the government's 5K1 motion, will
23 sentence you to no time or probation, isn't that your hope?
24 A. Yes, that's what I hope for.
25 Q. Mr. Melvin, let me just go back to Government's Exhibit 24

Page 993

1 and Government's Exhibit 24A, the November 21st meeting that
2 you had with Mr. St. John. Soon after the meeting began, you
3 received a telephone call from Agent Boss, correct?
4 A. Yes.
5 Q. And he told you -- what did he tell you when he called you
6 that first time?
7 A. That the wire wasn't working.
8 Q. The wire wasn't working or the transmitter wasn't working?
9 A. Transmitter.
10 Q. And there came a time when he called you a second time, do
11 you remember that?
12 A. Yeah.
13 Q. And that was before you left to go to the bathroom,
14 correct?
15 A. I don't think so.
16 Q. Okay.  You do remember going to the bathroom, correct?
17 A. Yeah.
18      MR. ARONWALD: May I approach the witness?
19      THE COURT: Yes.
20 Q. Let me show you what's marked as Government's Exhibit 24A
21 in evidence, directing your attention to page 11.  First let me
22 direct your attention to page 2.  Now on page 2 is when you
23 received the first cell phone call from Agent Boss, correct?
24 Do you see the reference in the transcript in the middle of the
25 page?

Page 994

1 A. I see it.
2 Q. That was when you received the first call from Agent Boss
3 telling you that the transmitter was not working, correct?
4 A. Yes.
5      MR. COLTON: If I may, the government requests that if
6 a document be shown to the witness as an exhibit, it be the
7 actual exhibit not one with counsel's markings and highlighting
8 on it.
9      MR. ARONWALD: All right, that's fine, Judge.  Let me
10 have the government's actual exhibit.
11      (Handed to counsel)
12 Q. Do you have Government's Exhibit 24A in front of you,
13 Mr. Melvin?
14 A. Yes.
15 Q. Turning to page 2, that's the first cell phone call that
16 you received from Agent Boss, correct?
17 A. Yes.
18 Q. That's when he told you the transmitter wasn't working,
19 correct?
20 A. Yes.
21 Q. Okay.  Now turn to page 11 of the transcript, directing
22 your attention to the middle of the page, do you see where the
23 words "cell phone rings" appear in brackets?
24 A. Yeah.
25 Q. That's the second call you received from Agent Boss,

Page 995

1 correct?
2 A. Yeah.
3 Q. What did Agent Boss tell you on that occasion?
4 A. I don't remember.
5 Q. Mr. Melvin, when Mr. St. John told you at page 2 of the
6 transcript that irrespective of whether you were the ct in the
7 Raymond Bryant case or not, whether it was true or not, that
8 would be helpful to Raymond Bryant, when he told you that,
9 didn't you understand that information concerning whether or
10 not you were the informant in the Raymond Bryant case would be
11 helpful in his defense?
12 A. Excuse me.
13 Q. Didn't you understand that when Mr. St. John told you that,
14 he told you that knowing that you were an informant or knowing
15 that you were not an informant would be helpful in representing
16 Raymond Bryant in the federal drug case pending against him?
17 A. Yeah.
18 Q. Okay.  And didn't you understand from what Mr. St. John
19 told you that the information that he was asking you about
20 could be helpful in getting a deal for Mr. Raymond Bryant?
21      MR. COLTON: Objection to the relevance of this
22 witness' understanding of the legal process.
23      MR. ARONWALD: I don't want to make an argument in
24 front of the jury, but I can do it at the sidebar very briefly
25 if your Honor feels it's necessary.

Page 996

1      THE COURT: I do feel it's necessary.
2      (At the sidebar)
3      THE COURT: What is the relevance of this testimony?
4      MR. ARONWALD: I can always ask a witness who has
5 testified to a conversation what his understanding was of what
6 was said to him, and in addition to that, throughout his direct
7 examination Mr. Colton asked him to give the benefit of his
8 understanding of what Mr. St. John said and meant.  If the
9 prosecution can ask those questions on direct, certainly
10 they're permissible on cross.  The propriety of a question
11 doesn't depend on whether it's direct or cross.
12      MR. COLTON: The difference is the prosecution asked
13 what was your understanding of what St. John said to you.  The
14 question he's asking is what is your understanding of whether
15 this would be helpful in a defense, is it your understanding
16 that this would be usable in court, which understanding is
17 completely irrelevant.  If it's an interpretation of what St.
18 John meant and maybe some body language or other inflection,
19 the witness can comment on that, that's relevant.  But not its
20 usability in court.
21      THE COURT: It is irrelevant what this witness thought
22 in terms of the ability of this information to be useful in
23 court.
24      MR. ARONWALD: I can ask certainly ask him what he
25 understand Mr. St. John to mean when he told him that.  We can

Page 997

1  do it that way.
2        (In open court)
3  Q. Mr. Melvin, what did you understand Mr. St. John to mean
4  when he told you at page 2 of the transcript "it will help Ray
5  if we know it's true and then you can tell me what you told the
6  police so we know what we, his attorney can make the best deal
7  that he can make?"  What did you understand Mr. St. John to
8  mean when he told you that?
9  A. I don't know.  I don't know.  I wasn't really -- I don't
10 know.
11 Q. Were you about to say that you weren't really paying
12 attention to what Mr. St. John said?
13 A. No, that wasn't what I was about to say.
14 Q. You said you weren't really, you started saying you weren't
15 really, what were you about to say to the jury?
16 A. I don't know.
17 Q. Okay.  When Mr. St. John told you at page 2 of the
18 transcript, "if you tell me stuff that, that you did with the
19 police and in that I can figure out something that maybe they
20 did wrong while you were doing it," what did you understand
21 Mr. St. John to mean when he told you that?
22 A. I don't know.
23 Q. At page 8 of the transcript after you told Mr. St. John
24 that Ray Bryant had sold you crack, what did you understand
25 Mr. St. John to mean when he told you "well, as of this point,

Page 998

1  I didn't know that.  Ray hadn't told me that.  Ray never told
2  me what you just told me."  What did you understand Mr. St.
3  John to mean when he told you that?
4  A. That Ray Love didn't tell him that he sold me crack.
5  Q. That Ray Love hadn't told him the truth, correct?
6  A. Yeah.
7  Q. And then turning to page 10 of the transcript, when
8  referring to the papers that you discussed with Mr. St. John in
9  the middle of the page, what did you understand Mr. St. John to
10 mean when he told you "what they typed up for me, it was a
11 general statement saying that you bought drugs or sold
12 drugs or worked for the police or had done this or done that.
13 Well, you're telling me you did so you know clearly, you can't
14 sign something like that because it would be a lie, right?"
15 What did you understand Mr. St. John to mean when he told you
16 that?
17 A. I don't know what he meant.
18 Q. By the way, on November 21, 2002 did you have any
19 difficulty hearing or understanding the English language?
20 A. No, I didn't have no.
21 Q. Thank you.  At page 11 of the transcript, what did you
22 understand Mr. St. John to mean when he said to you "the way
23 to, the only way to get around that is to discredit their
24 source.  The only way I know of we can discredit this, when I
25 say discredit, that doesn't mean that they have to make them

Page 999

1  out to be a real liar or something like that.  It means I have
2  to talk to them like I'm talking to you and find out what
3  actually happened and somewhere along the line, maybe there's
4  some little thing that was done wrong and that discredits the
5  search warrant."  What did you understand Mr. St. John to mean
6  when he told you that?
7  A. He was talking about discrediting somebody, you know, like
8  taking somebody's word, I guess.
9  Q. Making somebody what?
10 A. Making somebody out to be a liar.  Discrediting their word.
11 Q. When Mr. St. John told you that by discredit, "that doesn't
12 mean they have to make them out to be a real liar or something
13 like that," what did you understand that to mean?
14 A. Discredit somebody, I don't know.
15 Q. Turning to page 12 of the transcript what did you mean when
16 you told Mr. St. John "so, so I can't help Ray because you know
17 what I'm saying, I mean I told you what he said and for me to
18 sign that statement like you said, it would be a lie.  You know
19 what I mean?"  What did you mean when you told that to Mr. St.
20 John?
21 A. What I said.  I mean what I said right there, that he sold
22 me crack and if he want me to sign a statement saying that he
23 didn't sell me crack then it would be a lie.
24 Q. When you told Mr. St. John "for me to sign that statement
25 like you said it would be a lie," the "you" when you used the

