January 3, 2011

**BY US MAIL**
United States District Court
Southern District of New York
Hon. Lisa Margaret Smith
United States Magistrate Judge
300 Quarropas Street
White Plains, New York 10601

      R.E. Donald Roth v. United States
         09 Civ. 8712; 02 Cr. 1503 (LMS)(GBD)

Dear Judge Smith,

    I write in regard to the above-entitled action in which
I am the plaintiff, proceeding pro se, In Forma Pauperis and
am incarcerated in the Federal Bureau of Prisons, ("BOP").

    On December December 13, 2010 the Court granted me leave
to file a reply memorandum of law not to exceed twenty-five pages.
In 2009, the law library at FCI Sandstone began using handheld
word processors called "Neos" which do not allow for justifcation, margins
line spacing, formatting (bold, underline, italicize), or foot/end
notes and as a result my reply brief totals ___ pages. If I
were able to properly comply with the civil and local rules regarding
page layout/space using the "Neos" the memorandum would comport
with Court's order dated December 13, 2010, in that it would
be 25 pages. Because the "Neos" do not permit for formating which
would allow me to file the reply memorandum which consists of
25 pages please memo-endorse this letter and grant me leave to
file the brief as it stands, at ___ pages.

    Last, please read the end-notes in the context of the memorandum.
I was unable to use footnotes due to the restraints of the "Neos".

    Thank you for your consideration.

                  Respectfully,

                  By: _____
                  FCI Sandstone
                  Donald Roth, 83933054 K1
                  POB 1000
                  Sandstone, MN 55072

cc.  Benjamin Allee
     Assistant United States Attorney
     (by mail)

Deemed letter motion for permission to file
oversized Reply Brief. Motion granted. The
attached Reply Brief is to be docketed. [signature] USMJ 1/19/11
SO ORDERED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONALD ROTH,

    Petitioner,

vs.

·UNITED STATES OF AMERICA,

    Respondent.

---

    :  No. 09 Civ. 8712, 02 Cr. 1503

    :  Hon. Lisa Margaret Smith

    :  **MEMORANDUM OF LAW IN REPLY TO**
    :  **RESPONDENT'S MEMORANDUM OF LAW**
    :  **IN OPPOSITION TO PETITIONER'S**
    :  **MOTION UNDER 28 U.S.C. §2255**

Petitioner, Donald Roth ("Roth") respectfully submits this Reply Memorandum in further support of his §2255 motion and in response to the Government's Memorandum in opposition.

As shown in Roth's opening brief, the judgment herein should be vacated, or at the least·an evidentiary hearing should be granted, because the Government violated its obligation to disclose to Roth during his trial that it had arranged to pay its key witness a $5000 cash reward for his cooperation with the Government. This was the witness as to whom Roth was charged with conspiracy to commit witness tampering (and thereby obstruction of justice). This was the witness who testified as to the purported attempt to compromise him. Surely, the Government's arrangement to pay this witness was material information a reasonable jury surely would have wanted in assessing that witness's credibility before reaching their verdict.

Nevertheless, the Government contends that this impeachment evidence was immaterial, because (i) the witness was only a "minor witness" whose testimony was "corroborated" by other evidence, and (ii) the impeachment evidence itself was only cumulative of other impeachment evidence. The Government further contends that, in any event, the evidence was not unlawfully suppressed, because, according to the Government, "there was no promise or discussion of any payment" with the witness prior to his testifying.

As further shown below, the Government's position is unsupportable in each respect, as a matter of fact and law. The evidence was material, and the Government was obligated to disclose it.

2

I.

THE SUPPRESSED EVIDENCE WAS MATERIAL

A. Melvin's Testimony Was Crucial To The Government's Case

The Government rests its opposition on the remarkable proposition that in a witness tampering case the jury doesn't care very much about the testimony or credibility of that witness. According to the Government, that witness, Charles "Flip" Melvin, was only a "minor witness" in this case; the jury didn't need to rely on his testimony about what the defendants actually did, because they had other evidence as to what the defendants supposedly intended to do. This argument flies in the face of both common sense and the trial transcript.

The pivotal event in this case was the meeting between Melvin and defendant St. John (Roth's investigator) in St. John's car on November 21, 2002. That was when St. John allegedly attempted to persuade Melvin to falsify his testimony. That was the only meeting between Melvin and either of the defendants. A reasonable jury would want to weigh carefully Melvin's testimony about what occurred at that meeting.

The Government contends that during this meeting St. John attempted to compromise Melvin by silently proffering for his signature a false affidavit. This is despite an audio recording of the meeting which confirms St. John's testimony and indeed Melvin's own testimony that St. John expressly stated in the car that he did not want Melvin to sign the affidavit because it would not be true. Melvin testified at trial, however, that despite St. John's spoken words, St. John

3

indicated through a gesture -- by pushing the affidavit and a
pen toward Melvin -- that St. John actually wanted Melvin to
sign the false affidavit. Melvin's testimony in this regard,
flatly contradicted by St. John, was the only purported
evidence of this unrecorded attempt to obtain Melvin's false
testimony. It is therefore hard to reconcile with any logic
that the jury could have reached its guilty verdict without
attributing significant weight to this particular line of
testimony by Melvin.

The Government attempts to minimize the jury's obvious
reliance on this testimony by Melvin as to what happened
during his meeting with St. John by pointing to evidence of
three sets of conversations which preceded that meeting. All
of these conversations, however, only underscore the
importance of Melvin's testimony in the absence of any other
evidence of an overt act in furtherance of the alleged
conspiracy.

