UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :

UNITED STATES OF AMERICA,     :

           - v. -                    :

DONALD ROTH,                    :      09 Civ. 8712,
                                        :      S7 02 Cr. 1503 (GBD) (LMS)
              Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# POST-HEARING MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO PETITIONER'S PETITION FOR A WRIT OF HABEAS CORPUS

PREET BHARARA
United States Attorney for the Southern
District of New York
One St. Andrew's Plaza
New York, New York 10007

Benjamin Allee
Assistant United States Attorney
    -Of Counsel-

**PRELIMINARY STATEMENT**

The Government respectfully submits this post-hearing memorandum of law in opposition to Donald Roth's petition under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (the "Petition"). Roth claims that the non-disclosure of a payment made to a cooperating witness two months after the cooperating witness testified constituted a Brady and Giglio violation requiring a new trial. On November 29, 2010, the Government opposed Roth's petition on numerous grounds, including that there is no Brady or Giglio violation, and in any case the non-existent violation claimed by Roth resulted in no prejudice. On May 9, 2013, the Court held an evidentiary hearing on the issue whether the payment made to the confidential informant following his testimony was known or contemplated at the time he testified, if so by whom, and if so whether non-disclosure of the payment was material. For the reasons set forth below, the Government submits that Roth's petition should be denied, on each and every of the grounds set forth in the Government's previous opposition brief, because the evidence at the hearing was further proof that there was no Brady or Giglio violation and that the claimed violation, in any case, resulted in no prejudice.

**DISCUSSION**

The evidentiary hearing resulted in further proof – the testimony of (1) the federal agent, Special Agent Andrew Boss of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), who was responsible for handling the cooperating witness, (2) the Deputy Chief of Police in the Town of Newburgh, Bruce Campbell, who was among the officers who dealt with the cooperating witness, and (3) the former Assistant United States Attorney, Glenn Colton, who was responsible for preparing the cooperating witness to testify and conducting his direct

1

examination – unequivocally demonstrating that Roth's petition is without merit. As a result of the hearing, Roth's allegation in his petition that the cooperating witness received, prior to testifying, an undisclosed promise of a future cash payment in exchange for his testimony is debunked not only by common sense and the uncontested affidavits of knowledgeable witnesses, but now is flatly disproved by the very witnesses whom Roth called in an attempt to prove his claim.

Special Agent Boss testified that he was the agent who handled the cooperating witness, Charles Melvin. (Tr. at 15, 69).[1] Working with Special Agent Boss beginning in about March 2002, Melvin made controlled purchases of crack, cocaine, heroin, and a gun, during which he wore recording devices, in approximately five investigations involving approximately 30 individuals. (Tr. at 70). Throughout Melvin's cooperation, ATF provided him with payments for living and relocation expenses, which totaled approximately $11,395.06 by October 2003, and Melvin was additionally provided payments by the United States Attorney's Office under the Emergency Witness Assistance Program ("EWAP"). (Govt. Opp. Br., Exs. E, F). These payments were disclosed as 3500 material prior to Melvin's testifying at Roth's trial.

Special Agent Boss testified that after Melvin testified at Roth's trial, Melvin contacted him and requested provision of additional funds. Special Agent Boss determined that providing additional funds was appropriate, because "[Melvin] did a bunch of work for us, did good work, so we put him in for a reward." (Tr. at 74). Special Agent Boss then followed standard ATF procedures, completed standard ATF forms, and obtained authorization to provide Melvin with another payment, of $5,000. (Tr. at 72-74). Special Agent Boss did not discuss the

---

[1] "Tr." refers to the transcript of the evidentiary hearing, a copy of which is attached to this memorandum.

payment with Melvin prior to Melvin's testifying during Roth's trial (Tr. at 76), nor could he have, as the payment was not even yet conceived when Melvin testified. Nor did Special Agent Boss make any implication to Melvin about payment, nor did any other law enforcement officer, so far as Special Agent Boss is aware. (Tr. at 83-84).

