201359rothh

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x
    DONALD ROTH,
3   315 N. Righland Avenue
    Nyack, NY  10960,
4
                Petitioner,
5

6           v.                          09 Civ. 8712(GBD)(LMS)

7                                        HEARING

8   UNITED STATES OF AMERICA,

9               Respondent.
    ------------------------------------x
10

11                                       United States Courthouse
                                         White Plains, N.Y.
12                                       May 9, 2013
                                         10:30 a.m.
13

14

15  Before:
                    THE HONORABLE LISA MARGARET SMITH,
16
                                         Magistrate Judge
17

18

19                      APPEARANCES

20
    CULLETON, MARINACCIO & FOGLIA
21       Attorneys for Petitioner
    MICHAEL ANTHONY MARINACCIO
22

23  PREET BHARARA
         United States Attorney for the
24       Southern District of New York
    BENJAMIN ALLEE
25       Assistant United States Attorney

            CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                      (914) 390-4103

201359rothh

1          THE DEPUTY CLERK:  In the matter of Roth v. the United

2    States of America.

3          Counsel, please note your appearances for the record.

4          MR. ALLEE:  Good morning, your Honor.  Benjamin Allee

5    for the government.

6          THE COURT:  Good morning, Mr. Allee.

7          MR. MARINACCIO:  Good morning, your Honor.  And for

8    the Petitioner, Mr. Roth, Michael Marinaccio.

9          THE COURT:  Good morning, Mr. Marinaccio.

10         MR. MARINACCIO:  Good morning.

11         THE COURT:  We are here for an evidentiary hearing on

12   Mr. Roth's petition submitted before this Court.

13         Mr. Marinaccio was appointed by the Court for purposes

14   of representing Mr. Roth on what I believe to be a narrow issue

15   regarding allegations of Charles Melvin having potentially or

16   allegedly been promised certain benefits in connection with his

17   trial testimony which were not revealed to the defense at the

18   time.

19         I believe we have several witnesses available should

20   you wish to call them, Mr. Marinaccio.

21         Do you want to make a preliminary statement of any

22   sort?

23         MR. MARINACCIO:  Yes, your Honor.

24         There are three witnesses before the Court -- or

25   waiting outside today that I anticipate calling on behalf of

201359rothh

1    Mr. Roth; Special Agent Boss -- I think he's now a lieutenant

2    in the Newburgh Police Department -- Mr. Donald Campbell, and

3    also former AUSA, Mr. Colton, who tried the case.

4          The Court had indicated previously, at our conference

5    I believe on March 5th, that the issue of Judge Seibel's

6    subpoena would be held in abeyance pending what the Court hears

7    today.

8          Your Honor, as far as the narrow issues that we look

9    to go into, we are, of course, focusing in on the $5,000

10   payment that I do not believe there will be any dispute was

11   actually paid to Mr. Melvin.  I think the issue comes down to

12   when the discussions regarding that $5,000 payment were first

13   entered into, whether the trial was still ongoing, and whether

14   or not the payment to Mr. Melvin should have been disclosed to

15   the defense even at a date after he had testified, but before

16   the trial had concluded.

17         It is going to be our argument in addition, your

18   Honor, that, having failed to advise the defense of this

19   additional payment or that this additional payment was in the

20   works while the trial was still going on deprived Mr. Roth's

21   counsel of an opportunity to recall witnesses on this issue to

22   determine whether or not -- what the circumstances surrounding

23   that payment were.

24         Also, your Honor, having reviewed now the transcript

25   of the trial, including the examination and particularly the

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

201359rothh

1   examination of Mr. Boss and Mr. Melvin and the summations that

2   the government made at the conclusion of the case, the jury was

3   left with the impression that the only benefit that Mr. Melvin

4   could expect to receive was the 5K letter that's outlined in

5   his cooperation agreement when, in fact, if the paperwork is to

6   be believed on its face, discussions with Mr. Melvin had

7   occurred as early as perhaps January 26th, maybe even earlier

8   than that, and certainly as of February 1st, 2004, when

9   Mr. Melvin signed an application for public voucher for reward,

10  and it is our position, your Honor, that that information

11  should have been disclosed to the defense and, had it been

12  disclosed to the defense, there was ample time for an

13  application to be made to recall witnesses on this issue, and

14  failing to do that, it is our belief and our position that left

15  a misimpression with the jury that ultimately rendered its

16  verdict.

17          The problem is exacerbated, it seems to me, because

18  now Mr. Melvin is essentially unavailable to the Petitioner on

19  the basis of conversations that I had with his lawyer.

20          Is it Vita or D'Avita?  I always confuse them.

21          THE COURT:  James D'Avita?

22          MR. MARINACCIO:  D'Avita.  I apologize.

23          MR. ALLEE:  Well, your Honor, in this instance, it's

24  Joe Vita.

25          THE COURT:  Oh, Joe Vita.  Two different ones.

201359rothh

1            MR. MARINACCIO:  Oh, it's Joe Vita.

2            THE COURT:  Two different ones.

3            MR. MARINACCIO:  That's why I always confuse the two,

4    Judge.

5            Mr. Vita, who is, unfortunately, not available and,

6    therefore, unable to speak for himself because he's on an ocean

7    liner somewhere on a cruise for vacation, but prior to him

8    leaving, he advised me in no uncertain terms that his client,

9    on his advice -- given his pending charges pending within the

10   Southern District, his client, on his advice, would invoke his

11   Fifth Amendment privilege against self-incrimination, a

12   privilege that we submit would not have been an issue back in

13   2003, 2004 had this information been promptly disclosed.

14           I have had some discussions, your Honor, with the

15   government regarding the scope of the privilege, and it was my

16   intention, if Mr. Melvin were to take the witness stand, not to

17   ask him any questions about any of his prior bad acts, not ask

18   him any question about his pending charges.  The Court made it

19   very clear the last time we were here, it seems to me, that the

20   Court has available to it the full trial transcript, can read

21   all about Mr. Melvin and his prior bad acts, and, therefore, I

22   have taken the position that the invocation of the Fifth

23   Amendment privilege is not required here because, number one,

24   Mr. Melvin was not asked any questions about this $5,000

25   payment at the trial.  He wasn't even asked any questions about

201359rothh

```
 1    subsistence payments for which the defense got notice.  So,
 2    therefore, there is no possibility -- even if you get around
 3    the statute of limitations, there's no possibility that there
 4    would be any exposure for him.
 5            But regardless of my explanation of that to Mr. Vita,
 6    he indicated that it is his position that his client would
 7    invoke the Fifth.  I expect, your Honor, that his position
 8    would not change given the fact that, more recently,
 9    apparently, the government has superseded their indictment
10    against Mr. Melvin to add additional charges.  And I believe
11    Judge Karas has set a second trial date for July 8th.  So he
12    has a trial date right now for May 20th, meaning Mr. Melvin,
13    before Judge Karas, and I believe a second trial date for July
14    8th.  How that works out, I don't know.  I'm not involved in
15    that at all.  But I expect that Mr. Vita's position would not
16    be changed in view of those changed developments.
17            That is my preliminary statement.
18            THE COURT:  Okay.  Thank you, Mr. Marinaccio.
19            Mr. Allee, do you wish to make any introductory
20    remarks?
21            MR. ALLEE:  Well, your Honor, yes.  I would like to
22    just address what Mr. Marinaccio said.
23            I disagree with how he's characterized this hearing.
24    As the Court has described, this is a narrow hearing.  The
25    issue centers on this payment of $5,000 to Charles Melvin which
```

201359rothh

1    was made to him about slightly less than two months after he

2    testified in the trial of Donald Roth.  We're here because

3    Donald Roth challenges his conviction at trial on the ground

4    that allegedly the government suppressed favorable evidence to

5    him, impeachment material, and that the alleged suppression of

6    that impeachment material was material, would put the case in a

7    different light so as to undermine confidence in the verdict.

8         The factual disputes are the reason we're having this

9    hearing, and your Honor, as I understand it, has ordered it in

10   order to resolve the factual dispute about the timing of the

11   payment and sort of who knew what when among law enforcement

12   and among Charles Melvin.  That does not mean that the scope of

13   the hearing would include things like the summations of the

14   parties or inquiry into those types of things.

15        I am elaborating on this concern I have because I've

16   been handed just moments before you walked out what are marked

17   as 17 exhibits that are potential exhibits for Mr. Roth.  Many

18   of them appear to be just excerpts of transcripts from the

19   trial back in '03 and '04.  And I've had an opportunity to read

20   the first two of those trial excerpts.  They include, however,

21   additionally, the Attorney General's guidelines regarding the

22   use of confidential informants, which is marked as an exhibit,

23   a possible exhibit, and then a memorandum from 2010 about

24   guidance for prosecutors regarding criminal discovery.  It's

25   hard for me to imagine how this hearing could have a scope that

201359rothh

1    those would be relevant exhibits here, and I'm concerned about

2    that.

3          Somewhat relatedly, I have a point to make about the

4    procedure we're using here, your Honor.  It is the plaintiff's

5    burden of proof in a habeus --

6          THE COURT:  Petitioner's burden.  Petitioner's, not

7    plaintiff's.

8          MR. ALLEE:  Pardon me, your Honor.  Petitioner's.

9    I've gotten that all backwards.  I tried to sit at the wrong

10   table this morning.

11         It is the Petitioner's, Mr. Roth's, burden of proof

12   here, as we all know.  That came up at a conference, the most

13   recent conference here, and your Honor ordered -- as I

14   understand it, your Honor ordered the government to call

15   witnesses notwithstanding that that's the evidentiary burden,

16   and so we prepared -- pursuant to that order, we prepared that

17   way.  And I'm prepared to call Special Agent Boss and former

18   AUSA Glenn Colton, who are outside this courtroom.  They

19   appeared -- well, firstly, I asked them to appear, and they

20   did.  I also understand that they have also received subpoenas

21   from the Petitioner.

22         Mr. Marinaccio tells me he would like to call those

23   witnesses.  I don't really have a strong view about that, your

24   Honor.  I just want to point out that, to prepare today, I

25   never got any of these documents that may be shown to these

201359rothh

```
 1    witnesses that may be relevant or not, and they have been
 2    prepared to be directed by the government pursuant to what I
 3    understood the Court to order.  Again, however the Court wants
 4    to proceed is fine with me, but that's how we prepared for
 5    today, and that didn't include -- that was without the benefit
 6    of these exhibits or Mr. Marinaccio's view that he wants to
 7    call them as witnesses.
 8          THE COURT:  Let me just say, with regard to the
 9    transcript of the proceeding below, having not given it any
10    deep thought, my initial response is that the Court, in order
11    to make any assessment of materiality, has to consider and be
12    familiar with that trial transcript.  And it is a part of the
13    Court record with regard to the petition, so it is before the
14    Court.  But my view of that is that it goes to the question of
15    materiality and whether there was anything withheld that the
16    Court may determine would have been likely to have changed the
17    verdict.  In order to make that assessment, the Court has to be
18    familiar with the transcript below.  But the transcript is what
19    the transcript is.  It's not subject to argument or discussion
20    about what happened at trial.
21          MR. ALLEE:  And your Honor, maybe I can just put
22    what -- I don't mean to be cryptic.  I have a concern from the
23    outset of this proceeding that it will be a fishing expedition,
24    that subpoenas have gone out to all kinds of people, and that
25    there will be efforts to broaden this beyond what is necessary
```

201359rothh

1    based on what the Court has ordered.

2            The Court ordered us to put on witnesses.  The Court

3    described the narrow issue at the hearing.  We did that.  I now

4    fear what -- I now am concerned what is actually going to

5    happen is there's a bunch of testimony that these witnesses

6    haven't thought about for nine years that they're going to be

7    asked about from the Petitioner and that this will turn into

8    this sort of fishing expedition with ambush hooks, you know,

9    throughout that I have feared to begin with.  This is not what

10   I expected this hearing to be.  If there are relevant

11   questions, ask them.  If the plaintiff wants to call the

12   witnesses, that's all fine.  But I am starting to see the

13   beginnings of what I was concerned this hearing would become

14   and anticipate a lot of objections to relevance if all these

15   are being offered on sort of collateral or tangential detours

16   by the Petitioner here.

17           THE COURT:  Well, the first thing that I want to say

18   is, because we're proceeding without a jury, I may be somewhat

19   more amenable to broader questions, but, as I made clear

20   previously, I don't care if Mr. Melvin was treated or handled

21   differently from every other informant ever used by any

22   government attorney.  That's not an issue.  I don't care.  It's

23   not an equal protection issue.

24           To the degree that there may be any questions with

25   regard to whether he was handled in a way that's contrary to

201359rothh

1   any government guidelines, there may be some relevance there,

2   but that is really dependent on what the various government

3   agents, either law enforcement agents or prosecutors, knew and

4   when they knew it, and we can only find that out by asking

5   them.

6           My intention is to focus on the issue of the payment,

7   on the issue of discussions with Mr. Melvin or in Mr. Melvin's

8   presence, and the process by which that payment was made.  And

9   I didn't hear anything different from that from Mr. Marinaccio.

10  I thought that's actually what I heard from Mr. Marinaccio.

11          MR. MARINACCIO:  Yes, Judge.

12          Just so that the record is clear -- and, you know,

13  again, I am mindful of the fact that we're here without a jury,

14  you know.  I trust the Court to be able to filter the

15  information that's coming.  I mean, basically, the excerpts of

16  the transcript, as the Court correctly points out, the

17  transcript is the transcript.  The excerpts relate to the

18  cooperation agreement and the testimony regarding the

19  cooperation agreement and the benefit that was presented to the

20  jury as to -- withdrawn -- as to what Mr. Melvin could expect

21  as far as a benefit as a result of his cooperation.  We have

22  that.

23          We have the guidelines, meaning the government

24  guidelines deal with the obligations of the prosecution team

25  vis-a-vis discovery and payments.

201359rothh

1          Also included in the exhibits are evidence of payments

2     that were made, that were disclosed to the defense, in the form

3     of what's referred to as ATF subsistence payments,

4     approximately $11,300 and change.  That, in fact, was revealed

5     to the defense for them to make the determination as to whether

6     or not they wanted to use it or not in this particular case at

7     the trial.  It doesn't appear, from what I've read of the

8     transcript, that it was utilized, but the option was provided

9     for the defense attorneys to make that determination.

10         When it comes to the $5,000 payment, though, I don't

11    think there's any dispute that it was never revealed to the

12    defense.  And part of the argument is that, you know, now that

13    we have the voucher for reward, now that we have it, we can

14    certainly make the argument and the Court can certainly

15    consider that it was -- number one, we can ask about the

16    circumstances of it, but, number two, that it was certainly

17    discussed and paperwork generated in sufficient time for them

18    to have made this revelation to the defense for their use as

19    they saw fit.

20         And this trial, your Honor, did not conclude with a

21    verdict, if my memory serves me, until February 12th of 2004.

22    On January 26th, 2004, which is the first date that we have on

23    this voucher, this trial was still going.  As a matter of fact,

24    the defense was on the defense case at that point.  And when

25    Mr. Miller signed it on February 1st -- Mr. Melvin, rather,

201359rothh

1    signed it on February 1st, the case was still -- there was

2    still testimony being taken.  And on February 9th, another date

3    that we have here, I believe summations had commenced.  The

4    only thing that happened after, based upon the dates that are

5    on this document, after the trial was concluded, was the

6    payment actually being made.  And I think that the Court can

7    consider it and should consider that timing in deciding the

8    petition.

9        I'm mindful, Judge, of the limitations that the Court

10   placed upon us.  I've said that in a very long-winded way.  I'm

11   mindful of the fact that we're focusing in on the $5,000.

12       THE COURT:  I do think we need to go ahead and move

13   forward.  I know that we had had a discussion about who should

14   call witnesses.  I will admit my own notes are not as thorough

15   on this issue as I might have liked.  I know that I had

16   directed the government to produce witnesses.

17       If I told you, Mr. Allee, that I was going to have you

18   go first, I've changed my mind.  And I do think that the burden

19   is on the Petitioner.  To the degree that witnesses have been

20   made available, we should go forward and hear what they have to

21   say.

22       As previously noted by Mr. Marinaccio, I've withheld a

23   decision with regard to whether to require Judge Seibel to

24   testify.  I believe I've told the parties that she's willing to

25   appear to testify on the matter to the best of her ability,

201359rothh

1    but, after consultation with Judge Daniels, who is the assigned

2    District Judge in the matter, I'm going to hold off on making

3    that decision until I determine whether there's any open

4    factual issue which she would be able to shed light on.

5              So that having been said, do I understand, Mr. Allee,

6    that we have Mr. Boss, Mr. Campbell and Mr. Colton available?

7              MR. ALLEE:  They are outside the courtroom, your

8    Honor, yes.

9              THE COURT:  Very good.  Thank you.

10             Mr. Marinaccio, who do you want to hear from?

11             MR. MARINACCIO:  I want to hear from Mr. -- well,

12   Agent Boss initially.

13             THE COURT:  All right.

14             Mr. Plant, would you go get him.

15             MR. ALLEE:  I can do that.

16             THE COURT:  Thank you, Mr. Allee.

17    ANDREW BOSS,

18        called as a witness by the Defense,

19        having been duly sworn, testified as follows:

20             THE DEPUTY CLERK:  Please have a seat and state your

21   name for the record.  State and spell your name for the record.

22             THE WITNESS:  Andrew Boss.  A-N-D-R-E-W.  Last name

23   B-O-S-S.

24             THE COURT:  You may proceed, Mr. Marinaccio.

25             MR. MARINACCIO:  Thank you, your Honor.

201359rothh                Boss   -   Direct

1   DIRECT EXAMINATION

2   BY MR. MARINACCIO:

3   Q.  Agent Boss, good morning.

4   A.  Morning.

5   Q.  How are you?

6   A.  Great.  How are you?

7   Q.  We have never spoken before today, correct?

8   A.  No.  Just briefly in the hallway.

9   Q.  Agent Boss, just tell us how you are currently employed.

10  A.  Special agent with Bureau of Alcohol, Tobacco, Firearms and

11  Explosives.

12  Q.  And how long have you been so employed?

13  A.  Since July of 1998.

14  Q.  And you were involved, were you not, in the investigation

15  and prosecution of Mr. Donald Roth and Mr. St. John, correct?

16  A.  Yes.

17  Q.  And in connection with that investigation and others, you

18  had contact with an informant by the name of Charles Flip

19  Melvin; is that correct?

20  A.  Correct.

21  Q.  Okay.  Were you the handling agent for Mr. Melvin?

22  A.  Yes.

23  Q.  And what exactly does that entail, being the handling agent

24  for Mr. Melvin?

25  A.  You maintain contact, handle any paperwork related to the

201359rothh                Boss   -   Direct

1  informant, money, generally wiring up if you're doing

2  undercover-type deals, handling evidence.

3  Q.  And in connection with your handling of Mr. Melvin, during

4  the course of his cooperation, were subsistence payments made

5  to him from the Alcohol, Tobacco and Firearms Bureau?

6  A.  Yes.

7  Q.  Do you recall approximately how much money in subsistence

8  payments were made?

9  A.  Subsistence itself, somewhere around -- well, depends on

10  the time frame.

11  Q.  Okay.

12        MR. MARINACCIO:  May I have just a moment, your Honor?

13        THE COURT:  Sure.

14        (Pause)

15        MR. MARINACCIO:  Your Honor, I would like to show the

16  witness what I have premarked as Petitioner's Exhibit 11.  And

17  I have a copy for the Court.  I may have provided a marked-up

18  copy to somebody.  Or perhaps not.

19  A.  There's writing on the bottom of this one.  Is that your

20  handwriting?

21  Q.  No.

22        Is there any yellow markings on it?

23  A.  No.

24  Q.  If there's no yellow markings, then we're okay.

25  A.  No.

201359rothh                    Boss  —  Direct

1   Q.  Okay.

2        Do you recognize what has been marked as Petitioner's

3   Exhibit 11?

4   A.  Yes.

5   Q.  What do you recognize it to be?

6   A.  Want me to go page by page?

7   Q.  Just focusing on the first two pages.

8   A.  That is like a word document, like a summary sheet, for

9   subsistence paid to Charles Melvin.

