# EXHIBIT  A

United States Court of Appeals

FOR THE SECOND CIRCUIT

Docket Nos. 05-2430-cr(L), 05-2438-cr(CON)

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

DAVID ST. JOHN and DONALD ROTH,

*Defendants-Appellants.*

BRIEF FOR THE UNITED STATES OF AMERICA

**Preliminary Statement**

Donald Roth and David St. John appeal from judgments of conviction entered on May 16, 2005, in the United States District Court for the Southern District of New York, following a two-and-one-half month trial before the Honorable Stephen C. Robinson, United States District Judge, and a jury.

Superseding Indictment S7 02 Cr. 1503 (SCR) (the "Indictment") was filed on September 4, 2003.[*] The

* The underlying indictment, 02 Cr. 1503 (CM), was filed on November 16, 2002, in five counts, charging co-

Indictment charged Roth and St. John with conspiracy to commit witness tampering and obstruction of justice, in violation of Title 18, United States Code, Section 371.

Trial against Roth and St. John commenced on December 2, 2003, and concluded on February 12, 2004, when both defendants were convicted on the single count charged in the Indictment.

On April 15, 2005, Judge Robinson sentenced Roth to a term of 60 months' imprisonment, to be followed by a term of three years' supervised release. Judge Robinson also imposed a fine of $10,000 and a mandatory special assessment of $100. On April 19, 2005, Judge Robinson sentenced St. John to a term of 48 months' imprisonment, to be followed by a term of three years' supervised release, and imposed a mandatory $100 special assessment.

Both Roth and St. John currently are on bail pending appeal.

## Statement Of Facts

Roth and St. John contend in their briefs that the Government's prosecution of them was, at base, a frontal assault on "good faith traditional lawyering." (Roth Br. 70). The surfeit of evidence introduced by the Government at trial puts the lie to this contention. This evidence, which included testimony from cooperating witnesses, audiotapes, telephone records, and other documentary evidence, makes clear that this case was about the shameless tampering of witnesses and the concomitant perversion of the criminal justice system by a defense counsel, Roth, and his investigator, St. John. The defendants attempted to, and did, cajole and deceive percipient witnesses into signing statements (and, in one case, signing a blank piece of paper into which a "statement" was later inserted) that falsely disclaimed the culpability of their clients. The purpose of these false statements was simple: to obtain favorable dispositions in their clients' criminal cases. As detailed in the remainder of this section, the conduct alleged in the Indictment, and proven beyond

---

defendants Raymond Bryant and Sukeem Bryant with criminal conspiracy and narcotics charges. Superseding indictments were filed on December 17, 2002, April 24, 2003 (two were filed on this date), May 1, 2003, and September 4, 2003. St. John was first charged in the superseding indictment returned on December 17, 2002; Roth was first charged in the superseding indictment returned on September 4, 2003.

---

• "Roth Br." refers to Roth's brief on appeal; "Roth Supp. Br." refers to Roth's supplemental brief on appeal; "Roth A." refers to the appendix to Roth's brief on appeal; "St. John Br." refers to St. John's brief on appeal; "St. John Supp. Br." refers to St. John's supplemental brief on appeal; "St. John A." refers to the appendix to St. John's appeal; "[Name] PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with the named defendant's sentencing; "Tr." refers to the trial transcript; "GX" refers to a Government exhibit introduced at trial; "DX" refers to a defense exhibit introduced at trial; and "SA" refers to the Supplemental Appendix to the Government's brief on appeal.

a reasonable doubt at trial, was neither "good faith" nor "traditional" lawyering.

## A. The Government's Case

### 1. Charles "Flip" Melvin's Cooperation

The Government's investigation into Roth and St. John came about as a result of an arrest of an individual who associated with (and, in some cases, was related to) several of their clients. In March 2002, Charles Melvin, nick-named "Flip," was arrested and charged with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1). Following his arrest, Melvin agreed to cooperate with the Government and act as a confidential informant ("CI") for the Bureau of Alcohol, Tobacco & Firearms (the "ATF"), which was investigating criminal conduct in Newburgh, New York, along with the City of Newburgh Police Department. Under the supervision of ATF Special Agent Andrew Boss, Melvin made undercover purchases of cocaine base (in a form commonly known as "crack" cocaine) and firearms, provided information regarding individuals who were engaged in illegal firearms dealing, and provided information on the locations of stash houses and fugitives. As a result of Melvin's cooperation, approximately 20 arrests were made, and substantial quantities of narcotics (approximately one kilogram of crack cocaine and one half-kilogram of powder cocaine) and firearms (approximately ten) were recovered. (Tr. 160-67, 797-806).

### 2. Timothy Cherry's Federal Case

As part of the investigation arising from Melvin's cooperation, Timothy Cherry was arrested on September 30, 2002, and charged, in a complaint dated October 1, 2002 (the "Cherry Complaint"), with possession of 65 grams of crack cocaine with the intent to distribute it. The Cherry Complaint was based, in part, on evidence seized in a search of Cherry's residence in Newburgh. Cherry retained defendant Donald Roth as his attorney, and Roth engaged co-defendant David St. John to work as a private investigator on the case. (Tr. 167-72, 1114-16; SA 210). Cherry later testified as a cooperating witness at the defendants' trial, and his testimony confirmed that Roth and St. John were actively engaged in witness tampering.

Cherry explained that Roth had represented him in an earlier state drug case, which ended with Cherry accepting a guilty plea to a lesser offense. After Cherry's arrest in that case, but before his arrest by the ATF in the federal case, Roth invited Cherry to dinner at the New Orleans Steakhouse in Newburgh. In attendance were Roth, his investigator St. John, an individual nicknamed "Super" Bryant, and others. At the meal, Roth discussed his representation of one of Super's sons, Antonio, who had been charged in state court with murder. Roth asked if Cherry knew the individuals who had "helped out" in Antonio Bryant's murder case by giving to Roth and St. John different statements than they had given the police. Cherry understood Roth to be explaining that "[t]hat's the way he works. He get[s] witnesses to flip their story." (Tr. 1074-79, 1201-02).

During meetings with Roth in the Westchester County Jail after his federal arrest on September 30, 2002, Cherry admitted to possessing the crack (as well as .380-caliber ammunition) that had been seized from his residence. He

initially told Roth that the seized crack was for personal use, but then admitted that it was for sale. Cherry told Roth that he (Cherry) was indeed a crack dealer, that he "sold weight," and that he had supplied individuals—including Martez Williams, a/k/a "Tez," and Charles Melvin (the aforementioned cooperator known colloquially as "Flip")—who Cherry thought might have told the police about Cherry's crack dealing. With particular respect to Melvin, Cherry told Roth that he had sold to Melvin on more than one occasion. (Tr. 1116-20).

Despite Cherry's admissions to Roth that Cherry had in fact sold drugs to both Martez Williams and Flip Melvin, Roth told Cherry that Roth would have St. John arrange for Williams and Melvin to sign statements saying that they had had no illegal dealings with Cherry. Roth added that if Melvin demurred, St. John would attempt to tape-record Melvin saying that he had had no dealings with Cherry, or, even more troublingly, would try to get Melvin to sign a blank piece of paper, after which a statement disclaiming illegal dealings with Cherry could be typed in. (Tr. 1120-22, 1265).

Cherry met separately with St. John in the Westchester County Jail. St. John asked Cherry who might have "ratted [Cherry] out," and Cherry told St. John that he suspected, among others, Flip Melvin. Cherry explained to St. John that he (Cherry) had previously sold drugs to Melvin and that Melvin faced pending charges. Despite Cherry's admission to St. John that Cherry had in fact sold drugs to Melvin, which replicated the admissions he had made to Roth, St. John proposed the same course of action with

respect to Melvin that Roth had outlined. (Tr. 1125-29, 1314-23; SA 950).

At Cherry's bail hearing on October 8, 2002, Roth demonstrated that Cherry had identified Melvin to Roth and St. John as the probable source of the Government's information. Specifically, Roth argued—referring to Melvin—that Cherry should be released because the case against him was based on the word of an unreliable "snitch" who faced serious felony charges in the same court and had every reason to fabricate. (Tr. 3567-68; GX 86A). Notably, the Cherry Complaint did not refer to the source of the information that led to the issuance of the search warrant, and at the time of Roth's statements the search warrant had not yet been turned over to the defense; as of that time, therefore, Melvin's identity as the source of information about Cherry had not been revealed outside of law enforcement. (Tr. 171-72, 222-223, 304-05; SA 210).