Page 1000

1  words "you said," you were referring to what Mr. St. John told
2  you, isn't that true?
3  A. Yeah.
4  Q. Mr. St. John had already told you that if you signed the
5  paper saying that you never did drugs with Ray Love it would be
6  a lie, correct?
7  A. I don't recall.
8  Q. Go back to page 10 of the transcript, Mr. Melvin and see
9  whether that refreshes your recollection that Mr. St. John had
10 already told you that you couldn't sign the paper because that
11 would be a lie, the third David St. John entry up from the
12 bottom of page 10.  Does that refresh your recollection that
13 Mr. St. John had already told you that you couldn't sign the
14 paper because it would be a lie?
15 A. Which paper?
16 Q. The paper that you were talking about.  Look up on page 10.
17 You say "but I'm saying, you said had you papers for me to sign
18 to help Ray Love."  Do you see that, about three lines up?
19 A. Yeah, I see it.
20 Q. And then Mr. St. John told you, didn't he, at that time
21 that you can't sign something like that because it would be a
22 lie.  Didn't he tell you that?
23 A. Yeah.  I see it right here.
24 Q. Going back to page 12, after you told Mr. St. John "so, so
25 I can't help Ray because you know what I'm saying, I mean I

Page 1001

1  told you what he said and for me to sign that statement like
2  you said, it would be a lie, you know what I mean?" When
3  Mr. St. John responded and told you, "yeah, no, I'm not going
4  to have you, I'm not going to have you, it would be perjury,
5  I'm not going to have you commit perjury. Unless there was
6  something, you know, there's no way I would ever have you
7  commit perjury but if there was something involved with the
8  sale that was, was screwy, not screwy, I don't know what the
9  right word here for this, any little piece of it that might,
10 they might have done wrong in how their procedure was might
11 make a big difference. That's why I'm asking you all these
12 details because if they, let's say if they didn't search you
13 before you went up there, well, that's, that's wrong procedure.
14 They couldn't say for sure that you didn't have the stuff
15 already on you in your pocket." What did you understand
16 Mr. St. John to mean when he told you that?
17 A. That if I signed that statement it would be perjury.
18 Q. Mm-hmm. Let me ask you this question, Mr. Melvin. You
19 then proceeded -- remember Mr. St. John then proceeded to ask
20 you a series of questions about the drug transaction that you
21 had with Raymond and Sukeem Bryant when you were working for
22 ATF, do you remember that?
23 A. Yeah.
24 Q. And you provided him with details, correct?
25 A. Yes.

Page 1002

1  Q. And the details that you provided him with at that point,
2  that was the truth, correct?
3  A. Yes.
4  Q. And you had never discussed those details in any of the
5  taped telephone conversations that you had with Malcolm Bryant,
6  Yolanda Delgado or David St. John, had you?
7  A. No.
8  Q. Turning to page 20 of the transcript, what did you
9  understand, what did you understand Mr. St. John to mean when
10 he told you at the top of the page, "well, I don't, I don't
11 know if, some of the stuff you told me might help, it might
12 not. I don't know yet. I wouldn't tell you that it isn't
13 helping. It's a very, very, very, you mind if I call you,
14 should I call you Flip or you want me to call you by your real
15 name or what," what did you understand Mr. St. John to mean
16 when he told you that?
17 A. I don't know.
18 Q. What did you understand it to mean when he said to you on
19 page 20, "okay, at the very least my job, when I'm working for
20 somebody, whether it's Ray or anybody else who has been accused
21 of something, part of my job is to find out what kind of case
22 the police has against him." What did you understand Mr. St.
23 John to mean when he told you that?
24 A. He was trying to find out what's going on.
25 Q. Find out what's going on about what?

Page 1003

1  A. About Ray.
2  Q. About the case against Ray?
3  A. Yeah.
4  Q. And when Mr. St. John continued and said to you "if I go
5  out there and I found out they've got him stone cold on this,
6  they got an eyewitness to that, there's nothing we can do with
7  this other piece of evidence, you know, that they found at some
8  scene or something, I go to the attorney and say, look, they
9  got a real solid case. Now the attorney knows he isn't going
10 to win. Based upon that, when he starts doing the let's make a
11 deal with the DA, you know, where they play poker" what did you
12 understand Mr. St. John meant when he told you that?
13 A. I don't know. Some lawyer stuff. I don't know.
14 Q. Based upon your past criminal history, have you engaged in
15 plea bargaining before through your lawyer in other cases
16 against you?
17 A. Yes.
18 Q. Did you understand that that's what Mr. St. John meant when
19 he made that statement to you on page 20 of the transcript?
20 A. Yeah, that's what.
21 Q. Okay. Staying on page 20 of the transcript, what did you
22 understand Mr. St. John to mean when he told you "you see, now,
23 if I don't, if I can't go back to the attorney and give him all
24 the information, all the facts the police have and that the DA
25 has, he doesn't know, he's in the dark." What did you

Page 1004

1  understand Mr. St. John to mean when he told you that?
2  A. If he don't have whatever it is to take back to the lawyer
3  then the lawyer don't know what to do.
4       MR. ARONWALD: Could I have the last answer read back?
5       (Record read)
6  Q. You understood when Mr. St. John told you that that
7  whatever information he could take back to the lawyer would be
8  helpful to the lawyer, didn't you understand that?
9  A. Yes.
10 Q. And what did you understand Mr. St. John to mean when he
11 said to you, "so, and a lot of times your client doesn't,
12 doesn't tell us the truth or everything he should be telling us
13 so you know you could take someone like Ray and he's, you know,
14 he didn't tell me anything about this. I talked to him and you
15 know they're saying no, I never made any sales. No, that's
16 bullshit. They can't have anybody. They haven't got any tapes
17 on me. They haven't got anything." What did you understand
18 Mr. St. John to mean when he told you that?
19 A. That Ray didn't tell him that he made a sale.
20 Q. That Ray didn't tell him what?
21 A. That he made a sale.
22 Q. That he made a sale to you?
23 A. Yeah.
24 Q. Didn't you also understand that to mean that Ray Love had
25 lied to David St. John about the drug sale, isn't that your

Page 1005

1 understanding?
2 A. That's what he said to me.
3 Q. And that's what you understood him to mean, correct?
4 A. That's what he said.
5 Q. Now, there came a point -- withdrawn. And continuing with
6 that same discussion at page 20, what did you understand David
7 St. John to mean when he said to you "they can't have anything
8 so based on that, you don't know anything else, the lawyer will
9 push it far enough and you end up in a trial and the trial,
10 they start pulling out audiotapes. They start putting someone
11 like you on the stand and the jury is now five seconds before
12 they come back saying guilty. So now instead of looking at, he
13 could have had a deal where it was one to three or three to
14 five, now he's looking at 20." What did you understand Mr. St.
15 John to mean when he told you that?
16 A. That if Ray Love won't be real to him then they don't know
17 what to do.
18 Q. If Ray Love don't be real with him they don't know what to
19 do?
20 A. Yeah.
21 Q. Okay. Mr. Melvin, as soon as Mr. St. John told you that,
22 you told Mr. St. John at the bottom of the transcript, "I'm
23 saying, but I'm on the run, so I probably won't be there anyway
24 if he go to trial, you know what I mean?" What did you mean
25 when you told that to Mr. St. John?