First, the Government points to the testimony of
Roth's two clients, drug dealers Cherry and Bryant, about
unrecorded conversations they had with Roth upon their arrest
in which they say they discussed obtaining false testimony
from Melvin. Govt. Mem. at p.2. {FN1} These conversations
are not only inherently unreliable but, at most, could be
evidence only of the purported agreement among the co-
conspirators. They could not evidence any overt act in
furtherance thereof, which is necessary to complete the crime.
United States v. Wieschanborg, 604 F. 2d 326 (5th Cir. 2005).
St. John's purported gesture in the car was the requisite
evidence of the purported overt act. It could not be

4

"corroborated" by the testimony of Cherry or Bryant as to the predicate "agreement". {FN2}

The second set of conversations supposedly "corroborating" Melvin's testimony were recorded conversations between Melvin and Bryant's brother and Bryant's girlfriend, in which they urged Melvin to meet with St. John to obtain a false affidavit. Govt. Mem. at p.2. Again, however, even if one assumes that Roth and St. John can somehow be tied to these conversations in which they did not participate as evidence of a wrongful agreement including them, these conversations can be a basis for conviction only if joined by credible evidence of an overt act in furtherance of the purported agreement, such as the supposed gesture in the car. Melvin's testimony was crucial for that.

Finally, there was testimony about four phone conversations between Melvin and St. John before their meeting in the car. Govt. Mem. at p.2. All of these were recorded. In the first conversation, on November 13, 2002, (in which St. John was patched into a call between Melvin and Raymond's brother Malcolm), St. John asked to meet with Melvin. St. John said to Melvin (according to the transcript of the recorded conversation): "If we talk and it looks to me like your signing something might help us and not hurt you, then that's what I'll ask you to do. If what you tell me isn't going to help any, then I wouldn't want to put it on a piece of paper." In exchange for meeting, St. John offered only to give Melvin some advice on his own legal problems. There was no mention of what Melvin knew about either Cherry or Bryant and no mention whatsoever of having Melvin provide false

testimony. In the second conversation, on November 18, Melvin and St. John simply agreed to meet on November 21. Again, it is undisputed that there was no discussion about the facts or about Raymond's or Cherry's crime and no mention of Melvin providing any false testimony. The third conversation was on November 19. In this conversation, Melvin commented for the first time on Bryant's culpability, informing St. John that Bryant had sold crack to Melvin. St. John still asked for the meeting, but again, it is undisputed that there was no discussion of Melvin providing any false testimony. There was also still no discussion of Cherry at all. In the final conversation, on November 20, St. John and Melvin simply confirmed the time and location of their meeting the next day. Nothing else of any substance was said.

Thus, before the November 21 meeting itself there was no "corroborating" evidence of any attempt by St. John to obtain false testimony. It is undisputed that (i) the November 21 meeting between St. John and Melvin was proposed and agreed upon (on November 13 and 18) before Melvin ever told St. John (on November 19) that Bryant had in fact sold drugs to Melvin; (ii) before the November 21 meeting, Melvin had never even discussed Cherry with St. John; (iii) before the November 21 meeting St. John had made no mention whatsoever of Melvin providing any false testimony; and (iv) before the November 21 meeting, St. John had never threatened Melvin in any way or promised him anything other than perhaps some advice on Melvin's own legal problems.

Both St. John and Roth testified that the purpose of St. John's meeting with Melvin was to allow St. John to

determine, face-to-face, (i) what Melvin actually knew and
would testify to; (ii) whether he would provide an affidavit
if he had any truthful testimony which was useful; and (iii)
whether there were any fruitful areas for impeachment if
Melvin's testimony was harmful.  None of this is in any way
contradicted by any of the recordings, preceding the meeting
or by the recording of the meeting itself.  And all of this is
expressly permitted, if not mandated, by a criminal defense
attorney's professional obligations, even when his clients
have acknowledged guilt and even when the prospective witness
is known or likely to be adverse. {FN3}

        Yet St. John was arrested immediately after the
meeting.  Despite whatever importance the Government now
attributes to what preceded the meeting, the fact is that the
Government determined there was no basis for an arrest until
after the meeting.  Surely, a reasonable jury would conclude
that what transpired at that meeting between St. John and
Melvin was critical.

        Everything that was said at that meeting is
undisputed.  It was recorded.  Thus, by the Government's own
account, after Melvin explained in the car what he knew about
Raymond's case, St. John told Melvin that he could not sign
any affidavit for Raymond, "because it would be a lie."  St.
John added that "he would not have Melvin commit perjury."
Nothing to the contrary was ever said.  With regard to Cherry
(whom, the recordings show, they had never discussed before
meeting in the car), St. John read a proposed affidavit to
Melvin, but the Government concedes that when Melvin told him
the proposed affidavit was contrary to the facts, St. John

7

said that Melvin "could not sign the affidavit because that would be perjury" and St. John "couldn't be part of something illegal." Govt. Mem. at p.9. This was despite Melvin saying he was still willing to sign the affidavit for Cherry.

This is what the jury heard, from both the recording and from Melvin's and St. John's testimony. St. John clearly told Melvin he did not want him to sign any affidavit, he did not want him to lie, and he could not be part of anything illegal. All of this points to an acquittal. Whatever may have been contemplated before this meeting about obtaining an affidavit from Melvin, such a possibility was clearly and unequivocally abandoned at the meeting in the car based on everything that was said and recorded.