Former AUSA Glenn Colton testified that he was responsible for preparing Melvin to testify and for conducting the direct examination of Melvin at Roth's trial. (Tr. at 115-16). AUSA Colton testified that, consistent with the practice of the United States Attorney's Office for the Southern District of New York, it was his practice to disclose as Giglio material any benefits a witness received or expected to receive. (Tr. at 105). AUSA Colton further testified that, had there been any promise of future payment to Melvin or implication of any such promise, he would have disclosed it in his ordinary practice and elicited it on direct examination. (Tr. at 109, 110). So far as AUSA Colton recalls, there was no discussion or implication with Melvin by himself or anyone in his presence prior to Melvin's testifying that Melvin would be provided any future payment. (Tr. at 117).

Chief Campbell, who was formerly a Detective with the City of Newburgh Police Department who also worked with Melvin as a cooperating witness, also testified that he never observed any law enforcement officer or prosecutor promise or imply to Melvin that he would receive a future payment in exchange for his testimony. (Tr. at 99). Chief Campbell described that Melvin was provided with payments while he cooperated, and that Melvin often asked about getting paid, and "was told no frequently." (Tr. at 96).

The testimony of Special Agent Boss, former AUSA Colton, and Chief Campbell shows that, at the time Melvin testified, there was no promise or implication to Melvin that he

3

would be provided a future payment, and therefore demonstrates that there was no Giglio violation of the kind alleged by Roth.  (See Govt. Opp. Br., at 18-21).  The testimony of each of the three witnesses is consistent with each other, with the prior affidavits of Special Agent Boss and AUSA Colton (see Govt. Opp. Br., Exs. C, D), and with common sense.  As to the latter consistency, a secret conspiracy between the Government and Melvin to exchange testimony for cash would have gained the Government nothing.  Melvin was a relatively minor witness whose testimony the Government hardly mentioned during summation, and the Government had already made approximately 40 payments to Melvin totaling more than $11,000 and disclosed all of those payments to Roth's trial counsel.  On the other hand, as Roth is well aware, had such a secret arrangement existed, those who joined it would have lost a great deal upon its revelation, which here came unremarkably from Roth's FOIA request.  Roth's allegation that federal agents and prosecutors unethically made a secret promise to pay Melvin for his testimony, by which they gained nothing and risked their careers, is senseless, and falls completely flat against the brick wall built by the record adduced at the evidentiary hearing.

Moreover, the claimed Giglio violation, which does not exist, is immaterial.  (See Govt. Opp. Br., at 21-23).  Rejecting Roth's prior attempt to attack Melvin, post-trial, based on Melvin's having made misrepresentations during his testimony, Judge Robinson noted that Roth was convicted on ample proof aside from Melvin's testimony, which "was hardly the smoking gun the movants make it out to be."  (Rule 33 Decision, at 11).  Nor do the affidavits of trial counsel for Roth and his co-conspirator, David St. John, now offered on his behalf, change any of the analysis.  Whether the lawyers would have cross-examined witnesses about the alleged future payment is beside the point.  Rather, Roth must show that the Government suppressed

evidence such that it "put[s] the whole case in such a different light as to undermine confidence in the verdict." United States v. Payne, 63 F.3d 1200, 1209 (2d Cir. 1995) (internal quotation marks omitted). Here, the claimed Giglio material would have provided, at best, cumulative impeachment material for a witness who was impeached at length on cross-examination, and would have changed nothing at trial. The question is, in fact, not even merely hypothetical: the same trial counsel whose affidavits are offered on Roth's behalf now cross-examined Melvin for nearly two full trial days, four times as long as the direct testimony, about all variety of collateral impeachment matters, and never asked Melvin about the more than $11,000 in payments he had received while cooperating with the Government. Here, neither trial counsel nor Roth offers any reason why inquiry into an additional payment, yet to be made, would have made any difference at all at the trial.