10  Q.  And what period of time does it cover?

11  A.  Looks like early '02, March '02, through October '03.

12  Q.  Okay.  And do you recall whether or not this document was

13  provided to Mr. Roth's attorneys during the course of

14  discovery?

15  A.  I don't know if it was.

16        MR. ALLEE:  Objection.  Foundation.

17        THE COURT:  Overruled.

18  Q.  You don't recall?

19  A.  I know this was -- I saw this during the trial, but I don't

20  know who gave anything to who, no.

21        MR. MARINACCIO:  Your Honor, I offer it into evidence,

22  Petitioner's Exhibit 11.

23        MR. ALLEE:  No objection.

24        THE COURT:  The entire thing?

25        MR. MARINACCIO:  Yes, Judge, the entire thing.

201359rothh                    Boss   -   Direct

1        THE COURT:  Well, what I've heard is a description of

2   the first two pages, so I think I need more of a description of

3   the rest before I can receive it.

4        MR. MARINACCIO:  Very well, Judge.

5        THE COURT:  Let me inquire.

6        Mr. Boss, do you know what the marking at the bottom

7   right which starts with the numbers 3502, do you know what that

8   means?

9        THE WITNESS:  It's just the 3500 material.  I don't

10  know who put it there.

11       THE COURT:  And 3500 material would have been produced

12  by the government to defense counsel; is that right?

13       THE WITNESS:  That's usually the way it works, yes.

14       THE COURT:  Go ahead, Mr. Marinaccio.  You can ask

15  with regard to the pages beyond the first two.

16       MR. MARINACCIO:  Beyond the first two.  Thank you,

17  your Honor.

18  Q.  Page three, what do you recognize that page to be, if at

19  all?

20  A.  I've seen these pages before.  This is -- these forms are

21  done by the U.S. Attorney's Office.

22  Q.  Did you see this form, this particular form?

23  A.  I can't particularly say I saw this particular form.

24  Q.  Do you recognize that form?  Have you seen that form in the

25  past?  Not this particular one, but a form similar to it.

201359rothh                 Boss   -   Direct

1    A.   Yes.

2    Q.   What's the purpose of that form, if you know?

3    A.   It's for the victim witness coordinator of the courthouse,

4    or Southern District U.S. Attorney's Office, to provide money

5    to cooperating a witness victim.

6    Q.   And do you know if this particular form relates to Charles

7    Melvin?

8    A.   Reading it, yeah.  It says it does.

9    Q.   Okay.  Moving on to the next page, which is redacted, the

10   third page -- the next page after that, which is redacted, did

11   you ever see those pages in connection with the third page of

12   the document before?

13   A.   Yes.

14   Q.   Is it part of the third page which has the markings 3502-U,

15   those two redacted pages?

16   A.   I don't know if they're part of the same form, but it's --

17   it's part of the process, yeah.

18   Q.   How about the part of the document that's marked as 3502-V?

19   A.   This is the one I'm talking about that I saw before, yeah,

20   V.

21   Q.   You saw that one before as well?

22   A.   Yes.

23   Q.   Okay.  And how about the next page after that that's marked

24   3502-W?

25   A.   Yes.

201359rothh                    Boss   —   Direct

1    Q.   You saw that before?

2    A.   Yes.

3    Q.   And 3502-X?

4    A.   Can't say that I remember this one.

5    Q.   And what about the final page?

6    A.   I have two more after that.

7    Q.   You have two more after that?

8    A.   I have a declination form that's not marked with any 3500,

9    and then I have another copy of 3502-U.

10   Q.   Is that a duplicate copy of the --

11   A.   The first page?  Probably.  Yeah.  I have two 3502-Us.

12             MR. MARINACCIO:  Your Honor, I'll offer just the first

13   two pages of this document into evidence.

14             THE COURT:  Okay.  Just the first two pages.  3502-Z

15   is how the first page is marked, and then the second one

16   appears to be a continuation.  Is that right?

17             MR. MARINACCIO:  That's correct.

18             THE COURT:  All right.  So we're going to keep that as

19   Plaintiff's 11-A.  Sorry, not plaintiff, Petitioner.  So I'm

20   going to make that 11-A.  And there being no objection from the

21   government, 11-A is received.

22             (Petitioner's Exhibit 11-A received in evidence)

23             THE COURT:  I don't mean to interrupt, Mr. Marinaccio,

24   but, Mr. Boss, just for my edification, the two documents that

25   are marked 3502-V and W, is that your signature on the bottom

201359rothh                    Boss   -   Direct

1    right on those two documents?

2                THE WITNESS:  V, yes.  W, yes.

3                THE COURT:  Okay.  Thanks.

4                Go ahead, Mr. Marinaccio.

5                MR. ALLEE:  Your Honor, I'm sorry to interrupt, but I

6    just want to maybe, for the record, clarify.

7                These are documents submitted also with the

8    government's brief as Exhibit F, and so, while they're not

9    properly offered through Agent Boss, we have no objection to

10   authenticity or to the Court's consideration of them.

11               THE COURT:  The remainder of 11?

12               MR. ALLEE:  Yes, your Honor.  I would have voir dire.

13   This is not the right witness.  But my point is --

14               THE COURT:  If you're conceding that they're

15   admissible, we'll just receive them.  That's fine.

16               MR. ALLEE:  We're happy for the Court to consider

17   them.  We're not disputing their authenticity.  There are

18   problems with asking Agent Boss about them.

19               THE COURT:  All right.  Well, let's consider the rest

20   of the documents as Petitioner's 11-B.  So 11-A Mr. Boss has

21   been able to identify.  11-B I will receive, but it may be that

22   inquiry will have to be through someone else, though he did

23   identify that it's his signature on 3502-V and 3502-W.

24               Go ahead, Mr. Marinaccio.

25               MR. MARINACCIO:  Thank you, your Honor.

201359rothh                    Boss   –   Direct

1           (Petitioner's Exhibit 11-B received in evidence)

2     Q.  Now, Agent Boss, I'm sorry, the payments that are reflected

3     on Petitioner's 11-A, the last payment appears to have been

4     made on December 1st, 2003; is that correct?

5     A.  I have October 1st.

6     Q.  October 1st.  I am sorry.  You're correct.  October 1st,

7     2003.

8     A.  Yes.

9     Q.  Do you recall now whether that was before or after the

10    trial of Mr. Donald Roth commenced?

11    A.  I believe that was before.

12    Q.  Now, other than the payments -- withdrawn.

13           Did you have any role to play in determining whether

14    or not these payments that were made to Mr. Melvin, these

15    subsistence payments that are reflected here that were made to

16    Mr. Melvin, actually went for subsistence payments or were used

17    for some other purpose by Mr. Melvin?

18    A.  Like do I know exactly what he did with it?

19    Q.  Correct.

20    A.  Some of it, I know he paid his rent with, cell phone bill.

21    Q.  Did you request any documentation from him to confirm that

22    he was actually using these payments to pay for phone bills and

23    rent and things of that nature?

24           MR. ALLEE:  Objection.  Relevance.

25           THE COURT:  I'm going to allow it, but we're not going

201359rothh            Boss   -   Direct

 1   to go very deeply into this, Mr. Marinaccio.

 2              MR. MARINACCIO:  I'm not going to go very deeply into

 3   it.

 4              THE COURT:  You may answer the question, Mr. Boss.

 5   A.   No.

 6   Q.   And how did these payments come about?  Did he just request

 7   them and then you paid them or did you volunteer to give them?

 8   How did he come about getting these payments?  Do you know?

 9   A.   Both.  It could have been needing money for rent, a phone

10   bill was due, electrical.  Could have requested.  Could have

11   paid for the -- gave him the money to put more minutes on his

12   boost phone, something like that.

13   Q.   And are you the person that he would ask for these payments

14   from time to time?

15   A.   Yes.

16   Q.   And other than the documentation that is contained in

17   Petitioner's Exhibit 11-A and Petitioner's Exhibit 11-B, are

18   you aware of any other documentation that was generated in

19   connection with these payments?

20   A.   Yeah.  All of these payments, they would have requests of

21   the funds, return of the funds.  We have the paperwork related

22   to the other stuff.  But it's a request receipt and return,

23   basically.  It's government forms.

24              THE COURT:  When you say these payments, are you

25   referring to the ones that are identified on the list in

201359rothh                    Boss   —   Direct

```
 1    Petitioner's 11-A?
 2                THE WITNESS:  Yes.
 3                THE COURT:  Okay.
 4    Q.   Now, other than the payments that are reflected on
 5    Petitioner's 11-A, was Mr. Melvin provided with any other
 6    monies that you're aware of?
 7    A.   11-A?
 8    Q.   Other than 11-A.
 9    A.   Yes.
10    Q.   Okay.  Was he also presented at some point with a $5,000
11    payment?
12    A.   Yes.
13                MR. MARINACCIO:  Your Honor, I would like to show the
14    witness what I have marked as Petitioner's Exhibit 1.  And I
15    have a copy for the Court as well.
16    Q.   Agent Boss, have you had the opportunity to take a look at
17    what has been marked as Petitioner's Exhibit 1?
18    A.   Yes.
19    Q.   Do you recognize that document?
20    A.   Yes.
21    Q.   What do you recognize that document to be?
22    A.   Would you like me to go page by page?  They're separate
23    forms.
24    Q.   Okay.  How about the first page?
25    A.   First page is Treasury Department application for public
```

201359rothh                    Boss   -   Direct

1   voucher for reward.

2   Q.  What about the second page?

3   A.  That, again, is under the Department of the Treasury.  It's

4   a request for the advance of funds.  So that's requesting

5   money.

6   Q.  I want to make sure that we're looking at the same second

7   page.

8   A.  The top says request for advance of funds.

9   Q.  Your second page is not justification for payment?

10  A.  Oh, sorry.  Second page.  Sorry, yes.  Justification for

11  payment continued.

12  Q.  So is the second page part of the first page?

13  A.  Yes.  Same form.

14  Q.  All right.  Now moving on to the third page of the

15  document.

16  A.  That's the request for advance of funds.

17  Q.  Okay.  And the fourth page?

18  A.  This is the report of expenditure for the funds requested.

19  Q.  And is the fourth page part of the third page or are they

20  separate?

21  A.  Separate.

22  Q.  And how about the fourth page?  The last page, rather?  I'm

23  sorry.

24  A.  It's a receipt, payment receipt for investigative expense,

25  information and/or Treasury check.

201359rothh                    Boss   -   Direct

1   Q.  Now, have you seen these documents before?

2   A.  Yes.

3   Q.  And are these the documents that reflect a payment of

4   $5,000 to Mr. Melvin?

5   A.  Yes.

6       MR. MARINACCIO:  Your Honor, I offer the entirety of

7   what I've marked as Petitioner's Exhibit 1 into evidence.

8       MR. ALLEE:  No objection.

9       THE COURT:  Petitioner's 1 is received.  It's a

10  five-page document.

11      (Petitioner's Exhibit 1 received in evidence)

12  Q.  Now, Agent Boss, did you have a role to play in preparing

13  the documents that are part of Petitioner's Exhibit 1?

14  A.  Yes.

15  Q.  And taking a look at the first section at the top of the

16  first page, where it begins, "I, Charles Melvin," and you see

17  there's a date a couple of lines down, 26th day of January,

18  2004?

19  A.  Yes.

20  Q.  Okay.  Did you type that date in or have that date typed

21  in?

22  A.  No.

23  Q.  Okay.  Do you know what significance that date has?

24      MR. ALLEE:  Objection.

25      THE COURT:  Overruled.

201359rothh                  Boss  –  Direct

1   A.  No.

2   Q.  Was the trial of Mr. Roth still ongoing on January 26th,

3   2004, if you recollect?

4            MR. ALLEE:  Objection.  Relevance.

5            THE COURT:  Overruled.

6   A.  It was.

7   Q.  And then below that paragraph, there is a typed-in name,

8   Charles Melvin, a signature, and then a date, 2-1-04.

9   A.  Yes.

10  Q.  Is that Charles Melvin's signature?

11  A.  Yes.

12  Q.  And were you present when Charles Melvin signed that

13  document on 2-1-04?

14  A.  I -- I don't think so.  I don't remember.

15  Q.  Now, did you have discussions with Mr. Melvin regarding

16  this $5,000 payment?

17  A.  Yes.

18  Q.  Did he request the $5,000 payment?

19  A.  The specific amount?

20  Q.  Yes.

21  A.  I don't believe he requested a specific amount.

22  Q.  Do you recall what the circumstances were surrounding the

23  generation of this particular paperwork?

24            Do you understand my question?

25  A.  No, not really.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

201359rothh                        Boss    —    Direct

1   Q.  How did it come about that you were preparing these

2   documents or that these documents were being prepared?

3   A.  The background?

4   Q.  Yes.

5   A.  I had talked to him on the phone.  It was sometime early in

6   the year.  And we were talking about how he was either not

7   allowed to live at his mother's anymore in Virginia or he got

8   kicked out or something to that effect, and he was down on his

9   luck, and he was asking for money.

10  Q.  When you say sometime early in the year, are you talking

11  about early in 2004?

12  A.  Yes.

13  Q.  While the trial of Mr. Roth was still ongoing?

14  A.  Yes.

15          MR. ALLEE:  Objection.  I just object to questions

16  about whether the trial was ongoing.  I don't have to do it

17  every time, your Honor, but --

18          THE COURT:  You can have a continuing objection.  I'm

19  overruling it.

20          MR. ALLEE:  Thank you, your Honor.

21  Q.  Other than Petitioner's Exhibit 1, do you have any other --

22  withdrawn.

23          Other than Petitioner's Exhibit 1, have you seen any

24  other document relating to the payment of $5,000 to Mr. Melvin?

25  A.  The whole thing?  No.

201359rothh                    Boss  -   Direct

1   Q.  When Mr. Melvin called you sometime early in 2004, did you

2   prepare any notes or documentation concerning that

3   conversation?

4   A.  No.

5   Q.  No investigative reports?  No handwritten notes?  Nothing?

6   A.  No.

7   Q.  What was the next step that you took after Mr. Melvin

8   called you to tell you he was down on his luck and he needed

9   some money?

10  A.  I got with my boss at the time -- he was an acting boss,

11  John McKenna -- and asked him what we could do.

12  Q.  And what did Agent McKenna tell you?

13  A.  He told me part of what I already knew is we could not give

14  him any more money if he wasn't working for us

15  subsistence-wise.  We couldn't just give him money for --

16  because he needed it.  He was done cooperating.  But an option

17  was we could give him a reward for all the prior work that he

18  had done.

19  Q.  Now --

20          THE COURT:  I'm sorry, Mr. Marinaccio, I do think I

21  need to interrupt you just briefly.

22          With regard to Petitioner's Exhibit 1, in accordance

23  with my previous instructions to the government, they have

24  produced to me the unredacted version of all five pages from

25  Petitioner's Exhibit 1, and I'm satisfied that there's nothing

201359rothh                    Boss   -   Direct

1    in the redactions which would impact on Mr. Roth's ability to

2    pursue this question and that there's no need for you to have

3    the unredacted version.

4              MR. MARINACCIO:  Fine, Judge.

5              And just to complete the record, I was provided with

6    this copy that I've marked as Petitioner's 1 from the

7    government following the Court's determination regarding the

8    redaction.

9    Q.  Now, in the body of the document -- going down in the body

10   of the document, first page, after Charles Melvin's signature,

11   there's an explanation regarding why this particular payment is

12   justified; is that correct?

13   A.  Yes.

14   Q.  And there's no mention in that particular paragraph there

15   concerning Mr. Melvin's need for any monies to pay for living

16   expenses or things of that nature, correct?

17   A.  No, correct.

18   Q.  And I see that you took a look both at the first and the

19   second page; is that correct?

20   A.  Yes.

21   Q.  So there's absolutely no record in this particular

22   document, those first two pages, of any request by Mr. Melvin

23   for help with living expenses?

24   A.  Correct.

25   Q.  The only thing that's mentioned there is the work that he

201359rothh                    Boss  -   Direct

1    did in connection as a confidential informant in connection

2    with the prosecution or the investigation and prosecution of

3    various individuals, correct?

4    A.   Yes.

5    Q.   And on the first page, it indicates that there are 11

6    defendants that he helped with, correct?

7    A.   Correct.

8    Q.   Now, did those 11 include Mr. Roth and Mr. St. John?

9    A.   I believe this paragraph is referring to the defendants

10   prior to the initiation of the investigation with Mr. Roth and

11   St. John.

12   Q.   And the second page, the explanation there, that deals with

13   Mr. St. John and Mr. Roth, correct?

14   A.   Yes.

15   Q.   And then if you look in that last paragraph, it now talks

16   about 13 defendants to date, correct?

17   A.   Correct.

18   Q.   And it talks about, in the last line, the investigation of

19   and conviction of the defendants were a direct result of his

20   efforts, meaning Mr. Melvin's efforts, correct?

21   A.   Correct.

22   Q.   Mr. Roth and Mr. St. John had not yet been convicted,

23   correct?

24   A.   Right.

25   Q.   Would the fact that now you're talking about 13 defendants

201359rothh                    Boss   -   Direct

1    in that last paragraph as opposed to the 11 that you talked

2    about on the first page, would those additional two then

3    include Mr. Roth and Mr. St. John?

4    A.   I don't believe so.

5    Q.   You don't believe so?

6            Do you know who the two additional defendants may have

7    been?

8    A.   There was plenty of defendants he had helped arrest.  We

9    didn't prosecute everybody on the federal end.  Could have been

10   two state defendants.  Could be a typo.

11   Q.   But you don't know as you sit here right now?

12   A.   No.

13   Q.   And that last paragraph talks about assistance to the ATF

14   and the United States Attorney's Office, correct?

15   A.   Yes.

16   Q.   And that he provided testimony in Federal Court as needed,

17   correct?

18   A.   Yes.

19   Q.   Doesn't mention anything about state court?

20   A.   It does not, no.

21   Q.   Okay.  And the final line there is it's recommended that

22   there be a reward to Mr. Melvin, correct?

23   A.   Yes.

24   Q.   Now, who prepared this write-up, this summary that's in the

25   first two pages of the document?

201359rothh                    Boss   -   Direct

1    A.  I did -- I'm not sure how I did, but I did the write-up and

2    provided the substance of the paragraphs, but my acting

3    supervisor prepared the form.  I was on trial.

4    Q.  You were in court every day on the Roth and St. John

5    matter, correct?

6    A.  Yeah.  I don't believe we had laptops at that point,

7    either, so it wasn't --

8    Q.  It wasn't that long ago.

9    A.  I worked for the government.

10           THE COURT:  He works for the government.

11   A.  No laptops nine years ago.

12           THE COURT:  Unlikely.

13   Q.  Well, I didn't have a laptop, either, then.

14           Anyway, my point is do you know when it was that you

15   prepared the write-up that ultimately was transferred onto this

16   form?

17   A.  Not specifically, no.

18   Q.  Now, on going back to the first page, on the bottom,

19   there's a place for a signature on that first line.  Is that

20   your signature?

21   A.  No.

22   Q.  Whose signature is that?

23   A.  I can't tell whose signature that is.  Somebody signed it

24   for me.

25   Q.  Did they sign it for you with your permission?

201359rothh                    Boss   -   Direct

1   A.   Yes.

2   Q.   Do you know who it was that may have signed it for you?

3   A.   I can't make it out, no.

4   Q.   And that was done, as far as you know, on February 9th,

5   2004?

6   A.   That's what it says, yes.

7   Q.   And you weren't able to sign that because you were in court

8   on trial?

9   A.   The trial ended around this time, but I wasn't around to

10  sign it, right.

11  Q.   Now, who came up with the amount of $5,000?

12  A.   That -- I believe it was between myself and my boss, John

13  McKenna, like how much could we reasonably give him as a reward

14  considering the work that was done.