### 3. Raymond Bryant's Federal Case

Additional arrests stemming from Melvin's cooperation were made on October 28, 2002, including the arrests of Raymond and Sukeem Bryant, two other sons of Super Bryant. The criminal complaint charging the two Bryant brothers (the "Bryant Complaint") referred to their sale of 29 grams of crack cocaine to a CI (Melvin) at a particular street corner in Newburgh in May 2002. It also recounted the CI's observations of another crack transaction involving the Bryants and a third party at a Newburgh bowling alley. Raymond Bryant retained defendant Roth as his attorney, and Roth again engaged defendant St. John to

work as a private investigator on the case. (Tr. 168-69, 172-76, 2614-16; SA 212).

Within a day or two of his arrest, Raymond Bryant discussed the allegations in the Bryant Complaint with Roth. Raymond told Roth that he did not know who the CI was in connection with the bowling alley transaction, but that he knew that the CI in the street-corner transaction was Flip Melvin, a distant relative of his, because Raymond remembered the transaction. He told Roth that he (Raymond) and his brother Sukeem had sold Melvin the ounce of crack as described in the Bryant Complaint, and that Raymond had sold crack to Melvin on other occasions as well.

Roth advised Raymond that Roth wanted Melvin to sign an affidavit denying any drug dealings with Raymond, so that Roth could give it to the prosecutor and Raymond could "walk." (Tr. 2622). Roth analogized the situation to the homicide prosecution of Raymond's brother Antonio Bryant, who had received a very favorable plea deal (discussed *infra*) after Roth had presented the prosecutor with affidavits in which eyewitnesses recanted their earlier stories. Roth told Raymond to tell St. John (who would meet Raymond separately two days later) everything Raymond had just told Roth, so that St. John could be prepared for an upcoming meeting with Melvin. (Tr. 2619-23).

This first jailhouse meeting between Roth and Raymond Bryant took place on October 29, 2002 —the day after Raymond and Sukeem Bryant were arrested. (Tr. 359-60, 674; SA. 950, 1066). That same day, Roth communicated by cellular telephone ("cellphone") for

approximately eight minutes with Raymond's younger brother, Malcolm Bryant, and that evening Malcolm attempted to call Melvin for the first time. (Tr. 180-81, 198-99, 362; SA. 389, 574, 779, 824). Malcolm tried to reach Melvin repeatedly over the ensuing weeks, but they did not actually speak until November 12, 2002. (Tr. 816-17).

St. John visited Raymond Bryant in jail on October 31, 2002. (SA. 950, 1073). Raymond again recounted the transaction in which he and Sukeem had sold crack to Flip Melvin, as set forth in the Bryant Complaint, and told St. John that the CI "couldn't be nobody but Flip." (Tr. 2624). Bryant advised St. John (as he had told Roth) that Sukeem had handed Melvin the drugs but that Raymond had taken the money from Melvin. (Tr. 2842-43). Raymond also told St. John that he had had narcotics dealings with Melvin prior to the occasion described in the Bryant Complaint.

St. John told Raymond of his plan to contact Melvin and see if Melvin would sign an affidavit denying (falsely) any narcotics transactions with Raymond. Raymond told St. John that Malcolm Bryant could help to locate Melvin. (Tr. 2623-25). That same day, Roth and Malcolm spoke at 10:44 p.m.; shortly thereafter, at 10:55 p.m., Malcolm Bryant attempted to reach Flip Melvin by phone. (SA 389, 589, 779, 828). On November 4, 2002, St. John attempted to call both Melvin's cell phone and the telephone number of Melvin's girlfriend's residence. (Tr. 178-84; SA. 340, 373).

On November 6, 2002, Roth represented Raymond Bryant at a bail hearing. As at the Cherry bail hearing discussed above, Roth's statements confirmed that Ray-

mond had identified Melvin as the customer to whom Raymond and Sukeem Bryant had made the 29-gram crack sale described in the Bryant Complaint. As part of his argument as to why Bryant should be released, Roth referred to the "snitch" in the case, and described details about the background of that "snitch" that had not been provided by the Government, but that made clear that Roth knew the "snitch" was Flip Melvin. (Tr. 215-17, 223, 304-05, 2625-28; GX 85A, 85B).

## 4.   The Recorded Conversations Between Melvin And St. John

On November 12, 2002, at 8:55 p.m., Flip Melvin called Malcolm Bryant in response to the many calls that Malcolm had made to Melvin's cellphone, which resulted in Malcolm's number appearing on the caller-identification feature on Melvin's cellphone. Malcolm told Melvin that Malcolm's brother had been arrested; that Melvin had something to do with it; and that Malcolm wanted Melvin to sign a paper saying that Melvin had not had anything to do with it. Malcolm offered to "look out" for Melvin, i.e., pay him for the false statement. (Tr. 200-01, 746-47, 817-19; SA 921, 937). Shortly thereafter, at 9:07 p.m., Malcolm spoke to Roth for two minutes. (Tr. 3738-40; SA 779, 849).

Meanwhile, after his 8:55 p.m. conversation with Malcolm, Melvin contacted Agent Boss, who recorded Melvin's return call to Malcolm at 9:20 p.m. Melvin recaptured during that call much of what had been discussed in the unrecorded call earlier that evening. At Agent Boss' instruction, Melvin asked Malcolm, ". . .you want me to sign some papers, what the fuck, man, what are

10

ya'll gonna give me? That's what I want to know." Malcolm responded that he wanted to discuss the matter with Melvin in person, and expressed fear that his phone could be tapped. Melvin again asked, using slang for payment, "you going to hit me off, though?" Malcolm responded, "Yeah . . . I'm going to talk to you." They agreed to speak the next day. (Tr. 444-46, 747-53, 820-22; DX C; SA 1291). Following this contact with Melvin, Malcolm Bryant promptly reported to Roth and St. John. In the period between 10:34 p.m. on November 12, 2002, and 8:41 p.m. on November 13, 2002, there were 27 calls among the phones used by St. John, Roth, Malcolm Bryant, and Melvin, including a 17-minute three-way conversation among Roth, St. John and Malcolm at 11:10 p.m. on November 12, 2002. (Tr. 354-57; SA 313, 324, 340, 377-78, 389, 425-33, 779, 847-50, 921, 937-38, 948).

On November 13, 2002, Agent Boss again recorded a conversation between Malcolm Bryant and Melvin. Melvin asked Malcolm where Malcolm had gotten the paper he wanted Melvin to sign. Malcolm initially said he had gotten it from "[t]he investigator," but corrected himself to say, "[t]he lawyer, the lawyer." Melvin asked what the paper said, and Malcolm responded that it said that "Raymond didn't have nothing to do with it," and that Melvin had never gotten drugs or guns from Raymond Bryant. Raymond's girlfriend, Yolanda Delgado, briefly got on the phone and urged Melvin to sign the document. Malcolm then asked when Melvin could sign the paper, "so they can send it to the judge," and told Melvin that "the lawyer needs it by next week." Melvin asked why the lawyer had not contacted Melvin. Malcolm attempted without success to patch in the lawyer, whom he called

11

"Donald," but succeeded in patching David St. John into the call. (GX 20; SA 217).

St. John told Melvin that while Melvin's name was not in court papers, "[w]e keep hearing your name thrown at us." St. John asked to meet Melvin and offered to give advice on Melvin's own legal problems. Melvin asked about the paper he was being asked to sign, and St. John said he wanted to talk first, because he would not want to put down on paper information that would not help the case. St. John said he wanted information he could bring to the prosecutors to show them they were wrong. When Melvin asked what was in it for him, St. John said that his advice was "probably worth quite a bit," whereupon Malcolm interrupted, stating, "That's, that's why I want to talk, talk to you in person," and St. John added, "I want to work with you here, Flip." St. John also told Melvin, "Now, I don't want to talk on the phone and I'm sure you understand why." Melvin said he would call when he was ready to meet, and St. John urged him not to delay, because "they move along pretty fast here in Federal Court." (Tr. 203-04, 211-17, 822-24; GX 20; SA 217). Immediately following this conversation, Malcolm called Roth, and then St. John called Roth. (See SA 949).

On November 18, 2002, Melvin placed a recorded call to St. John. They agreed to meet three days later somewhere near Yonkers, New York. When Melvin asked St. John about the "paper" to which Malcolm Bryant had been referring, St. John responded, "Oh, that might have been from the attorney, from the lawyer." In feigning ignorance about the paper, St. John claimed to communi-

12

cate with Roth only for about five minutes a day.* St. John told Melvin that based on the Bryant Complaint, Raymond Bryant was pretty sure the CI was Melvin. St. John said he might get together with Roth to prepare a statement for Melvin, which Melvin could sign if he chose. St. John and Melvin agreed to speak again two days later. (Tr. 218-23; GX 21; SA 231).