Page 1006

1 A. I just told him what the agent told me to say.
2 Q. The agent, which agent was that, was that Agent Boss?
3 A. Yeah.
4 Q. So Agent Boss told you to tell Mr. St. John that you were
5 on the run and that you weren't going to show up for the trial
6 anyway, is that so?
7 A. No, he didn't tell me to say that.
8 Q. What did he tell you to say?
9 A. He just said tell him I'm on the run.
10 Q. Well, whose idea was it to tell Mr. St. John at the bottom
11 of page 20 "so I probably won't be there anyway if he go to
12 trial. You know what I mean?"
13 A. He just told me to tell him that I was on the run. So
14 that's what I stuck with.
15 Q. Did Agent Boss ever tell you to tell Mr. St. John that
16 because you were on the run, you probably wouldn't be there for
17 the trial?
18 A. No, he didn't tell me that.
19 Q. All he told you was to tell Mr. St. John you were on the
20 run?
21 A. Yes.
22 Q. When did he tell you to tell that to Mr. St. John, do you
23 remember?
24 A. Before the meeting.
25 Q. On the same day of the meeting, during breakfast at the

Page 1007

1 Popeye's or whatever it was?
2 A. It was during the phone calls or whatever.
3 Q. In any event, when you told that to Mr. St. John, what did
4 you understand Mr. St. John to mean when he told you at page 21
5 of the transcript, top of the page, "well I understand that you
6 don't want, I'm sure you don't want to through this but you got
7 to realize that at some point, they're going to look hard for
8 you."
9 A. Excuse me, what you say?
10 Q. What did you understand Mr. St. John to mean at the top of
11 page 21 when he said to you, after you told him you were on the
12 run and that you probably weren't going to be there for the
13 trial, what did you understand Mr. St. John to mean when he
14 said to you, "well, I understand that you don't want, I'm sure
15 you don't want to through this but you got to realize that at
16 some point they're going to look hard for you." Didn't you
17 understand him to mean that the authorities, the police, ATF
18 would come looking for you to make you come in and testify at
19 the Ray Love trial?
20 A. Yeah.
21 Q. And then you told Mr. St. John "it's okay, you know. They
22 do what they do, that's why I'm in a place like this right
23 here, you know what I mean, talking to you. I ain't stupid,
24 you know what I'm saying. I try to stay three steps ahead of
25 them. I know how they is. You know what I mean?" What did

Page 1008

1 you mean when you told that to Mr. St. John?
2 A. That if they came looking for me that they won't find me.
3 Q. And then what did you understand Mr. St. John to mean when
4 he said to you, "well, not for nothing, you know, how long can
5 you live a life like that?" What did you understand Mr. St.
6 John to mean when he told you that?
7 A. How long you going to be on the run for.
8 Q. Didn't you understand Mr. St. John was telling you that it
9 was not a good idea for you to be on the run?
10 A. No.
11 Q. You didn't understand that Mr. St. John, when he told you
12 that, he was telling you that it was not a good idea --
13 THE COURT: He asked and answered. Let's move on, Mr.
14 Aronwald.
15 Q. There came a time when you left to go to the bathroom. Do
16 you remember that?
17 A. Yes.
18 Q. And as soon as you got out of the car and walked to the
19 bathroom, you made a phone call on your cell phone, correct?
20 A. Yes.
21 Q. Who did you call?
22 A. The agent.
23 Q. Right before you went to the bathroom at page 21 of the
24 transcript you had a discussion with Mr. St. John about Tim
25 Cherry, correct?

## Page 1009

1  A. Yeah.

2  Q. And you told Mr. St. John that you had never done any drug

3  deals with Tim Cherry while you were working with the agents,

4  do you remember that?

5  A. Yes.

6  Q. And then what did you understand Mr. St. John to mean when

7  he said to you "I got one of those blank forms made up with his

8  name on it because I was going to use it for somebody else.

9  You want to sign one of them, that you never did anything for

10  the agents for Tim Cherry?" What did you understand him to

11  mean when he said that to you?

12  A. That he wanted me to sign a form saying that I never did no

13  business with Tim when I was with the agents.

14  Q. And that was about when you decided that you wanted to

15  leave to go to the bathroom, correct? You can turn to page 22

16  of the transcript and see whether that assist you in any way.

17       THE COURT: Mr. Aronwald, how much more do you have?

18       MR. ARONWALD: I would say about 20 minutes, your

19  Honor. But that's just an estimate. Judge, I'm right now

20  focusing on the transcript and I'm almost ready to leave that

21  area of the transcript.

22       THE COURT: Is there another area after that?

23       MR. ARONWALD: Yes. And that should be brief.

24       THE COURT: It's just that I heard some jurors'

25  stomachs rumbling over there.

## Page 1010

1       MR. ARONWALD: If the jurors can bear with me for

2  another 20 minutes, I'm sure I'll be through.

3       THE COURT: Let's keep going.

4  Q. Mr. Melvin, that's when you decided to leave to go to the

5  bathroom, correct?

6  A. Yeah.

7  Q. When you told Mr. St. John that you had never done any drug

8  deals with Tim Cherry while you were working for the agents,

9  that was the truth, wasn't it?

10  A. Yes.

11  Q. Okay. Now you went to the bathroom and you called Agent

12  Boss, correct?

13  A. Yes.

14  Q. And the reason you went to the bathroom is because Mr. St.

15  John was now discussing Tim Cherry with you, correct?

16  A. Yes.

17  Q. Okay. And you met with Agent Boss in the rest stop in the

18  bathroom, correct?

19  A. Yes.

20  Q. Did you have a discussion with him?

21  A. Yes.

22  Q. What did you tell him?

23  A. I told him that he wanted me to sign a paper for Tim

24  Cherry.

25  Q. Did you tell him what kind of a paper he wanted you to sign

## Page 1011

1  for Tim Cherry?

2  A. Saying that I never did no work for him, never bought no

3  drugs from him while he was with the agents.

4  Q. Did you tell him anything else?

5  A. No.

6  Q. You were in the bathroom for about ten minutes, weren't

7  you?

8  A. Yes, he was trying to fix the transmitter.

9  Q. When you told Agent Boss that Mr. St. John wanted you to

10  sign an affidavit saying that you had never done any drug deals

11  with Tim Cherry -- by the way, are you certain that that's what

12  you told him?

13  A. Yes, I'm certain that's what I told him.

14  Q. What did Agent Boss say, if anything, to you?

15  A. He said sign it.

16  Q. Did Agent Boss give you any other instructions?

17  A. He said ask him what they going to give you.

18  Q. Is that all you can remember about what Agent Boss said?

19  A. Yes.

20  Q. And then you left and went back to the car, correct?

21  A. Yes.

22  Q. Now, when you got back to the car at page 23 of the

23  transcript, after you told Mr. St. John or asked Mr. St. John,

24  "what are you all going to do for me," what did you understand

25  Mr. St. John to mean when he said to you "I don't, I don't know

## Page 1012

1  anything about what you mean here?" What did you understand

2  Mr. St. John to mean when he told you that?

3  A. What he said.

4  Q. You said to him, "what are you all going to do for me," you

5  were trying to get him to agree to give you money, correct?

6  A. No, I just asked him what he was going to do for me.

7  Q. Well, in the telephone taped conversations at one point you

8  asked Malcolm Bryant for some paper. You already told us on

9  direct examination that when you asked for paper you meant

10  money, do you remember that?

11  A. No. I don't remember that.

12  Q. Do you remember using the term paper when you spoke to

13  Malcolm Bryant?

14  A. I can't recall right now.

15  Q. Have you used the term paper in the past to refer to money?

16  A. Yeah.

17  Q. Okay. So you're not saying that you never asked Malcolm

18  Bryant for paper, you're just telling us you don't remember?

19  A. Yeah, I'm just saying I don't remember.

20  Q. And when Mr. St. John said to you "I don't know anything

21  about what you mean there," you don't know what he meant by

22  that?

23  A. I guess he meant he didn't know what I was talking about.

24  Q. Did you understand at the time that he meant that he wasn't

25  going to give you any money or any paper?