The only evidence pointing to any overt act in the car in furtherance of an agreement for tampering, in the face of this clearly contravening evidence of what was actually said, was Melvin's testimony about what was not said. Melvin testified that as St. John was telling him in the car that he could not use any affidavit from him, St. John was nevertheless "pushing an affidavit [regarding Cherry] and a pen towards Melvin." There was absolutely no evidence to support this purported occurrence other than Melvin's testimony. His testimony about St. John's gesture was the only evidence that St. John in fact proceeded with any attempt to procure false testimony from Melvin, notwithstanding his explicit recorded statements that he did not wish to have any false testimony from Melvin.

Yet somehow the Government contends that Melvin was a "minor witness" in this case. The foregoing shows that Melvin

8

was in fact the star witness. The guilty verdict cannot be reconciled with any other conclusion. {FN4}

'    '    In urging that Melvin was a minor witness, the Government emphasizes that "Melvin's direct testimony occupied less than one percent of the trial transcript." Govt. Mem. at 22. In fact, however, this demonstrates only that Melvin was a weak witness, not an unimportant one. The Government bombarded the jury with prolonged testimony about Roth's background, his billing practices, his performance on other cases -- all to create the impression that he was somehow unworthy of a presumption of innocence and to obfuscate the lack of any real evidence of a crime here, to obfuscate the fact that this case still very much depended on Melvin's testimony of what was not on tape here. The jury had to believe Melvin that while St. John was clearly saying on tape that he could not use any affidavit from Melvin because it would be false, off tape St. John was motioning to Melvin that he should still sign the false affidavit.

Without the purported evidence of that pantomime by St. John, all the jury has is an investigator doing precisely what he is expected to do in assisting a criminal defense attorney. He convinces an apparent informant to meet with him (using the criminal defendants to assist him in doing so); he meets with the witness (and records the meeting); he brings with him the form of an affidavit in case the witness can provide useful and truthful testimony (knowing that the witness is considering flight and may not be available for a second meeting); he explores the witness's knowledge of what occurred (whether or not it corroborates guilt); he rejects

9

the possibility of an affidavit upon determining that the witness cannot provide useful and truthful testimony; and he looks for ways to possibly challenge the witness's credibility (by, among other things, having the witness state on tape that he was willing to sign a false affidavit). This is precisely what St. John testified to (see Tr. at 4181-4182) and precisely what the tape reflects, and there is no crime in any of that. See 18 U.S.C. §1515 (C) ("Safe Harbour Provision"). Indeed, as shown above, it is entirely consistent with a defense attorney's obligations to his client, even clients who have acknowledged their culpability.

And so Melvin's testimony about St. John's purported "gesture" becomes the key to the Government's case. Only if that gesture occurred could a jury reasonably conclude that the defendants crossed the line. The Government's argument now that Melvin's testimony was unimportant is belied not only by logic and the tape of the November 21 meeting but also by the Government's own actions at issue here, which speak louder than its words. The Government rewarded Melvin with a $5000 payment for his cooperation, and, according to the Government, it did so gratuitously, with no promise or obligation. Is the Government in the habit of so generously rewarding unimportant witnesses? Obviously not. Indeed, while the Government paid $5000 to Melvin, a witness they claim was "minor" (in addition to giving him a 5K1 letter), the Government paid nothing to either Cherry or Bryant, the cooperators to whom the Government attributes primary importance and whose testimony the Government contends Melvin only "corroborated." Clearly, Melvin's testimony had far more

10

importance than the Government acknowledges.

B. The Impeachment Evidence at Issue Was Material and Not Merely Cumulative

It is because Melvin's testimony about his meeting with St. John was so crucial -- and still so questionable -- that further impeachment evidence such as that at issue here would have been highly material to a jury.  It would likely have prompted further reflection on and skepticism of Melvin's testimony about St. John's gesture.  It would have underscored the following facts showing just how illogical and unbelievable that testimony was:

-Melvin failed to mention St. John's gesture during his grand jury testimony or his debriefings/proffers with law enforcement officials, and the Government failed to disclose any evidence of this purported gesture in the course of discovery.  Melvin first brought it up at trial, only when the recording of St. John telling Melvin he did not want Melvin to sign any affidavit seemed to completely discredit the Government's charge.

-St. John was recording his meeting with Melvin.  This leads one to puzzle over why St. John would supposedly attempt to have Melvin sign an affidavit by silently pushing it in front of him while St. John knew there would be a taped record of his saying that the affidavit would be a lie.  A jury might assume that St. John intended to destroy the tape, but if that is so why would he go through the effort of a pantomime rather than verbalizing his presentation of the false affidavit to Melvin?

-A jury might suppose that St. John made the silent

11

gesture that Melvin claims he made because St. John believed Melvin was wired, which was in fact the case, but, again, if that were so it would be entirely illogical for St. John to silently urge Melvin to sign an affidavit while unequivocally declaring on the Government recording that the affidavit would be false and useless.

-Melvin did not sign any affidavit.  If, as Melvin testified, St. John really did urge Melvin to sign an affidavit by silently pushing it and a pen toward Melvin, why didn't Melvin sign it?  Certainly, that would have been the best evidence of an overt act in furtherance of the purported conspiracy; it would have been the very sort of evidence the federal agents were looking for.  According to their testimony (Tr. at 398-400), after St. John told Melvin he could not use the draft affidavits because they would not be true, Melvin excused himself from the car purportedly to use the restroom to get further instructions from the agents, and they told Melvin to do whatever he could to get St. John to proffer a false affidavit.  Certainly they would have wanted Melvin to sign or at least take with him any false affidavit that St. John might actually put to him when Melvin returned to the car.  Melvin claims that St. John then silently gestured for him to sign such an affidavit when he returned to the car. Yet there is no signed affidavit, and Melvin never took any affidavit -- because the silent gesture by St. John never occurred.