In his post-hearing brief, Roth simply realleges the speculative claims he made prior to the hearing, ignoring the credible testimony of Special Agent Boss, former AUSA Colton, and Chief Campbell squarely rejecting such speculation. Roth, in fact, makes no sustained argument that the testimony of these witnesses was not credible, even though he effectively asks the Court to conclude that each lied under oath. Rather, with all the evidence supporting denial of his petition, Roth attempts to rely instead on the absence of evidence, asserting that the Court may draw an adverse inference against the Government based on the silence of a non-party witness, Melvin. At the time of the hearing, Melvin was facing prosecution in a separate matter in the Southern District of New York, United States v. Charles Melvin, 12 Cr. 727 (RPP), and on the basis of that prosecution, his counsel, Joseph Vita, Esq., informed the Court that Melvin would invoke the Fifth Amendment privilege against self-

5

incrimination were Roth to call him as a witness.

Roth is wrong. The Second Circuit has identified four, non-exhaustive factors to consider when determining whether a Court should take the unusual step of drawing an adverse inference based on the silence of a non-party witness. See United States v. LiButti, 107 F.3d 110, 123 (2d Cir. 1997):

> 1. The Nature of the Relevant Relationships: While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a non-party witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship.
>
> 2. The Degree of Control of the Party Over the Non-Party Witness: The degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed.R.Evid. 801(d)(2), and may accordingly be viewed, as in Brink's, as a vicarious admission.
>
> 3. The Compatibility of the Interests of the Party and Non-Party Witness in the Outcome of the Litigation: The trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation.
>
> 4. The Role of the Non-Party Witness in the Litigation: Whether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court.

Id. at 123-24. The Court continued, "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." Id. at 124; see Banks v. Yokemick, 144 F. Supp. 2d 272, 290 (S.D.N.Y. 2001) (noting that the relationship between the non-party and the party at the time of the invocation of the Fifth

Amendment privilege governs).

All of the factors set forth in LiButti weigh strongly in favor of not drawing any adverse inference based on Melvin's silence. First, the relationship between Melvin and the Government not only does not feature a close bond, but is the opposite, as Melvin and the Government are adversaries in a criminal proceeding. Melvin, in fact, invoked the Fifth Amendment because of concern that the Government might use his statements against him in the separate prosecution currently pending (for which Melvin has now been convicted at trial and awaits sentencing). Second, the Government has no control over Melvin as a witness with regard to the key facts and subject matter of the litigation. Melvin long ago completed his cooperation with the Government during which he testified in the Roth matter, and was sentenced in 2004. See United States v. Charles Melvin, 03 Cr. 92 (SCR). Since then, Melvin has had no agreement with the Government, and is under no obligation to cooperate or otherwise assist the Government in any way. Third, Melvin has no interest in the outcome of Roth's habeas petition. Melvin is not pragmatically a non-party; so far as Melvin is concerned, the outcome of Roth's petition is mere trivia. Fourth, Melvin has no controlling role in this litigation. None of the enumerated factors in LiButti, in sum, weigh in favor of drawing the adverse inference Roth seeks. Nor should they, since the overarching concern is whether such an adverse inference would be trustworthy, and here, inferring based on Melvin's silence that multiple Government agents and prosecutors engaged in a secret payment scheme, for which scheme there is no corroboration and which scheme contravenes all of the other testimony as well as common sense, requires throwing trustworthiness out the window. The petitioner's claim, in short, is based on nothing, and to the extent that he seeks, through an adverse inference,

7

to turn nothing into something, the Court should reject this attempt.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in the Government's pre-hearing opposition brief to Roth's petition, the Government respectfully requests that the Court deny Roth's petition.

Dated: White Plains, New York
       October 22, 2013

>Respectfully submitted,
>
>PREET BHARARA
>United States Attorney for the
>Southern District of New York
>
>By:  /s
>    Benjamin Allee
>    Assistant United States Attorney
>    (914) 993-1962