15  Q.   So it had nothing to do with what Mr. Melvin said he needed

16  to help him out with his living expenses?

17  A.   That was a consideration, yeah.

18  Q.   Did he show you any bills or any backup for why he may have

19  needed this money?

20  A.   I don't remember if he did or didn't.

21  Q.   And you wrote this up as a reward?

22  A.   Yes.

23  Q.   But your testimony is that Mr. Melvin had requested some

24  assistance for living expenses?

25  A.   Yes.

201359rothh                    Boss   -    Direct

1    Q.  And this was a way for you to get around the fact that you

2    would not be able to give him any money because he was no

3    longer actively participating, correct?

4              MR. ALLEE:  Objection.

5              THE COURT:  Sustained.  Rephrase it.

6    Q.  Well, let's go to the third page.

7              Did you fill out those boxes that are on the third

8    page of the where it says informant subsistence and then other

9    with the parentheses explain?  Did you check off those boxes?

10   A.  I'm not sure if I did the top.  I can't say for sure if I

11   actually filled out the top part.  I probably did, but I'm not

12   sure.

13   Q.  Now, there's a section, then, underneath that that calls

14   for an explanation and justification, and, there, there is an

15   explanation.  And it makes no mention, does it, of any request

16   by Mr. Melvin for subsistence assistance, correct?

17   A.  Correct.

18   Q.  The explanation deals solely with a reward?

19   A.  Yes.

20   Q.  And then there's a place on the bottom there for signature

21   under the date February 20th, 2004.  Is that your signature

22   next to your name, Andrew M. Boss?

23   A.  Yes.

24   Q.  That is your signature?

25   A.  Yes.

201359rothh                  Boss   -   Direct

1    Q.  And there is a figure to the right of total funds expended

2    in this case to date, $2,582.72.  What was that figure?  What

3    did that represent?

4    A.  That was money expended on this case to date, to that date.

5    Q.  Was that monies that were expended for Mr. Melvin or monies

6    that were expended for routine investigative expenses?

7    A.  Probably both.

8    Q.  Is part of that $2,582.72 reflected in what was marked as

9    Petitioner's Exhibit 11-A?

10   A.  Yeah.  Should be.  If any of this was subsistence.  If this

11   was the subsistence, yeah, it would be reflected here.

12   Q.  You we can't tell just from looking at this document?

13   A.  No, I cannot.

14   Q.  So that additional money could have been an additional

15   reward that was paid, correct --

16            MR. ALLEE:  Objection.

17   Q.  -- to Mr. Melvin?

18            THE COURT:  Sustained.

19            Let me ask you, Mr. Boss, to look back at Petitioner's

20   2-A.  On the second page of 2-A -- sorry, 11-A, I'm sorry,

21   11-A, on the second page of 11-A, under the date 10-24-02, it

22   says $3,000, relocation expense, correct?

23   A.  Correct.

24            THE COURT:  And so, quite clearly, the amount of money

25   identified on the list that makes up Plaintiff's 11-A is not

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

201359rothh                    Boss   -   Direct

1   reflected in the $2,582.72 on the third page of Petitioner's 1;
2   is that right?
3              THE WITNESS:  Um.
4              THE COURT:  Couldn't be.
5              THE WITNESS:  Well, right, couldn't be, but say -- I'm
6   just saying, just for clarification, say in 10-1-03, if he --
7   he may have been paid subsistence out of like a different case.
8   But it probably isn't.  Because now I remember correctly we
9   didn't open this case until after this takedown.  We had a big
10  sweep in Newburgh, and that happened in end of October of '0 --
11  it might have been '02.
12             THE COURT:  So the subsistence payments that are
13  identified on Petitioner's 11-A would not necessarily have come
14  under this case number.  It could have come under any of the
15  other case numbers that, for example, are on the first page of
16  Petitioner's 1, but which I've allowed to have redacted --
17             THE WITNESS:  Yes.
18             THE COURT:  -- with regard to other defendants that
19  Mr. Melvin participated in the investigation and prosecution
20  of.
21             THE WITNESS:  Yes.  There was approximately like five
22  separate investigation numbers we used over -- when we were
23  using Mr. Melvin.
24             THE COURT:  So if, in fact, we had the various
25  additional documents that you referenced earlier relating to

201359rothh                    Boss   -   Direct

1    the subsistence payments on Petitioner's 11-A, each of those

2    payments would reflect separately which case number that

3    subsistence was related to.

4              THE WITNESS:  Correct.

5              THE COURT:  Am I getting it?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.

8              I'm sorry, Mr. Marinaccio.  Go ahead.

9    Q.  Do you know when the $5,000 payment was actually made to

10   Mr. Melvin?

11   A.  Yes.

12   Q.  When was that?

13   A.  February 21st, 2004.

14             MR. ALLEE:  Your Honor, if the record could just

15   reflect the witness appears to have refreshed his recollection

16   with a document before he made the answer to the question.

17   Q.  Which page of the document did you look at to get that

18   date, sir?

19   A.  Last page.  It's on the bottom of --

20   Q.  Date received, February 21st, 2004?

21   A.  Yeah.  It's also reflected on the bottom of the request to

22   advance funds.  When I return, if there's any money to return,

23   it has the date on it.  It's basically the date that's used.

24   Q.  Now, you were part of this prosecution team, were you not,

25   the prosecution team that was prosecuting Mr. Roth and Mr. St.

201359rothh                    Boss   —   Direct

1   John?  Correct?

2   A.  Yes.

3   Q.  And you were in court with the U.S. Attorneys every day,

4   correct?

5   A.  Yes.

6   Q.  And you indicated that, when you received the request from

7   Mr. Melvin, was he residing in the New York area or was he down

8   in Virginia at the time?

9   A.  He was residing in Virginia.

10   Q.  Okay.  And according to Petitioner's Exhibit 11-A, the

11   second page, the amount that the Judge pointed out dated

12   10-24-02, relocation expense of $3,000, was that to assist him

13   to relocate down to Virginia?

14   A.  Possibly some of it.  He was initially relocated out of the

15   City of Newburgh briefly, right before the takedown.

16   Q.  Now, getting back to the payment of the $5,000, you

17   indicated that you had spoken to Agent McKenna about how you

18   can go about doing this, and you came up with the reward

19   scenario, correct?

20   A.  Yes.

21   Q.  And you were in court just about every day the court's in

22   session on the Roth and St. John matter.  Did you ever discuss

23   this additional payment with either Mr. Colton or Ms. Seibel?

24   A.  I may have.  I don't know.

25   Q.  And do you have any recollection of when you might have

201359rothh                    Boss   -   Direct

 1    discussed it with -- well, let's break it down.

 2              Do you recall ever discussing it with Mr. Colton?

 3    A.   I don't recall.

 4    Q.   How about with Ms. Seibel?

 5    A.   No.

 6    Q.   But you may have?

 7    A.   Yes.

 8    Q.   And if you had discussed it with one of them, is there one

 9    in particular that you would have discussed it with or doesn't

10    matter?

11              MR. ALLEE:   Objection.

12              THE COURT:   Overruled.

13    A.   No.

14    Q.   Do you have any idea where that discussion might have taken

15    place?

16              MR. ALLEE:   Objection.

17              THE COURT:   Sustained.

18    Q.   Do you have any recollection of whether or not the trial

19    was still going on?

20              MR. ALLEE:   Objection.

21              THE COURT:   Sustained.

22    Q.   Is it your testimony, Agent Boss, that, to the extent the

23    Petitioner's Exhibit number 1 reflects the payment of a reward

24    as opposed to a request or the fulfillment of a request for

25    subsistence, that that report is inaccurate?

201359rothh                    Boss   —   Direct

1          MR. ALLEE:  Objection.

2          THE COURT:  I'm not sure I understand the question,

3    Mr. Marinaccio.  Perhaps you can rephrase it.

4          MR. MARINACCIO:  I'm sorry to be repetitious, Judge.

5    It's the only way I can rephrase it.

6    Q.  You've indicated that the request came sometime early in

7    the year, to the best of your recollection, from Mr. Melvin

8    that he needed some help.

9    A.  Yes.

10   Q.  He was falling on some hard times.

11         You discussed it with Agent McKenna.  And the only way

12   you came up with that you can get him that help was to prepare

13   a document for a reward, correct?

14   A.  Yes.

15   Q.  And the document itself, with the exception of the one box

16   that's checked off as subsistence, the descriptions all reflect

17   a reward, correct?

18   A.  Yes.

19   Q.  Is it your testimony that, to the extent the document

20   reflects the reward and not subsistence, that that document,

21   Petitioner's Exhibit 1, is inaccurate?

22         MR. ALLEE:  Objection.

23         THE COURT:  Well, Mr. Boss, looking at the very last

24   page of Petitioner's Exhibit 1, am I correct that, on that

25   page, as well as on the third page, there's a box checked that

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

201359rothh                    Boss   -   Direct

1    says subsistence?

2              THE WITNESS:  Correct.

3              THE COURT:  All right.

4              Perhaps you can rephrase it, Mr. Marinaccio.

5    Q.  Well, other than the two boxes that reflect subsistence,

6    the descriptions themselves reflect only a reward, correct?

7    A.  Yes.

8    Q.  To the extent that the descriptions reflect only a reward,

9    Petitioner's Exhibit 1 is inaccurate, correct?

10             MR. ALLEE:  I object to this.  This mischaracterizes

11   the document in evidence.

12             THE COURT:  I'll allow this question, and then we're

13   moving on.

14             You may answer the question, if you can.

15   A.  But you got to ask it again.  I don't --

16   Q.  To the extent the descriptions that are contained in

17   Petitioner's Exhibit 1, the descriptions, reflect only the

18   payment of a reward and make no mention of subsistence

19   payments, that document is inaccurate, correct?

20             MR. ALLEE:  I renew that objection.

21             THE COURT:  Overruled.

22   A.  The narrative in this request for the reward is correct.

23   Q.  But the initial request was for subsistence payments,

24   correct?  That's what Mr. Melvin wanted?

25   A.  The understanding is, yes, yes.

201359rothh                    Boss  -  Direct

1   Q.  And there's nothing in the description that indicates that,

2   in fact, there was a subsistence -- this payment was for

3   subsistence?

4   A.  Correct.

5   Q.  There's no mention of rent, relocation, hard times, none of

6   that, correct?

7            MR. ALLEE:  Objection.

8            THE COURT:  The document speaks for itself,

9   Mr. Marinaccio.  I can read it.

10            MR. MARINACCIO:  Thank you, your Honor.  You are

11   correct.  It does speak for itself.

12   Q.  Now, Agent Boss, by the time Mr. Melvin was testifying at

13   the trial of Mr. Roth and Mr. St. John, he had already executed

14   a cooperation agreement, correct?

15   A.  Yes.

16            MR. MARINACCIO:  I am going to show the witness, with

17   your permission, what I've marked as Petitioner's Exhibit 2.  I

18   have a copy for the Court as well.

19            THE COURT:  Thank you.

20   Q.  Do you recognize what has been marked, premarked, as

21   Petitioner's Exhibit 2?

22   A.  No.

23   Q.  You don't recognize Petitioner's Exhibit 2 as being the

24   cooperation agreement?

25   A.  I don't know if I've ever seen it.

201359rothh                    Boss   —   Direct

1    Q.  Were you aware of whether or not, when he testified in the

2    trial of Mr. Roth and Mr. St. John, that he had a cooperation

3    agreement in place?

4    A.  Yes, he did.

5    Q.  But you don't recognize that document as being the

6    cooperation agreement?

7    A.  It could be, but I've never seen it before.

8    Q.  Well, take a look at the last page of the document.  Do you

9    recognize the signature of Mr. Melvin?

10   A.  Yes.

11   Q.  Do you recognize the signature of Mr. Colton?

12   A.  Not -- no.

13           MR. ALLEE:  Objection, your Honor.

14           THE COURT:  Overruled.

15           No?

16   Q.  You don't recognize it?

17   A.  No.

18   Q.  Well, let me ask you this, then.  Other than the

19   cooperation agreement that Mr. Melvin signed with the

20   government, were you aware of any other agreements that

21   Mr. Melvin had signed that reflected benefits that he was to

22   receive in connection with his cooperation?

23   A.  No.

24   Q.  And do you recall testifying at the trial of Mr. Roth and

25   Mr. St. John concerning the cooperation agreement that

201359rothh                    Boss   —   Direct

1    Mr. Melvin had with the government?

2              MR. ALLEE:  Objection.  Relevance.

3              THE COURT:  Overruled.

4    A.  You asked me if I remember testifying about his

5    cooperation?

6    Q.  Cooperation agreement.

7    A.  I don't remember.

8              MR. MARINACCIO:  Your Honor, I'm going to show Agent

9    Boss what I've premarked as Petitioner's Exhibit 3.

10   Q.  Now, directing your attention in particular in Plaintiff's

11   Exhibit 3 to page 290, line 20 to page 291, line 21.  I would

12   ask you to read that to yourself.

13   A.  I'm sorry.  What was the end?

14   Q.  From 290, line 20 to 291, line 21.

15   A.  Okay.

16   Q.  It's on several pages the way the computer broke it up.

17             (Pause)

18   A.  Okay.

19   Q.  Does that refresh your recollection that, during your

20   direct testimony at the trial, you were asked questions

21   regarding Mr. Melvin's cooperation agreement with the

22   government?

23             MR. ALLEE:  Objection.  Well, your Honor --

24             THE COURT:  The question is does it refresh his

25   recollection.

201359rothh                    Boss   -   Direct

1          MR. ALLEE:  Your Honor, I will withdraw that

2    objection.

3          THE COURT:  All right.

4          Go ahead.  Answer the question.

5    A.  Does it refresh my recollection?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Now, you were asked questions about whether or not

9    Mr. Melvin, pursuant to his cooperation, had to make any

10   recordings in connection with the St. John/Roth matter,

11   correct?

12   A.  Whether he had to?  Yes.

13   Q.  Whether he had to.

14          You recall that?

15   A.  Whether he had to make recordings?

16   Q.  Right.  Pursuant to his cooperation agreement.

17   A.  Just ask me the question again.

18   Q.  Do you recall being asked questions at the trial about

19   whether or not Mr. Melvin had to participate in making phone

20   calls in connection with the Roth/St. John investigation in

21   November of 2002 in order to satisfy his obligations with the

22   government?

23   A.  I don't specifically remember the part about making

24   recorded calls.

25   Q.  Well, do you recall testifying that you had advised

201359rothh                    Boss   -   Direct

1    Mr. Melvin --

2              THE COURT:  Don't try to summarize the testimony.

3    Either read the specific question and answer or move on.

4    Q.  Do you recall being asked these questions and giving these

5    answers, beginning on page 290, line 20:

6    "Q.  Prior to the time that Charles Melvin began making

7    recordings of David St. John, Malcolm O'Brien and Yolanda

8    Delgado at your instruction, did you have a conversation with

9    him with respect to his obligation to do that?

10   "A.  Yes.

11   "Q.  Okay.  What did you tell him?

12   "A.  I told him it was up" -- this is at page 291 now, at the

13   top.

14   A.  Got it.

15   Q.  Okay.

16   "A.  I told him it was up to him if he wanted to continue this

17   investigation.

18   "Q.  Did you tell him what effect, if any, that might have on

19   his chances of getting the benefits of his cooperation

20   agreement?

21   "A.  Yes.

22   "Q.  What did you tell him?

23   "A.  I told him that he was cooperating, he was doing

24   everything he was supposed to do, and, by not doing this

25   investigation, which was up to him, it would not effect the

201359rothh                    Boss   -   Direct

1   outcome of his cooperation.

2   "Q.  Did you promise him that he would already get the 5K

3   letter?

4   "A.  No.

5   "Q.  Did you explain to him what his obligations were in order

6   to earn that?

7   "A.  Yes.

8   "Q.  What was some of the obligations you explained that he

9   had?

10  "A.  Stay out of trouble, do not get arrested, continue to tell

11  the truth and provide information."

12          Do you recall being asked those questions and giving

13  those answers?

14  A.  Not specifically.

15  Q.  Well, then, let me ask you this.  In November of 2002, when

16  Mr. Melvin was making these recorded conversations, he didn't

17  have a cooperation agreement, did he?

18          MR. ALLEE:  Judge, again, I object to the relevance to

19  that question and to this line of questions.

20          THE COURT:  I'll allow brief inquiry in this

21  direction.

22          To the best of your knowledge, Mr. Boss, was there any

23  other cooperation agreement involving Mr. Melvin other than

24  Petitioner's Exhibit 2?

25          MR. MARINACCIO:  Well, Judge, he doesn't recognize 2.

201359rothh                    Boss   -   Direct

1      THE COURT:  I know he doesn't recognize it.  I'm

2  asking if he's aware of any other cooperation agreement.  He

3  did say he was aware that there was a cooperation agreement.

4  He couldn't identify that one.  My question is if he's aware

5  whether there were any other cooperation agreements.

6      THE WITNESS:  No.

7      THE COURT:  Go ahead.  Put your next question.

8  Q.  Are you aware if there was any kind of agreement whatsoever

9  that reflected what benefits Mr. Melvin might expect to receive

10  in connection with his cooperation with the ATF, ATF and E?

11  A.  I was aware he was eventually signed up with a cooperation

12  agreement, but I don't know what the timing was, though.

13      MR. MARINACCIO:  Your Honor, I would offer

14  Petitioner's 3 into evidence.  I know it's a part of the Court

15  record, the trial record, but I would offer that particular

16  section into evidence.

17      MR. ALLEE:  Judge, I don't object.  I'm sure they're

18  authentic because they're being offered.  And any trial

19  transcripts Mr. Roth seeks to admit for your Honor to consider,

20  I don't object on any sort of authenticity grounds.

21      THE COURT:  Okay.  Petitioner's 3 is received.

22      MR. ALLEE:  Or foundation grounds.  He can put them in

23  with or without this witness is what I'm saying.

24      THE COURT:  I understand.  Thank you.

25          (Petitioner's Exhibit 3 received in evidence)

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

201359rothh                    Boss  -   Direct

1   Q.  Agent Boss, by the way, in connection with the application

2   for a reward, Petitioner's Exhibit 1, did you have any

3   discussion -- other than with Agent McKenna, did you have

4   discussions with any other agent regarding that reward payment?

5   A.  Probably.

6   Q.  Do you recall ever having any discussion with -- I guess

7   he's, today, Lieutenant Campbell of the Newburgh Police

8   Department?

9   A.  Deputy chief.

10  Q.  Deputy chief.  I'm sorry.  I didn't mean to demote him.

11  Did you have any discussion with him?

12  A.  I don't remember, but, most likely, yeah.

13  Q.  Do you recall being asked questions on cross-examination

14  regarding -- cross-examination by Mr. Hochheiser, Mr. Roth's

15  attorney, regarding the possibility of Mr. Melvin getting a 5K1

16  letter?

17           MR. ALLEE:  Objection.

18           THE COURT:  Overruled.

19           MR. ALLEE:  Relevance.

20           THE WITNESS:  Answer?

21           THE COURT:  Yes.

22  A.  Again, I don't specifically remember, but it's highly

23  likely.

24           MR. MARINACCIO:  Your Honor, I would like to show the

25  witness what I've marked as Petitioner's Exhibit 4.

201359rothh              Boss   -   Direct

1   Q.  And in particular, Agent Boss, I would like to direct your

2   attention to page 558, line 24 to page 559, line 24.

3   A.  Okay.

4   Q.  Okay.

5   A.  Stop at -- sorry.  Stop at line 24 again on 559.

6   Q.  On 559.

7   A.  Okay.

8   Q.  And then let me direct your attention again also to page

9   560, lines 3 to 5.

10  A.  Okay.

11  Q.  And page 560, line 12 to page 563, line -- I'm sorry, page

12  560, line 12 on page 563, lines 10 to 13.