On November 19, 2002, Melvin and St. John had another recorded conversation. When Melvin inquired if St. John had found out anything about the paper Melvin was to sign, St. John said he had spoken to "the lawyer" about it but did not want to discuss it over the phone. Melvin then told St. John four separate times that Raymond Bryant had indeed sold Melvin crack and was guilty of the charges.** St. John nevertheless pressed Melvin for an in-person meeting, and they agreed to speak the following day. (Tr. 285-88, 824-25; GX 22; SA 239).

On November 20, 2002, Melvin and St. John spoke and agreed to meet the next day at a rest stop on Interstate 87 in lower Westchester County. (Tr. 288-90, 566-67; GX 23; SA 239).

―――――――――

* During the three-week period between Raymond Bryant's arrest on October 28, 2002, and David St. John's arrest on November 21, 2002, there were 123 calls between Donald Roth's cellphone and David St. John's home and cell phones. (Tr. 221-22; SA 313, 340, 389, 949).

** Melvin referred to Raymond Bryant by his nickname, "Ray Love," and told Melvin: "he did sell me some crack"; "he did sell me something"; "he did do it, he did do it", and "he did do it." (GX 22; SA 239).

13

14

SA 245). Later that day, St. John sent an e-mail to Roth telling him of the time and place of the meeting. Despite the fact that Melvin (and, perhaps more importantly, Raymond Bryant) had told St. John in no uncertain terms that Melvin had in fact bought crack cocaine from Raymond, St. John made clear in the e-mail that he and Roth were seeking a false statement to the contrary:

> While I know that a total recantation of his involvement in anything and everything would do nicely here, I'm not too sure that will be forthcoming. Do you have any thoughts or suggestions on what I should be trying to accomplish or get in writing, to at least cover the bare minimum?

St. John added that he would try to capture on tape any attempts by Melvin to bribe or extort St. John. (Tr. 338-40; Roth A. 557).

### 5. St. John's Meeting With Melvin

The meeting occurred as scheduled. Ironically, both Melvin and St. John carried hidden recording devices. They spoke in St. John's Jeep, which was parked in the rest stop parking lot. Their conversation began with St. John discussing the Bryant Complaint. St. John stated that Raymond Bryant thought that Melvin was the CI on whom the charges had been based.* He added that if Melvin was in fact the CI, St. John would want to know what informa-

_____

\* As of the date of the rest stop meeting, law enforcement had not divulged that Melvin was the CI described in the Bryant Complaint. (Tr. 304-05).

15

tion Melvin had provided to the police, so that Raymond could make the best deal possible, and would also want to know whether the police had followed proper procedures. (Tr. 291-95; GX 24; St. John A. 30-31).

When Melvin inquired how St. John would help him, St. John proceeded to ask Melvin questions about his pending federal gun case, and then commented (inaccurately, as it happened) that Timothy Cherry was facing federal gun charges as well. St. John offered to speak to the witness who had reported that Melvin had possessed a firearm. Melvin interrupted, saying he had come to discuss Raymond Bryant; that St. John was talking about Cherry but that Melvin could not help Cherry; and that Raymond had in fact sold Melvin an ounce of crack. St. John immediately asked if Melvin had told the police that Raymond had sold Melvin an ounce of crack, and Melvin said he had. St. John then quizzed Melvin about the circumstances, the roles of Raymond and his brother Sukeem, and whether the agents had taped and/or observed the transaction. (Tr. 828; St. John A. 31-39).

Melvin asked St. John how, given that they both know that Raymond Bryant had sold Melvin crack, they could help Raymond. St. John—despite having repeatedly been told by Raymond and Melvin that Melvin had bought crack from Raymond—denied having known, up to that point, that Raymond had sold to Melvin. When Melvin asked if St. John had a paper for Melvin to sign, St. John said that someone had typed up a general statement saying that Melvin had never bought drugs or worked with the police, but that Melvin obviously could not sign it "be-

16

cause it would be a lie. Right?" Melvin concurred. St. John then said, "Shit," in a disappointed manner. (Tr. 828-29; St. John A. 37-39).

St. John said that he would keep his promise to give Melvin advice, and again offered to speak to the witness who had provided information about Melvin to the police. He added that he would not have Melvin commit perjury, but he wanted to ask Melvin about the procedures the agents followed in connection with Melvin's buy from Raymond, such as whether they had searched Melvin before the buy. St. John then reviewed the transaction again, and Melvin described how he had called Raymond under the supervision of the agents to arrange the sale, was searched and wired by the agents, met Sukeem Bryant on the sidewalk to take the drugs, gave payment to Raymond in the car in which the Bryants had arrived at the scene, and then met with agents to be searched again and turn over the recording and the drugs. (St. John A. 40-46).

St. John and Melvin discussed other buys Melvin had made. St. John told Melvin that he was collecting the information to assist the lawyer (*i.e.*, Roth) in evaluating the strength of the case. St. John then returned to the subject to Timothy Cherry. He asked Melvin if he had ever bought or sold drugs or guns with Cherry, and Melvin

* Of course, St. John knew from Melvin's four statements during the November 19, 2002 conversation that Melvin had bought crack from Raymond Bryant, and that Melvin could not truthfully sign the affidavit. Nevertheless, St. John brought the false affidavit with him to his meeting with Melvin.

17

replied, "Yeah, I, yeah I did some with him before, but I ain't never did nothing with him while we was with, while I was with the agents." Seizing on the fact that the agents would thus not have any recordings of Cherry, as they did of Raymond Bryant, St. John immediately replied, "You never did anything with the agents?" and when Melvin replied, "Nah," St. John asked Melvin to sign "one of those blank, uh, forms made up with his [Cherry's] name on it, 'cause I was gonna use it with somebody else." (Tr. 829-30; St. John A. 49-51). The form was a detailed affidavit, with the name of the affiant left blank, to the effect that the affiant had never engaged in a gun or drug transaction with Cherry. (SA 205). It was identical to blank form affidavits, also in St. John's possession at the time, exculpating Raymond Bryant and Sukeem Bryant (Roth A. 556; SA 204).

St. John falsely suggested to Melvin that the affidavit was limited to what Melvin had done with Cherry under supervision of the agents, saying to Melvin, "[Y]ou want to sign one of them? That you never did anything for the, for the agents for Tim Cherry." (St. John A. 50). Melvin said that he needed to go to the bathroom, and when he returned, St. John read Melvin the affidavit, which, as St. John knew, went well beyond what Melvin had done with the agents. It stated in substance that the affiant knew nothing of any involvement by Cherry in illegal narcotics or weapons, and that the affiant had nothing to do with the charges against Cherry and was never an informant. Melvin told St. John twice that Melvin had bought drugs from Cherry, but was willing to sign the affidavit. St. John then said that Melvin could not sign the affidavit because "that would be perjury," and he (St. John) "can't be a part

18

of anything illegal." (Tr. 831-36; St. John A. 51-53). As he made those remarks, however, he was pushing the affidavit and a pen toward Melvin. (Tr. 836-37). Melvin did not, however, sign the affidavit. When Melvin commented that St. John had not said on the phone that he wanted to talk about Cherry, St. John claimed—despite the fact that Cherry was charged only with a narcotics offense—that St. John had made no connection between Melvin and Cherry until Melvin said something about guns, and that Raymond Bryant had mentioned Melvin's name to St. John (though in fact Cherry had as well). (St. John A. 55-56).

Following the rest stop meeting, St. John was arrested and his vehicle was searched pursuant to a warrant. The affidavit exculpating Cherry, which St. John had read to Melvin, as well as form affidavits exculpating Raymond Bryant and Sukeem Bryant, were seized. (Tr. 298-303; SA 204, 205, 1257; Roth A. 556). An identical copy of the Raymond Bryant form affidavit was later obtained from Raymond's girlfriend, Yolanda Delgado, who had discussed it with Melvin in the November 13, 2002 phone conversation, during which Malcolm Bryant had described the affidavit to Melvin. (Tr. 212, 345-46; Roth A. 560; GX 20; SA 217). Another identical form affidavit, exculpating a different client of Roth's, was found in the hard drive of the computer in Donald Roth's law office, which was searched pursuant to warrant on November 22, 2002. (Tr. 318-37, 340; SA 206, 1257).

During the three weeks between Raymond Bryant's arrest on October 28, 2002, and David St. John's arrest on November 21, 2002, Donald Roth's cellphone had contact with the cellphone used by Malcolm Bryant 131 times.

19

The total calls among the cellphones used by Roth, Malcolm Bryant, and Melvin, as well as St. John's home phone, during that period was 325. (Tr. 177-97, 351-54; SA 313, 340, 389, 779, 921, 949).