Page 1013

1  A. No, he didn't say that.
2  Q. By the way, Mr. St. John never in that car offered to give
3  you money, did he?
4  A. No.
5  Q. Now, on page 24 of the transcript, what did you understand
6  Mr. St. John to mean when he said to you "well, if you bought
7  drugs from him -- referring to Tim Cherry -- then you know
8  obviously you can't sign something like this?" What did you
9  understand him to mean when he told you that?
10 A. That if I bought drugs from Tim Cherry that I can't sign
11 nothing like that.
12 Q. And then after he told you that, you told him "I'm saying
13 I'll sign it." Do you remember telling him that?
14 A. What page you said that's on?
15 Q. Page 24. Are you on page 24, Mr. Melvin?
16 A. Yeah.
17 Q. Go up from the bottom of the page to the fourth entry with
18 your name on it up from the bottom of the page. Do you see
19 where you said to him "I'll sign it?"
20 A. Yeah.
21 Q. And then drop down to the next entry where your name
22 appears on page 24. Do you see where you told him again "I'll
23 sign it?"
24 A. Yeah.
25 Q. And then go down to the next entry where your name appears,

Page 1014

1  you see where you said to him "I'll sign it, man, but you --"
2  did you see where you said that?
3  A. Yes.
4  Q. What did you understand Mr. St. John to mean when he said
5  "you told me if you bought drugs from him that would be
6  perjury, and I can't, I understand you want to help, I can
7  tell, but I can't be a part to anything illegal?" What did you
8  understand Mr. St. John to mean when he told you that?
9  A. He's saying that he can't be a part of anything illegal.
10 Q. And Mr. Melvin, you then told Mr. St. John "but we never
11 did nothing with him." Do you see that?
12 A. Yeah.
13 Q. When you made that statement, what you meant was that you
14 had never done any drug deals with Tim Cherry while you were
15 working with the agents, correct?
16 A. Yes.
17 Q. And then what did you understand Mr. St. John to mean when
18 he said to you "just knowing that helps me a lot because now
19 his attorney knows that, you know, they say, well, we got tape
20 recordings from the same guy that we got Raymond with. We know
21 it's not true," what did you understand Mr. St. John to mean
22 when he told you that?
23 A. That somebody said they had tape recordings from the same
24 guy that he got Ray Love with that it wasn't true.
25 Q. Okay. And then on page 25, Mr. Melvin, after you told

Page 1015

1  Mr. St. John "I'm telling you, I did business with Tim, you
2  know what I'm saying, but it was before any of this shit ever
3  happened with the feds or whatever; it was way before that; you
4  know what I mean?" After you told Mr. St. John that, what did
5  you understand Mr. St. John to mean when he said to you "okay,
6  then that's all I need to know. You don't have to sign
7  something. I wouldn't ask you to anyway because it's not, it
8  wouldn't be the truth. You know as much as I've got to do
9  things on the up-and-up, I always, as you could tell by looking
10 at me, I used to be a cop, and I always did things on the
11 up-and-up when I was a cop. That's the truth, too."
12      What did you understand Mr. St. John to mean when he
13 told you that?
14 A. That he just was telling me about hisself.
15 Q. Didn't you understand that when Mr. St. John said that to
16 you he was again telling you that you couldn't sign the paper
17 because it would be a lie? Mr. Melvin, look at page 25 of the
18 transcript. What did you think Mr. St. John meant when he said
19 to you "you don't have to sign something, I wouldn't ask you to
20 anyway because it wouldn't be the truth," what did you
21 understand Mr. St. John to mean when he told you that?
22 A. That he didn't want me to sign nothing because it wouldn't
23 be true.
24 Q. Mr. Melvin, I want you to turn now to page 27 of the
25 transcript. What did you understand David St. John to mean

Page 1016

1  when he said to you " Flip, just by coming here and talking to
2  me and being honest with me helps?" What did you understand
3  Mr. St. John to mean when he told you that?
4  A. What he said. Just coming here talking to him and being
5  honest with him will help.
6  Q. Help with what?
7  A. I don't know.
8  Q. Didn't you understand that to mean it would help with
9  respect to his representation of Raymond Bryant and Tim Cherry?
10 A. Yeah.
11 Q. All right, now, you then left the car and when you left the
12 car you made another phone call, didn't you?
13 A. Yeah.
14 Q. Who did you call then?
15 A. I called the agent.
16 Q. When you say the agent, are we talking about Agent Boss or
17 some other agent?
18 A. Agent Boss.
19 Q. What did you tell Agent Boss?
20 A. That I'm not, you know, what he want me to do. I think I
21 told him I didn't sign no papers.
22 Q. Didn't you tell Agent Boss that Mr. St. John asked you to
23 sign the affidavit but you didn't sign it?
24 A. Yeah.
25 Q. Afterwards --

## Page 1017

1  MR. ARONWALD: May I just have one moment very
2  briefly, Judge.
3  (Defense counsel confer.)
4  MR. ARONWALD: I'm pleased to say I have no further
5  questions.
6  THE COURT: Great. Ladies and gentlemen, we'll break
7  for our lunch. We'll take our normal hour and fifteen minutes
8  which will bring us back at a quarter to two. Thank you.
9  (Jury not present)
10  THE COURT: Mr. Hochheiser, do you have an estimate of
11  how long you'll be?
12  MR. HOCHHEISER: Very, very short, Judge.
13  THE COURT: What does that mean? We've had this with
14  witnesses.
15  MR. HOCHHEISER: Single digit minutes. I made you
16  smile.
17  MS. SEIBEL: We'll tell the marshals, because the next
18  witness is in custody.
19  THE COURT: Will there be redirect of this witness?
20  MR. COLTON: I'd venture to say about ten to fifteen
21  minutes.
22  THE COURT: Let's break until about a quarter to two.
23  (Luncheon recess)
24
25

## Page 1018

1  AFTERNOON SESSION
2  1:50 p.m.
3  (Jury present)
4  THE COURT: Good afternoon. I believe we'll just jump
5  right in and continue. Please, Mr. Melvin, remember you're
6  under oath.
7  Mr. Hochheiser.
8  MR. HOCHHEISER: I think everyone will be pleased to
9  hear I have literally a handful of questions.
10  THE COURT: Let's not make speeches and let's just ask
11  questions.
12  CROSS EXAMINATION
13  BY MR. HOCHHEISER:
14  Q. Mr. Melvin, I want to go back to the point in the
15  conversation on November 21, 2002 where Mr. St. John raised the
16  subject of Tim Cherry and you went into the bathroom. You got
17  certain instructions from Agent Boss in the bathroom?
18  A. Yeah.
19  Q. And what instructions were those?
20  A. If he want me to sign the paper, sign it.
21  Q. So at least one of the things he told you was if Mr. St.
22  John wants you to sign the paper, you should sign it, right?
23  A. Yes, just sign it.
24  Q. And was another one of the instructions to see what Mr. St.
25  John was going to give you?

## Page 1019

1  A. Yes.
2  Q. And by that, did you understand Mr. Boss to be asking you
3  to see if Mr. St. John would offer you money?
4  A. He just said to me: Ask him what he going to give you.
5  Q. What did you understand that to mean?
6  A. Money.
7  Q. Money?
8  A. Yeah.
9  Q. Okay. So that when Mr. Boss said to you, okay, in words or
10  some words like this, see what he's going to give you, you
11  understood Mr. Boss to be telling you to see whether Mr. St.
12  John would offer you money?
13  MR. COLTON: Objection, asked and answered.
14  THE COURT: I'll allow it as a background question but
15  let's not dwell on it.
16  Q. Is that right, Mr. Melvin?
17  THE COURT: You can answer that.
18  A. Yeah.
19  Q. And when you said in other words or similar words to
20  Mr. St. John, what's in it for me or what are you going to do
21  for me, you were talking about money, weren't you?
22  A. Yeah.
23  Q. You talked about the cooperation agreement and the 5K1
24  letter. Just first, in addition to the Sentencing Guidelines
25  that you talked about, 21 to 29 years, whatever that was, you

## Page 1020

1  understand that there are mandatory minimums that come with
2  certain crimes, right?
3  A. Yes.
4  Q. You understand that one of the crimes that you pled guilty
5  to involves a mandatory minimum sentence of ten years.
6  A. Yeah.
7  Q. Okay. And that has nothing to do with the guidelines,
8  that's just in the law that makes it a crime to commit that
9  act. You know that, right?
10  A. No.
11  Q. Okay. You know -- but you do know that one of the crimes
12  that you pled to involves a mandatory minimum of ten years.
13  A. Yeah.
14  Q. Okay. And you do know that it also has a maximum of life.
15  A. Yes.
16  Q. And you know that if you figure out what you are facing
17  aside from the guidelines that you had a mandatory minimum of
18  ten years and a maximum of something like life plus ten years,
19  right?
20  A. I don't know. I didn't do the math.
21  Q. Pardon me.
22  A. I didn't do the math to it. So I don't know.
23  Q. Well, I'm not talking about doing the math, I'm talking
24  about doing the time.
25  MR. COLTON: Was that a question?