It also bears emphasis that the wire Melvin was wearing during his meeting in the car with St. John malfunctioned.  The agents, therefore, could not hear what St.

12

John was saying in the car and had to rely instead on what Melvin told them had transpired (during his "restroom break" and again when Melvin conferred with the agents upon exiting the car at the end of his meeting with St. John) before arresting St. John in the parking lot.  Melvin (unaware that St. John himself had recorded the meeting) evidently told the agents that St. John had ultimately urged him to sign a false affidavit, but when St. John's recording later belied that, Melvin had no choice but to invent the silent gesture.

It is thus clear that Melvin's testimony regarding St. John's gesture in the car was not only crucial rather than cumulative but also highly questionable, such that additional impeachment evidence regarding Melvin could not be considered immaterial unless the impeachment evidence itself was so cumulative of other impeachment evidence regarding Melvin that a reasonable jury could not have been influenced by it.  This impeachment evidence was not merely cumulative.

There were two types of impeachment evidence adduced at trial regarding Melvin's testimony (apart, of course, from the testimony of St. John and the recording itself contradicting his testimony).  First there was the evidence of Melvin's criminal history and prior bad acts.  Melvin acknowledged his guilty pleas to gun and crack distribution charges, his convictions for attempted assault and petit larceny, his car theft, his use and sale of marijuana and other drugs, his failure to pay income taxes, his robberies as a juvenile and his resisting arrest.

The second type of impeachment evidence pertained to Melvin's history of cooperation with the ATF.  In his trial

testimony in December 2003, he acknowledged having worked with the ATF since March 2002 and having received "subsistence payments" from the ATF, for living and relocation expenses, between March 27, 2002 and October 11, 2003, in the amount of $11,395.06.' Also disclosed to the jury was Melvin's plea agreement with the Government, dated January 8, 2003, pursuant to which (a) the Government accepted a guilty plea to two counts of distributing crack cocaine and unlawful possession of a firearm; (b) Melvin agreed to truthfully cooperate as to all matters in which the Government might seek his cooperation; (c) the Government agreed to forego prosecution for certain additional charges if Melvin fully complied with his obligations under the plea agreement; (d) the Government agreed to inform the Probation Department and Melvin's sentencing judge of the nature and extent of Melvin's cooperation; and (e) the Government agreed to file a 5K1.1 motion with regard to Melvin's sentencing if Melvin fully complied with his obligations under the plea agreement and the Government determined that he had provided "substantial assistance" in an investigation or prosecution. There was no evidence introduced of any other promises, benefits or payments to Melvin, and the Government disclosed no such information to defense counsel.

Now we learn of a very different sort of benefit that the Government conferred on Melvin, a cash payment of $5000, not for living and relocation expenses such as the Government acknowledged at trial but for "his cooperation with ATF," including his cooperation in this case. Agent Boss states in his declaration that "on or about February 1, 2004, I obtained

14

authorization for the disbursement of $5000 to Melvin by
ATF... because Melvin had completed his cooperation with ATF,
and his cooperation had been 'significant and useful'and had
led to the successful prosecution of numerous individuals, and
was undertaken at a risk to Melvin's safety." Although Agent
Boss avoids the use of the word "reward" in his declaration,
the authorization for the payment attached to his declaration
expressly refers to the payment as a "CI reward...". And
although Boss avoids specifying in his declaration that the
reward was for Melvin's testimony in this case in particular,
and the copy of the requisition provided with his declaration
redacts all of the description of the "justification for
payment," the lesser redacted copy attached to Roth's §2255
application herein (see Pet. Mot. Exhibit 82-83, ATF FOIA)
shows that the justification was expressly for Melvin's
cooperating in this case specifically and for his trial
testimony herein in particular.

     Thus, the Government's requisition for this $5000 paym
ent was very clearly a reward to Melvin at least in part, if
not entirely, for his testimony against Roth and St. John. It
was the only monetary reward to Melvin acknowledged by the
Government (the other approximately $11,000 in aggregate
payments being for expenses only). If the jury were informed
of the requisition, defense counsel would have explored and
surely a reasonable jury would have wanted to consider whether
Melvin had an expectation of such payment in providing his
testimony and whether and to what extent that may have
influenced his testimony. A jury would want to know, and
defense counsel would want to inquire (i) whether Melvin had

discussed such a reward with anyone on behalf of the
Government at any time before his testimony; (ii) whether
Melvin, in any event, had expected such a reward if He
testified in a manner that incriminated the defendants, and if
so, what his expectation was based on; and (iii) whether there
was a custom or practice of the Government to reward Melvin or
other informants in such manner following incriminating
testimony which would create an expectation of such reward.
{FN5}

A jury would likely be interested too in the timing of
the payment.  Why did Boss put the authorization in on
February 1?  Was Melvin asking for the payment?  Was Melvin
looking for assurance he would be paid before the trial ended,
while he perceived he still had some leverage?  Why was
payment not made until February 21, when the trial was over?
In delaying the actual payment until after the trial, was the
Government seeking to avoid any appearance that the reward
depended on the verdict?  Was the Government looking to avoid
any concern that it would otherwise have to be disclosed?