13  A.  Just the one line, 12, on 560?

14  Q.  I'm sorry.  Let me start that over again.

15          Page 560, line 12, and then go to 561, lines 6 to 11.

16  A.  6 through 11?  Okay.

17  Q.  And page 563, lines 10 to 13.

18  A.  Okay.

19  Q.  Does that refresh your recollection that, on

20  cross-examination by Mr. Hochheiser, you were asked questions

21  concerning the benefit of a 5K1 letter for Mr. Melvin and

22  whether or not you had discussed that with him?

23  A.  Still doesn't refresh my recollection.

24  Q.  Okay.  Turning now to page 558, line 24.  Do you recall

25  being asked these questions and giving this answer at the

201359rothh                    Boss   -   Direct

1    trial.

2    A.   One second.

3    Q.   It's on the unmarked page.  It's the continuation of page

4    558.  You got it?

5    A.   Yes.

6    Q.   Okay.

7    "Q.   Now, Mr. Melvin signed a cooperation agreement with the

8    government; is that right?

9    "A.   Yes, he did.

10   "Q.   Okay.  And that's a cooperation agreement that deals with,

11   among other things, the subject of this 5K1 letter that we have

12   been talking about?

13   "A.   Yes.

14   "Q.   Now, on November 21st, 2002, Mr. Melvin had not signed a

15   cooperation agreement; is that right?

16   "A.   I'm not sure.

17   "Q.   Well, he signed it on January 8th, 2003; did he not?

18   "A.   I'm not sure.

19   "Q.   You don't know whether Mr. Melvin signed a cooperation

20   agreement on or about November 21st, 2002, at the time of this

21   conversation with St. John?

22   "A.   No; I do not.

23   "Q.   Did you discuss with Mr. Melvin his cooperation on

24   November 21st, 2002?

25   "A.   Did I discuss his cooperation on that date?  I don't

201359rothh                    Boss   -   Direct

1   recall.

2   "Q.   Did you discuss his cooperation shortly before that date?

3   "A.   We did discuss it, yes.

4   "Q.   Did you discuss with him the question of benefits that he

5   might receive?

6   "A.   No."

7          Do you recall being asked those questions and giving

8   those answers?

9                MR. ALLEE:   Objection.   There's no inconsistency.

10               MR. MARINACCIO:   He says he doesn't recall.

11               THE COURT:   Overruled.

12   A.   No, I don't recall.

13   Q.   Okay.

14          Going now to page 560, lines 3 to 5, do you recall

15   being asked this question and giving this answer:

16   "Q.   And did you explain to him the procedures -- the concept

17   concerning the 5K1 letter?

18   "A.   No; I did not, no."

19          And then going down to line 8:

20   "Q.   Well, then, you testified on direct that when you said to

21   Mr. Melvin you don't have to, you know, do this for some reason

22   that you had already done a good deal, something like that,

23   right?   You had already done a lot?

24   "A.   He had done enough to earn a letter, yes."

25          Do you recall being asked those questions and giving

201359rothh                    Boss   —   Direct

1   those answers?

2          MR. ALLEE:  I object to this method of questioning.

3   The witness doesn't recall.  There's no inconsistency for which

4   he could read in prior testimony.

5          THE COURT:  All of the testimony is part of the record

6   before the Court.  Doesn't matter whether he reads it in or

7   not.  It's a part of the record before the Court and may be

8   considered and may be the subject of argument.  So I'm not

9   quite sure why we're using our time this way, but I'll overrule

10   the objection.

11          MR. MARINACCIO:  I'm just looking to highlight those

12   portions, your Honor, without having to search through a

13   6,000-page record.

14          MR. ALLEE:  Just to hone in on my objection, your

15   Honor, we can argue about the transcript all day, but Mr. Boss

16   is on the stand now, the Petitioner has called him, and there's

17   no basis to read to him prior testimony for a purpose other

18   than to show an inconsistency.

19          THE COURT:  I don't disagree with you.

20   Q.  Well, let me ask you this, then, Agent Boss.  Having read

21   the sections of the transcript that I've pointed out to you,

22   they do not refresh your recollection that you were asked at

23   the trial questions about Mr. Melvin's cooperation and his

24   eligibility for a 5K letter, correct?  Is that your testimony?

25   A.  Yes.  It doesn't refresh my recollection.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

201359rothh                    Boss   -   Direct

1    MR. MARINACCIO:  Your Honor, I offer Petitioner's 4,

2    the excerpts, into evidence.

3    MR. ALLEE:  Again, I have no objection to the Court's

4    receiving the transcript, copies of the transcript.

5    THE COURT:  Okay.  Petitioner's 4 is received.

6    (Petitioner's Exhibit 4 received in evidence)

7    Q.  Do you recall on redirect being asked by Mr. Colton,

8    following the cross-examination by Mr. Hochheiser, about any

9    discussions you may have had with Mr. Melvin concerning

10   Mr. Melvin's cooperation and his eligibility for a 5K letter?

11   MR. ALLEE:  Objection.

12   THE COURT:  Overruled.

13   A.  No.

14   MR. MARINACCIO:  Your Honor, I'm going to show the

15   witness what we've marked as Petitioner's Exhibit 5 for

16   identification.  We have a copy for the Court as well.

17   Q.  Agent Boss, I would like to direct your attention to page

18   742, lines 10 through 15 and lines -- well, let's stay with

19   that so we don't confuse.

20   A.  Okay.

21   Q.  Page 742, lines 10 through 15.  Does that refresh your

22   recollection that you were asked on redirect by Mr. Colton

23   concerning any discussions you may have had with Mr. Melvin

24   regarding his obligations?

25   A.  No.

201359rothh                    Boss  -   Direct

1   Q.  And now directing your attention to that same page, but the

2   continuation, line 23.  So that would be page 742, line 23 to

3   page 743, line 1.

4   A.  Okay.

5   Q.  Okay.  Does that refresh your recollection that you were

6   asked questions by Mr. Colton on redirect concerning

7   Mr. Melvin's obligations?

8   A.  No.

9         MR. MARINACCIO:  Your Honor, I offer Petitioner's 5

10  into evidence.

11        MR. ALLEE:  No objection.

12        THE COURT:  Petitioner's 5 is received.

13        (Petitioner's Exhibit 5 received in evidence)

14  Q.  Do you recall, Agent Boss, if you were asked any questions

15  on recross by Mr. Hochheiser concerning Mr. Melvin's

16  cooperation agreement and what his expectations might be and

17  what you may have discussed with him about that?

18        MR. ALLEE:  Again, I object to all of this on

19  relevance grounds.

20        THE COURT:  I understand the objection.  Overruled.

21  A.  No, sir.

22        MR. MARINACCIO:  Your Honor, I would like to show the

23  witness what has been marked as Petitioner's Exhibit 6 with a

24  copy for the Court.

25  Q.  I would like to draw your attention to page 770, line 21

201359rothh                    Boss  —  Direct

1    through page 772, line 18.

2    A.   Stop at 17, you said?

3    Q.   Page 772, line 18.

4    A.   Oh, 18.  Okay.

5    Q.   Does that refresh your recollection that, on recross by

6    Mr. Hochheiser, you were asked questions concerning the

7    cooperation agreement and any discussions you may have had with

8    Mr. Melvin regarding his expectations of any benefit?

9    A.   No.

10   Q.   Does it refresh your recollection that the government

11   stipulated that, in fact, Mr. Melvin signed the cooperation on

12   January 22nd, 2003?

13   A.   Does not.

14        MR. MARINACCIO:  Your Honor, I offer what I've marked

15   as Petitioner's Exhibit 6 into evidence.

16        MR. ALLEE:  No objection.

17        THE COURT:  Petitioner's 6 is received.

18        (Petitioner's Exhibit 6 received in evidence)

19   Q.   Agent Boss, do you recollect whether or not you advised the

20   jury during your testimony either on direct, cross-examination,

21   redirect, recross as to whether or not there was any other

22   agreement with Mr. Melvin regarding his cooperation and what

23   benefits he might expect to receive if he lived up to his end

24   of the bargain?

25   A.   No.

201359rothh              Boss   -   Direct

1   Q.   Do you recall discussing in your testimony at the trial any

2   other benefit that Mr. Melvin might expect to receive other

3   than a 5K1 letter from the government?

4   A.   No.

5   Q.   Did you discuss with the jury any other benefit, for

6   example, in the form of cash payments, whether they be for

7   reward or subsistence or anything of that nature?

8   A.   I don't remember.

9   Q.   And you don't remember discussing even the 5K1 letter

10  benefit that he might receive?

11  A.   No.

12  Q.   Now, Mr. Melvin himself testified in this trial, correct,

13  at the trial of Mr. St. John and Mr. Roth?

14  A.   He did.

15  Q.   And were you present in the courtroom during his testimony?

16  A.   Most of it, I believe, yes.

17  Q.   And he was called as a witness by the government, correct?

18  A.   Yes.

19  Q.   And do you recollect as you sit here now that, as part of

20  his cooperation agreement, he was expected to make himself

21  available to testify when required by the government?

22  A.   That's part of the cooperation agreements, yes.

23  Q.   And do you recall as you sit here now that, when Mr. Melvin

24  took the witness stand in the Roth and St. John matters, he was

25  testifying pursuant to his obligations under a cooperation

201359rothh                    Boss    -    Direct

1   agreement?

2   A.   That's my understanding, yeah.

3   Q.   Were you present during any prep sessions that Mr. Melvin

4   may have engaged in with the government prior to his actual

5   testimony?

6   A.   Yes.

7   Q.   During any of those prep sessions, was the issue of a 5K1

8   letter under the guidelines discussed with Mr. Melvin?

9            MR. ALLEE:   Objection.   Relevance.

10           THE COURT:   Overruled.

11           You may answer the question.

12  A.   Yeah.   I'm sure it was several times.

13  Q.   And as you sit here now, can you tell us essentially what

14  was the discussion with Mr. Melvin regarding the 5K letter

15  during these prep sessions?

16  A.   During the prep for the trial?

17  Q.   Yes.

18  A.   They generally -- I don't remember specifically if they

19  actually showed it to him and said this is what you're going to

20  be asked about, the actual 5K letter, cooperation agreement,

21  or -- no, the 5K.   I don't know if they discussed how it's

22  going to work or -- I don't know the specifics.   They

23  definitely discussed it, though.   It's preparation for trial,

24  yes.

25  Q.   And your recollection of what they discussed was the

201359rothh                     Boss   -   Direct

1   cooperation agreement and a 5K letter, correct?

2   A.   Topics, yeah, that would come up during cross or direct,

3   sure.

4   Q.   Was there any discussion regarding any payments that may

5   have been made to Mr. Melvin and what questions he might expect

6   in that regard?

7   A.   No.

8   Q.   Anything about the subsistence payments that are reflected

9   on the Petitioner's Exhibit 11?   11-A, rather?

10  A.   They may have brought that up with him.   I'm not sure.

11  Q.   Was there any discussion whether he can expect any

12  questions regarding any reward, cash reward, that he might

13  ultimately receive?

14  A.   No.

15  Q.   Do you recall specifically, on direct examination by

16  Mr. Colton, Mr. Melvin testifying regarding his cooperation

17  agreement?

18          MR. ALLEE:   Objection.   There's no relevance

19  whatsoever of Agent Boss' recollection of the testimony of

20  other witnesses.

21          THE COURT:   Sustained.

22  Q.   Well, you were present -- were you present during the

23  testimony of Mr. Melvin?

24          THE COURT:   If you want to make argument --

25          MR. ALLEE:   Objection.

1          THE COURT:  -- Mr. Marinaccio, about other things in

2    the transcript, make argument to me.  Don't ask him what

3    somebody else may or may not have said during the testimony.

4    We have an official certified transcript.  That's what I'm

5    going to pay attention to, not what this witness might say

6    about what was or was not asked.

7          Put your next question.

8          MR. MARINACCIO:  Your Honor, if I may be heard just

9    briefly on that.

10          The question comes down to, it seems to me, what this

11    witness was aware of when he was putting together the

12    documentation for the reward.

13          THE COURT:  Then ask him that specific question.  Were

14    you aware of X?

15          MR. MARINACCIO:  I thought that's where I was going.

16    I'll try to rephrase it.

17    Q.  Were you aware when you were putting together the

18    documentation that's reflected in Petitioner's Exhibit number

19    1, the reward, that Mr. Melvin had been asked questions during

20    his trial testimony on direct examination, on

21    cross-examination, and even on recross and redirect regarding

22    the benefits that he might expect to receive as a result of his

23    cooperation agreement?

24    A.  At the time, I would have certainly been aware.

25    Q.  And you were aware, were you not, at the time you were

201359rothh                    Boss   —   Direct

1  putting together this documentation for the reward,

2  Petitioner's Exhibit 1, that Mr. Melvin testified that the only

3  benefit he hoped to get was a 5K letter, which would possibly

4  result in a reduction of his sentence, correct?

5  A.  I don't remember what he testified about to that.

6  Q.  You don't remember that?

7  A.  To that particular stuff, no.

8          MR. MARINACCIO:  Your Honor, I have excerpts of

9  Mr. Melvin's trial testimony which I would like the Court to

10 consider specifically on this issue.

11         THE COURT:  Fine.

12         MR. MARINACCIO:  May I offer them into evidence at

13 this point?

14         THE COURT:  Sure.

15         MR. MARINACCIO:  I am offering what has been marked as

16 Petitioner's Exhibit 7 and Petitioner's Exhibit 8.

17 Specifically, your Honor, on Petitioner's Exhibit 7, I'm

18 offering page 801, line 11 to page 806, line 23 and page 804,

19 line 7 to 9.  And on Petitioner's number 8, I am specifically

20 offering for the Court's consideration page 990, line 3 to page

21 992, line 24, page 1029, line 5 to line 20, and page 1044, line

22 15 to line 20.

23         May I hand them up to the Court?

24         THE COURT:  Yes, certainly.  7 and 8 are received.

25         (Petitioner's Exhibits 7, 8 received in evidence)

201359rothh                    Boss   -   Direct

1   Q.   Now, Agent Boss, were you present in the courtroom during

2   the summations and the rebuttal summations that were given to

3   the jury by Mr. Colton and Ms. Seibel, respectively?

4           MR. ALLEE:  Objection.  Any line of this inquiry

5   cannot be relevant.

6           THE COURT:  I'm not sure why we're doing it in this

7   fashion, Mr. Marinaccio.  I think it's a tremendous waste of

8   time.  I'll allow you to point me to something.  If the

9   question is were you aware -- I don't get it because this would

10  have had nothing to do time-wise with what he knew or didn't

11  know at the time that he put in the application for the reward.

12  I'm very confused, Mr. Marinaccio.  I think you're wasting the

13  Court's time.

14          MR. MARINACCIO:  I apologize if the Court thinks I'm

15  wasting time.  My point is, your Honor, that this witness had

16  the opportunity between early part of January of 2004, when he

17  apparently began this process, and the trial's conclusion to

18  not only bring this to the attention of the government, but

19  also had various triggers that would have alerted him to make

20  that information known to the prosecutors, not the least of

21  which was the fact that he was in court when he heard questions

22  regarding this benefit pursuant to the cooperation agreement,

23  and he heard the summations by both Mr. Colton and Ms. Seibel,

24  which referred to the benefits that Mr. Melvin could have

25  received.  That's the point, Judge.  And the point being that

201359rothh                    Boss   -   Direct

1    my client was prejudiced by the fact that this revelation was

2    not --

3                 THE COURT:  Well, that's the argument.

4                 MR. MARINACCIO:  That's the argument.

5                 THE COURT:  We're looking for facts now,

6    Mr. Marinaccio.

7                 MR. MARINACCIO:  That facts, your Honor --

8                 THE COURT:  That's what I'm asking you to elicit.

9                 And guess what?  When you talk and I talk, she only

10   hears me.

11                MR. MARINACCIO:  I understand that, Judge.

12                THE COURT:  So there's no point in your trying to talk

13   over me.  It won't do any good.

14                If you want the Court to focus on a specific portion

15   of the summation and you want to ask the witness whether he was

16   present, then ask that question.

17   Q.  Were you present during the summation of Mr. Colton where

18   he argued that the benefit that Mr. Melvin could expect to

19   receive -- and his summation was on February 9th, 2004.  Were

20   you present when Mr. Colton made the argument that the benefit

21   he would receive was his 5K letter and that he risked that if

22   he didn't tell the truth?

23                MR. ALLEE:  Objection.  Compound.

24                THE COURT:  Sustained.

25                Were you present during the summations?

201359rothh                    Boss   —   Direct

1    Q.  Were you present during the summations?

2    A.  Yes.

3           THE COURT:  All right, then, focus my attention on the

4    specific part of the summation that you want my attention

5    focused on.  He was present.  That's all you need to do.

6           MR. MARINACCIO:  Your Honor, I would like to offer to

7    the Court Petitioner's Exhibit 9 specifically referencing page

8    4700, lines 13 to 22.

9           THE COURT:  Petitioner's 9 is received.

10          (Petitioner's Exhibit 9 received in evidence)

11   Q.  Agent Boss, were you present during the rebuttal summation

12   of Ms. Seibel?

13   A.  Yes.

14   Q.  Do you recall her arguing about the benefit Mr. Melvin

15   could expect to receive pursuant to the cooperation agreement

16   and what he risked if he did not tell the truth, specifically

17   the 5K letter?

18          MR. ALLEE:  Objection.

19          THE COURT:  He was present.

20   Q.  Were you present?

21   A.  Yes.

22          MR. MARINACCIO:  Your Honor, I would offer what I've

23   marked as Petitioner's Exhibit 10, specifically page 4970,

24   lines 18 to 22 to page 4974, line -- oh, sorry -- page 4970,

25   lines 18 to 22 and page 4974, lines 6 to 11.

201359rothh                    Boss   -   Direct

1   THE COURT:  All right.  Petitioner's 10 is received.

2   (Petitioner's Exhibit 10 received in evidence)

3   Q.  During the summations of Mr. Colton and Ms. Seibel, did you

4   ever consider advising them of the application for the reward

5   that's reflected in Petitioner's number 1?

6   MR. ALLEE:  Objection.

7   THE COURT:  Overruled.

8   A.  Not that I remember.

9   Q.  Is there any particular reason why you did not advise them?

10  A.  I don't know if I did or didn't.

11  MR. MARINACCIO:  May I have a moment, your Honor?

12  THE COURT:  Yes, sure.

13  (Pause)

14  Q.  Agent Boss, are you familiar with the Attorney General's

15  guidelines regarding the use of confidential informants?

16  MR. ALLEE:  Objection.

17  THE COURT:  Overruled.

18  You may answer the question.

19  A.  I've heard of them.  I mean, familiar as in well versed?

20  MR. MARINACCIO:  Your Honor, I'm going to ask the

21  witness be shown Petitioner's Exhibit 12.

22  Q.  Specifically, I want to draw your attention to section

23  III(b)(8).

24  THE COURT:  Is there a page?

25  MR. MARINACCIO:  I'm looking for it right now, Judge.

201359rothh                    Boss    -    Direct

```
 1           Page 19.
 2   Q.  Are you familiar with that provision -- or were you
 3   familiar with that provision at the time that you were
 4   preparing the application for voucher and reward?
 5   A.  No.
 6   Q.  You were not familiar with your obligation to coordinate
 7   with the U.S. Attorney's Office any payments made to a
 8   confidential informant?
 9   A.  I was aware of that, but this -- referring to this, no.
10           MR. MARINACCIO:  Your Honor, I offer Petitioner's 12
11   in evidence, in particular the section III(b)(8).
12           MR. ALLEE:  I object to this, your Honor.  I would
13   voir dire, but he's the wrong witness.  I object to the time
14   period for this, where Mr. Marinaccio got it, when it was in
15   effect, the agencies it's provided to.  This may be something
16   we don't need any witnesses for.  If he wants to argue about
17   it, I'm sure we can figure it out, but, so far, I haven't heard
18   any basis for the time period for this or the use of this being
19   offered by Petitioner.
20           THE COURT:  Well, I see on the last page that it's
21   dated May 3th, 2002, so I suppose it would have some
22   application to at least some of the period of time during which
23   Mr. Melvin was cooperating, which started before May 30th,
24   2002.
25           I'll receive it.  The weight, however, in this context
```

201359rothh                 Boss   -   Direct

1   is pretty limited.  I don't think the issue before the Court

2   has anything to do with whether Mr. Boss did or didn't comply

3   with any guidelines.  The only relevance would be whether he

4   had reason to know that the information should be shared with

5   members of the prosecution, but whether he did or didn't

6   comply, that's not an issue before me.  I will receive it for

7   that limited purpose only.  And what I've heard so far is less

8   than convincing.  Petitioner's 12 is received for that purpose.