### 6. Roth's Final Jailhouse Visits To Cherry And Bryant

On December 3, 2002, Roth visited Cherry in jail accompanied by an individual whom Roth introduced as an interpreter, despite the fact that Cherry spoke English and had never had any difficulty communicating with Roth. Roth told Cherry that Cherry was going to be charged with witness tampering and that St. John had been arrested for the same crime. (Tr. 1122-24; SA 950, 1202).

On the same day, Roth visited Raymond Bryant, also accompanied by the man who he introduced as an interpreter. The man "[j]ust s[a]t there" during the meeting. (Tr. 2641). Raymond was concerned that he might be an agent. Roth told Raymond that St. John had been arrested for meeting with Melvin and that Raymond would be facing a new charge of witness tampering as a result. Roth added that he (Roth) had nothing to do with the new charge. Raymond was about to confront Roth about that statement when Roth signaled, by holding up his hands and making a pushing motion, that Raymond should not discuss the issue at that time, but should wait until the next time they met, which Roth said would be before Raymond had to go to court on the new charge. Raymond agreed to wait to discuss the witness tampering until he met with Roth alone. They had no more meetings, however, and Raymond was thereafter appointed new counsel by the District Court. (Tr. 2639-42, 2648-52).

20

After receiving new counsel, Raymond Bryant and Timothy Cherry initially denied their culpability of the offenses charged, before ultimately deciding to cooperate with the Government. Both testified at Roth's and St. John's trial. (Tr. 1057-67, 2545-50, 2651; SA 1274, 1282).

### 7. Roth's And St. John's Prior Witness Tampering In The Antonio Bryant State Murder Case

Donald Roth's and David St. John's efforts to get Melvin falsely to recant his prior statements to law enforcement were not their first such efforts. Evidence concerning a prior episode of witness tampering in which the two defendants participated was introduced at trial pursuant to Federal Rule of Evidence 404(b). Specifically, in 2001 and 2002, Roth represented Antonio Bryant, a/k/a "Tone"—another of Raymond Bryant's brothers—who was charged with the fatal shooting of a Jamaican man, Delroy Williams, on Lander Street in Newburgh on July 18, 2001. (Tr. 2158-60).* Antonio Bryant's family retained Roth as his lawyer, and Roth retained St. John as his investigator. (Tr. 2577-81).

In November 2001, Roth was told by the prosecutor that the three eyewitnesses to the shooting were Marco Boykin, Jason Melendez, and Joseph McDonald, all of

_____

\* Roth had referred to Antonio's state court murder case in the New Orleans Steakhouse meeting with Timothy Cherry (Tr. 1074-79, 1201-02), and in his first meeting with Raymond Bryant on the latter's federal charges. (Tr. 2619-23).

21

whom were friends of Antonio Bryant. (Tr. 2160). Roth spoke with Raymond Bryant (who had not yet been arrested on his federal case and who communicated with Roth regarding Antonio's defense), and told him who the eyewitnesses were. Roth said that St. John would talk to them "so they could change their statements" from what they had told the police and deny that Antonio Bryant was the shooter. (Tr. 2582). Roth explained that if St. John "got the statements switched over," Roth would give them to the prosecutor and Antonio "could walk." (Tr. 2583). In a separate conversation with Raymond, St. John confirmed that he wanted to meet with the eyewitnesses in the hope that they would switch their statements. In the ensuing weeks, Raymond, his brother Sukeem, and his father Super helped St. John to track down the three witnesses. (Tr. 2581-89).

### a. Marco Boykin

When Antonio Bryant killed Delroy Williams, Marco Boykin was 17 years old. He had grown up with Antonio Bryant, whom he referred to as "Tone." On the night before the shooting, Boykin and Antonio went to a "weed spot" in a basement apartment on Lander Street to buy marijuana, but were chased out by a man who beat them with a crowbar. Antonio explained to Boykin that he had earlier robbed the weed spot. The next day, Antonio showed Boykin a gun and said he wanted to retaliate by shooting the person who had beaten them. Boykin (who also had a gun), Antonio, Joseph McDonald and Jason Melendez went to Lander Street. When the man who had beaten them—Delroy Williams—emerged from the basement weed spot and got into his car, Antonio ran up to

22

the car, pulled his gun and shot into the car. The car drove off, and Boykin heard it crash as he, Antonio, and the others ran from the scene. (Tr. 1946-56).

Soon after the shooting, Boykin went to the Newburgh police station and gave the police a statement in which he said that "Tone" had done the shooting. Some time later Antonio's brother, Sukeem Bryant, asked Boykin to speak to Antonio's lawyer. Boykin agreed, and went to the home of Super Bryant. St. John arrived and took Boykin to a nearby eatery. St. John asked Boykin about the shooting, and Boykin told St. John that Antonio was the shooter. (Tr. 1971). St. John responded that the word on the street was that Joseph McDonald was the shooter. Boykin told St. John that that was incorrect and that Antonio was the shooter, but St. John kept coming back to Joseph McDonald being the shooter. Boykin felt that St. John "was trying to get me to say that Joseph was the shooter." (Tr. 1972). Because St. John kept pressing and because Boykin was tired, wanted to leave, and feared that St. John would keep bothering him, Boykin agreed that McDonald was the shooter. St. John wrote up some papers, which Boykin signed without reading. Although Boykin did ultimately say that McDonald was the shooter, he never provided other details, such as Antonio's purported absence from Lander Street at the time of the shooting and McDonald's purported threatening of Boykin, that appeared in an affidavit, purportedly prepared by Boykin, a copy of which Roth later gave to the Assistant District Attorney ("ADA") who was prosecuting Antonio Bryant. (Tr. 1956-79, 2175-77; SA 249, 255, 256; DX DD).

23

### b. Jason Melendez

David St. John also met with Jason Melendez, who had been present on Lander Street and saw Antonio Bryant shoot Delroy Williams with a sawed-off shotgun. The day after the shooting, Melendez, after some initial prevaricating, gave a statement to the Newburgh police identifying Antonio as the shooter. (SA 257, 259; Tr. 1499-1511). Melendez was thereafter asked by "Super" Bryant to meet with St. John. Melendez agreed. At the meeting, he told St. John that Antonio had committed the murder of the Jamaican male on Lander Street. St. John told Melendez that Melendez was wrong in saying Antonio was the shooter, and that Joseph McDonald was the shooter. Melendez maintained that the shooter was Antonio. (Tr. 1499-1511, 1593-1607, 1613-18, 1650-66).

St. John asked Melendez to sign a piece of paper with background details such as age and address. Melendez never signed a statement or affidavit for St. John regarding the homicide. When shown a photocopied affidavit that purported to be his—which Roth had also given to the ADA prosecuting Antonio Bryant—Melendez stated that while the signature was his, the handwriting and initials "JM" at the end of the text on each page were not, and that he had never seen the affidavit until it was shown to him by Agent Boss. The phony Melendez affidavit stated that

• The parties stipulated that the handwriting—with the exception of the signature (which the parties agreed was Melendez's) and the "JM" initials at the end of each page (as to which there was no agreement)—was St. John's. (Tr. 2177). The "JM" initials on the affidavit

24

Antonio Bryant was not present at the time of the shooting but that Joseph McDonald was. (Tr. 1658-66, 2174-78; SA 260).

### c. Jessica Ortale

St. John also met with Jessica Ortale. On the night Antonio Bryant shot and killed Delroy Williams, Ortale was twelve years old. She was in her next-door neighbor's home on Route 9W, a main thoroughfare through Newburgh, when she heard a disturbance in the parking lot of an ice cream stand across the street. She heard two people arguing. One person said, "Tone, you just threw your life away," and "Tone" agreed. "Tone" also stated that he had just "blazed somebody with a shotgun over 30 bags of weed." (Tr. 1829). Ortale reported what she had heard to

looked entirely different from the initials that Melendez had placed on a proffer agreement executed with the United States Attorney's Office. The agreement was introduced as a Government Exhibit at trial. (Tr. 2504-06; SA 1280).

Raymond Bryant's testimony confirmed Ortale's. After the shooting, Raymond, his girlfriend Yolanda Delgado, Antonio, and Sukeem drove together out of Newburgh, intending to meet a sister who would take Antonio to her home in Albany. According to Raymond, he told Antonio that he had thrown his life away by shooting Delroy Williams, and Antonio responded that Raymond "could get it too." (Tr. 2570). Raymond asked Delgado to pull over, and he and Antonio got out of the car in a store parking lot. They fought and argued until Sukeem broke up the fight, and the drive continued.

25

the police. The police report was provided to Roth just prior to Antonio Bryant's trial.