Page 1021

1 THE COURT: Sustained.
2 Q. Mr. Melvin, you understand that the 5K1 letter not only
3 gives the judge the power, the authorization to go below the
4 guidelines, but gives him the power and the authorization to go
5 below the mandatory minimum sentence of ten years, right?
6 A. Yes.
7 Q. And your understanding is that in order for you to qualify
8 to get a lesser sentence than the guidelines or the mandatory
9 minimum, you must have that 5K1 letter, right?
10 A. Yes.
11 Q. And that 5K1 letter is the letter that's issued by
12 Mr. Colton or the United States Attorney's Office, right?
13 A. Yes.
14 Q. And you told us I think in direct testimony that in order
15 to qualify for the 5K1 letter, you have to be honest, tell the
16 truth, right?
17 A. Yes.
18 Q. Now, the 5K1 letter -- withdrawn. You understand, don't
19 you, that the one who determines, who makes the judgment as to
20 whether you told the truth for the purpose of giving you a 5K1
21 letter is the United States Attorney, do you understand that?
22 A. Yes.
23 Q. Do you understand it's not the judge who decides whether
24 you told the truth, do you understand that?
25 A. Yes.

Page 1022

1 Q. Do you understand it's not a jury that decides whether you
2 told the truth?
3 THE COURT: Let's go to the sidebar.
4 (At the sidebar)
5 THE COURT: Mr. Hochheiser, I find this line of
6 questioning at the very least confusing as to what the facts
7 are around what the sentence is going to be and at worst
8 disingenuous, because there is a chance, perhaps a likelihood,
9 that there will be significant misunderstanding around what
10 you're asking this witness. For instance, you have implied
11 through this witness that the only way in which the judge can
12 depart below the guidelines is with a 5K1 letter. We've
13 already discussed at sidebar that that's not accurate. And now
14 I suggest that this jury doesn't understand how it actually
15 works. You are also asking him questions around whether or
16 not -- strike that. You were asking him questions regarding
17 who decides if he's lying. I know you're trying to narrow that
18 down to the 5K1 letter.
19 MR. HOCHHEISER: That's exactly what I said.
20 THE COURT: I want you to be very careful here,
21 because whether it's your intention or not, I think the way
22 you're asking these questions is confusing and misleading to
23 this jury and frankly to the extent that you want to make sure
24 the jury understands that the government determines whether he
25 gets the 5K1 letter based on the extent of his cooperation,

Page 1023

1 that's only been said now to this witness probably a half dozen times. And so I'm concerned that
2 witness probably a half dozen times. And so I'm concerned that
3 to continue down this path only is going to confuse them to the
4 extent that they're not confused already and I think you need
5 to be very careful.
6 MR. HOCHHEISER: Let me just explain this. First of
7 all, I'm astounded that your Honor finds my questions
8 confusing. Astounded. My intention is to make it perfectly
9 clear that before the judge gets involved in this process of
10 sentencing, in order to get the 5K letter, it is the prosecutor
11 who has sole discretion and determines what the truth is and
12 whether the person told the truth, not the judge, because we're
13 not even up to the judge yet.
14 As far as the fact --
15 THE COURT: Frankly, that's not even true. Because
16 the government could decide not to give him a 5K1 letter and if
17 I'm the sentencing judge his lawyer can make an application to
18 court and the court can then make the determination and the
19 government can appeal what the court does, just as without a 5K
20 letter the court can depart and the government can appeal. But
21 that's my concern, that you may have given a misimpression to
22 this jury over a matter that has been gone over and over with
23 this witness. This is not new ground.
24 MR. HOCHHEISER: I'm getting to the point where he
25 hasn't gotten the 5K1 letter. You haven't given me an

Page 1024

1 opportunity to explain my position most respectfully. The
2 point is what he understands and what he understands is the
3 practicalities of this. There is no 5K2, which is the only
4 other way to depart. There is no 5K2 available to him. You
5 told us we can't ask him what his lawyer says so we can only
6 ask him what he understands.
7 THE COURT: The law says you can't ask him that.
8 MR. HOCHHEISER: We disagree with that but that's your
9 ruling. I am operating within your ruling. I can't ask him
10 what his lawyer told him but I have to establish that it is his
11 understanding that he, Charles Melvin, can only as a practical
12 matter get a departure through a 5K1.
13 THE COURT: I'm going to rule that that's been asked
14 and answered and I want you to move on.
15 MR. COLTON: If we can request an instruction because
16 this is my problem with what was just said.
17 THE COURT: I understand your problem.
18 MR. COLTON: 30 seconds and I promise to let it go.
19 It is the jury province to determine who is telling the truth
20 for the purpose of ruling whether the government has met its
21 burden of proof. The judge, even if the government writes a
22 5K1 letter, if the judge reviews the testimony and believes
23 it's not truthful, the judge is also going to make a
24 determination about the witness' cooperation and testimony.
25 THE COURT: I understand that concern. I'm not going

US v. St. John      Condenselt!      December 9, 2003

Case 7:02-cr-01503-ER-LMS   Document 248-2   Filed 11/29/10   Page 77 of 82

Page 1025

1 to make an instruction, but part of my concern about why this
2 is confusing is what the jury may have heard, and I think it
3 likely has heard, is whatever you do in this trial, a series of
4 questions about whether or not the jury gets to make a
5 determination as to whether or not he lied or not which might
6 say something different to them than even you intend and could
7 be very confusing and that's my concern. Particularly when
8 this topic has gone into more than once on the record with
9 this witness. We don't need to do it over and over again in a
10 way that can be confusing.
11      MR. HOCHHEISER: You're saying two things. You're
12 saying that it's cumulative, but you keep saying that my
13 questions are confusing and I'm telling you that although I
14 haven't read the transcript, that if you read the transcript
15 you'll see there is precision and no confusion in my questions.
16      THE COURT: You can read whatever you want to read.
17 I'm standing here listening to this testimony and watching this
18 jury. I'm telling you it's confusing. You may disagree and
19 that's fine but I'm making that judgment.
20      MR. ARONWALD: Can I just say one thing. I think your
21 Honor would not have any problem if the questions that were
22 being asked were asked in the form to ask the witness whether
23 he understands that in terms of determining truth for purposes
24 of whether he gets a 5K1 letter that's a province left solely
25 to the government by the terms of his cooperation agreement.

Page 1026

1 In other words, the jury could find that he's telling the truth
2 but the government may not feel he's telling the truth.
3      THE COURT: He asked that question and I didn't stop
4 him from asking that question, did he understand that. My
5 concern became when he started saying things in his question do
6 you understand that it's not the jury that determines whether
7 you're telling the truth and it's not the judge that determines
8 whether you're telling the truth. That's my concern. I let
9 him ask the initial question which I didn't object to, which
10 was in fact cumulative but I let it go because I thought you
11 were going to get into a different area with it. I don't want
12 this jury to be confused. To the extent that this witness
13 understands that it is the government who makes the
14 determination of whether or not he writes a 5K1, gets a 5K1
15 letter, that's actually fair and I don't think confusing.
16      MR. HOCHHEISER: That's all I intended to do.
17      THE COURT: You asked that and there was no objection
18 to that. It was the next set of questions which was, you
19 understand that the jury and the judge don't get to determine
20 if you're telling the truth.
21      MR. HOCHHEISER: For that purpose only.
22      THE COURT: I don't think it's necessary, given the
23 record.
24      MR. HOCHHEISER: Speaking for the record, I don't
25 think it's confusing. I think it's crystal clear.