Certainly, the foregoing questions are not resolved by
the carefully worded declarations which the Government now
submits.  Agent Boss states that "during" the proffer
sessions, debriefings and trial preparation sessions that he
attended "there was no discussion of any payment to Melvin
following his testimony."  Did he ever discuss this subject
with Melvin outside these formal meetings?  Did other law
enforcement agents have contact with Melvin to which Boss
cannot attest?  For instance, Newburgh City Police Detective
Donald Campbell worked side-by-side with Agent Boss as a

16

deputized ATF Special Agent in handling Melvin in this case. He signed the ATF reward receipt as a witness thereto. However, we have no statement from Campbell as to what he discussed with Melvin.

Boss further states in his declaration: "I did not discuss with Melvin the $5000 payment until after Melvin testified." Did he discuss a potential payment in some other amount? Did he discuss the likelihood of some payment in some unspecified amount? When did he first discuss with Melvin any payment to reward him for his cooperation? Curiously, the Application for Reward attached to Melvin's declaration refers to some cooperation provided by Melvin on January 26, 2004. What cooperation does that refer to?

Likewise, the declaration of former AUSA Colton is in no way definitive. He states that he was present for numerous of the sessions with Melvin "leading up to Melvin's testimony" and that he does "not recall any discussion during these meetings of any promised payment to Melvin to be paid following his testimony at the trial." He does not deny that any such discussion occurred, only that he does not recall such discussion in any meeting he attended. He does not speak to what was said at meetings he did not attend. We have no statements from former AUSA Teresa Pesce or former AUSA (presently U.S.D.J.) Cathy Siebel, each of whom also participated in the prosecution and had responsibilities regarding Melvin. Nor do we have any statement from Melvin himself.

At the very least, the foregoing suggests that an evidentiary hearing is warranted to ascertain additional

17

facts bearing on the materiality of this new information.

The Government protests that no further consideration need be given to the materiality of this evidence, because the Court has already found, in defendant's Rule 33 motion, that other impeachment evidence regarding Melvin was only cumulative and not material. That ruling, however, is not determinative here. In the Rule 33 motion Judge Robinson was considering the materiality of new information regarding the nature of Melvin's prior bad acts that he had not disclosed at trial. The Court found that these were "details of prior bad acts" (as characterized by the Court and the Government) (Govt. Mem. at p.21) that were only cumulative evidence, inasmuch as the bad acts themselves had been disclosed and the specifics of those acts would not have affected the jury's verdict.

However, the evidence on the present application is very different. The $5000 payment is certainly not a detail. Nor is it cumulative of prior evidence. While the Rule 33 motion concerned new evidence of the specifics as to bad acts already on the record, the new evidence here does not merely elaborate on a benefit to Melvin that was previously disclosed; it is the only evidence of the benefit itself. It is the only evidence of any monetary reward to Melvin. The only other payments to Melvin were expense payments -- not compensation or reward. This evidence, therefore, is not cumulative of any prior evidence. See Tankleff v. Senkowski, 135 F. 3d 235, 251 (2d Cir. 1988) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional

18

impeachment evidence will generally be immaterial...") (emphasis added). {FN6}

'At the very least, there must be an evidentiary hearing as to its materiality before this new evidence can be found immaterial. That much is required on the face of §2255 "unless the motion and the files and records of the case conclusively show" that Roth is entitled to no relief.  The two declarations offered by the Government -- ambiguous, incomplete and unsubstantiated as they are -- cannot provide a conclusive basis for denying materiality. {FN7}


II

THE GOVERNMENT IMPROPERLY SUPPRESSED THE EVIDENCE

As the Government acknowledges (Govt. Mem. at 15), if impeachment evidence is material, it cannot be suppressed. Giglio v. United States, 405 U.S. 150, 154 (1997); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  As shown above, the evidence at issue here was indeed material, but the Government urges that even if this is so, the evidence was not suppressed.  Again the Government's argument is unsupportable.

This is clear from the law on this issue cited by the Government itself (Govt. Mem. at 15-16): "The touchstone of the inquiry [as to whether evidence was suppressed] is principally whether the prosecution's office possessed the information in question at the time of the trial." Morgan v. Salamach, 735 F. 2d 354, 358 (2d. Cir. 1984) (emphasis added). Here the Government failed to disclose evidence demonstrating, irrefutably, that while the trial was still pending, the

19

Government made arrangements for a $5000 cash payment to
Melvin as a reward (at least in part) for his cooperation in
this case.  As shown in its Application for Reward attached to
Eoss' declaration, the Government had this information on
February 1, 2004, the date that it made the application for
the payment, which was joined in by Melvin himself (as
evidenced by his signature on the application).  It is
undisputed that the trial was still pending.  Clearly, then,
this was suppressed evidence within the definition and
authorities put forth by the Government itself.

The Government seeks to circumvent this inconvenient
truth with two irrelevant assertions.  First, the Government
points to the fact that "the payment was made after Melvin
testified."  Govt. Mem. at p.18.  Because "the payment did not
exist" when Melvin testified, the Government claims that "the
evidence of it was not in the Government's possession and was
not suppressed."  Roth, however, is not arguing that the
Government was obliged to disclose the payment.  Roth is
arguing that the Government was obliged to disclose the
arrangements it had made for the payment and Melvin's
knowledge of those arrangements, all of which is evidenced by
the "Application for Reward" filled out by Melvin and the
Government on February 1, 2004.  That was indeed after
Melvin's testimony, but it was while the trial was still
pending.  As shown above, the authorities make clear that it
is the date of the trial's conclusion, not the conclusion of a
witness's testimony, which governs the timeframe for the
Government's obligation to disclose <u>Giglio</u> evidence.  Indeed,
the Government blindly cites the <u>Eubanks</u> decision of this

Court as purported authority for its argument that this evidence need not have been disclosed because it did not exist as of the time of Melvin's testimony (Govt. Mem. at 18), but a s the Government's own description of <u>Eubanks</u> demonstrates, the Court there rejected the <u>Giglio</u> challenge because the impeachment evidence arose after trial. That is not the case here.