9           (Petitioner's Exhibit 12 received in evidence)

10  Q.  Agent Boss, you prepared an affidavit in connection with

11  these proceedings?

12  A.  Yes.

13  Q.  And in that affidavit, you explained the circumstances

14  surrounding the payment of the $5,000 reward to Mr. Melvin,

15  correct?

16  A.  Yes.

17  Q.  I will show you what has been marked as Petitioner's

18  Exhibit 14.

19          Is that the affidavit?

20  A.  Yes.

21  Q.  Now, in that affidavit, sir, you speak about, in paragraph

22  1, the subsistence payments that were made to Melvin, correct?

23  A.  Yes.

24  Q.  And in the second paragraph, you talk about the $5,000

25  payment, correct?

201359rothh                    Boss  —  Cross

1    A.  Yes.

2    Q.  And in that second paragraph, there's no mention, is there,

3    of any request by Mr. Melvin for subsistence assistance?

4    A.  No.

5                MR. MARINACCIO:  Your Honor, I offer Petitioner's

6    Exhibit 14.

7                MR. ALLEE:  No objection.

8                THE COURT:  14 is received.

9                (Petitioner's Exhibit 14 received in evidence)

10               MR. MARINACCIO:  I have no further questions, your

11   Honor.  Thank you.

12               THE COURT:  Mr. Allee.

13               MR. ALLEE:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. ALLEE:

16   Q.  Good afternoon, Agent Boss.

17   A.  Good afternoon.

18   Q.  You testified that you were responsible for essentially

19   handling Charles Melvin as a cooperator for ATF.

20   A.  Yes.

21   Q.  Roughly when did you begin working with Melvin as a

22   cooperator?

23   A.  Roughly March of 2002.

24   Q.  How did it come about that you began working with him as a

25   cooperator?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

201359rothh                    Boss   —   Cross

1   A.   I received a call from Bruce Campbell -- Donald Campbell

2   from the City of Newburgh Police Department.   They had arrested

3   Charles Melvin with some guns the night before, and he wanted

4   to talk.

5   Q.   Campbell was an officer in the City of Newburgh?

6   A.   He was a detective at the time.

7   Q.   Did you thereafter work with Melvin in a cooperating

8   capacity?

9   A.   Yes.

10   Q.   Can you describe generally the work that Melvin did.

11   A.   Street-level work.   We investigated middle-level drug

12   dealers, purchased crack cocaine, cocaine, a little bit of

13   heroin, purchased guns with him, all the while wiring him up,

14   putting on recorders, transmitters.

15   Q.   And, just roughly, how many cases did you work with Melvin

16   where Melvin was cooperating with law enforcement?

17   A.   Cases?  About five.

18   Q.   And again, just approximately, a ballpark, how many

19   individuals -- withdrawn.

20        How many people who were targets, whether or not they

21   became criminal defendants, but people who were targets in the

22   work that you did with Melvin?

23   A.   Approximately like 30.

24   Q.   Now, prior to testifying in the trial of Donald Roth, the

25   Petitioner here, Melvin was provided money in connection with

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

201359rothh                    Boss  -  Cross

 1    his cooperating?

 2    A.   He was provided subsistence.

 3    Q.   Who provided Melvin with -- well, withdrawn.

 4         When you say subsistence, what do you mean?

 5    A.   Money to spend on rent, phone, food.

 6    Q.   And a name for that under the ATF procedures is subsistence

 7    money?

 8    A.   Yes.

 9    Q.   That's what that's called?

10    A.   Yes.

11    Q.   Who provided Melvin with that money?  Again, this is prior

12    to his testifying at the trial.

13    A.   Me.

14    Q.   And were you responsible for doing that on behalf of ATF?

15    A.   Yes.

16    Q.   When you say me, you're talking about ATF?

17    A.   Mostly just me, but I get the money through ATF.  I thought

18    you meant directly to him.

19    Q.   Let me just clarify that for the record.

20         It's the ATF that's providing money to Melvin?

21    A.   Yes.

22    Q.   And you're the person responsible for doing that at ATF?

23    A.   Correct.

24    Q.   While he was cooperating, and again, I'm still asking about

25    prior to the testimony at trial, Melvin was not in custody; is

201359rothh                    Boss   -   Cross

1  that right?

2  A.  He was in custody briefly, for maybe two weeks after his

3  initial arrest.  After that, he was out.

4  Q.  So at some point -- that's sort of around March of '02,

5  but, after that, he's working and he's not in custody?

6  A.  Correct.

7  Q.  Now, at about the time Melvin testified in the trial of

8  Donald Roth, where was he living?

9  A.  Virginia.

10  Q.  After Melvin testified in the trial of Roth, did he contact

11  you?

12  A.  Yes.

13  Q.  On direct, you described that it was early in the year

14  2004.

15  A.  Yes.

16  Q.  This is about roughly a month after Melvin's testimony?

17  A.  Correct.

18  Q.  Can you describe in substance for the Court your discussion

19  with Melvin when he contacted you.

20  A.  He was in rough times.  He -- like I said, I don't know if

21  he got kicked out or couldn't live with his mother anymore.  He

22  had his girlfriend at the time.  He had a couple of kids with

23  her and possibly even a couple of her kids.  I remember at

24  least four kids and her and him.  And they needed -- they were

25  looking for a place to stay, needed help.

201359rothh                    Boss   -   Cross

1   Q.   And did he ask you, in substance, for help?

2   A.   Yes.

3   Q.   And in substance, how did you respond to him?

4   A.   I said I'll see what I can do.

5   Q.   How did he contact you?  What means?

6   A.   Cell phone.

7   Q.   At that time, was he still a working cooperator with ATF?

8   A.   No.

9   Q.   Or with the Federal Government?

10  A.   No.

11  Q.   He was done?

12  A.   Yes.

13  Q.   What did you do after you spoke to Melvin to look into how

14  or whether you could help him?

15  A.   That's when I contacted my boss at the time, McKenna.

16  Q.   And what did you learn?

17  A.   Learned that the only way we could help him out, give him

18  money, was to give him a reward.

19  Q.   And what is a reward?

20  A.   It's a payment of money for the work that he had done in

21  the past.

22  Q.   And let me explain.  I don't mean reward in the sense we

23  all use it, but you're referring to an ATF reward, capital R?

24  A.   Yes.

25  Q.   What is that?

201359rothh              Boss   -   Cross

1   A.  As I explained, he did a bunch of work for us, did good

2   work, so we put him in for a reward.

3   Q.  And is there a protocol for obtaining and dispensing a

4   reward under ATF's procedures?

5   A.  Yes.

6   Q.  What's the protocol in general?

7   A.  You fill out that initial form.  It's on Plaintiff's

8   Exhibit 1, the top form, application for public voucher.  You

9   fill out that form.  It gets approved by the first-line

10  supervisor, which, in this case, was John McKenna, and then it

11  goes up the chain.  Supposed to be signed by the division

12  director, or the SAC, but, in this case, it was signed by the

13  ASAC, assistant special agent in charge.

14  Q.  Here, you followed that protocol in obtaining a reward for

15  Melvin?

16  A.  Yes.

17  Q.  And the paperwork that's Plaintiff's Exhibit 1 is part of

18  what you did to obtain that?

19  A.  Yes.

20  Q.  You were asked on direct examination about portions of this

21  document and whether this document, meaning Plaintiff's Exhibit

22  1, and whether you referred to what Melvin had told you about

23  Virginia.  Do you recall those questions?

24  A.  Yes.

25  Q.  Now, in the document, on the first page, which is the

201359rothh                 Boss   -   Cross

1   application of public voucher for reward, there's a

2   justification for payment section.

3   A.   Yes.

4   Q.   You see that?  And that's kind of the body of the document.

5   A.   Yes.

6   Q.   All right.  That doesn't talk about Virginia or what Melvin

7   told you about Virginia, right?

8   A.   No.

9   Q.   But the purpose of that section is about describing,

10  basically, the assistance that the individual provided, who's

11  the candidate for the reward?

12  A.   Yes.

13  Q.   And that's what you described in that section?

14  A.   Yes.

15  Q.   And even in the first part, where it says justification for

16  payment, and there's examples, names of persons arrested,

17  seizures made, those are the types of instances of cooperation

18  that you would be describing in that section?

19  A.   Right.

20  Q.   Then later, where there are boxes to check about what the

21  money's for -- this is page three of Exhibit 1.

22  A.   Okay.

23  Q.   There's a box to check for informant subsistence.  Do you

24  see that?

25  A.   Yes.

201359rothh                    Boss   —   Cross

1    Q.   The box is checked there; is that right?

2    A.   Yes.

3    Q.   And then on the last page, which is the receipt that you

4    testified about -- it's page five of the exhibit -- it says

5    investigative expenses subsistence?

6    A.   Yes.

7    Q.   You collected subsistence there, right?

8    A.   Yes.

9    Q.   So there's sort of two things going on in this document; is

10   that correct?

11   A.   Correct.

12   Q.   It's describing why the candidate is worthy of the reward.

13   And that's done in some portions; is that right?

14   A.   Yes.

15   Q.   And in other portions, there's boxes to check about what

16   the person is understood or expected to do with the money.

17   Here, it's subsistence, to subsist?

18   A.   Yes.

19   Q.   You've testified that the paperwork and everything having

20   to do with this $5,000 payment took place after Melvin

21   testified?

22   A.   Yes.

23   Q.   At any time prior to or during Melvin's testimony, did you

24   discuss this payment with Melvin?

25   A.   No.

201359rothh                    Boss   -   Cross

1    Q.   And by testimony, I mean his testimony at the trial of

2    Donald Roth.

3    A.   I understand.

4    Q.   Did you discuss any payment or any compensation of any kind

5    to him that would be made in the future prior to or at the time

6    of his testimony?

7    A.   No.

8    Q.   Did anybody else in your presence do so?

9    A.   No.

10   Q.   You described some on direct, but let me ask this.   There

11   were prep sessions for Melvin prior to his testifying?

12   A.   Yes.

13   Q.   Did you attend those prep sessions?

14   A.   Yes.

15   Q.   Do you recall now whether you attended all of those

16   sessions or just some of those sessions?

17   A.   Most.   Most of those sessions.

18   Q.   Most.   Maybe all, but you don't know?

19   A.   Definitely not all.   He was still being prepped while I was

20   on cross.

21   Q.   So you know you weren't at all of them, but you recall that

22   you were at most of them?

23   A.   Yes.

24   Q.   All right.

25            Now, returning to the line of questions, in your

201359rothh                    Boss   -   Cross

1    presence at the prep sessions or really whether it was a prep

2    session or not, did anybody discuss making a payment to Melvin

3    in the future, after his testimony in the Roth trial?

4    A.   No.

5    Q.   Or, again, any kind of compensation?

6    A.   No.

7    Q.   Do you recall having any discussions with anyone at the

8    U.S. Attorney's Office, other than in connection with this

9    habeus petition, about the $5,000 payment?

10   A.   Back then, you're talking about?

11   Q.   Yes.

12            Maybe I can rephrase that.

13            Whether it was back then or now, did you discuss

14   making the payment with AUSA Colton?

15   A.   I don't remember if I did.

16   Q.   Or then AUSA Seibel?

17   A.   Same.  I don't remember if I did.

18   Q.   Or anyone at the U.S. Attorney's Office who took part in

19   prosecuting the Donald Roth trial.

20   A.   Same.

21            THE COURT:  Let me interrupt for a moment.

22            I know that Ms. Pesci's name has been referenced a

23   number of times in connection with the matter.  What was her

24   connection with the prosecution?

25            MR. ALLEE:  Is that for the witness, your Honor?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

201359rothh                    Boss   -   Redirect

1            THE COURT:  Yes.

2            THE WITNESS:  She was the -- Glenn Colton was a new

3    assistant at the time when we took the Charles Melvin case.  It

4    was a trigger lock, a 922(g).  Terry Pesci was mentoring him,

5    basically, and then she eventually left the office after -- I

6    believe after Mr. Roth was arrested, and then Judge Seibel was

7    put on.

8            THE COURT:  All right.  So Ms. Pesci's involvement was

9    well before the trial.

10           THE WITNESS:  Prior to trial, right.

11           THE COURT:  Okay.  Thank you.  That's all I needed to

12   know.

13   Q.  In case I left a hole in the questions, let me ask you

14   this.  You've spoken to the government, to the U.S. Attorney's

15   Office, in connection with this habeus proceeding about this

16   payment of $5,000, right?

17   A.  Yes.

18   Q.  Apart from that, apart from your preparing for today and

19   the habeus proceeding, did you speak to anyone at the U.S.

20   Attorney's Office about the payment before?

21   A.  Not that I remember.

22           MR. ALLEE:  No further questions.

23           THE COURT:  Go ahead, Mr. Marinaccio.

24   REDIRECT EXAMINATION

25   BY MR. MARINACCIO:

201359rothh                 Boss   —   Redirect

1    Q.  Agent Boss, in the case of a payment for subsistence and

2    subsistence alone, would it be necessary, pursuant to the

3    protocol of the ATF, to prepare the application for public

4    voucher for reward that is contained in Petitioner's Exhibit 1?

5    A.  That's all driven by the -- well, partly driven by the

6    amount.  I can't give -- if a guy's working for me, I can't

7    give him $5,000.

8    Q.  My question to you is, if you're making a payment that's

9    strictly to go towards subsistence as opposed to reward, would

10   the first two pages of Petitioner's Exhibit 1 need to be filled

11   out?

12   A.  Depending on the amount, no.

13   Q.  Okay.  So you can --

14   A.  The amount and the circumstances, I should say.

15        MR. MARINACCIO:  Your Honor, I've marked a document as

16   Petitioner's number 18.  I'll make a representation, your

17   Honor, that I received this document from the government in

18   connection with discovery.  The Bates stamping is the

19   government's stamping.

20   Q.  Agent Boss, do you recognize what is Petitioner's 18?

21   A.  Yeah.

22   Q.  Okay.  This is a request for funds in the amount of $200,

23   correct?

24   A.  Yes.

25   Q.  Okay.  And it's basically a request for $200 to cover

201359rothh                    Boss   -   Redirect

1   certain expenses; travel, meals, incidentals, correct?

2   A.   I don't know.

3   Q.   Take a look at page two of the document.

4   A.   Oh.   Thank you.   Yes.

5   Q.   Okay.   Is this a report that you filled out or prepared?

6   A.   I definitely did part of it because the amount in the -- on

7   the first page, the total funds column, that's my handwriting.

8   But the last page, where it's written on the bottom special

9   agent, that's not my handwriting.   But the rest of it on that

10  page is.   It's safe to say I had a significant part of

11  involvement in this, yeah.

12  Q.   So in the case of a request for funds for expenses of, say,

13  $200, there would be no need to present a document for an

14  application for public voucher for reward, correct?

15  A.   Not for 200, no.

16  Q.   Okay.   And for other incidental expenses, what we see here

17  as an example in Petitioner's 18 is the type of paperwork that

18  would follow such a request, correct?

19  A.   Yes.

20          MR. MARINACCIO:   Your Honor, I offer Exhibit 18.   And

21  I have no further questions.

22          MR. ALLEE:   No objection.

23          THE COURT:   Do we know whether this document relates

24  to Mr. Melvin?

25          THE WITNESS:   I can tell you this, your Honor.   The

201359rothh                    Boss   —   Redirect

1    last page, the receipt, has a case number, and I believe that's

2    the case number I had for Donald Roth, the 765050-03-0017.

3            THE COURT:  All right.  I can say, based on the

4    unredacted version of -- is it Petitioner's 1?  No,

5    Petitioner's 11, sorry, that that is, in fact, the same case

6    number.  So, on that understanding, Petitioner's 18 is

7    received.

8            (Petitioner's Exhibit 18 received in evidence)

9            THE COURT:  Do you know, Mr. Boss, if the $200 that's

10   referenced here is included in the list of subsistence payments

11   on Plaintiff's 11-A?  Do you know?  Do you know?

12           THE WITNESS:  I don't.

13           THE COURT:  That's fine.  Thank you.

14           Mr. Allee, anything else?

15           MR. ALLEE:  No, your Honor.

16           THE COURT:  Mr. Boss, do you know whether there were

17   any additional payments made to Mr. Melvin between October 1st,

18   2003, which is the last date on Plaintiff's 11-A, and February

19   1st, 2004, which is the date upon which Mr. Melvin signed the

20   application that's reflected in Petitioner's 1?  Do you know if

21   there were any additional subsistence payments made?

22           THE WITNESS:  Between October 1st of '03, you're

23   asking?

24           THE COURT:  Right.  And February 1st of '04.

25           THE WITNESS:  Yes, there was.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

201359rothh                    Boss   —   Redirect

1          THE COURT:  Do you know how many, how much?

2          THE WITNESS:  I have the -- attached to that is the

3   government's victim witness forms.  I think it's Wendy Olsen

4   does it in Southern District.  There's an EWAP request form.

5          THE COURT:  Oh, is that the 11-B?

6          THE WITNESS:  Yes.  It says 5100.  He was paid --

7          THE COURT:  But, for example, the document that's

8   numbered 1 is for a period of time in 2002, and I'm asking in

9   late --

10         THE WITNESS:  Oh, I'm sorry.

11         THE COURT:  -- in late 2003 into early 2004.

12         THE WITNESS:  I apologize.  Correct, no, there is none

13  that I know of.

14         THE COURT:  Unless, for example, the document that you

15  were just provided, Petitioner's 18, if that, for example,

16  reflected the cost of Mr. Melvin's travel in order for him to

17  testify.

18         THE WITNESS:  It may, but I remember the U.S.

19  Attorney's Office set up the hotel, travel.

20         THE COURT:  So the payment for his travel would have

21  been taken care of through the U.S. Attorney's Office, not

22  through ATF, when it came time for his testimony.

23         THE WITNESS:  He was a witness at that point, so it

24  was either through Julia Goodwin or Wendy Olsen.

25         THE COURT:  I know that you've said that there were no

201359rothh

1   discussions with Mr. Melvin about any potential additional

2   payments, but did you yourself either engage in communication

3   with him or observe communication by any of the other law

4   enforcement or prosecutors in this case that might be described

5   as a wink and a nod or an implication, for instance, saying

6   something like, no, you can't be assured of any additional

7   payments, but, at the same time, nodding of heads, what I would

8   describe as a wink or a nod?  Did you ever engage in that with

9   Mr. Melvin or observe anyone else having that kind of

10  communication?

11              THE WITNESS:  I understand what you're saying, and no.

12              THE COURT:  Thank you.

13              All right, any other questions, Mr. Marinaccio, as a

14  result of my inquiry?

15              MR. MARINACCIO:  No, your Honor.

16              THE COURT:  Mr. Allee?

17              MR. ALLEE:  No, your Honor.

18              THE COURT:  Good.

19              Mr. Boss, you're excused.

20              THE WITNESS:  Thank you.

21              (Witness excused)

22              THE COURT:  We're going to have to take a lunch break.

23  I don't mind doing a short break, but I don't know what

24  counsel's preference is.  I suspect you're going to need to eat

25  something.

201359rothh

1          MR. ALLEE:  I don't need to eat, your Honor.  Lunch is

2     for wimps.  I'm ready to go.