St. John interviewed Ortale in the presence of her father and grandmother. Ortale told St. John that she had overheard the name "Tone" mentioned, and St. John said "that a lot of names sound like that and it probably wasn't Tone." (Tr. 1832). When Ortale maintained that that was what she had heard, St. John got annoyed. When Ortale recounted the comment by "Tone" about having "blazed somebody with a shotgun," St. John asked if she was sure it was a shotgun, said it might not have been, and got annoyed when Ortale maintained that she had heard "shotgun." Similarly, when Ortale mentioned "30 bags of weed," St. John said it was probably thirteen or three, and got more annoyed when Ortale adhered to her account. (Tr. 1826-44, 4320-26). Ortale testified at trial that she felt intimidated during the interview, because she felt St. John "was trying to change what I was saying." (Tr. 1844).

### d. The False Affidavits Result In A Reduced Plea For Antonio Bryant

Antonio Bryant's murder case was handled by Orange County ADA David Byrne. On November 5, 2001, Roth e-mailed Byrne after a case conference that had been covered by another ADA because Byrne was away. Roth told Byrne that the court had inquired as to the sort of negotiated disposition in which Roth might be interested on behalf of Antonio, and Roth reported that he was

(Tr. 2569-71). Antonio stayed with his sister for a few days and then turned himself in. (Tr. 2577).

looking for a plea to manslaughter in the first degree with a sentence of ten to twelve years' imprisonment. Byrne did not extend such an offer, and prior to the commencement of trial in January 2002 had offered only a plea to murder in the second degree, which would carry a sentence of 20 years to life in prison. (Tr. 2157-59, 2170-73; Roth A. 566).

During the course of pretrial hearings in mid-November 2001, Byrne disclosed to Roth the names of the three eyewitnesses to the murder—Boykin, Melendez and McDonald, all of whom had identified Antonio Bryant as the shooter—and disclosed their statements to the extent they related to the suppression issues being litigated at the hearings. The remainder of their statements, along with the statement of Jessica Ortale, were disclosed at the start of trial, on January 3 or 4, 2002. (Tr. 2159-70; SA 249, 253, 255, 256, 257, 259, 263, 264, 265, 266, 291).*

On January 2, 2002, Byrne met with Marco Boykin, who said that the shooter was actually Joseph McDonald and that he had provided Roth's investigator with a statement to that effect. Byrne informed Roth, both in writing and in person, of Boykin's statement, and requested of Roth any statements of potential prosecution witnesses that Roth had obtained. On January 3 or 4, 2002, Roth handed Byrne photocopies of purported affidavits of

• The affidavit St. John obtained from Boykin was dated November 21, 2001, and the affidavit that he purported to have obtained from Melendez was dated December 29, 2001. (DX DD; St. John A. 59). St. John interviewed Ortale on January 5, 2002. (Tr. 4319-20).

Boykin and Melendez.* On January 7, 2002, Byrne met with Boykin again. Boykin at first adhered to the statement in the affidavit, i.e., that McDonald had shot Delroy Williams, but then admitted that his original statement inculpating Antonio Bryant was the truth. The Boykin affidavit showed Boykin "to be a compromised witness who had provided contradictory statements on crucial facts." (Tr. 2178). It was one of two exculpatory affidavits produced by Roth, which, taken together, prompted a "reevaluation of the [prosecution's] case," and ultimately caused a reduced plea offer to be made to Antonio Bryant. (Tr. 2174-78; St. John A. 59; DX DD).

Jason Melendez had been subpoenaed as a trial witness but failed to appear. Byrne began work on a material witness warrant and was confident that Melendez would be located (as he had been from time to time while the case was pending) in time to testify. The receipt from Roth of the purported Melendez affidavit, however, caused Byrne to reevaluate Melendez as a witness, because he, too, was on record as having told contradictory stories about whether Antonio Bryant was the shooter or not. That left McDonald as the only witness who had consistently identified Bryant as the shooter, and he was identified as the shooter in the Boykin affidavit and at least implicated

• According to Roth, he gave the originals of the affidavits to ADA Byrne, (Tr. 3373), but according to Byrne, Roth gave him only photocopies (Tr. 2176-77, 2192), raising the possibility that one or both affidavits could have been "cut-and-paste jobs" or otherwise doctored.

28

in the purported Melendez affidavit. As a result, on January 7, 2002, Byrne offered Bryant, through Roth, a plea to manslaughter in the first degree with a sentence of approximately 15 to 17 years in prison. Roth said that he would consider it and that his client was trying to reach out for family members to discuss the offer. Later Roth told Byrne that Bryant was "having difficulty" contacting his family but that he would plead guilty right away to a five-year sentence. Byrne grudgingly decided to make that offer, because

> in reevaluating the case after getting those late affidavits, it led to the really significant and real chance that Mr. Bryant could actually get away with murder in the literal sense that he could face full acquittal. Rather than face full acquittal in the case, it was thought the better objective was to see that justice was served and that would be that Mr. Bryant would have to be responsible in some measure, yes, a lesser measure than earlier thought, but in some measure for the death of Delroy Williams.

(Tr. 2196). Although there had been problems in the case apart from the affidavits Byrne received from Roth, they did not influence Byrne to offer a plea to less than 20 years' imprisonment. Only the two affidavits from Roth caused Byrne to reduce the offer to five years. (Tr. 2192-96, 2200, 2239-40).

Antonio pleaded guilty the day the five-year offer was made. In his allocution he admitted that after Williams exited the "weed spot" and entered his car, Antonio

29

approached with a shotgun, shot Williams, and killed him. He was sentenced on February 5, 2002, to the agreed-upon five-year sentence. (Tr. 2197-2200; SA 273, 291).

After the plea, on January 15, 2002, Roth sent an e-mail to a chat group of attorneys of the New York State Association of Criminal Defense Lawyers, in which he boasted about how the affidavits St. John had obtained had resulted in a five-year sentence despite his client's having shot and killed Delroy Williams. Roth "wanted to share a sweet surprise [he had] sprung on the ADA" in the Antonio Bryant case, which, Roth explained, involved a "[g]ang-related shotgun slug to the back over thirty bags of weed." Roth described the "sworn and signed statements [his] PI [private investigator] had obtained" from two of the three prosecution eyewitnesses "in which they flip and state my client was not there and the state's third key ID witness was the shooter." According to Roth, revelation of the statements resulted in a greatly reduced plea offer of five years' imprisonment on a plea to manslaughter in the first degree. Roth reported that the "[c]lient was ecstatic," and that "[f]or once it felt good to dictate the 'odds' of receiving a fair plea deal." (Tr. 2540-41; Roth A. 813).

• After his success in representing Antonio Bryant, Roth represented the youngest Bryant brother, Malcolm, on a state drug case. (Tr. 2591). Roth then represented Raymond Bryant on a state assault case. According to Raymond, he told Roth that he and Sukeem had jumped the victim because the victim had previously robbed Raymond of a gold chain at gunpoint. Roth advised

30

## B. The Defense Case

### 1. Karen Greene

St. John called Karen Greene, Marco Boykin's foster mother, who testified that Marco experienced hallucinations from time to time, ending in 2000 or so. (Tr. 2902, 2932-34). She also testified about an interview that St. John had purportedly conducted of Marco in her apartment, during which St. John wrote a statement, gave it to Marco to read, and had Marco sign it. According to Greene, Boykin later told her that he had told the truth to St. John but not to the police. Greene identified as Boykin's the initials on the Boykin affidavit that had been given to ADA Byrne. (Tr. 2900-12). Ms. Greene was unaware whether Marco had spoken to St. John on any other occasions, but she said that he had been interviewed by someone at a coffee shop during a time he was living with a different foster family. (Tr. 2923, 2932).

---

Raymond to tell the story to St. John so that St. John could "get [the victim] to back off the situation" (Tr. 2602), by signing a statement that Raymond was not the person who had assaulted him. Raymond met with St. John and they agreed that St. John would let the victim know that Raymond's defense team knew about the victim's robbery of Raymond, in hopes the victim either would not come to court or would sign a statement that Raymond had not assaulted him. The case was still pending when Raymond was arrested on his federal crack case. (Tr. 2598-2602, 2609-13).

31

### 2. Michael Benvie

Michael Benvie, a former law enforcement officer, testified that he had worked with St. John as a private investigator and that St. John had an excellent reputation for truthfulness and honesty, although he admitted that he spent little time discussing St. John's reputation, did not socialize with him, and knew little about St. John's earlier employment. (Tr. 2984-3005).