Page 1027

1      MR. ARONWALD: Can the question be asked whether or
2 not he understands that the jury does not get to decide whether
3 he gets a 5K1 and the judge doesn't get to decide whether he
4 gets a 5K1. Can he ask that question?
5      THE COURT: I think that that's fair. I think that
6 question has been asked.
7      MR. HOCHHEISER: You stopped me. I just basically
8 asked the question about the cooperation agreement. I didn't
9 ask him anything about whether you can decide whether he gets a
10 5K or the jury does. I would ask that you allow those two
11 questions.
12      THE COURT: I don't have a problem with those
13 questions.
14      MR. HOCHHEISER: Let me do that so whatever confusion
15 I've caused I'll straighten out and I'll go on to my ultimate
16 question.
17      MR. COLTON: I have to be able to ask him what is your
18 understanding of whether, even though the prosecutor decides,
19 whether you get a 5K if the judge thinks your lying.
20      THE COURT: If you think that's necessary, you can ask
21 it.
22      (In open court)
23      THE COURT: Mr. Hochheiser.
24      MR. HOCHHEISER: Thank you, your Honor.
25 Q. Mr. Melvin, do you understand, sir, as you sit there now,

Page 1028

1 that concerning whether to give you the 5K1 letter, that's
2 entirely up to the government, do you understand that?
3 A. Yes.
4 Q. It's not up to a judge, it's not up to a jury, right?
5 A. Yes.
6 Q. Do you understand that whether you've met the condition of
7 your cooperation agreement that you tell the truth in
8 connection with whether you get the 5K1 letter, that's up to
9 the government, do you understand that?
10 A. I don't understand that part.
11 Q. Do you understand that in determining whether you tell the
12 truth for the purpose of whether you qualify for a 5K1 letter
13 is a decision that's up to the government?
14 A. Yes.
15 Q. Not up to a judge, not up to a jury. Talking about whether
16 you get the 5K1 letter based on whether you told the truth,
17 that's up to the government, you understand that?
18      MR. COLTON: Asked and answered.
19      MR. HOCHHEISER: Asked but not answered, your Honor.
20      THE COURT: I thought this is what we just talked
21 about at sidebar. If this witness understands the question he
22 can answer it, if not you should move on.
23 Q. Mr. Melvin, do you want to tell me whether you claim to
24 understand the question or not.
25      MR. COLTON: I'm going to renew as asked and answered.

Page 1029

1 Lines 19 to 24 on your Honor's screen, same questions, same
2 answers.
3   THE COURT: Yes. I'm going to sustain that objection.
4 Move to the next topic.
5 Q. Mr. Melvin, this 5K1 letter, it's fair to say you want it,
6 right?
7 A. Yeah.
8 Q. And on November 21, 2002, when you had this meeting with
9 Mr. St. John, on that date you didn't have a 5K1 letter, did
10 you?
11 A. No.
12 Q. And you don't have one now, do you?
13 A. No.
14 Q. Do you know when you're going to get it?
15 A. Sentencing time.
16 Q. Okay. Do you know when your sentencing is?
17 A. No.
18 Q. Do you know whether it's going to be in a month or six
19 months or a year or five years?
20 A. I don't know when it's going to be.
21 Q. When you were arrested for the three guns, you were put in
22 jail for awhile, right?
23 A. Yes.
24 Q. And then I think you came out after some time, I don't
25 remember how long you said, two or three weeks, is that right?

Page 1030

1 A. About two weeks.
2 Q. Okay. You're out on bail?
3 A. Yes.
4 Q. And you've been out ever since, is that right?
5 A. Yes.
6 Q. And you want to stay out, right?
7 A. Yes.
8 Q. You don't want to go back to jail.
9 A. No.
10 Q. When you told us that the three guns that you pled guilty
11 to possessing, that they belonged to the kids next door, that
12 was the truth, right?
13 A. Yes.
14 Q. And you were just holding them for the kids next door,
15 isn't that right?
16 A. Yes.
17 Q. But am I correct that when you pointed the gun at Asia's
18 head because she dis'd your mother, that that was one of the
19 guns that you claimed belonged to the kids next door, right?
20 A. I don't recall.
21 Q. Well, you told Mr. Aronwald that it was one of the guns,
22 didn't you?
23 A. I don't recall.
24 Q. Mr. Melvin, you were arrested on the same day that you
25 pointed the gun at Asia's head, right?

Page 1031

1 A. Yeah.
2 Q. And then the police came with a search warrant and they
3 recovered three guns from the place where you stay, your
4 mother's place, right?
5 A. Yeah.
6 Q. You were in custody from the time they arrested you until
7 the time they found the three guns, right?
8 A. Yeah.
9 Q. So Mr. Melvin, the gun that you pointed at Asia's head, was
10 that a fourth gun that the police didn't find or was that one
11 of the three guns that they did find?
12 A. I think it was one of the guns that they found.
13 Q. You think or you know?
14 A. I really don't remember.
15 Q. Well, when you pointed the gun at Asia's head because she
16 dis'd your mother, did you put the gun back in its hiding place
17 in your attic where the three guns were found?
18 A. No.
19 Q. What did you do with it?
20 A. I put it in the house but I didn't put it in the attic.
21 Q. Was the gun that you used to point at the head of Asia, was
22 that one of the three guns that the police found or is that
23 another gun that they didn't find?
24 A. I'm not sure.
25 Q. All right. If it was one of the guns that they didn't

Page 1032

1 find, where would that be now?
2   MR. COLTON: Objection.
3   THE COURT: Sustained.
4 Q. What did you do with the gun that you pointed at Asia?
5   MR. COLTON: Asked and answered, your Honor.
6   THE COURT: Can you give a more specific answer than
7 you did last time? He said he put it in the house but he
8 wasn't more specific than that.
9   If you can, can you answer that question, what did you
10 do with the gun when you brought it back in the house?
11 A. I put it in the house behind a picture, a picture frame.
12 Q. You've seen the papers that the police made out in
13 connection with the search, haven't you?
14 A. I don't remember.
15 Q. You know there was no gun taken from behind a picture
16 frame, don't you?
17   MR. COLTON: Objection.
18   THE COURT: Sustained.
19 Q. Do you know whether any gun was found behind a picture
20 frame, Mr. Melvin?
21 A. No, I don't know.
22 Q. Do you know, Mr. Melvin, while you're sitting here and
23 testifying, while you're waiting for your 5K1 letter, do you
24 know whether that gun is still behind the picture frame?
25 A. We're not even living in that house any more.

Page 1033

1  Q. What happened to the gun that was behind the picture frame?
2  A. I don't recall.
3  Q. Do you recall what kind it was?
4  A. No, I don't recall what kind of gun it was.
5      MR. HOCHHEISER: Thank you, your Honor.
6      THE COURT: Mr. Colton, any redirect?
7      MR. COLTON: Yes, please.
8  REDIRECT EXAMINATION
9  BY MR. COLTON:
10 Q. You were asked during cross-examination about whether you
11 reviewed the transcripts of the tape recordings between
12 yourself and Yolanda Delgado, Malcolm Bryant?
13 A. Yes.
14 Q. Were you part of the team that listened to the tapes to
15 make the transcript?
16 A. No.
17 Q. Did you make any corrections on transcripts if you heard
18 something wrong? Let me rephrase the question. When you were
19 listening to the tapes, you read the transcript at the same
20 time, correct?
21 A. Yes.
22 Q. When you were reading the transcript if you heard something
23 on the tape that wasn't on the transcript, did you make a
24 notation on the transcript?
25 A. Yes.

Page 1034

1  Q. Did you provide that information to the government?
2  A. Yeah.
3  Q. And after you provided that information to the government,
4  did you sit down again and listen to the tape with the
5  transcript?
6      MR. HOCHHEISER: May I object to the leading. I think
7  this should be the same as direct.
8      MR. COLTON: The question was did he, not didn't he.
9      THE COURT: Yes. I'm going to allow the question.
10 A. Excuse me.
11 Q. After you made notations on the transcript and provided the
12 government with information that you believe you heard on the
13 tape, you got back -- did you get back a new clean version of
14 the transcript?
15 A. Yes.
16 Q. And then did you listen to the tapes while reading the new
17 clean versions of the transcripts?
18 A. Yes.
19 Q. As far as you knew, the final versions of the transcript,
20 were they accurate?
21 A. Yeah.
22 Q. On cross-examination Mr. Aronwald asked you whether you
23 rode up in the elevator with the prosecutors after lunch, is
24 that correct?
25 A. Yes.