Second, the Government asserts that it was not obligated to disclose this evidence because there was no "promise" of a payment. Govt. Mem. at 18. The Government concludes there was no "promise" from the untested declarations of Agent Boss and former AUSA Colton, which, as shown above (<u>supra</u>, at p.15), are in fact decidedly inconclusive on this point. Nevertheless, even assuming there was no explicit promise of a payment, that in no way settles the Government's obligation. Roth is not contending that he was entitled to know only about an explicit promise, and the law does not so limit his entitlement.

Even if there were no explicit "promise", given that the law (as shown above) requires disclosure of material impeachment evidence that occurs anytime before the end of trial (rather than just before the end of the witness's testimony), there is no basis to limit that evidence to promises of payment before testimony rather than arrangements for payment afterwards. So long as those arrangements are made while the trial is still pending, witnesses such as Melvin and Agent Boss and others are still available to be called or recalled by defense counsel to address the circumstances behind this arrangement and whether the witness

21

had an expectation of payment based on some assurance or tacit
understanding.

Certainly the information that the Government has now
provided raises this question: If no assurances of payment had
been given before Melvin's testimony, why in fact did the
Government pay Melvin the $5000?  Boss' explanation that it
was simply a gratuitous reward because he had been "useful"
and had been put "at risk" simply defies common sense.  Surely
the Government is not in the habit of being gratuitous to
career criminals such as Melvin.  And surely a gratuitous
$5000 payment flies in the face of the Government's repeated
insistence in their opposition here that Melvin was a "minor"
witness.  Even if there were no explicit promise of a payment
before Melvin's testimony, the evidence that the Government
arranged to pay Melvin $5000 afterwards (but while the trial
was still pending) would have informed a jury how important
the Government thought his testimony was and would have
underscored its reliance on his uncorroborated testimony of
St. John's gesture, which the Government now disingenuously
characterizes as a "detail" in the case.  Govt. Mem. at 25.

Furthermore, if the Government had not led Melvin to
believe he would be paid for incriminating Roth, one wonders
why he met with St. John at all.  Agent Boss testified that he
told Melvin before Melvin's meeting with St. John (and indeed
before Melvin ever spoke with Bryant's brother and his
girlfriend and recorded those conversations) that he didn't
need to continue this investigation in order to receive his
cooperation letter.  Tr. at 290-91.  Why would Melvin still do
so if he didn't understand from the Government, either

expressly or tacitly, that he would get some additional reward
for doing so, especially if his testimony was incriminating?
A jury might certainly infer from the requisition for this
reward that Melvin was motivated to invent the gesture on St.
John's part in the absence of any incriminating words on St.
John's part during the meeting in the car.

Defense counsel should have the right to explore, and
a reasonable jury would want to know --  from the Government
and from Melvin -- whether there were prior acts or
discussions which created a tacit understanding and an
expectation on Melvin's part that he would be rewarded for his
testimony, even if there was no explicit promise.  It is
Melvin's actual expectation that matters, not merely an
explicit promise, at least insofar as the expectation arises
from identifiable conduct on the part of the Government from
which one could infer an intended expectation.  Now that we
know Melvin received this payment, there should be an
opportunity to explore the Government's prior dealings with
Melvin (and other CI's Melvin was familiar with) to assess
whether past practice created an understanding both by Melvin
and the Government that he would receive a monetary reward for
incriminating testimony.  See supra, at p.14, FN4.

The Government contends that a claim of materiality
"similar to" Roth's was rejected in Shabazz v. Artuz, 336 F.
3d 154 (2d Cir. 2003).  (Govt. Mem. at 20).  In fact, that is
not so.

In Shabazz, the §2254 petitioner contended that there
were Brady violations in connection with the testimony of
three witnesses, Boone, Landers and Pullum, in his state

23

court trial. He contended that the district attorney had
failed to disclose promises of leniency in their sentencing
made prior to their testimony. The Court held an evidentiary
hearing on the matter (which is what Roth asks for in the
alternative here) and determined, among other things, that
there were no undisclosed promises. In regard to Boone, the
Court found that the only promise or other intended benefit
was exactly what had been disclosed to defense counsel and the
jury. As it turned out, after the trial Boone's sentencing
judge sua sponte imposed a slightly lesser sentence than what
the district attorney had disclosed would be recommended, but
the Court determined that before that there had been no
promise or recommendation or any arrangement for such lesser
sentence by the Government. In fact, the Court found that the
possibility of Boone receiving a lesser sentence than what he
had testified was part of his deal "arose for the first time
at Boone's sentencing," which was five months after
petitioner's conviction. Thus, nothing had occurred during or
prior to petitioner's trial other than what was disclosed.
Therefore, unlike here, there was no basis for the Shabazz
court to find any suppression of impeachment evidence as to
Boone.

As to Landers and Pullum, they testified at
petitioner's trial in Shabazz that they had not been promised
any leniency in exchange for their testimony, and, following
its evidentiary hearing, the Court found no basis to challenge
that. The Court did find that after the trial the district
attorney made sentencing recommendations for favorable
treatment because they had testified against the petitioner,

24

but again this was after petitioner's conviction. The Court found no basis to conclude that any favorable treatment had been discussed but not disclosed before the end of petitioner's trial, and therefore there was no information that existed during the trial which was suppressed.