3          THE COURT:  I need to eat.

4          MR. ALLEE:  Except for you, your Honor.  You're not a

5     wimp.

6          THE COURT:  I mean, I'm willing to break for a half an

7     hour, but if counsel wants an hour, we can have an hour.

8          Mr. Marinaccio?  I won't be critical.  You want 45

9     minutes?

10          MR. MARINACCIO:  Yeah.  I have to walk across the

11     street and put a dime in the meter.

12          THE COURT:  Okay.

13          MR. MARINACCIO:  That's it.

14          THE COURT:  Let's reconvene at 1:45.  Thank you.

15          (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

201359rothh                    Campbell   -   Direct

1          A F T E R N O O N   S E S S I O N

2                          1:50 p.m.

3          THE COURT:  All right, Mr. Marinaccio, you can call

4   your next witness.

5          MR. MARINACCIO:  Call Deputy Chief Campbell.

6   DONALD BRUCE CAMPBELL,

7       called as a witness by the Defendant,

8       having been duly sworn, testified as follows:

9          THE DEPUTY CLERK:  Please have a seat and state and

10  spell your name for the record.

11         THE WITNESS:  Donald, D-O-N-A-L-D, Bruce, B-R-U-C-E,

12  Campbell, C-A-M-P-B-E-L-L.

13         THE COURT:  You may proceed whenever you're ready.

14  DIRECT EXAMINATION

15  BY MR. MARINACCIO:

16  Q.  Mr. Campbell, how are you currently employed?

17  A.  I'm employed as the Deputy Chief of Police in the Town of

18  Newburgh Police Department.

19  Q.  How long have you been so employed?

20  A.  I've been there for the past year.

21  Q.  I'm going to draw your attention to the early part of 2002.

22         What was your law enforcement position then?

23  A.  I was a detective in the City of Newburgh Police

24  Department.

25  Q.  And in connection with your role as a detective in the City

201359rothh                Campbell   —   Direct

1   of Newburgh Police Department, did you have an occasion to

2   encounter an individual by the name of Charles Flip Melvin?

3   A.   Yes.

4   Q.   And when, approximately, was that?

5   A.   Sometime in the early part -- early to mid 2002.

6   Q.   Did you become familiar with Mr. Melvin through an arrest

7   that you had made or participated in --

8   A.   Yes.

9   Q.   -- of Mr. Melvin?

10  A.   I didn't participate in the arrest.  However, I did

11  interview him after his arrest on gun charges.

12  Q.   Did you have any contact with Mr. Melvin once he became a

13  confidential informant for the Federal Government?

14  A.   Yes.

15  Q.   And how frequent was your contact with Mr. Melvin after

16  that?

17  A.   Fairly regular while -- maybe not at first because he was

18  incarcerated immediately, but once he was released, fairly

19  regular.

20  Q.   When you say regular, was it more than once a week, twice a

21  week?

22  A.   I think it fluctuated different from week to week, but -- I

23  would have to guess to say any different.

24  Q.   Were you working along with the agents from the Bureau of

25  Tobacco, Firearms and Explosives, ATF --

201359rothh              Campbell  -  Direct

1   A.  Yes.

2   Q.  -- the ATF, in their investigation that involved the use of

3   Mr. Melvin as an informant?

4   A.  Yes.

5   Q.  Now, you were situated or stationed up in the Newburgh

6   area.  Is that where Mr. Melvin was living at the time?

7   A.  Yes.

8   Q.  Now, during the course of your involvement with Mr. Melvin,

9   did you ever have any opportunity or -- withdrawn -- did you

10  ever have any occasion to discuss with him his cooperation with

11  the government and what benefits he might receive as a result

12  of his cooperation?

13  A.  I didn't discuss what the government could give him.  When

14  he initially indicated that he wanted to work, he had stated

15  that he wanted to turn his life around, he was tired of the

16  drug game, and said he was willing to basically do whatever he

17  needed to do in order to help himself get out of that

18  lifestyle.

19  Q.  And did you forward that information over to the federal

20  authorities?

21  A.  Yes.

22  Q.  Did he work for the City or Town of Newburgh separate and

23  apart from the work he was doing for the ATF?

24  A.  Not that I recall.

25  Q.  Were you aware of a cooperation agreement that Mr. Melvin

201359rothh                 Campbell  —  Direct

1   entered into with the United States Attorney's Office for the

2   Southern District of New York?

3   A.  Just that he entered into an agreement.  I don't know the

4   specifics of it.

5   Q.  I'm going to show you what we have we've marked for

6   identification as Petitioner's Exhibit 2 and ask you if you

7   recognize this document.

8   A.  It appears to be a cooperation agreement.

9           THE COURT:  Are you familiar with it, sir?

10          THE WITNESS:  I don't believe I've ever read this

11  before.

12  Q.  Did you ever see any cooperation agreement that

13  specifically dealt with the cooperation of Mr. Melvin?

14  A.  Not that I recall, no.

15  Q.  Did you have any other discussions, other than Mr. Melvin

16  looking to turn his life around, regarding any benefits that he

17  might seek or be entitled to as a result of his cooperation?

18  A.  No.

19  Q.  Did Mr. Melvin, during the term of his cooperation --

20  withdrawn.

21          Approximately how long did you work with Mr. Melvin

22  and the ATF in connection with your law enforcement activities?

23  A.  I think the initial investigations that we worked with him

24  were six to eight months, approximately.  And I don't think we

25  did much work with him after that, after the initial arrests

201359rothh                   Campbell   -   Direct

1   were made where he was, as I say, burned or might be known that

2   he was utilized after that.

3   Q.   Did you have any involvement in the investigation of David

4   St. John and Mr. Donald Roth?

5   A.   Yes.

6   Q.   And was it after that particular investigation that you

7   didn't use Mr. Melvin very much?

8   A.   That's correct.

9   Q.   Now, during the time that you did use Mr. Melvin, did he

10  ever request of you any financial assistance?

11  A.   Yes.

12  Q.   And how frequently did he request financial assistance?

13  A.   I couldn't say.

14  Q.   Did he indicate what that financial assistance was for?

15  A.   To pay his bills and rent.

16  Q.   And when those requests were made, what, if anything, did

17  you do?

18  A.   I didn't pay anything to him, but I did meet with Special

19  Agent Boss, who, at times, gave him money for subsistence, or

20  if we were to do a drug purchase, he was doing -- buying guns

21  and drugs for us at the time, and at that time, we would -- he

22  would give him money.

23  Q.   Other than monies that were paid in connection with actual

24  investigations like buy money and things of that nature, was it

25  Mr. Melvin that would request monies from you or would you

201359rothh                 Campbell   -   Direct

1   offer monies to him?  How did that work?

2   A.  He wouldn't normally ask me for any money unless Agent Boss

3   wasn't around because he knew we don't have significant funds

4   to pay informants.

5   Q.  During any of your conversations with Mr. Melvin, did he

6   ever express to you that he expected that the government would

7   provide him with these subsistence payments in view of the work

8   that he was doing?

9           MR. ALLEE:  Objection.  That's vague as to time period

10   and as to work that he was doing.

11           THE COURT:  I think you need to clarify your question,

12   Mr. Marinaccio.  Perhaps you can rephrase it.

13           MR. MARINACCIO:  I'll try, Judge, yes.

14   Q.  Your initial conversation with Mr. Melvin about him wanting

15   to change his lifestyle, that led to him becoming a cooperator;

16   is that correct?

17   A.  Yes.

18   Q.  That's information that you forwarded over to the federal

19   authorities, and you began working jointly with them on a

20   number of cases; is that correct?

21   A.  That's correct.

22   Q.  How soon after you had this initial encounter with

23   Mr. Melvin did the topic of monetary compensation for

24   subsistence come up?

25   A.  I don't recall it ever coming up.  As a normal course of

201359rothh                    Campbell   -   Direct

1    business, whenever we do drug buys, we compensate the informant

2    in some way, but I don't recall any specific conversations that

3    he requested a specific amount.

4         I think that's the question you're asking.

5    Q.  Well, how soon after he began cooperating in the joint

6    investigation that you were involved in was he advanced the

7    first payment?

8    A.  I don't recall.

9    Q.  Well, was it within a matter of weeks, months?

10        MR. ALLEE:  Objection.  Lacks foundation with this

11   witness.

12        THE COURT:  He said he didn't recall.  Put your next

13   question.

14   Q.  Chief Campbell, I'm going to show you what has been marked

15   as Petitioner's Exhibit 11-A.

16        THE COURT:  I already have it.

17        MR. MARINACCIO:  I want to show it to the witness.

18        THE COURT:  Yes.

19   Q.  I ask you if you've ever seen that document.

20   A.  I don't recall ever seeing this.

21   Q.  Are you aware of how much monies were paid to Mr. Melvin

22   during the course of his cooperation with the Federal

23   Government and with your participation in those investigations?

24   A.  I met with him frequently as a witness turning over some

25   monies, but I don't know what the total was.

201359rothh                    Campbell  —  Direct

1    Q.  Now, were you present when a payment of $5,000 was made to

2    Mr. Melvin on or about February 21st, 2004?

3    A.  I don't specifically recall the actual incident.  I do have

4    a vague recollection of Andy calling me saying -- sorry --

5    Agent Boss calling me saying I needed to meet up with

6    Mr. Melvin to give him a payment, but I don't specifically

7    recall the details or even where we met with him.

8    Q.  I'm going to show you what has been marked in evidence as

9    Petitioner's Exhibit 1 and ask you if you recognize that

10   document?

11   A.  I don't recognize the first several pages, the application

12   for public voucher for reward.  However, the last page is a

13   typical form that we filled out when paying informants.

14   Q.  When you say we, who are you talking about?

15   A.  Myself and Special Agent Boss.

16           This is an ATF form, not a City of Newburgh form.

17   Q.  And I think you testified that the City of Newburgh or the

18   Town of Newburgh made no payments to Mr. Melvin; is that

19   correct?

20   A.  Not that I recall.

21   Q.  It is possible that additional payments were made other

22   than payments that were made by the ATF?

23   A.  It's possible, but I don't recall any.  If he was working a

24   different case, I don't recall any.

25   Q.  Was it the practice of the City of Newburgh to pay

201359rothh                    Campbell  -  Direct

1   informants who were cooperating with them?

2   A.   Yes.

3   Q.   Did you at any time discuss that particular practice with

4   Mr. Melvin?

5   A.   I'm sorry.   In regards to just what the City of Newburgh --

6   Q.   Payment for compensation for work that they were doing for

7   law enforcement.

8   A.   I don't recall.

9   Q.   Did you ever have a conversation with Mr. Melvin approached

10  you and discussed, listen, I want, you know, some payment, you

11  know, I've been working for you guys, you know, quite

12  effectively, something like that?

13  A.   I believe so.   He constantly complained about money, and it

14  wasn't -- on a fairly regular basis.   He was always complaining

15  about money, how he needed money.

16  Q.   And when he asked for money, was there ever an occasion

17  where, to your knowledge, either you or the ATF said no?

18  A.   Oh, yeah.

19  Q.   Now, this $5,000 payment, did you have any involvement --

20  the $5,000 payment that's referred to in Petitioner's Exhibit

21  1, did you have any involvement whatsoever in preparing that

22  form?

23  A.   No.

24  Q.   Did you have any discussion with Agent Boss concerning this

25  particular payment?

201359rothh                  Campbell  -  Direct

1  A.  Not that I recall.  I'm sure I had a conversation.  I don't

2  remember the substance of the conversation.

3  Q.  Did you ever have a conversation with Agent Boss in which

4  the payment of a reward to Mr. Melvin was discussed?

5  A.  Not that I recall, no.

6  Q.  How is it this you came to sign this particular form as a

7  witness?

8  A.  As I recall, and like I say, I only vaguely recall him

9  calling me and asking me to meet with him.  As a normal course

10  of business, whenever we're giving money to an informant,

11  whether it be for a drug buy or subsistence, to have somebody

12  with you as a witness, to sign as a witness, count the money

13  and make sure it's the proper money and make sure it's going,

14  obviously, where it's supposed to go.

15  Q.  Okay.  In this particular case, the $5,000 was to go to

16  Mr. Melvin?

17  A.  Correct.

18  Q.  Did you have any conversation with Mr. Melvin before this

19  payment was made about this particular payment that's reflected

20  in Petitioner's Exhibit 1?

21  A.  Not that I recall.

22  Q.  Did you arrange for Mr. Melvin to be present at the meeting

23  in which he was provided with the money?

24  A.  I just don't remember the circumstances.  Like I said, I

25  don't even remember specifically where we met.  It was nine

201359rothh                  Campbell   —   Direct

1   years ago.  And we met with him on multiple occasions, so it's

2   difficult to select -- figure out which one of those times this

3   particular payment was.

4   Q.   When you say you met with him on several occasions, was

5   that several occasions in which monies were advanced to him?

6   A.   Yeah, monies, drug buys, gun purchases.

7   Q.   Again, putting aside the monies that were given in

8   connection with what I would call drug purchases, gun

9   purchases, things of that nature, monies for Mr. Melvin's use,

10  did you have several of those kinds of meetings with

11  Mr. Melvin, where monies were advanced to him for his use?

12  A.   Most of the money that was given to him was at the end of a

13  deal that had gone down, a successfully completed deal.  It

14  wasn't a normal course of business just to give him money

15  because he either asked for it or said he needed it.  That's

16  why he was told no frequently.  And he complained a lot about

17  not getting money.

18  Q.   Did you discuss with any members of the U.S. Attorney's

19  Office these cash payments that had been paid to Mr. Melvin

20  over the course of his cooperation?

21  A.   I don't recall any discussions specific to cash payments.

22  Q.   Did you have any discussion with Mr. Melvin concerning what

23  likely benefit he would receive as a result of his cooperation

24  if it was deemed to be successful?

25  A.   I think, at the time that I spoke with him, he was more

201359rothh                Campbell  —  Direct

1    concerned with his charges, it wasn't -- not in regards to any
2    type of monetary advancement or compensation.
3    Q.  So, during the period of his cooperation, he had charges
4    pending against him that he, in effect, was working off as
5    well; is that correct?
6    A.  Yes.
7    Q.  And that was in addition to payments that he was receiving?
8    A.  Yes.
9    Q.  And have you ever seen an agreement between the
10   government -- and by government, I use that term, you know,
11   broadly, not only the United States Government, District
12   Attorney's Office, police department, Town of Newburgh, City of
13   Newburgh -- have you ever seen any agreement that reflects the
14   understandings between law enforcement and Mr. Melvin
15   concerning what benefits he would receive as a result of his
16   cooperation?
17   A.  I don't recall ever seeing any document like that.
18   Q.  Do you recall ever seeing any document between any
19   government entity and Mr. Melvin that reflected that, in
20   connection with his cooperation, he could expect to receive
21   monetary payments?
22   A.  No.
23   Q.  But monetary payments were made as a matter of course over
24   the period of time of his cooperation?
25   A.  Yes.

201359rothh                    Campbell  —  Direct

1      MR. MARINACCIO:  Just give me one moment, your Honor.

2          (Pause)

3   Q.  Do you know where Mr. Melvin was living at the time that

4   the payment of $5,000 that's reflected in Petitioner's 1 was

5   made?

6   A.  I don't know.

7      MR. MARINACCIO:  One moment.

8          (Pause)

9   Q.  Do you know if Mr. Melvin was ever sentenced in connection

10  with the original charges that were brought against him that

11  led to his cooperation?

12  A.  Yes.

13  Q.  Do you know when that was?

14      MR. ALLEE:  Objection to the relevance.

15      THE COURT:  Overruled.

16  Q.  Do you know when that was?

17  A.  I don't recall the date, no.

18  Q.  Do you know if he received a lesser sentence than he might

19  otherwise have received as a result of his cooperation?

20  A.  Yes.

21  Q.  And the answer to that is that he did receive a lesser

22  sentence than he might otherwise have received?

23  A.  I believe so, yes.

24      MR. MARINACCIO:  Thank you, your Honor.  I have

25  nothing else.

201359rothh                    Campbell  —  Direct

 1              Thank you, Deputy Chief.

 2              THE COURT:  Thank you.

 3              Mr. Allee.

 4              MR. ALLEE:  No questions, your Honor.

 5              THE COURT:  Mr. Campbell, did you ever observe any

 6    communication with Mr. Melvin and any law enforcement or

 7    prosecutorial personnel that might have been described as a

 8    wink and a nod, along the lines of, no, you're not going to get

 9    any money, if you understand what I'm saying, where words might

10    be one thing, but actions might imply something else?  Did you

11    ever observe anything like that?

12              THE WITNESS:  No, ma'am.

13              THE COURT:  Thank you.

14              Anything else, Mr. Marinaccio?

15              MR. MARINACCIO:  Just to follow up.

16    Q.  But there were occasions when Mr. Campbell -- sorry, you're

17    Mr. Campbell -- when Mr. Melvin asked for money where you

18    either said yes or no?

19    A.  Correct.

20              MR. MARINACCIO:  Thank you.

21              THE COURT:  Mr. Allee, anything else?

22              MR. ALLEE:  No.

23              THE COURT:  Thank you.

24              You may step down, sir.  You're excused.

25              (Witness excused)

201359rothh                     Colton   -   Direct

1           THE COURT:  Mr. Marinaccio, will we have Mr. Colton?

2           MR. MARINACCIO:  We have Mr. Colton.

3           THE COURT:  Thank you.

4           Thank you, Mr. Allee.

5    GLENN COLTON,

6        called as a witness by the Defendant,

7        having been duly sworn, testified as follows:

8           THE DEPUTY CLERK:  Please be seated and state and

9    spell your name for the record.

10          THE WITNESS:  Glenn Colton.  G-L-E-N-N, C-O-L-T-O-N.

11          THE COURT:  Go ahead, Mr. Marinaccio.

12   DIRECT EXAMINATION

13   BY MR. MARINACCIO:

14   Q.  Good afternoon, Mr. Colton.

15   A.  Good afternoon.

16   Q.  You and I have never spoken before today, correct?

17   A.  That's correct.

18   Q.  How are you currently employed, sir?

19   A.  I work at a law firm, Dentons U.S., LLP.

20   Q.  And how long have you been so employed?

21   A.  Well, the firm name has changed a few times, but I've been

22   with the firm since April of '09.

23   Q.  And prior to that, were you with the United States

24   Attorney's Office in the Southern District of New York?

25   A.  There was an intervening firm, but, yes, prior to that, I

201359rothh                    Colton   —   Direct

1    was with the U.S. Attorney's Office.

2    Q.   And just skipping right back to when you were a U.S.

3    Attorney, when were you a United States Attorney?

4    A.   I was an Assistant United States Attorney.

5    Q.   Assistant United States Attorney.

6    A.   From 1995 to 2004.

7    Q.   And in connection with your duties as an Assistant United

8    States Attorney, were you involved in the prosecution of David

9    St. John and Mr. Donald Roth?

10   A.   Yes.

11   Q.   Were you involved in the investigation into Mr. St. John

12   and Mr. Roth as it was going on?

13   A.   Yes.

14   Q.   In connection with your involvement in the investigation,

15   did you have occasion to meet with and interview a person by

16   the name of Charles Flip Melvin?

17   A.   Yes.

18   Q.   And how frequently, in connection with the investigation of

19   Mr. St. John and Mr. Roth, would you say you met with

20   Mr. Melvin?

21   A.   It's hard to answer the question as asked because

22   Mr. Melvin was involved in a very substantial number of cases

23   and investigations that were going on, so to answer it in

24   connection with just that one case is hard to answer.

25   Q.   Okay.  Then let me try it this way.

201359rothh                    Colton   —   Direct

1          When did you first become introduced to Mr. Melvin?

2    A.   It would have been early in 2002, I believe.

3    Q.   And there came a point when Mr. Melvin entered into a

4    cooperation agreement with the government; is that correct?

5    A.   Yes.

6    Q.   Mr. Colton, I'm going to show you what has been marked as

7    Petitioner's Exhibit 2 for identification and ask you if you

8    recognize that document.