### 3. Todd Burrell

Roth called Todd Burrell, the "interpreter," who had accompanied him to see Tim Cherry and Raymond Bryant at the Westchester County Jail following St. John's arrest. He testified that when Roth met with Cherry, Roth said that St. John had been accused of witness tampering, that "that can't happen" (Tr. 3014), and that Roth was not going to be a part of it. Burrell did not recall Cherry's response except for a vague recollection that Cherry denied being a part of it, nor did he recall any other details of the conversation. Burrell did not recall anything of the conversation with Bryant, nor did he recall seeing Roth make any gestures suggesting that Bryant should not talk, though he conceded that it was possible Roth had made such a gesture that Burrell did not see. (Tr. 3010 -22).

### 4. Donald Roth

Donald Roth then took the stand in his own defense. He began by describing his busy solo criminal defense practice, and then launched into extended testimony discussing his work in the Antonio Bryant case. Roth described various accounts provided by Antonio Bryant and his family as to Antonio's whereabouts at the time of

32

the murder. (Tr. 3024-74, 3407-08; SA 1300, 1302, 1312, 1322, 1327). On cross-examination Roth admitted to additional versions that Antonio Bryant had recounted to Roth and St. John regarding where he had been, what he had seen, and what he had been doing at the time of the murder. Curiously, Roth claimed that these varying stories—six in total—did not engender any suspicion on his part that Antonio was falsely denying his guilt. (Tr. 3761-65, 3773-88).

According to Roth, during jury selection on January 7, 2002, the presiding Orange County Supreme Court Judge, the Honorable Stewart Rosenwasser, inquired as to why the case was going to trial. Roth responded that his client was not interested in a plea, and Judge Rosenwasser asked ADA Byrne if he was going to make a plea offer. Byrne raised the possibility of a plea in the thirteen-to-seventeen year range, but Antonio remained uninterested. Thereafter, Roth said, either Roth or Byrne showed the purported Boykin and Melendez affidavits to Judge Rosenwasser, who, according to Roth, again asked if the case would be resolved. Roth thereupon said that he would recommend that his client accept a plea to manslaughter in the first degree with a five-year sentence. Judge Rosenwasser agreed to the sentence and Antonio took the plea. (Tr. 3091-99).

Roth testified that he never intended to get false affidavits and that he did not know whether the Boykin and Melendez affidavits were true or false. He claimed to believe, from the time he was first retained until Antonio Bryant was sentenced, that Antonio was not guilty, based on his client's statements, the family's statements, the

33

affidavits from St. John, reports he had received from St. John about various witness interviews, and the discovery in the case. He further claimed that the affidavits were to be used to impeach Boykin and Melendez, not to negotiate a plea. Significantly, however, Roth could not explain how he could, on the one hand, believe Antonio to be not guilty, and on the other hand suggest in the November 5, 2001 e-mail to ADA Byrne that Antonio might plead to a ten-to-twelve year sentence—a disposition that Roth, as he admitted on cross-examination, regarded as reasonable at the time. He further claimed that he did not know, as he sat on the witness stand, whether Antonio was guilty or not. He described Antonio balking at the plea but eventually admitting his guilt. Finally, Roth stated that he had sent the e-mail boasting about having gotten Antonio a "fair deal" because he felt good about the outcome. (Tr. 3074-91, 3176-81, 3377-3409, 3757-58).

Roth then discussed his representation of Timothy Cherry in a state drug case in 2002, during which St. John had gotten affidavits from witnesses regarding an auto stop in that case that helped Roth convince the ADA to permit Cherry to plead to a mere violation, rather than to the felony that had originally been charged. (Tr. 3139-46). Roth then discussed the New Orleans Steakhouse meeting with Cherry, and claimed that he had told Cherry only that the process of St. John talking to necessary witnesses in connection with the state drug case would take time. (Tr. 3146-53).

Roth stated that in a conversation with Cherry within three days of Cherry's federal arrest, Roth told Cherry that Flip Melvin's name had come up in connection with the

case (Roth did not explain how), and that St. John would go and talk to Melvin. Roth claimed that Cherry said that he did not know anything about Melvin. (Tr. 3163-64).* On cross-examination, however, Roth admitted that when he argued for Cherry's bail on October 8, 2002, he was referring to Melvin when he discussed the "snitch" in the case. (Tr. 3567-68).

Roth also claimed that in the days following Raymond Bryant's arrest, Raymond maintained his innocence and denied knowing anything about why he had been charged with a drug offense or who could be accusing him. Roth gave several contradictory versions of what Raymond had said about Flip Melvin: that Melvin was someone with whom Raymond had "hung out"; that Melvin and he would sometimes be in the same areas; that Melvin was in the universe of people present on the date cited in the Bryant Complaint; that Raymond did not remember the date described in the Bryant Complaint; and that Melvin very well could have been present because they were often together. (Tr. 3167-69, 3415-21, 3452-53, 3494-99). Roth claimed that when he referred to the "snitch" at Raymond Bryant's bail hearing, he was referring to Melvin, based on the complaint and on Bryant and Cherry having indicated that they associated with Melvin. (Tr. 3165-68, 3419-21, 3690-91).

Roth testified that when he learned that St. John was meeting with Melvin, Roth told St. John to inquire of Melvin regarding his background, any criminal dealings he

* Roth also claimed, contradictorily, that Cherry said that he associated with Melvin. (Tr. 3421).

34

had had with Raymond Bryant or Tim Cherry, and the procedures the police had followed in using Melvin as an informant.* He said he gave those instructions pursuant to his ethical obligation as a lawyer to investigate the facts. He denied ever discussing false affidavits or agreeing with anyone to obtain such affidavits. (Tr. 3169-75).**

Roth maintained that St. John alone had authored the form affidavit exculpating Raymond Bryant, and could not recall when he first saw the other two affidavits. (Tr. 3585, 3597, 3607-08). Confronted with an electronic version of the affidavit that had been found on his computer, Roth claimed that St. John had used Roth's computer to draft the affidavit because his computer was broken. Roth admitted that he had authorized St. John to try to obtain a

• Roth later claimed, while being examined by St. John's counsel about the various things that Roth learned through St. John's meeting with Melvin, that as of that November 21, 2002 meeting, Roth did not have confirmation that Melvin was the informant, but rather had heard rumors that there were pending criminal charges against Melvin. (Tr. 3915, 3959). On re-cross examination, Roth could not explain why, if his information was based on unconfirmed rumor, he had told the federal Magistrate Judge at Cherry's bail hearing on October 8, 2002—without qualification—that the informant in Cherry's case had pending felony charges against him. (Tr. 3971-72).

** Roth testified that he knew that it was against the law to seek false testimony from witnesses and that it was also illegal to seek false testimony even if one also sought some true information. (Tr. 3976).

35

36

complete recantation in writing, despite the fact that St. John had already told Roth that Melvin had told St. John more than once that Raymond had in fact sold crack to Melvin. Roth also admitted that he knew, at the time of St. John's meeting with Melvin, that Raymond had told St. John that Melvin was the confidential informant described in the Bryant Complaint, and that Roth therefore had strong reason to believe that an affidavit from Melvin in the form possessed by St. John—which included the claims that Melvin was not a CI and had not done a drug deal with Raymond Bryant—would be false. Roth did not believe he had ever provided a copy of the Raymond Bryant form affidavit to anyone in Raymond's family, and could not explain how Raymond's girlfriend Yolanda Delgado had gotten a copy. (Tr. 3585-96, 3735-37, 3741, 3797-99). Roth also denied having given Malcolm Bryant a copy of the form affidavit, despite Malcolm's recorded statement to Melvin on November 13, 2002, that he had gotten from "the lawyer" the affidavit exculpating Ray-

• On redirect examination, Roth claimed that he wanted St. John to be armed with the form affidavits because a pre-printed affidavit can save time with witnesses, who can leave at any time, and that any parts of the affidavit that are not true can be crossed off and initialed by the witness. (Tr. 3924-26). He did not explain why, if saving time were truly the goal, St. John had not prepared a pre-printed affidavit that conformed to what Melvin had already told St. John, but rather brought one that Roth and St. John knew contradicted many things that Melvin had already said.

37

mond that Malcolm wanted Melvin to sign. (Tr. 3727-29; SA 245).

On re-cross examination by St. John's counsel, Roth suggested for the first time that it would have been helpful to Roth's defense of Bryant had St. John succeeded in getting Melvin to offer to sign a false affidavit exculpating Raymond Bryant—not because Roth would have argued that a false affidavit was true, but rather because Roth could have used Melvin's willingness to sign a false statement as impeachment material for Melvin at trial. (Tr. 3931-33). He did not further detail how such impeachment would work in practice, nor could he have: After all, it would be of no help to Raymond Bryant at a trial for drug offenses for Roth to attack Melvin on the ground that Melvin had *falsely* stated that Raymond had *not* sold drugs to Melvin. Had Roth made such an argument, he would be admitting that Melvin's denial of drug dealings with Raymond was false, and therefore that Raymond had sold drugs to Melvin—hardly an argument that would have helped Bryant at his drug trial.