Page 1035

1  Q. While you were on cross-examination did the prosecutors
2  tell you what to say here?
3  A. No.
4  Q. At any point in time did the prosecutors tell you what to
5  say here?
6  A. No.
7  Q. What were you told about the most important thing in
8  testifying?
9  A. Tell the truth.
10 Q. Was that told to you by one prosecutor or more than one
11 prosecutor?
12 A. By more than one prosecutor.
13 Q. During the cross-examination, page 884, line 16 you were
14 asked.
15 "Q And since March of 2002, when you were arrested, you
16 haven't been selling any crack, is that it?"
17     MR. HOCHHEISER: Objection to the leading.
18     MR. COLTON: I'm asking him to clarify the answer.
19     THE COURT: He's just stating what the question was to
20 this witness.
21     MR. HOCHHEISER: Withdrawn.
22 Q. Page 884, line 16 you were asked by Mr. Aronwald.
23 "Q And since March of 2002, when you were arrested, you
24 haven't been selling any crack, is that it?
25 "A No."

Page 1036

1      Does that mean Mr. Aronwald is not correct or no you
2  haven't been selling crack since you were arrested?
3  A. No, I haven't been selling crack.
4  Q. You were also asked a whole series of questions about
5  whether you were married in March of 2002. Do you remember
6  that?
7  A. Yes.
8  Q. When Mr. Aronwald, you had told Mr. Aronwald that you were
9  married to Antoinette Boykin, is that right?
10 A. Yeah.
11 Q. Not Antoinette Boykin, Annette. Did you believe that when
12 one is separated, one is not technically married?
13     MR. ARONWALD: Objection, leading.
14     THE COURT: Sustained.
15 Q. What is your understanding of whether someone is married
16 when they're separated?
17 A. You could still be married but not be together.
18 Q. So when you answered his question what did you believe as
19 to whether when someone is separated they're still married, did
20 you believe they're still married?
21 A. Yes.
22 Q. You were asked many, many questions about the 5K letter. I
23 just have one about that. If you get, even if you get the 5K
24 letter, what's the maximum sentence the judge could give you?
25 A. Life.

Page 1037

1 Q. Who decides what sentence you get?
2 A. The judge.
3 Q. I'm going to turn your attention now to Government's
4 Exhibit 24A that's still in front of you. Can you turn to page
5 2 of that, please. Are you on page 2, Mr. Melvin?
6 A. Yes.
7 Q. Mr. Aronwald questioned you about the first David St. John
8 entry and quoted for you Mr. St. John's statement, "it would
9 help Ray if we know it's not true, it would help Ray if we know
10 it's true." Do you remember him pointing you to that?
11 A. Yes.
12 Q. I want to show you what's been marked as Government's
13 Exhibit 22A, the conversation from November 19th. At the time
14 that David St. John said, "it will help Ray if we know it's
15 true, it will help if we know it's not true," had you already
16 told David St. John you bought crack from Ray Love?
17 A. Yes.
18     MR. HOCHHEISER: I think Mr. Colton is shaking his
19 head yes when he's answering the questions that he gets a yes
20 answer to. I'm sure it's just a tic.
21     MR. COLTON: I'd rather not dignify that remark.
22     THE COURT: I've been watching Mr. Colton and I
23 haven't seen any indication on how the witness should answer
24 the question, but I'll keep an eye out for that. Thank you.
25 Q. At any point in time, Mr. Melvin, have I ever told you what

Page 1038

1 to testify to?
2 A. No.
3     THE COURT: Have you seen him shaking his head as he
4 was asking you questions indicating how you should answer?
5 A. No, sir.
6     THE COURT: Go ahead.
7     MR. COLTON: Thank you, your Honor.
8 Q. On page 8 of Government's Exhibit 24A, if you could turn to
9 that. Are you on page 8, Mr. Melvin?
10 A. Yes, sir.
11 Q. Specifically the third David St. John entry, actually the
12 one before that with Charles Melvin, you tell him, St. John,
13 "I'm telling you, he sold me crack" and then St. John replies,
14 "well, as of this point, I didn't know that." Prior to the
15 meeting in the car of November 21st had you in fact told David
16 St. John that Raymond Bryant sold you crack?
17 A. Yes.
18 Q. And then on the next phrase St. John says "Ray hadn't told
19 me that." Do you see that? The third St. John entry, second
20 sentence.
21 A. You said the third St. John from the top.
22 Q. The third one that says David St. John from the top. Do
23 you see where it says, "well, as of this point, I didn't know
24 that. Ray never told me that. Ray never told me what you just
25 told me," do you see that?

Page 1039

1 A. Yes.
2 Q. I'm going to show you what's been marked into evidence as
3 Government's Exhibit 21A, the November 18th conversation
4 between yourself and David St. John. Specifically referring
5 your attention to the seventh page of that document, the third
6 Charles Melvin entry. You ask, "so my name is on some
7 paperwork then," do you see that?
8 A. Yes.
9 Q. And St. John responds, "not specifically, they won't give
10 us your name but from the way it's written up, you know, Ray is
11 pretty sure that they are talking about you." Did St. John
12 tell you that before you had the meeting in the car?
13 A. Yeah.
14 Q. So when St. John told you, "Ray hadn't told me anything,"
15 he previously told you Ray's pretty sure they're talking about
16 you buying drugs from Ray Love?
17     MR. HOCHHEISER: Excuse me, that's a
18 mischaracterization.
19     THE COURT: If you have an objection make an
20 objection. Don't give me a speech.
21     MR. HOCHHEISER: Objection, your Honor. The --
22     THE COURT: Don't --
23     MR. HOCHHEISER: I'm giving you the grounds.
24     THE COURT: In two words or less.
25     MR. HOCHHEISER: Improper premise to the question.

Page 1040

1     THE COURT: Overruled.
2 Q. Mr. Melvin, in your cross-examination you were asked about
3 whether you told David St. John you were going to be on the
4 run, do you remember that?
5 A. Yes.
6 Q. And you were asked whether that meant you wouldn't be
7 around to testify against Raymond Bryant, do you remember that?
8 A. Excuse me.
9 Q. You wouldn't be around if Raymond Bryant's case went to
10 trial.
11 A. Yes.
12 Q. The meeting between yourself and Raymond Bryant, was that
13 recorded by the agent?
14 A. Yes.
15 Q. When you told St. John you're going to be on the run, did
16 you also tell him you were going to take with you all of the
17 recordings and evidence --
18     MR. ARONWALD: Objection, your Honor.
19     THE COURT: Sustained.
20 Q. The meeting with Raymond Bryant where you bought crack from
21 him, were there agents observing the meeting to your knowledge?
22 A. Yes.
23     MR. ARONWALD: May we approach, please, briefly?
24     THE COURT: Yes.
25     (At the sidebar)

Page 1041

1   MR. ARONWALD: Judge, I object to the last series of
2   questions and move to strike, number one, in terms of creating
3   a misimpression to the jury by saying something that confused
4   the jury. As your Honor well knows, assuming that Flip was not
5   an informant and assuming he had absented himself from the
6   jurisdiction and did not make himself available to testify, the
7   government would not have been able necessarily to get the
8   tapes in or to get any other evidence unless they could
9   establish that the defense was responsible for his
10  unavailability. And they're getting into areas here -- excuse
11  me, Mr. Colton, Mr. Colton has shook his head --
12      MR. COLTON: I'm behind the Judge.
13      THE COURT: The jury can't hear what you're saying.
14  We don't want to get into the behavior of counsel at the
15  sidebar, let's just ask the questions and we'll try to go on.
16  We're all beginning to slip in our behavior here and I find it
17  very troubling. Go ahead.
18      MR. ARONWALD: I just, I'm taking into account what
19  your Honor just said and I'm trying to think what it is I've
20  done this morning that falls into that category, but passing on
21  from that, Judge, I think the questions are improper. The fact
22  of the matter is whether or not the tape recording or other
23  evidence would be admissible is a legal issue that would have
24  to be determined by a judge in the event a Raymond Bryant case
25  went to trial, but Flip Melvin was not available because he had