Here, on the other hand, the suppressed evidence clearly existed during trial. The requisition for Melvin's reward was prepared during trial and was discussed with Melvin during trial. That is undisputed. The Government was bound to disclose that. Shabazz does not in any way say otherwise.

Nor does Shabazz resolve that rewards after testimony need not be disclosed in the absence of a "promise" of the reward before testimony. The Court said only that if the defense was trying to demonstrate such a promise, one could not infer from the favorable treatment alone that there had been a prior promise of favorable treatment. "We hold only that the fact that the prosecution afforded favorable treatment to a Government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony." Id at 13. {FN8}

What Shabazz does demonstrate is that this Court should not resolve any doubtful issue of materiality without an evidentiary hearing, such as that conducted in Shabazz. And where the evidence shows that there was undisclosed favorable treatment while the trial was still pending, as was the case here, the Government must be found to have improperly suppressed that evidence.

CONCLUSION

25

For the foregoing reasons, Roth respectfully submits that his §2255 motion should be granted and that the Court should vacate the judgment herein, or, in the alternative, order an evidentiary hearing in respect of the materiality of the suppressed evidence.

Date: 1/06/11

Respectfully Submitted;

By: _____

Donald Roth

Reg. No. 83933-054

FCI Sandstone

P.O. Box 1000

Sandstone, Minnesota 55072

FN1: Noteworthy is the Government's testimony that it determined not to record any conversations involving Roth, even though the Government contends that his conversations with Cherry and Bryant were the primary evidence of Roth's participation in the purported conspiracy, which Melvin's testimony of St. John's gesture -- also unrecorded -- only "confirmed."

FN2: Indeed, in his instructions to the jury, Judge Robinson was very clear that the agreement itself could not evidence the necessary overt act. Tr 5054. He pointed out that the Indictment here identified just two purported overt acts -- a meeting between Roth and one of his co-conspirators in October

2002, in which they "discussed plans for obtaining false affidavits," and the November 21 meeting between St. John and Melvin in St. John's car.  See Indictment at paragraph 13. Inasmuch as the October meeting itself, just as Judge Robinson instructed, could actually evidence only the purported agreement itself, the jury could look only to the November 21 meeting in the car as the overt act necessary to convict. Evidence about this meeting was therefore crucial.

This was not made any less so by the testimony of Craig Wallace, whom the Government now claims provided other important testimony incriminating Roth which Melvin only corroborated.  Govt. Mem. at p.22.  Wallace testified that in late October Roth told him he would be obtaining an important statement from the CI contradicting his statement to the Government.  While the Government misconstrues this testimony in attributing significance to it, in any event it too could "corroborate" only the purported agreement itself allegedly reached in late October.  It could not bear on any overt act -- as to which Melvin's testimony was indispensable.

FN3: See ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-4.1 (3d ed. 1993): "Duty to investigate.  It is the duty of the lawyer to conduct a prompt investigation of the case and explore all avenues leading to f acts relevant to the guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.  The duty to investigate exists regardless of the accused's admission or statements to the

27

lawyer of facts constituting guilt..." <u>See also</u> <u>Commentaries</u>,
at 182-83: "Considerable ingenuity may be required to locate
persons who observed the criminal act charged or who have
information concerning it.  After they are located, their
cooperation must be secured.  It may be necessary to approach
a witness several times to raise new questions stemming from
facts learned from others... Effective investigation by the
lawyer has an important bearing on competent representation at
trial, for without adequate investigation the lawyer is not in
a position to make the best use of such mechanisms as cross-
examination or impeachment of adverse witnesses at trial...
Failure to make adequate pretrial investigation and
preparation may also be grounds for finding ineffective
assistance of counsel."

FN4: The Government points to the previous observation of
Judge Robinson, in respect of defendant's prior Rule 33 motion
(<u>see</u>, <u>infra</u>, at p.16), that Melvin's testimony about St.
John's gesture "was hardly the smoking gun the [defendants]
make it out to be."  Roth disagrees and submits, based on the
demonstration herein, that this view should be reconsidered.
Nevertheless, materiality within the meaning of a <u>Brady/Giglio</u>
motion does not require that the suppressed evidence
necessarily bear on the "smoking gun" of the case.  It only
needs to be evidence that, if disclosed, could have
"reasonably been taken to put the case in such a different
light as to undermine confidence in the verdict." <u>United
States v. Bagley</u>, 473 U.S. 667, 682 (1985); <u>United States v.
Schwartz</u>, 259 F. 3d 59, 64 (2d Cir. 2001).  "The question is

not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. United States v. Douglas, 525 F 3d 225, 246 (2d Cir. 2008). For the reasons shown herein Melvin's testimony as to St. John's gesture was important enough and vulnerable enough that significant additional impeachment testimony such as this would be material.

Judge Robinson himself recognized in his Rule 33 decision that "Melvin's testimony was significant because it was the only evidence of St. John's gesture." Decision at 11. He acknowledged that Melvin "undeniably provided facts that could have persuaded the jury of the [defendants'] guilt." Id. The importance of impeaching Melvin thus cannot be minimized. See United States v. Wong, 78F. 3d 73, 79 (2d Cir. 1996) (Govt. Mem. at 17) (suppressed impeachment evidence is "material if the witness whose testimony is attacked supplied the only evidence linking the defendant to the crime or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case") (emphasis added).