9    A.   I don't specifically recall the precise document, but it

10   does appear to be in the form of what the cooperation agreement

11   would have been.  It has my name on it, but it was signed, I

12   believe, by Terry Pesci, not by me.

13   Q.   Well, could you tell us if this was the cooperation

14   agreement entered into between the government and Mr. Charles

15   Melvin?

16   A.   Ten years later, I can't tell you this was the precise

17   agreement, but I have no reason to doubt it is.

18          MR. MARINACCIO:  Your Honor, I offer it into evidence.

19          MR. ALLEE:  No objection, your Honor.  We're prepared

20   to stipulate based on counsel's representation.

21          THE COURT:  I don't mean to put myself in a -- I

22   definitely don't mean to put myself into a position of a

23   witness, but I can tell you that the handwriting on the upper

24   right-hand corner of the first page is my handwriting, and I

25   can tell you that I was the judge who took Mr. Melvin's guilty

201359rothh                    Colton   —   Direct

 1   plea at the time that the cooperation agreement was provided to

 2   the Court.  I don't have any recollection of it.  I can tell

 3   you that only based on recognizing my own handwriting and

 4   checking my records, which show that I did, indeed, preside the

 5   entry of the guilty plea, for whatever that's worth.

 6          But based on the government's stipulation, I'll

 7   receive Petitioner's 2.

 8          MR. MARINACCIO:  Your Honor, just so that the record

 9   is abundantly clear, there is a section of the trial transcript

10   where the agreement is referred to by the 3500 number, and

11   there's a stipulation during the trial that this is, indeed,

12   the cooperation agreement.

13          THE COURT:  Well, between that stipulation and this

14   one, I think we're on solid ground.  So Petitioner's 2 is

15   received, and it's five pages.

16          (Petitioner's Exhibit 2 received in evidence)

17   Q.  Now, Mr. Colton, this agreement was entered into between

18   the government and -- withdrawn.

19          This agreement was apparently signed by Mr. Melvin on

20   January 22nd, 2003, correct?

21   A.  That's the date on the document.  I can't tell you I

22   independently recollect the date.

23   Q.  So there was a period of time when Mr. Melvin was

24   cooperating without the benefit of a cooperation agreement,

25   correct?

201359rothh                    Colton   –   Direct

1    A.   There was a time he was providing assistance to law

2    enforcement under a different agreement than this one.

3    Q.   Okay.   There was a distinct and separate agreement than the

4    one that we have here?

5    A.   I can't tell you whether it was a written agreement at this

6    point, this many years later, but the government agreed to

7    recommend to the magistrate, I believe it was Magistrate Fox at

8    the time, that Mr. Melvin be released on bail for the express

9    purpose of aiding law enforcement in investigations.

10   Q.   Other than the agreement to have Mr. -- withdrawn.

11              And Mr. Melvin was released soon after his arrest in

12   order to be allowed to cooperate with the government, correct?

13   A.   He was released after his arrest.   I don't remember how

14   much time.   My guess is it wasn't that long because you would

15   lose the efficacy of his ability to be a CI if he's in the

16   system for a long period of time.

17   Q.   And people on the street would know that and perhaps

18   suspect once he got released, correct?

19   A.   That's a fair assumption.

20   Q.   Okay.   And so, in order to avoid that, you want to move as

21   quickly as possible?

22   A.   Another fair assumption.

23   Q.   Okay.   Regarding the benefits that Mr. Melvin could expect

24   to receive as a result of his cooperation, was there any other

25   agreement between the government and Mr. Melvin other than the

201359rothh              Colton  –  Direct

1   agreement that's reflected in Petitioner's Exhibit 2?

2   A.  As of the time he entered into a cooperation agreement as

3   opposed to an agreement to be released on bail for working on

4   the street, the only benefits he was to expect were either in

5   this agreement or any payments, CI payments, made by ATF, which

6   would have been documented by ATF at the time.

7   Q.  And if they were documented by ATF at the time, they would

8   have also been disclosed to Mr. Roth's attorney during the

9   course of the trial, correct?

10  A.  It would have been my practice and the practice of the

11  Office to request any information about any benefits, including

12  payments, aggregate those and include them in the production at

13  the time the 3500 and Giglio material was produced to the

14  defense.

15  Q.  And it wasn't only your practice, but it's also the policy

16  of the United States Attorney's Office, isn't it?

17  A.  Yes.

18  Q.  I'm going to show you what has been marked as Petitioner's

19  Exhibits 11-A and 11-B.

20           For the record, Mr. Colton, the first to pages of that

21  document are 11-A and all the remaining pages are 11-B.

22  A.  Okay.

23  Q.  Do you recognize 11-A?

24  A.  I don't specifically remember this document, but it

25  wouldn't surprise me that we produced a document that listed

201359rothh                    Colton    -    Direct

1    the payments.  And it would have been our practice to produce a

2    document or some other proof of the payments so they would be

3    available to the defense.

4    Q.  Well, the number --

5    A.  Look, I'll add that I have no reason to doubt that this is

6    what was produced as 3502-Z and 3502-U.

7    Q.  Okay.  And the 3502-Z and the 3502-U numbers that appear on

8    the exhibits, those were the 3500 numbers that were assigned to

9    the case -- the prosecution of Mr. Roth and Mr. St. John; isn't

10   that correct?

11   A.  It's not exactly accurate.  In every case --

12   Q.  Correct me.

13   A.  In every case that I ever was the AUSA on, we produced 3500

14   material, and 3501 would have been one witness, 3502 another

15   witness, et cetera.

16        I presume, based on the document in front of me, that

17   3502 dash various letters were the materials that were the

18   Giglio or 3500 material related to Charles Melvin.

19   Q.  Okay.  Were you aware, Mr. Colton, of any other payments

20   made to Mr. Melvin -- and I'm talking now during the course of

21   the trial of Mr. Roth and Mr. St. John.  Were you aware of any

22   other payments made to Mr. Melvin other than those reflected in

23   Petitioner's Exhibit 11-A?

24   A.  I can't tell you, ten years later, that I remember all the

25   payments.  What I can tell you is that it was my practice and

201359rothh                 Colton   -   Direct

1    the Office's practice to request the information about any

2    payments that were made prior to testimony or any promises of

3    payment made or any other promises of benefits.  To the extent

4    we received information about any promised or actual benefits,

5    they were turned over to the defense.  That's my recollection,

6    but I can't tell you I remember every single payment.

7            I will tell you that my habit was, if I knew at any

8    point in time prior to Mr. Melvin finishing his testimony of

9    any payments or, frankly, any -- if I learned ever that he was

10   promised something that we didn't disclose, we would have

11   disclosed it.

12   Q.  Well, how about if you had found out that a payment had

13   been made prior to the conclusion of the trial?  Would you have

14   disclosed that as well?

15   A.  In an exercise of caution, I probably would, but I have no

16   recollection of learning that fact.  And I don't know that that

17   ever happened.  I just don't know one way or another.

18   Q.  I'm going to show you what has been marked in evidence as

19   Petitioner's Exhibit 1 in evidence.

20           Do you recognize that document, Mr. Colton?

21   A.  I do not.

22   Q.  Have you ever seen that document before today?

23   A.  I don't have any recollection of seeing this document prior

24   to you handing it to me.

25   Q.  Do you have any present recollection of when the trial in

201359rothh          Colton  -  Direct

1  this matter, meaning the matter of David St. John and Donald

2  Roth, do you have any recollection now as to when that trial

3  commenced and when it concluded?

4  A.  I can't tell you the exact dates, but I do remember that it

5  started either late November or early December of 2003 and it

6  was planned that it would only go a couple of weeks.  It ended

7  up going all the way somewhere around early to mid-February.

8  But I can't tell you precisely.  And of course, there was a

9  break for the holidays in between.

10  Q.  At any time after early January of 2003 to the conclusion

11  of the trial, were you ever advised by Agent Boss that

12  paperwork for the payment of a $5,000 reward for Mr. Melvin had

13  been begun to be produced?

14  A.  Not that I recall.

15  Q.  Were you ever told by Mr. Boss at any time before the

16  conclusion of the trial that the payment of a $5,000 reward to

17  Mr. Melvin had been approved?

18  A.  Not that I recall.

19  Q.  Had you ever been told at any time by Agent Boss that a

20  $5,000 reward had actually been paid to Mr. Melvin?

21  A.  Not that I recall.

22        Let me just add my answers to your last three

23  questions are referring to a time period after the time period

24  in which we produced the list of payments.  I didn't study the

25  list of payments or remember whether there might have been a

201359rothh                    Colton   -   Direct

1   5,000 that I did know at the time that was disclosed.  I'm

2   interpreting your question to mean a $5,000 payment or promise

3   or paperwork that wasn't disclosed, and the answer is no, I

4   don't recollect that.

5   Q.  Well, had you been advised that a payment of $5,000 was, to

6   use the colloquial, in the works as early as January of '03,

7   would you have disclosed that information to the attorneys for

8   Mr. Roth and Mr. St. John?

9           MR. ALLEE:  Objection.  It's compound, it's got the

10  wrong date, and it calls for a speculative answer.

11          THE COURT:  I'll allow it as it stands if the witness

12  is able to answer.

13  A.  I mean, I understand the mistake in the dates, but the

14  general practice and the cautious practice that we would have

15  followed, myself and AUSA now the Honorable Cathy Seibel who

16  tried the case with me, would have been to exercise caution and

17  disclose either a potential payment or an actual payment or

18  anything we may have learned about.

19  Q.  You recall the examination of -- withdrawn.

20          You conducted the examination of Agent Boss at the

21  trial of Mr. St. John and Mr. Roth, correct?

22  A.  I believe so, yes.

23  Q.  I believe you also conducted the examination of Mr. Melvin.

24  A.  That's correct.

25  Q.  Do you recall questioning Mr. Boss, Agent Boss, regarding

201359rothh                    Colton   —   Direct

1   the benefits that Mr. Melvin may have been promised as a result

2   of his cooperation?

3   A.   I don't recall that.   I don't dispute it if you have the

4   transcript.   I just don't recall it.   It would certainly have

5   been our practice to bring out in direct of the cooperator the

6   benefits we knew about, but I don't recall whether that was

7   also brought out through the case agent, Mr. Boss.

8   Q.   Well, how about with the cooperator?   Do you recall

9   eliciting testimony from Mr. Melvin regarding his obligations

10  pursuant to the cooperation agreement and the government's

11  obligations pursuant to the cooperation agreement?

12  A.   I don't --

13          MR. ALLEE:   Objection, your Honor, again, to

14  recollections of testimony.   We have a transcript available to

15  the Court.

16          THE COURT:   I'll allow this question.

17          If you can answer it.

18  A.   I don't have a specific recollection of the specific

19  questions and answers, but it would have been my practice and

20  the practice of the Office to, on direct examination, bring out

21  from a cooperator what he expected or she expected, what he or

22  she was promised, and to go over the cooperation deal, if you

23  will.

24  Q.   To your knowledge, as you sit here today, were there any

25  promises made to Mr. Melvin in connection with his cooperation

201359rothh                    Colton   —   Direct

1   that were not included in his cooperation agreement?

2   A.  I will answer it this way.  I know of no promises or

3   benefits or recollect no promises or benefits that weren't

4   either in the cooperation agreement or otherwise disclosed in

5   the 3500/Giglio material.

6          MR. MARINACCIO:  May I have a moment, Judge?

7          THE COURT:  Yes, sure.

8          MR. MARINACCIO:  Just let me have one moment, your

9   Honor.

10          THE COURT:  Sure.

11          (Pause)

12   Q.  By the way, Agent Boss was present during most of the

13   testimony in the case of Donald Roth and David St. John,

14   correct?

15   A.  Yes.

16   Q.  And they were considered part of the prosecution team?

17   A.  When you say they, who are you referring to?

18   Q.  I'm sorry.  He was considered part of the prosecution team?

19   A.  Yes.  It was typical to have the case agent be at counsel

20   table with the government team during a trial.

21   Q.  I'm going to show you what has been marked for

22   identification as Petitioner's Exhibit 13.

23          Have you ever seen that document or a similar document

24   before?

25          MR. ALLEE:  Objection.  Relevance.

201359rothh                    Colton   -   Direct

```
 1              THE COURT:  Overruled.  I'll allow it briefly.  I
 2   think that it is arguably relevant, and I'll allow it in the
 3   interest of assuring full and fair opportunity for Petitioner
 4   to pursue the issue that he has raised that is pertinent to
 5   this hearing.
 6   A.  Can you reask the question, please, or have it read back.
 7   Q.  Are you familiar with that document?
 8   A.  I've seen what is colloquially called the Ogden memo, which
 9   was issued years after I left the U.S. Attorney's Office.
10   Q.  Was there a similar type of memo in existence when you were
11   in the U.S. Attorney's Office regarding guidance for
12   prosecutors regarding discovery?
13   A.  I don't recall.
14   Q.  Take a look at page six, paragraph seven.
15              I just ask you if there was -- if you were aware of a
16   similar direction --
17              THE COURT:  Excuse me, Mr. Marinaccio.  The document
18   is not in evidence.
19              MR. MARINACCIO:  I'm not asking him to read the
20   document.
21              THE COURT:  Well --
22              MR. MARINACCIO:  I'm just asking if there was a
23   similar provision in any document that he was familiar with
24   when he was in the U.S. Attorney's Office.
25              THE COURT:  But how could a reviewing court know what
```

201359rothh            Colton   -   Direct

1   that means since the document is not in evidence?  There's

2   nothing for it to be similar to because it's not in evidence.

3            MR. MARINACCIO:  Your Honor, then I would offer

4   Petitioner's 13 in evidence.

5            MR. ALLEE:  That's fine, your Honor.  No objection.  I

6   mean, I object on relevance grounds, but --

7            THE COURT:  Absolutely, you may, and I'm sustaining

8   the objection.

9            MR. ALLEE:  If he wants to ask the question about the

10  Ogden memo, he can refer to this document.

11           THE COURT:  Seems to me if he wants to ask about the

12  subject matter that's identified in the paragraph he

13  referenced, he can ask about the subject matter, but I'm

14  sustaining an objection to a memo that's dated 2010, after

15  Mr. Colton left the office and long after this trial was

16  concluded.

17  Q.  In 2003 and 2004, when you tried this case, was there a

18  policy in the U.S. Attorney's Office that discovery, including

19  discovery of payments made to a cooperator, was a continuing

20  obligation on the part of prosecutors?

21  A.  I can't tell you --

22           MR. ALLEE:  Objection to the form of that question.

23           THE COURT:  Overruled.

24           You can answer the question.

25  A.  I can't tell you whether there was a written policy from my

201359rothh                Colton    —    Cross

1    recollection this many years back, but I will tell you that it

2    was my understanding and my practice and the practice of the

3    Office, to my knowledge, to turn over benefits to a government

4    witness and that, if you learned of benefits after you made the

5    3500 or Giglio presentation, in an exercise of caution, you

6    would augment that Giglio or 3500 production.

7    Q.  You prepared an affidavit in connection with this petition

8    by Mr. Roth?

9    A.  I assume it was a declaration, but, yes.

10   Q.  A declaration.

11         I'm going to show you what has been marked for

12   identification as Petitioner's Exhibit 16.

13         Is that the declaration you prepared in connection

14   with this matter?

15   A.  It appears to be, yes.

16         MR. MARINACCIO:  I offer it into evidence, your Honor.

17         MR. ALLEE:  No objection, your Honor.

18         THE COURT:  Petitioner's 16 is received.

19         (Petitioner's Exhibit 16 received in evidence)

20         MR. MARINACCIO:  I have no further questions.

21         THE COURT:  Mr. Allee.

22         MR. ALLEE:  Yes, your Honor, briefly.

23   CROSS-EXAMINATION

24   BY MR. ALLEE:

25   Q.  Good afternoon, Mr. Colton.

201359rothh                    Colton    —    Cross

1    A.   Good afternoon.

2    Q.   You were one of the AUSAs who prosecuted Donald Roth?

3    A.   One of the AUSAs who handled the prosecution for the

4    government of Donald Roth.

5    Q.   And there were other AUSAs who participated in the handling

6    of the prosecution?

7    A.   Yes.

8    Q.   All right.  And you described you were one of the AUSAs who

9    tried the case.

10   A.   That's right.

11   Q.   Can you describe your role with respect to the witness

12   Charles Melvin.

13   A.   Myself and then AUSA Cathy Seibel divided the government

14   witnesses.  I was primarily responsible for Mr. Melvin and a

15   bunch of other witnesses.  AUSA Seibel had other witnesses.

16   And we often worked together in some of the preparation

17   sessions, strategy issues, et cetera, as to all of the

18   witnesses.

19   Q.   And you ended up doing the direct of Charles Melvin?

20   A.   That's correct.

21   Q.   Did you prepare, prior to his testifying, with Charles

22   Melvin?

23   A.   I'm sure we did.

24   Q.   Generally speaking, what type of preparation did you do?

25   A.   I can't tell you I remember the prep sessions, but my

1    practice would have been to meet with the witness, go over the

2    types of questions that would be asked, give them basic

3    instructions like tell the truth, listen to the question, think

4    about your answer and things of that nature.

5    Q.  And as Melvin was the witness that you were going to put on

6    the stand, you were mainly the person handling the preparation

7    of Melvin in advance of trial?

8    A.  I would say with primary responsibility, but, as practice,

9    what would typically happen is the other AUSA would play the

10   mock cross, if will you, and ask questions and help in

11   preparing the witness to understand the questions that he or

12   she would be asked and make sure that they understand their

13   obligations, understand the questions that are being asked, and

14   give accurate answers to the Court.

15   Q.  And in those types of preparation sessions with a witness,

16   and, here, a cooperating witness, is it just yourself, the AUSA

17   and the witness, or were there ordinarily others present?

18   A.  It was my practice and the practice of the Office not to

19   meet with witnesses without a nonlawyer present, typically a

20   law enforcement officer.  So, in the case of Melvin, it would

21   have been Agent Boss, Detective Campbell or potentially one of

22   the Office's investigators if neither Agent Boss nor Detective

23   Campbell were available.

24   Q.  During the prep sessions, do you recall discussion of any

25   kind -- the prep sessions with Melvin, do you recall discussion

201359rothh                    Colton   -   Cross

1   of any kind that you took part in or that you heard about

2   making a future payment to Melvin after he testified?

3   A.  I have no recollection of that.

4   Q.  And do you recall -- my first question was about whether

5   you recalled discussion of any kind.  Do you recall implication

6   of any kind, whether or not it was discussed, any implication

7   in any way that Melvin would be given money in the future,

8   following his testimony?

9   A.  No.

10  Q.  The other limitation on my question, which I'll elaborate

11  on, forget money, just any kind of compensation in any form in

12  the future, any promise of any benefit following his testimony,

13  do you recall discussion of that with Melvin in the prep

14  sessions leading up to his testimony at the trial of Donald

15  Roth?

16  A.  When you say any benefit, I'm sure we discussed the

17  possibility, if he met all of his obligations under the plea

18  agreement, to get a 5K letter from the government at the

19  sentencing phase.

20  Q.  And you recall, in the prep sessions, discussion of what we

21  refer to as a 5K?

22  A.  I don't tell you I remember those discussions, but I'm sure

23  we had them.

24  Q.  All right.  And why do you say you're sure that you had

25  them?

201359rothh                    Colton   -   Cross

1    A.   Because it was our pattern and our practice with every

2    cooperator to review, again, in preparation and then actually

3    during direct examination the plea agreement and the benefits

4    and obligations for both the cooperator and the government.

5    Q.   And it was your practice, in preparing a witness in

6    Melvin's position, to talk about -- preparing him to testify

7    about the 5K -- the potential of a 5K letter?