Roth described his December 3, 2002 meetings at the Westchester County Jail with interpreter Todd Burrell in connection with Cherry's and Raymond Bryant's federal cases. Roth said that, St. John having been arrested and Roth's office having been searched pursuant to warrant, he needed to discuss with his clients his intention to withdraw as counsel, and that his own counsel had advised doing so with a witness present. Roth chose Burrell because he was the first person of whom Roth thought who had access to the jail and was available the next day. Roth said that he told each client that he would probably withdraw from

their cases. Roth denied ever having agreed with Cherry to obtain false affidavits from witnesses, or ever having discussed the subject. (Tr. 3154-59). He also denied having signaled to Bryant not to speak. (Tr. 3412).

Roth summarized phone records that showed him talking to St. John frequently on days in October prior to Raymond's arrest (but after Cherry's). He claimed that telephone traffic among himself, St. John, Malcolm Bryant, and Flip Melvin in November 2002 concerned both Raymond Bryant's federal case and a state drug case in which Roth represented Malcolm Bryant, and suggested that the vast majority of calls concerned *Malcolm's* desire to withdraw the guilty plea he had entered on October 31, 2002. Notably, Roth never moved to withdraw the plea or took an appeal in the case. The phone records plainly showed that during the period of the charged conspiracy (*i.e.,* October 28, 2002, to November 21, 2002), the volume of phone traffic between Malcolm and Roth was more than six times what it had been before Raymond's arrest, and that after St. John's arrest, that traffic returned to its pre-Raymond-arrest level, thus establishing that the increase had nothing to do with Malcolm's case and everything to do with Raymond's. (Tr. 547-49, 735, 753-54, 3181-91, 3376-77; SA 389, 779; DX DDD).

On cross-examination, Roth maintained that he still did not know who killed Delroy Williams, despite his having

---

\* St. John acknowledged during his cross-examination that his conversations with Malcolm Bryant in November 2002 did not concern Malcolm's case. (Tr. 4372-73).

38

assured Judge Rosenwasser that Antonio Bryant's admission to that crime was knowing, voluntary and intelligent; having stated at Antonio's sentencing that there was no legal reason sentencing could not proceed; and having never moved to withdraw the plea. When asked if he was proud of the result in the Antonio Bryant case (as reflected in his "sweet surprise" e-mail (Roth A. 813)), because an innocent man was sentenced to five years in jail or because a guilty man was only going to do five years in jail, Roth had no answer. (Tr. 3440-47).\*

Roth was confronted with evidence that he had over-billed Dutchess County, New York, for working as assigned, or "18-B," counsel. Specifically, Roth had billed the county for more than 24 hours of 18-B work in a single day.\*\* (Tr. 3523-42; SA 1273). Additional 18-B vouchers offered during Roth's cross-examination demonstrated that he had done the same on at least two other occasions. (Tr. 3770-72; Roth A. 567-809; SA 1262, 1269; *see* Tr. 4666-68). Roth's 18-B vouchers also claimed payment for

---

\* Roth's initial answer was, "I don't understand what you're—was I proud of either of those?" When the prosecutor affirmed that that was indeed the question, Roth's answer was, "I was told that on that evidence that I had, that in totality, that was the result of the case." (Tr. 3447).

\*\* On redirect examination, Roth testified that eight of the 25.25 hours he had billed on May 25, 2001 were in error, in that he actually did the work on the day before, so he had only done 17.25 hours of 18-B work on that date. (Tr. 3839-44, 3896-97).

39

numerous jail visits that were not reflected in the diaries Roth used to keep track of his appointments and whereabouts. (Tr. 3983-92, 4002-07). Roth also had no explanation for a bank loan application in which he represented his personal annual income as $200,000, when in reality his personal income that year was about $50,000 and even the gross income of his law practice was significantly less than $200,000. (Tr. 3558-59). Roth was also confronted with instances in which he had agreed to one price for his services and later claimed to be entitled to a higher fee. (Tr. 3510-14, 3573-74).

Despite the volume of typewritten reports and handwritten notes that Roth received from St. John regarding St. John's interviews in connection with Antonio Bryant case, and despite Roth's testimony on direct that it was his general practice to request and receive such documentation from St. John when they worked together, Roth testified that he had obtained no reports from St. John regarding his interviews in connection with Raymond Bryant's or

---

• On redirect examination, Roth stated that he had estimated his income based on how much he had taken in during the seven months of the year prior to the date of the loan application, but, despite his admission on re-cross examination that he understood the difference between gross income and net income (Tr. 4010), he never explained why he had used gross income for his business in answering a question about his personal income. (Tr. 3864-68).

Timothy Cherry's cases. (Tr. 3058-59, 3079-87, 3610-14).*

### 5. David St. John

David St. John also testified in his own defense. He described his various occupations, including stints as a part-time police officer in Millerton, New York, and as a Deputy Sherriff in Dutchess County. He became a licensed private investigator in 1991. The Antonio Bryant case, on which St. John began working in August 2001, was the first case St. John worked with Donald Roth. Between August 2001 and his arrest in November 2002, about three-quarters of St. John's income came from work done for Roth. St. John described his duties for Roth as gathering as much information as possible about the case—be it good, bad or indifferent for the client—and relaying it to Roth. (Tr. 4141-54, 4165-68).

St. John testified that when he spoke to Timothy Cherry in the Westchester County Jail shortly after Cherry's arrest, Cherry told him that the drugs that had been found in Cherry's house were not Cherry's. (Tr. 4172-73). On cross-examination, St. John could not explain why, if Cherry had indeed said the drugs were not his, St. John's notes of his meeting with Cherry did not reflect any such statement, but did reflect that Cherry had given St. John information about the drugs—including

---

• St. John later testified that he had made all his reports to Roth on the Timothy Cherry and Raymond Bryant cases verbally, and said that the Antonio Bryant case was the last one in which he had given Roth written notes or memoranda. (Tr. 4260).

40

41

their location (in Cherry's nightstand), composition and weight—that Cherry would not have had if the drugs were not his. (Tr. 4335-57; SA 1260).

According to St. John, he himself suspected that Flip Melvin was working as a CI and brought up Melvin's name in his meeting with Cherry, which, he claimed, took place after St. John's meeting with Bryant. According to St. John, Cherry denied having any illegal dealings with Melvin. (Tr. 4172-73). Records of the Westchester County Jail, however, showed that St. John visited Cherry for the first time on October 2, 2002, a few days after Cherry's arrest, and did not visit Raymond Bryant for the first time until October 31, 2002, a few days after Raymond's arrest. (SA 950, 957, 1073). On cross-examination, St. John conceded that he did not meet with Raymond Bryant until well after his meeting with Timothy Cherry, and thus could not have brought up Melvin's name based on information from Raymond Bryant. While he continued to deny hearing from Cherry that Cherry had had drug dealings with Melvin, St. John had no explanation for what might have prompted St. John to raise Melvin's name in the meeting, as he claimed to have done. Nor could he explain why, if Cherry had not admitted doing drug deals with Melvin, Roth had been so sure at Cherry's bail hearing on October 8, 2002 that Melvin was the CI in Cherry's case—information that Roth said at the bail hearing he had learned from St. John. (Tr. 4357-62).

St. John then testified about his first visit to Raymond Bryant in the Westchester County Jail shortly after Raymond's arrest. According to St. John, they discussed the transaction with the CI, as described in paragraph 16 of the

42

Bryant Complaint, and Raymond claimed to be innocent. St. John claimed that Raymond said that he was giving Sukeem Bryant a ride somewhere when Sukeem saw Flip Melvin on the street, asked Raymond to pull over, left the car to do some kind of undisclosed business with Melvin, and then reentered the car, whereupon they drove off. According to St. John, Raymond said that Melvin must be the CI described in the Bryant Complaint, but that he (Raymond) had nothing to do with the transaction and had never had drug dealings with Melvin. St. John claimed that he told Raymond that it would be important to talk to Melvin, but that there was no discussion of a false affidavit or even of how St. John might be able to locate Melvin. (Tr. 4168-71, 4173).