Page 1043

1       THE COURT: Let's do this. Since we've passed that,
2   what I'd like to do is pull up the transcription section of the
3   question that he asked that was not, that was, I take it, prior
4   to the objection --
5       MR. ARONWALD: These last two questions.
6       THE COURT: All right. Let me check that.
7       (Pause)
8       MR. ARONWALD: If you want to, let's take it up at the
9   afternoon break.
10      THE COURT: I found it. The questions immediately
11  preceding the question that was objected to when the objection
12  was sustained was: The meeting between yourself and Raymond
13  Bryant, that was recorded, wasn't it? And the answer to that
14  is yes. There's nothing objectionable about that. And you
15  objected to the next question and I sustained.
16      MR. ARONWALD: The last question I don't think there
17  was an objection. The last question before the sidebar.
18      I'm going to object to any further questions along the
19  line that would suggest to the jury that even if Flip had run
20  away, the evidence would have been still admissible and
21  available to the government.
22      MR. COLTON: Given that the defense is clearly going
23  to argue David St. John's intent is clearly demonstrated by his
24  trying to talk Melvin out of running, a monitored and recorded
25  transaction very well could be admissible, and if the defense

Page 1042

1   jumped bail or had absented himself from the jurisdiction with
2   none of the responsibility of that being laid on the doorstep
3   of Raymond Bryant and the questions Mr. Colton is asking are
4   being asked to suggest to the jury that even if Flip had run
5   away, the government would have had available to it as
6   admissible evidence everything that had taken place and that's
7   not necessarily so.
8       THE COURT: Mr. Colton.
9       MR. COLTON: Two things. First, the question was
10  objected to and the objection was sustained so there's nothing
11  in the record. The suggestion is perfectly proper because the
12  testimony was that the habit of Agent Boss in doing these
13  things was to listen real time, make a recording, and agents
14  observed Mr. Melvin said he was wired, he was wired, he never
15  learned the wire wasn't working. He was searched before and
16  after. I think there's a very, very good chance that even
17  without Mr. Melvin, in a trial against Raymond Bryant, agents
18  listening real time to the transactions, searching him before
19  and after and observing Raymond Bryant in a car with Sukeem
20  Bryant and Charles Melvin, we could get the evidence in. I'm
21  might be wrong about that but it's not a wild suggestion.
22      MR. ARONWALD: I think it gets into an area that's
23  confusing to the jury and it ain't necessarily so that just
24  because the prosecution would want to get the evidence in that
25  the judge would find it admissible.

Page 1044

1   wants to say they're not going to argue and then use in
2   summation this other part, that's different.
3       THE COURT: I don't quite get that. But why don't you
4   tell me where you intend to go, what question you intend to ask
5   next along this line if any.
6       MR. COLTON: I'm done unless -- my problem is if I
7   release the witness and then your Honor strikes the testimony,
8   I'm stuck.
9       THE COURT: I don't think there's any testimony to be
10  struck based on what's on the record now.
11      MR. ARONWALD: As long as he's clear he's not going to
12  go in any further questions if the area, that's fine.
13      (In open court)
14      THE COURT: Mr. Colton continues.
15  Q. Mr. Melvin, I just want to clear up one more thing about
16  the 5K letter and I think your Honor I'll be done. Mr. Melvin,
17  at any point in time up to the minute you're sitting right
18  here, has anybody from the U.S. Government told you you are
19  definitely getting a 5K?
20  A. No.
21      MR. COLTON: Nothing further.
22      THE COURT: Mr. Aronwald.
23      MR. ARONWALD: Just one or two questions.
24      (Continued on next page)
25

Page 1045

1  RECROSS EXAMINATION
2  BY MR. ARONWALD:
3  Q. Mr. Melvin, do you recall being asked a few minutes ago by
4  Mr. Colton the following question, I believe it's at page 87,
5  line 12, when Mr. Aronwald, you had told Mr. Aronwald you were
6  married to Antoinette Boykin, is that right, you answered yeah.
7  You understood the question Mr. Colton asked you before you
8  answered it, is that correct?
9      MR. COLTON: I would just ask that the witness --
10     MR. ARONWALD: Excuse me.
11     MR. COLTON: I'm making a request of the Court that
12  counsel provide us with the page and line.
13     THE COURT: He just did. Can you repeat the page and
14  line.
15     MR. ARONWALD: On my computer, assuming the pagination
16  is the same, page 87, during Mr. Colton's direct examination,
17  and it appears, redirect examination, I'm sorry, and it appears
18  at line 12 through line 14.
19     THE COURT: It's not the same.
20     MR. ARONWALD: I'm happy to have Mr. Colton come over.
21     MR. COLTON: That's fine with me, your Honor.
22  Q. Mr. Melvin, do you remember on redirect examination about
23  ten minutes ago Mr. Colton asked you the following question:
24  When Mr. Aronwald, you had told Mr. Aronwald you were married
25  to Antoinette Boykin, is that right? Do you remember him

Page 1046

1  asking you that question?
2      MR. COLTON: I have an objection based on the reading
3  of the transcript for incompletion.
4      THE COURT: I'm going to allow him to answer that
5  question. This witness can answer. I'll allow you one more
6  chance to make it complete if you feel it's necessary. Mr.
7  Aronwald, continue.
8  Q. Did you hear my question a moment ago?
9  A. Yes, I remember him asking me that question.
10 Q. Do you remember what your answer was?
11 A. Yeah.
12 Q. Your answer was what?
13 A. Yes.
14 Q. That wasn't the truth, was it?
15 A. Well, the lady that I'm married to, her name is Annette
16 Boykin.
17 Q. Her name is Annette Boykin?
18 A. Her name is Annette Boykin, you know what I'm saying. It's
19 Annette Boykin Melvin.
20 Q. What about Antoinette Boykin?
21 A. I misunderstood what he was saying.
22     MR. ARONWALD: No further questions.
23     THE COURT: Mr. Hochheiser?
24     MR. HOCHHEISER: No thank you, Judge.
25     THE COURT: Mr. Colton.

Page 1047

1      MR. COLTON: Mr. Aronwald --
2      THE COURT: No, no. If you want to say something to
3  him, go over to him. We have far too much extraneous speaking
4  in front of this jury. I'm not blaming you, I'm not blaming
5  anyone. I'm sure it's unintentional. Everybody is operating
6  with the best of intentions here one can hope. However, we're
7  going to stop that. So if you have something to say, go over
8  and whisper very gently in his ear.
9      (Counsel confer)
10 REDIRECT EXAMINATION
11 BY MR. COLTON:
12 Q. Mr. Melvin, right after I asked you and said Antoinette
13 Boykin, do you recall me changing it to Annette?
14 A. Yes.
15     MR. COLTON: That's all, Judge.
16     THE COURT: All that for the difference between
17 Antoinette and Annette. No other questions from anyone.
18     MR. HOCHHEISER: Can we just have one moment.
19     (Defense counsel confer)
20 RECROSS EXAMINATION
21 BY MR. HOCHHEISER:
22 Q. Are you related to Marco Boykin in any way or is your wife
23 related to Marco Boykin?
24     THE COURT: This is beyond the scope of the redirect
25 and recross. This is a whole new area you're trying to go

Page 1048

1  into.
2      MR. HOCHHEISER: Just one question, Judge, based on
3  the significance of this.
4      THE COURT: Go. One question.
5  A. I have no idea.
6      MR. HOCHHEISER: Thank you.
7      THE COURT: Mr. Melvin, you are excused. Thank you,
8  very much.
9      (Witness excused)
10     MR. COLTON: The government would call Tim Cherry.
11     THE COURT: While we're attempting to get that witness
12 in, why don't we take this as our mid-afternoon break. We'll
13 try to get him here in the next ten minutes or so. Thank you.
14     (Jury not question)
15     THE COURT: If anyone in this trial thinks that a
16 lawyer is acting inappropriately, I want you to raise it with
17 me either at a sidebar or out of the hearing of the jury. You
18 don't get to do that, Mr. Hochheiser, and then say, well, I'm
19 sure it's a nervous tic. That is quite a serious allegation
20 that you're making, one that could be leveled at all sorts of
21 counsel for the shenanigans that have gone on at sidebar where
22 one lawyer has called another a moron, Mr. Hochheiser.
23     MR. HOCHHEISER: I did not.
24     THE COURT: Where one lawyer has implied out loud to
25 the extent that the jury could hear that the other side was