FN5: The Government insists that its requisition for a reward to Melvin after his testimony cannot possibly be material impeachment evidence, because it was not a promise of a reward before his testimony. Even if one assumes, without the benefit of an evidentiary hearing, that there was no promise of a reward prior to his testimony, the fact that a payment

29

was requisitioned during trial (and indeed thereafter made)
warrants further inquiry into what actions on the part of the
Government prior to Melvin's testimony may have created an
expectation on Melvin's part that he would be rewarded for his
incriminating testimony.  Certainly, in the next case that
Melvin testifies as a CI, a jury would want to know that the
Government paid him a cash reward of $5000 in this case,
whether or not there was promise of another payment in the
next case.  Obviously, the first payment might well create an
expectation, indeed an intended expectation, on Melvin's part
that he would be rewarded in the subsequent case, but,
according to the Government, if there were no explicit promise
of a reward to Melvin in the subsequent case, it would not
need to disclose its $5000 payment in this case or any such
custom and practice of rewards to Melvin.  That narrow view of
its <u>Giglio</u> obligation lends itself to easy circumvention of
the purpose of the rule.

The Attorney General's Guidelines regarding the use of
Confidential Informants in effect at the time of this trial
(<u>see</u> Petitioner Memo., Exhibit p.12-18), provided that prior
to utilizing a person as a CI, a case agent shall complete a
report, which, among other things, shall address the CI's
motivation and expectations in cooperating, specifically in
regards to benefits.  Even in the absence of a "promise" of
payment, this report might evidence an indication that Melvin
expected some compensation from the Government for useful
testimony.  It was not produced.

FN6: It bears reminder that the materiality of suppressed

information must be "considered collectively, not item-by-
item." Kyles v. Whitley, 514 U.S. 419, 436 (1995).   The
Court must consider the materiality of this impeachment
evidence in conjunction with the impeachment evidence that was
found immaterial in the prior Rule 33 motion.   The Court is
also urged to take judicial notice of the facts that (i) in
November 2009 Melvin was arrested in Newburgh for murder; (ii)
at his murder trial Orange County Assistant District Attorney
David Byrne attempted to impeach Melvin by attacking the
credibility of Melvin's trial testimony against Roth in this
case; and (iii) at Melvin's trial D.A. Byrne also showed that
Melvin himself had engaged in a "clear pattern of conduct to
tamper with witnesses."   While each of these items may be
deemed immaterial separately, in combination they enhance the
materiality of the suppressed impeachment evidence here and
may combine to create a constitutional violation in its
suppression.   See United States v. Basciano, US Dist. Lexis
85502 at 1 (E.D.N.Y. 2010)


FN7: The Government relies on Chang v. United States, 250 F.
3d 79, 84-86 (2d Cir, 2001) (Govt. Mem. at p.24), for support
that an evidentiary hearing is not needed, but Chang (like the
related authorities cited by the Government) emphasizes that a
full hearing can be avoided only where, unlike here,
affidavits are clearly dispositive.   Moreover, Chang and these
other cases point to the fact that the trial judge was able to
consider the affidavits submitted in the context of the trial
proceedings which that judge had personally presided over.   In
Chang, the Second Circuit concluded its opinion with the

observation that "Judge Glasser, having tried the case, was intimately familiar with the trial proceedings and circumstances surrounding them," such that "it was within the Court's discretion that more was not needed."  Id at 25.  That is not the case here.  The trial judge is not available to consider this petition or the sufficiency of the Government's declarations in the context of all the other evidence he observed.  An evidentiary hearing is therefore the prudent, if not requisite, course.

FN8: The Government purposefully misled this Court in setting forth the holding of Shabazz by representing the foregoing sentence as the holding but omitting therefrom the word "only" -- the important qualifier used by the Second Circuit.

     The Shabazz Court further qualified its holding as follows: "At the same time, however, the fact that a witness actually received favorable treatment may be relevant in establishing the existence of undisclosed promises of leniency when considered with other facts -- not present in this case-- such as a state court's finding that the prosecutor's account was not credible."  As set forth hereinabove (supra, at p.14), there are many reasons, based both on fact and logic, to question the credibility or completeness of the Government's account of the circumstances regarding its payment to Melvin and its interaction with Melvin which may have been designed to create an expectation of payment to him following incriminating testimony.  See Dubose v. Leferre, 619 F. 2d 973, 979 (2d Cir. 1980) (cited by Shabazz at 13) ("The prosecution cannot, by keeping its promises of consideration

to a witness general in language or tone, escape the fact that
it gives the witness <u>reason</u> to <u>believe</u> that his or her
testimony will lead to favorable treatment by the State.
Unquestionably, agreements in general terms to reward
testimony by consideration create an incentive on the
witness's part to testify favorably for the State and the
existence of such an <u>understanding</u> is important for purposes
of impeachment").  (emphasis added).

It is noteworthy too that in <u>Shabazz</u> the Court
determined that the evidence it found was not suppressed was
also not material.  As shown above, that is not the case
here.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONALD ROTH,

    Petitioner,

vs.


UNITED STATES OF AMERICA,

    Respondent.

No. 09 Civ. 8712, 02 Cr. 1503

Hon. Lisa Margaret Smith

**CERTIFICATE OF SERVICE**

---

    I, Donald Roth, the Petitioner in this action, hereby declare
that on January 6, 2011, I served a true and correct copy of
the Plaintiff's Memorandum of Law in Reply to the Respondent's
Memorandum of Law in Opposition to the Petitioner  Motion Under
28 U.S.C. §2255, and declare such under penalty of perjury pursuant
to 28 U.S.C. §1746(2) and the laws of the United States of America
and the State of Minnesota, service by U.S. Mail, postage prepaid.

Sandstone, Minnesota             By:_____
January 6, 2011                    Donald Roth