8    A.   Yes.

9    Q.   After Melvin testified at the trial of Donald Roth, do you

10   recall any discussion with Agent Boss about a payment made to

11   Melvin after his testimony?

12   A.   I do not recall any discussion like that.

13   Q.   And now not to limit the question to Agent Boss, with

14   anyone from ATF or law enforcement about making a payment to

15   Melvin after his testimony.  Do you recall any such discussion?

16   A.   I do not recall any such discussion.

17   Q.   And the allegation of such a payment came to your attention

18   in connection with this habeus proceeding?

19   A.   I learned from either you or an ATF supervisor that there

20   was such an allegation being made.  I don't know, frankly, if a

21   payment was ever made or not.

22          MR. MARINACCIO:  No further questions.

23          THE COURT:  Mr. Marinaccio.

24          MR. MARINACCIO:  No questions.

25          THE COURT:  Mr. Colton, in addition to the list of

201359rothh          Colton  -  Cross

1    subsistence payments that were incorporated in 3500 material

2    that came from ATF apparently during the course of Mr. Melvin's

3    cooperation, would it also be fair to say that there would have

4    been some payments that would have had to be made in order for

5    Mr. Melvin to be present and testify; that is to say travel

6    expenses, hotel, food, that sort of thing?

7         THE WITNESS:  It's possible.  I can't recall, your

8    Honor, whether he was living in the area, whether he was

9    working.  I don't recall.  I have a vague recollection that he

10   was working in some type of job at that time, but I won't swear

11   to it under oath because my recollection is not good enough.

12   But it's possible, but possibly not, that such payments would

13   have needed to be made.

14        THE COURT:  Well, assuming for the moment that there's

15   been testimony that he was living in Virginia at the time of

16   his testimony.  Would I be correct in saying that it would have

17   been the U.S. Attorney's Office that would have arranged for

18   his travel rather than the ATF, that that would have been the

19   normal course with regard to a witness who was being called

20   upon to testify?

21        THE WITNESS:  Yes.  The normal course of practice,

22   through Wendy Olsen's office, the victim witness coordinator

23   would have coordinated travel and the logistics.

24        THE COURT:  And so my question is -- and I know you

25   don't have any specific recollection about how Mr. Melvin's

201359rothh                Colton    —    Cross

1    circumstance was handled, but my question is, in the ordinary

2    course of the procedures that you followed, would there have

3    been any additional information provided to defense counsel in

4    the criminal case about those additional travel payments or

5    would that have just been inferred, that they would be

6    recognizing that that had to have been made?

7              THE WITNESS:  I don't have a specific recollection,

8    but I -- sitting here today, I would guess that there was a

9    difference between repaying an out-of-pocket expense versus

10   giving a benefit like cash which somebody could use for

11   whatever they chose to use it for.

12             THE COURT:  All right.

13             With regard to your conversations with Mr. Melvin

14   during the investigation and prosecution of the case, and

15   particularly prior to and during his testimony, were there any

16   occasions when now Judge Seibel had worked with Mr. Melvin, but

17   you were not present?

18             THE WITNESS:  I don't recall that, but it's certainly

19   possible.

20             THE COURT:  All right.  Thank you.

21             Anything else, Mr. Allee?

22             MR. ALLEE:  No, your Honor.

23             THE COURT:  Mr. Marinaccio?

24             MR. MARINACCIO:  No, your Honor.  Thank you.

25             THE COURT:  Thank you.

201359rothh

1        You may step down, sir.

2        THE WITNESS:  Thank you, your Honor.

3        THE COURT:  You're excused.

4        (Witness excused)

5        THE COURT:  Mr. Marinaccio, what's your pleasure?

6        MR. MARINACCIO:  Your Honor, the additional witness

7   that I would have liked to call is Mr. Melvin.  I've indicated

8   on the record already that, in my conversation with his

9   counsel, his counsel has indicated that he intends to have

10  Mr. Melvin invoke his Fifth Amendment privilege.  His attorney

11  is not available and won't be available until next week

12  sometime.  It is my position that, given the nature of these

13  proceedings, the examination of Mr. Melvin can be conducted

14  without him incriminating himself in any way.

15        THE COURT:  Well, Mr. Marinaccio, the difficulty that

16  I have with that is that, despite any limitation on the subject

17  matter of direct examination of Mr. Melvin, in addition to the

18  scope of the direct examination, Respondent's counsel would be

19  entitled to inquire into issues relating to the witness'

20  credibility, and if Respondent's counsel were hampered in that

21  effort, then Respondent's counsel would be entitled to seek to

22  strike the testimony, and I think it's reasonable to assume

23  that that would include inquiry about currently pending charges

24  against Mr. Melvin for which he clearly would have a Fifth

25  Amendment right.

201359rothh

1          So it seems to me an exercise in futility to make

2     further efforts along those lines, although I could, of course,

3     inquire of Mr. Allee whether he would intend to limit his

4     examination simply to what occurred in this case or whether he

5     would be seeking to make further inquiry into other matters

6     relating to Mr. Melvin's credibility.

7          MR. ALLEE:  Mr. Melvin's credibility would be at

8     issue.  We would ask questions that go to his credibility,

9     which includes conduct more recent than the -- conduct that is

10    recent and that is directly part of what he's now being

11    prosecuted for.

12         But I would add there are lots of reasons that I can

13    imagine Mr. Melvin and Mr. Vita, on Mr. Melvin's behalf, would

14    want to invoke the Fifth Amendment that are not even about

15    directly his pending charges or even about his credibility.  I

16    mean, even for him to admit he was a cooperator or that he --

17    or if asked questions about whether he was paid and whether

18    that payment was disclosed, that might be something that could

19    be a link in a chain that the government would want to offer

20    against him in the criminal case.  So it seems to me there's a

21    good basis, a substantial basis, for the invocation of the

22    Fifth Amendment on both the direct testimony that

23    Mr. Marinaccio would ask and certainly on our cross on the

24    events of this case and our cross of other matters about his

25    credibility.

201359rothh

1          THE COURT:  And is it fair to assume, Mr. Allee, that

2     your office is not interested in granting Mr. Melvin immunity?

3          MR. ALLEE:  Yes, your Honor.  We are prosecuting

4     Mr. Melvin now.  And he's indicted.  He actually has a trial.

5     I understand there's a trial scheduled for Mr. Melvin later

6     this month.  And, yes, your Honor, to answer your question, we

7     have no intention to immunize him in this matter.

8          THE COURT:  I'm inclined, Mr. Marinaccio, to move

9     forward without further pursuing the matter.  I, of course, am

10    very familiar with Mr. Vita.  I trust his judgment.  I

11    certainly trust that you are fairly and accurately reporting

12    what he has said to you.  I have no reason to doubt that.  And

13    I think, rather than further telescoping the process, I'm

14    inclined to sustain Mr. Melvin's right to invoke his Fifth

15    Amendment privilege and not to go through an exercise in

16    futility by having him attend simply to invoke that privilege.

17          As I said, I don't think that it's appropriate where

18    credibility is the crucial issue for me to make some type of

19    effort to hamstring the U.S. Attorney's Office in their

20    examination of Mr. Melvin, and that would be the only prospect

21    under which he could be expected to testify, though, frankly,

22    if I were Mr. Vita, I still wouldn't let him testify even with

23    a limited scope.

24          MR. MARINACCIO:  Your Honor, I think that this

25    highlights the prejudice that Mr. Roth is suffering as a result

201359rothh

1    of the failure of the agents to promptly notify the government,

2    if that, indeed, is what ultimately is the Court's finding,

3    about this reward payment, because, clearly, in 2004, we would

4    not have been faced with this issue.  We're faced with this

5    issue now because a cooperator has strayed back onto the bad

6    path that he had been walking prior to his cooperation

7    agreement, and now he becomes a witness who is unavailable to

8    Mr. Roth through no fault of Mr. Roth's, and, frankly, he's a

9    witness who can best shed light on, in a non-circumstantial

10   way, what his expectations were as he was proceeding here down

11   this course of cooperation.  We've gotten a little glimpse,

12   through Agent Boss and through Deputy Chief Campbell, but

13   clearly the best evidence of what his expectations were, what

14   his desires were and what he believed the government was

15   prepared to do for him comes from him.

16         I think that, Judge, given the narrow issue, I think

17   the Court can restrict cross-examination under its general

18   powers to restrict cross-examination.  There's certainly enough

19   material in the record as it stands, in the trial record, to

20   call into question Mr. Melvin's credibility on a slew of other

21   issues, including his prior bad acts, that it would certainly

22   be gilding the lily to go into any further collateral matters

23   when you have a witness who is crucial on this issue of what

24   was his expectation, what was his mind-set, and what he had

25   requested in connection with the ultimate payment of the

201359rothh

1    reward, you know, to him.

2              So I would ask the Court to reconsider or at least

3    give me the opportunity to present further argument at a time

4    when Mr. Vita is available to state his position.  But,

5    frankly, Judge, I'm an officer of the Court.  I've stated it as

6    accurately as I can.  I think the issue comes down to whether

7    or not it's a legitimate exercise of his Fifth Amendment

8    privilege and whether or not there is a way, short of immunity,

9    which I don't expect the government to award him, that we can

10   go with in order to get his vital testimony.

11             THE COURT:  Mr. Allee.

12             MR. ALLEE:  Well, the government's position is your

13   Honor has already ruled correctly that this is a proper

14   invocation of Fifth Amendment.

15             Mr. Vita, by the way, what Mr. Marinaccio is saying

16   about his availability, he's just out of the country this week,

17   but he's been very responsive.  I've asked him what

18   Mr. Melvin's position is, and I know Mr. Marinaccio has.

19   Mr. Vita returns next week if the Court wants to hear from him.

20   But that's a proper invocation of the right.

21             To put it in context, I disagree with Mr. Marinaccio.

22   This is not some habeus petition and this hearing is not some

23   abstract inquiry into what were the raw thoughts or emotions or

24   expectations in Melvin's head.  This is about a specific

25   instance of a payment of $5,000 to Melvin after he testified,

201359rothh

1    which arguably, at best, gives an implication or prompts some

2    further inquiry into whether there was an expectation of this

3    payment beforehand or whether that expectation was created from

4    a promise, whether there was a basis for it from the

5    government.  You heard from the handling agent.  You heard from

6    the handling AUSA, testimony from them.  They already put in

7    affidavits.  They were credible witnesses.  There's no evidence

8    to the contrary that this is a payment that came -- that was

9    not even in anybody's mind's eye until after Melvin testified.

10   It is, therefore, definitionally, not impeachment.  And that

11   not only is what they testified to, that makes a whole lot of

12   sense.  For example, $11,000 in payments were made to Melvin

13   before he testified, and that was all disclosed.  There was all

14   kinds of other impeachment of Melvin.  He's committed all kinds

15   of crimes prior to his testimony.  That was all disclosed.  He

16   was crossed on that.  He was directed on that.

17            THE COURT:  Do I recall that there was no cross about

18   the $11,000 in payments?

19            MR. ALLEE:  Yes, your Honor, which is something I

20   emphasized slightly in our brief to point out the immateriality

21   of this.  The defense had $11,000 in payments to someone now

22   Mr. Marinaccio would try to describe as a star witness,

23   Mr. Roth would, and they didn't even bother to cross on that.

24   They had so much other cross, they didn't even bother with the

25   $11,000 in payments that were made.  So the baseless assertion,

201359rothh

1    the unproved assertion, that there was some promise of more

2    money to Melvin and to keep it quiet until after he testified,

3    there will be a reward, just doesn't square with common sense

4    under the circumstances.

5           There's another reason why it doesn't square with the

6    circumstances, which is Melvin was a key person in this

7    investigation.  There's no dispute about that.  He's the person

8    who was at the center of the charged allegations, the witness

9    that was allegedly attempted -- that was the subject of the

10   attempt at tampering.  However, his testimony was not real

11   vital.  There's a couple easy ways to explain how that is.  The

12   first is it was recorded.  What he did was recorded.  There was

13   a head bob that wasn't recorded that he testified about, but

14   that's about it.  It occupied very little of the summation

15   proportionately, discussion of his testimony, and even very

16   little of the transcript of the trial, at least the direct.

17          And don't take my word for it, Judge.  Judge Robinson,

18   at our post-trial motion where Melvin was challenged on other

19   grounds, there was a Rule 33 motion that arose while the appeal

20   was pending, and Judge Robinson then addressed the claimed

21   error, the claimed problem, and then went on to sort of

22   prejudice analysis and pointed out -- summarized basically what

23   I'm -- I'm re-summarizing what Judge Robinson said in response

24   to that motion, that Melvin was not the star witness he was

25   made out to be by Mr. Roth.

201359rothh

1          So, for those reasons, my first point is Mr. Vita's

2     telling me that his client would invoke the Fifth Amendment.   I

3     have every reason to believe that that's in good faith and

4     there's a basis for his doing that.   And second, we don't need

5     to hear from Mr. Melvin.   There are ten reasons why the habeus

6     petition -- why the Petitioner has not met his burden and why

7     it should be denied.

8          MR. MARINACCIO:   Your Honor, if I just may briefly

9     respond.

10          There are a number of strategic reasons why the

11    attorneys for Mr. Roth and Mr. St. John would not have gone

12    into subsistence payments, not the least of which it may have

13    raised the specter of, you know, a witness who had to be

14    relocated, threats, things of that nature, and so,

15    strategically, I can see why that would not be gone into in

16    view of the other materials, as well, that they had to go into.

17          But this is something different, your Honor.   This is

18    a reward.   And the context of this reward has to be viewed in

19    the context of the questioning of the witnesses and the

20    arguments made by the prosecution and the impression that was

21    left in the minds of this jury, and that is that the only

22    benefit -- the only benefit that Mr. Melvin could expect to

23    receive were the benefits that were outlined in the cooperation

24    agreement, to wit, the 5K letter.   It is said over and over and

25    over and over again.

201359rothh

 1              Now, we've heard today from Deputy Chief Campbell that
 2      Mr. Melvin was constantly asking for money and that it was
 3      their practice to reward an informant whenever there was a
 4      successful investigation or investigative technique, whether it
 5      be a purchase of drugs or a purchase of guns or whatever, and
 6      that he was constantly asking for money.  So it really begs the
 7      question as to what Mr. Melvin really thought he was going to
 8      get over and above the cooperation agreement and whether or not
 9      that information should have been made available to the
10      defense, who would have then been able to decide for themselves
11      whether or not, as a strategic matter, that was something that
12      should be put before the jury.  And again, we can only find
13      that out through -- because I can't go into -- no one in this
14      room can go into the mind of Mr. Melvin.  This is Mr. Melvin,
15      crucial testimony from him.

16              Short of that, your Honor, the other issue that we
17      have is the issue of Judge Seibel.

18              I would also request that, regardless of what the
19      Court's ruling is on Mr. Melvin or Judge Seibel, that I be
20      allowed to order the minutes of this hearing and be given a
21      period of time, at least 30 days, to make a written submission
22      to the Court.

23              THE COURT:  Well, I want to point out, in carefully
24      reviewing Petitioner's Exhibit 1, and specifically the first
25      two pages, the application and public voucher for reward, I

201359rothh

1    think it's important to recognize that, whether or not the

2    application for reward was listed under the St. John and Roth

3    case number, the substance of the section that says

4    justification for payment identifies on the second page the

5    successful prosecution of 13 defendants to date, and, as I read

6    this, that does not include Mr. St. John, et al., and Mr. Roth.

7    In fact, in the more lengthy paragraph under justification for

8    payment, it refers to 11 defendants who pled guilty or were

9    found guilty at trial.  So that's the first 11 apparently in a

10   single case involving cocaine apparently having been completed

11   to its final end before the form was completed.  Then in the

12   next paragraph, another separate person who, according to the

13   last line, had, by that date, already pled guilty.  Then in the

14   next paragraph, a reference to yet another defendant who was

15   found guilty.  So my reading is those are the 13 defendants

16   that are referenced in the second-to-last paragraph on the

17   second page.

18        And in addition to that, on the bottom paragraph of

19   the justification for payment on the first page, there's a

20   reference to a case that had not yet resulted in a plea and

21   then at the top of the second page, the then ongoing trial

22   involving Mr. St. John and Mr. Roth.  And while it's clear that

23   Mr. Melvin's testimony in that case was a part of the

24   justification for the reward, in my view, it is, at best, a

25   modest part of the entire justification.  And that's true even

201359rothh

1  though the application was apparently put in under that case

2  number.

3          So, yes, there was a reward.  Yes, in my view, the

4  information should have been produced since the agreement to

5  make the payment apparently was reached prior to the conclusion

6  of the trial.  But it is a de minimus part of the justification

7  for the reward, and I have a hard time trying to conclude that

8  it could possibly have made any difference to the results of

9  the trial in St. John and Roth.

10         Mr. Allee, would you like to address for a moment the

11 government's current position with regard to Petitioner's

12 application to examine Judge Seibel in this connection?

13         MR. ALLEE:  Well, your Honor, obviously, she's a

14 judge, but, regardless of whether she's a judge, it just seems

15 there's no basis to call witnesses who have no personal

16 knowledge here, and she fits in that category.  The testimony

17 from Mr. Colton was consistent with what I understood in

18 looking into this matter, which is it was Mr. Colton who put on

19 Melvin as a witness.  Mr. Colton described and I think we all

20 understand --

21         MR. MARINACCIO:  Your Honor, maybe I can cut this

22 short.  We will withdraw the subpoena for Judge Seibel and deal

23 with the testimony of Mr. Colton.

24         THE COURT:  Okay.  Thank you.  That resolves that

25 issue.

201359rothh

1          MR. ALLEE:  Must be my powerful persuasive argument.

2          THE COURT:  Well done, Mr. Allee.

3          MR. MARINACCIO:  That as well, that as well,

4     Mr. Allee.

5          THE COURT:  All right.  I am concluding that

6     Mr. Melvin has a valid Fifth Amendment right to decline to

7     testify.  I am concluding that Mr. Vita has properly interposed

8     that objection to Mr. Melvin being called as a witness.

9          I will certainly grant you the opportunity,

10    Mr. Marinaccio, to order the transcript and to provide a

11    written submission on any of the issues raised in the matter.

12          Thirty days takes us to a weekend, so it would be June

13    10th, the Monday.

14          MR. MARINACCIO:  Will we be able to get the

15    transcript?  Okay.  Let me make sure that somebody doesn't have

16    my -- your Honor, I don't want to hit this one too hard.

17    There's a possibility I'll be out of commission for a week

18    beginning Monday for a personal medical issue.

19          THE COURT:  I'm sorry.  This coming Monday?

20          MR. MARINACCIO:  Yes, yes, this coming Monday.  So can

21    we make it either the 18th or the 24th of June as opposed to

22    the 10th?

23          THE COURT:  Any objection, Mr. Allee?

24          MR. ALLEE:  Absolutely no objection.

25          The first two weeks of July, I'm on leave, and so if

201359rothh

1    it's the 18th, I can probably get it in before then no problem.

2    If it's the 24th, it might be tight, depending on what the

3    submission is.  I would ask it be either the 18th or have time

4    in July after I return.

5            THE COURT:  Tell you what.  Why don't we make it the

6    24th and then, Mr. Allee, give you 'till the 29th of July.

7            MR. ALLEE:  Yes, your Honor.  Thank you.

8            THE COURT:  Is that all right?

9            MR. ALLEE:  Thank you.

10           MR. MARINACCIO:  So 6-24 for Petitioner's submission.

11           THE COURT:  Yes.

12           MR. MARINACCIO:  7-29 for any reply.

13           THE COURT:  Well, for the opposition.  Your reply then

14   August 9th.  Is that all right?

15           MR. MARINACCIO:  8-9 for reply.

16           THE COURT:  Yes.

17           MR. MARINACCIO:  Fine.

18           THE COURT:  Let's schedule -- can we plan to come

19   back, then, how's Friday, September 13th?  Friday the 13th?

20   It's an auspicious day.  At 10 a.m.

21           MR. MARINACCIO:  Friday the 13th at 10 a.m.

22           THE COURT:  All right.  Thank you very much.  We are

23   adjourned.

24           MR. MARINACCIO:  Thank you.

25                          - - - -