St. John's testimony suggesting that Raymond Bryant had claimed that Sukeem was responsible for the 29-gram crack sale in the Bryant Complaint was completely undermined by Roth's testimony that: (i) Raymond had never suggested that Sukeem was involved in drug dealing or that Sukeem had anything to do with the crack sale to Melvin, and (ii) Roth did not recall St. John ever reporting that Raymond had made any such claims. (Tr. 3609-10). Further, not only did St. John fail, on both direct or cross-examination, to explain how or why Raymond could possibly have remembered an uneventful sidewalk interaction of some kind between Sukeem Bryant and Flip Melvin that had occurred six months earlier—whereas he might well have remembered a $1,000, 29-gram crack deal that he had undertaken with Sukeem and Melvin—but St. John's own notes of his jailhouse meeting with Raymond

43

44

read, "RB and SB met w/ Flip by his house—sold 29 grams." (Tr. 4369-72; SA 1261).[*]

St. John said that he had told Melvin that he did not want to discuss the case over the phone because an in-person meeting would enable him to assess mannerisms and body language. He claimed that his offer to assist Melvin with Melvin's legal problems was a way to get more information on Melvin's legal troubles, which could be used on cross-examination of Melvin. He acknowl-edged that he knew from a phone conversation before the meeting that Melvin had bought drugs from Raymond Bryant, so, St. John said, he had no intention of asking Melvin to sign a false statement denying such dealings. He claimed that his e-mailed message to Roth stating that "a total recantation [by Melvin] . . . would do nicely" was tongue-in-cheek, but could not explain why he then brought a form affidavit exculpating Raymond Bryant to the meeting. Nor did he explain why, if in fact Raymond had told St. John that Sukeem Bryant was the guilty party, St. John had also brought a form affidavit exculpating Sukeem. St. John added that he brought a hidden tape-recorder to the meeting hoping to capture Melvin soliciting

• On redirect examination, St. John claimed for the first time that Raymond had told St. John that Raymond had learned from Sukeem, after their arrests, that Sukeem had sold Melvin 29 grams of crack on the sidewalk. He continued to maintain that the note "RB and SB met w/ Flip by his house—sold 29 grams" referred to Sukeem alone having sold 29 grams to Melvin while Raymond waited, unknowingly, in the car. (Tr. 4398-99).

45

a bribe or offering to sign a false affidavit. He testified that in his mind, Melvin's offer to sign an affidavit falsely exculpating Raymond Bryant was useful in undermining Melvin's credibility if he testified against Bryant. (Tr. 4173-87, 4199).[*]

St. John described items of information he had learned during the November 21, 2002 meeting with Melvin. He asserted that he had not let Melvin sign the affidavit exculpating Raymond Bryant because that affidavit was not true, and St. John would not have a witness commit perjury because it would be illegal. (Tr. 4187-4203). According to St. John, he brought up the name Timothy Cherry during the meeting with Melvin because Melvin had mentioned guns, which made St. John think of Cherry. (St. John so testified despite the fact that the only charge pending against Cherry at the time was a narcotics charge.) St. John maintained on cross-examination that, despite his and Roth's beliefs that Melvin was the CI in Cherry's case, it had not crossed St. John's mind before the meeting to question Melvin about Cherry. (Tr. 4387).[**]   St. John

• As with Roth's similar claim, had Melvin offered to sign an affidavit falsely exculpating Roth's and St. John's client, or sought money to do so, those facts would hardly have been the stuff of successful impeachment of Melvin at trial, because to attack Melvin for offering to falsely exculpate the client would have been to inculpate the client.

** Roth, however, had testified that he instructed St. John, the night before the meeting, to find out from Melvin what St. John could about "any criminal activity to

claimed that once Melvin told St. John that Melvin had bought drugs from Cherry, but not under the supervision of law enforcement, St. John decided to see if Melvin would offer to sign a false affidavit for Cherry, as he had offered for Raymond. (Tr. 4203-05). St. John testified that the reason that Melvin had not signed either affidavit was because St. John would not let him, and that he (St. John) had not let him because it would have been perjury. (Tr. 4205-06).

St. John conceded on cross-examination that he knew that even if he believed his client to be innocent, he could not concoct false evidence or attempt to persuade a witness to say something that the witness said was not true. (Tr. 4289). He also admitted that he knew that if he had obtained an exculpatory affidavit from Flip Melvin, Roth would use it to try to convince the prosecutor that the Government had its facts wrong, so as to influence the outcome of the case against his client. (Tr. 4383).

With respect to the Antonio Bryant case, St. John testified that the purported Boykin and Melendez affidavits accurately reflected what those witnesses had said to St. John; that he had given the affiants the opportunity to read over the affidavits and make corrections if necessary; and that the signatures and initials belonged to the affiants. (Tr. 4025-36). St. John produced a tape recording of Boykin from November 9, 2001, in which Boykin said that he had not seen the shooting, but St. John claimed that on November 21, 2001 Boykin said—and memorialized in an affidavit—that he had seen Joseph McDonald (the one

do with *Cherry or Bryant*." (Tr. 3172 (emphasis added)).

46

eyewitness whom St. John had not been able to interview) shoot Delroy Williams. St. John said that Boykin attributed the November 9 version to fear from a threat McDonald had made shortly after the shooting, but St. John was unable to explain why a fear that had ostensibly lasted from shortly after the July 18 shooting until November 9 had suddenly dissipated by November 21. (Tr. 4077-78; 4219). St. John also conceded that Boykin's third version—his alleged November 21 statement that McDonald was the shooter, as opposed to his November 9 statement that he had not seen the shooter and his statement to the police that Antonio Bryant was the shooter—was the one St. John chose to believe and memorialize in an affidavit. (Tr. 4224-29).

St. John then reviewed various interviews he had conducted that, according to St. John, made him believe that Antonio Bryant was not guilty. (Tr. 4070-4139; SA 1322, 1289, 1295, 1296, 1297, 1299, 1316, 1317, 1324, 1325, 1288; Roth A. 816; DX YY-1, AAA-1, EEE-1, JJJ, JJJ-1, UUU, ZZZ). On cross-examination, St. John professed ignorance of the notion that a witness might, out of concern for his reputation on the street and in order to avoid being perceived as having cooperated with the police, give a defense investigator a version of events that exculpated the investigator's client. He also acknowledged that he conducted an interview of Boykin while Boykin was standing with Antonio Bryant's father "Super," but claimed not to think that Super's presence would have any effect on what Boykin said. (Tr. 4216-17). St. John was also confronted with the several contradictory stories about his conduct and whereabouts that Antonio Bryant had told Roth and St. John over the course of their repre-

47

48

sentation, but St. John denied that these shifting stories made him skeptical of Antonio's claims of innocence, or even that it had occurred to him that Antonio could not get his story straight because he was hiding something. (Tr. 4276-88).

St. John also discussed an affidavit he had taken from an inmate witness in the Antonio Bryant case. According to St. John, the inmate had said that he had seen a male other than Antonio running from the scene of the shooting with a gun. On cross-examination, St. John said that the inmate did not know the male's name, but when St. John asked if the name could be Joseph McDonald, the inmate said that "could possibly" be the name. As St. John wrote up the affidavit, however, he had the inmate saying, "I believe his name is Joseph McDonald"—a far stronger characterization than the inmate had really given, and one that had to be crossed out when the inmate balked. When confronted with this disparity, St. John then claimed that the inmate had not said that the name "could possibly" be McDonald, but rather, "Yeah, I think that's his name." When questioned about his sudden switch as to what the inmate had said, St. John demonstrated his elastic view of the truth by saying, "Same thing as far as I'm concerned, what I'm saying." (Tr. 4269-72; Roth A. 816).

Finally, St. John testified about collecting documents in response to a subpoena that the Government had served upon learning that St. John would likely testify. That subpoena called for, among other things, his check registers for 1999 to 2002 and the schedules of business income from St. John's tax returns for 2001 and 2002. St. John claimed that in the course of reviewing the records,

he and his wife had discovered "errors" in his tax returns, in that his income was underreported. He thereupon filed amended returns and paid the underpaid tax. (Tr. 4208-11). On cross-examination he conceded that he had underreported his income on his 2000, 2001, and 2002 returns, and was unable to substantiate his claimed expenses for the same three years—"errors" that just happened to be in his favor—and that the inaccuracies were not corrected until the Government served the subpoena. (Tr. 4255-58).

## C. The Government's Rebuttal Case

In rebuttal, the Government called defense attorney Craig Wallace, a former Kings County ADA. Wallace met Roth in the Dutchess County courts and became friendly with him. On October 29, 2002, Roth referred Sukeem Bryant to Wallace as a potential client. Wallace visited Sukeem in prison on October 29 and November 1. Between those visits, Roth told Wallace that the CI in the case against Raymond and Sukeem Bryant was named "Flip" and that Roth had information that would "blow the roof off" the case. Roth further informed Wallace that Roth's investigator (St. John) would speak to Flip, and that Flip would give Roth's investigator a statement that contradicted what Flip had told law enforcement officials about the Bryant brothers' case. (Tr. 4507-16, 4524).

On February 12, 2004, after three days of deliberation, the jury convicted Roth and St. John of the single conspiracy count charged in the Indictment.

49